RODGER M. LANDAU (State Bar No. 151456)
JON L. R. DALBERG (State Bar No. 128259)
SHARON M. KOPMAN (State Bar No. 164449)
LANDAU GOTTFRIED & BERGER LLP
1801 Century Park East, Suite 1460
Los Angeles, California  90067
Telephone: (310) 557-0050
Facsimile: (310) 557-0056
jdalberg@lgbfirm.com
rlandau@lgbfirm.com
skopman@lgbfirm.com

Counsel for Vineyard National Bancorp

UNITED STATES BANKRUPTCY COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

RIVERSIDE DIVISION

| | |
|---|---|
| In re | Case No.  6:09-bk-26401-RN |
| VINEYARD NATIONAL BANCORP, | Chapter 11 |
| Debtor. | **DISCLOSURE STATEMENT IN SUPPORT OF THE DEBTOR'S JOINT PLAN OF LIQUIDATION OF THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, DATED AS OF JANUARY 6, 2010** |
| | **Disclosure Statement Hearing** |
| | **Date:**  January 21, 2010 <br> **Time:**  2:00 p.m. <br> **Place:**  Courtroom 301 <br>       3420 Twelfth Street <br>       Riverside, CA 92501-3819 |
| | **Confirmation Hearing** |
| | **Date:** <br> **Time:** <br> **Place:** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LANDAU
GOTTFRIED &
BERGER LLP

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ....................................................................................................3

     A.   Section 1125 ................................................................................................3

     B.   Voting Classes. ...........................................................................................4

     C.   Additional Information. ...............................................................................4

     D.   Disclaimer. ..................................................................................................5

     E.   Balloting. .....................................................................................................7

II.  SUMMARY ............................................................................................................7

     A.   The Debtor. ..................................................................................................8

     B.   Overview Of The Plan. ................................................................................8

     C.   Recommendation. ........................................................................................8

III. BACKGROUND .....................................................................................................8

     A.   The Debtor's Business. ................................................................................9

     B.   The Debtor's Financing. ............................................................................10

          1.   Statutory Business Trusts ................................................................10

          2.   Junior Subordinated Indenture Unrelated to Statutory Business
               Trusts ..............................................................................................12

          3.   Senior Secured Lender - FTBN .......................................................13

          4.   Investment Interests ........................................................................14

               (a)   Preferred Stock Interests ......................................................14

               (b)   VNBC Common Stock ........................................................16

               (c)   Warrants ...............................................................................17

     C.   Events Leading Up to Bankruptcy .............................................................17

          1.   Overall Business Erosion ................................................................17

          2.   Resignation of Directorship and Termination of CEO of Bank
               and Debtor .......................................................................................19

          3.   Consent Solicitation & Proxy Contest .............................................19

          4.   Regulatory Actions By OCC Impacting the Bank .............................19

LANDAU
GOTTFRIED &
BERGER LLP

i

# TABLE OF CONTENTS (CONT'D)

**Page**

| | | | |
|---|---|---|---|
| | 5. | Regulatory Action by FRB Impacting Debtor | 20 |
| | 6. | Slate of New Directors for Debtor and the Bank | 20 |
| | 7. | Restructuring by New Board of Directors of Debtor and Bank | 22 |
| | 8. | Efforts by the Debtor to Raise Capital and Seek Strategic Alternatives | 26 |
| D. | | Debtor In Possession Administration | 28 |
| | 1. | Employment Applications. | 28 |
| | 2. | Motion to Reject Certain Executory Contracts and Unexpired Leases | 28 |
| | 3. | Motion to Wind-Down Employee Stock Ownership Plan | 29 |
| | 4. | Bar Date Motion. | 30 |
| | 5. | Insurance Refunds | 31 |
| | 6. | Formation of the Committee. | 31 |
| | 7. | Schedules and Statement of Financial Affairs. | 32 |
| | 8. | Motion to Vest the Prosecution of Certain Litigation in the Committee | 32 |
| | 9. | Tax Audit and Refunds. | 33 |
| E. | | Prosecution of Estate Causes Of Action and D&O Claims. | 34 |
| | 1. | Estate Causes of Action Against Third Parties. | 34 |
| | 2. | Committee's Investigation of Claims Against Directors, Officers, and Shareholders and Complaint | 35 |
| | 3. | Recovery of Preferential or Fraudulent Transfers. | 37 |
| | 4. | Objections to Claims. | 38 |
| IV. | THE PLAN OF REORGANIZATION | | 38 |
| A. | | Summary Of Certain Other Provisions Of The Plan. | 40 |
| | 1. | Executory Contracts and Unexpired Leases. | 40 |
| | 2. | Means Of Implementation. | 42 |
| | | (a) From the Confirmation Date to the Effective Date | 42 |

**TABLE OF CONTENTS (CONT'D)**

|  |  |  | Page |
|---|---|---|---|
| (b) | Vesting of Assets. | | 42 |
| (c) | Establishment of the Liquidating Trust | | 44 |
| | (i) | Beneficiaries. | 44 |
| | (ii) | Implementation of the Liquidating Trust. | 44 |
| | (iii) | Transfer of Debtor's Assets. | 45 |
| | (iv) | Representative of the Estate. | 45 |

3.   No Liability of Liquidating Trustee or Post-Confirmation Committee. ................46

4.   Prosecution Of Estate Causes Of Action and D&O Claims By The Liquidating Trustee or the Post-Confirmation Committee. ...................46

    (a)   Issuance And Execution Of Plan Related Documents And Corporate Action. ................48

    (b)   Cancellation/Surrender of Debentures and Related Agreements. ................48

5.   Provision For Allowance Of the Indenture Trustee Claims ................49

6.   Establishment Of The Post-Confirmation Committee. ................49

7.   Resolution of Disputed Claims. ................51

8.   Distributions Under The Plan. ................52

    (a)   General Provisions. ................52

    (b)   Delivery of Distributions, Address of Holder. ................52

    (c)   Record Date. ................53

9.   Conditions Precedent. ................53

10.  Retention Of Jurisdiction. ................53

11.  Effective Date. ................53

12.  Amendment, Modification Or Revocation Of The Plan. ................53

13.  Post Confirmation Notice. ................54

V.   EFFECT OF PLAN CONFIRMATION ................54

    A.   Preservation of Rights of Action. ................54

LANDAU
GOTTFRIED
& BERGER LLP

# TABLE OF CONTENTS (CONT'D)

**Page**

B.  No Liability For Solicitation Or Participation. ...................................................55

VI.  CONFIRMATION PROCEDURE .............................................................................55

A.  Voting; Acceptance...............................................................................................56

B.  Confirmation Hearing. ..........................................................................................57

C.  Feasibility..............................................................................................................59

D.  Best Interests Test. ................................................................................................59

E.  Risks.......................................................................................................................60

VII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
THE PLAN OF REORGANIZATION.........................................................................60

A.  Liquidation Under Chapter 7. ...............................................................................60

B.  Alternative Plan Of Liquidation...........................................................................61

VIII.  VOTING PROCEDURES ...........................................................................................61

A.  Procedures For Tabulation Of Votes On The Plan. ..............................................62

B.  Special Provisions With Respect To Voting By Beneficial Owners
Of The Indenture Securities; Instructions For Nominees. ....................................63

IX.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES.........................................63

A.  Introduction............................................................................................................63

B.  Consequences to the Debtor..................................................................................65

C.  Consequences to Holders of General Unsecured Claims .....................................65

1.  Recognition of Gain or Loss Generally ....................................................65

2.  Distributions in Payment of Accrued but Unpaid Interest.......................67

3.  Tax Treatment of the Liquidating Trust and Holders of Interests
Therein ......................................................................................................68

4.  Withholding ...............................................................................................70

X.  FEES AND EXPENSES...............................................................................................71

XI.  SUMMARY OF ADDITIONAL SOURCES OF INFORMATION.............................71

XII.  RECOMMENDATION AND CONCLUSION.............................................................73

# TABLE OF AUTHORITIES

**Page(s)**

**STATUTES**

Bankruptcy Code, 11 U.S.C.

§ 101 et seq. .......................................................................................................3
§ 101(27) ..........................................................................................................30
§ 345 ...................................................................................................................3
§ 502 ...................................................................................................................8
§ 544 .................................................................................................................36
§ 547 .................................................................................................................36
§ 548 .................................................................................................................36
§ 550 .................................................................................................................36
§ 1123 ...............................................................................................................43
§ 1123(a)(5) ......................................................................................................43
§ 1123(a)(7) ......................................................................................................43
§ 1123(b)(3)(B) ................................................................................................43
§ 1125 .................................................................................................................3
§ 1125(e) .............................................................................................................7
§ 1126(e) .............................................................................................................9
§ 1126(g) .....................................................................................................16, 17
§ 1127 .................................................................................................................6
§ 1127(a) .............................................................................................................4
§ 1128(a) .............................................................................................................9
§ 1128(b) .............................................................................................................9
§ 1129 .........................................................................................................8, 10
§ 1141 ...............................................................................................................43
§ 1146 ...............................................................................................................43

Bank Holding Company Act of 1956 ..................................................................7

Internal Revenue Code of 1986 ........................................................................17
§ 641 et seq. .....................................................................................................23
§ 1031 ..........................................................................................................9, 25

Financial Institutions Reform, Recovery and Enforcement Act of 1989
§ 914 .................................................................................................................19

**OTHER AUTHORITIES**

1994-2 C.B. 684 ................................................................................................21

12 C.F.R. 337.6 ...........................................................................................23, 24

Treasury Regulation
§ 301.7701-4(d) ...............................................................................................42

LANDAU
GOTTFRIED &
BERGER LLP

# PLAN OVERVIEW

The Plan provides for the disposition of all assets of the Debtor's Estate through the establishment of a Liquidating Trust for the benefit of the Holders of Allowed Claims consistent with the priority provisions of the Bankruptcy Code, as provided for in the Debtor's Plan of Liquidation.  Remaining assets, to the extent not converted to cash or other proceeds as of the Effective Date, will be sold or otherwise disposed of after the Effective Date, with all net cash proceeds to be distributed to Holders of Allowed Claims as provided for in the Plan.

| Plan Summary | | | | |
|---|---|---|---|---|
| **Class** | **Treatment** | **Property Distributed** | **Recovery (approx.)** | **Voting Status** |
| **Class 1**: Other Priority Claims | Payment in Cash in full | Cash | 100% of Allowed Claim | Unimpaired - **not** entitled to vote (deemed to accept) |
| **Class 2**: Secured Claims | Retention of all legal, equitable and contractual rights | Cash and/or Property | 100% of Allowed Secured Claim | Unimpaired - **not** entitled to vote (deemed to accept) |
| **Class 3**: General Unsecured Claims | Pro Rata distribution of Available Cash in the Liquidating Trust | Cash | | Impaired - entitled to vote |
| **Class 4**: Subordinated Claims of Holders of Indenture Trustee Claims and Unpaid Indenture Trustee Fees | Each Holder of a Class 4 Claim shall be allocated a Pro Rata share of each Distribution available to Holders of Class 3 Claims; provided, however, that the amount of distributions to Holders of Allowed Class 4 Claims shall be paid (i) first on account of unpaid Indenture Trustee Fees, in an estimated amount of $100,000 to $120,000 and (ii) second on account of the Allowed FTBN Claim, until such time as the Allowed FTBN Claim is satisfied in full, after which time distributions to Holders of Allowed Indenture Trustee Claims shall be made.  The Plan further sets forth a process by which challenges to the priority accorded to the Allowed FTBN Claim or any other Class 4 Claim.  Such process is more fully | Cash | | Impaired – entitled to vote |

LANDAU
GOTTFRIED &
BERGER LLP

| Plan Summary | | | | |
|---|---|---|---|---|
| Class | Treatment | Property Distributed | Recovery (approx.) | Voting Status |
| | described at Section II C 4 (c) of the Plan | | | |
| **Class 5**: Preferred Stock Interests | Receives no distribution under the Plan unless and until Class 4 is paid in full | N/A | N/A | Impaired - **not** entitled to vote (deemed to reject) |
| **Class 6**: VNBC Common Stock Interests | Receives no distribution under the Plan unless and until Class 5 is paid in full | N/A | N/A | Impaired – **not** entitled to vote (deemed to reject) |

**<u>Note Regarding Distributions</u>**:

Distributions to holders of Administrative Expenses and Priority Tax Claims and holders of Claims in Classes 1 and 2 are anticipated to be made on the later of: (i) the Effective Date, or as soon as practicable thereafter; and (ii) as soon as practicable after the date the claim becomes an Allowed Claim.  Distributions to Holders of Allowed Claims in Class 3 will be conducted as soon as practicable after the Effective Date in the discretion of the Liquidating Trustee, <u>provided, however</u>, distributions could be delayed by reason of: (a) claims filed after the Effective Date (including claims arising from rejection of executory contracts and unexpired leases); (b) Disputed Claims (including Disputed Claims that are not liquidated); and (c) the Liquidating Trustee's evaluation of the Available Cash.  Distributions to holders of Allowed Claims in Class 4, subject to Section II.C(4)(c) and the provisions of the Plan related to the payment of the Indenture Trustee Fees, will be made at the same time as each Distribution to Holders of Allowed Class 3 Claims; provided, however, that the amount of distributions to Holders of Allowed Class 4 Claims shall be paid (i) first on account of unpaid Indenture Trustee Fees, and (ii) second on account of the Allowed FTBN Claim, until such time as the Allowed FTBN Claim is satisfied in full, after which time distributions to Holders of Allowed Indenture Trustee Claims shall be made, provided, however, distributions could be delayed by reason of: (a) claims filed after the Effective Date (including claims arising from rejection of executory contracts and unexpired leases); (b) Disputed Claims (including Disputed Claims that are not liquidated); and (c) the Liquidating Trustee's evaluation of the Available Cash.

LANDAU
GOTTFRIED
& BERGER LLP

I.    **INTRODUCTION**

Vineyard National Bancorp, a California corporation ("VNBC," or the "Debtor"), filed a voluntary petition (the "Petition") under chapter 11 ("Chapter 11") of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), on July 21, 2009 (the "Petition Date"), thereby commencing the above-captioned Chapter 11 case (the "Chapter 11 Case"). VNBC has operated as a debtor-in-possession since the Petition Date. No trustee or examiner has been appointed. The Official Committee of Unsecured Creditors was appointed by the Office of the United States Trustee ("OUST") on August 12, 2009 and additional members were added on September 10, 2009 (collectively, the "Committee"). The Debtor has filed its "*Debtor's Plan of Liquidation*" on November 30, 2009. Subsequently, a consensual plan was reached between the Debtor and the Committee, the terms of which are included in the "*Joint Plan of Liquidating of the Debtor and the Official Committee of Unsecured Creditors*" (as the same may be modified, amended or supplemented, the "Plan"). The Plan envisions a liquidation of all the Debtor's remaining assets pursuant to the provisions of the Bankruptcy Code and in accordance with the terms of the Plan.

A.    **Section 1125.**

This *Disclosure Statement In Support of the  Joint Plan of Liquidation of the Debtor and the Official Committee of Unsecured Creditors* (as the same may be modified, amended, or supplemented, the "Disclosure Statement") is submitted pursuant to section 1125 of the Bankruptcy Code to holders of impaired Claims in connection with the proceedings seeking confirmation of the Plan, which has been proposed by the Debtor and the Committee and filed with the Bankruptcy Court. A copy of the Plan is attached hereto as **Exhibit A**. Unless otherwise defined herein, all capitalized terms contained herein shall have the meanings ascribed to them in the Plan.

This Disclosure Statement sets forth information regarding, among other things, the history of the Debtor and its business, the filing of the Petition and the Plan, and alternatives thereto. Its purpose is to provide the holders of impaired Claims adequate information to assist them in making an informed decision regarding acceptance or rejection of the Plan. Each holder of an impaired Claim should read this Disclosure Statement (including its exhibits) and the Plan (including its exhibits) in their entirety and consider them with such holder's legal and financial advisors in

LANDAU
GOTTFRIED
& BERGER LLP

connection with the proceedings seeking confirmation of the Plan.  No person has been authorized by the Debtor to utilize for purposes of solicitation any information concerning the Debtor or its business other than the information contained or referred to herein.

**B.    Voting Classes.**

Pursuant to the Bankruptcy Code, each holder of an Allowed Claim in Classes 3 and 4 (the "Voting Classes"), is entitled to vote on the Plan.  Holders of Allowed Claims in Classes 1 and 2 are presumed to accept the Plan pursuant to 1126(f) of the Bankruptcy Code because their Claims are not impaired under the Plan.  Holders of Equity Interests in Classes 5 and 6 are presumed to reject the Plan pursuant to 1126(g) of the Bankruptcy Code because they will not receive a distribution under the Plan.  For a description of the Classes of Claims and of the Equity Interests and their treatment under the Plan, see Section II of the Plan entitled "*Classification and Treatment of Claims and Equity Interests*."

Except as described below, the Plan may be confirmed only if accepted by the Voting Classes.  The Bankruptcy Code defines "acceptance" with respect to a class of impaired Claims, as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such class counting only those holders who cast Ballots (as defined below).

**THE DEBTOR AND THE COMMITTEE BELIEVE THAT THE PLAN PROVIDES THE BEST FEASIBLE RECOVERIES TO THE HOLDERS OF IMPAIRED CLAIMS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF SUCH HOLDERS.  THE DEBTOR AND THE COMMITTEE THEREFORE RECOMMEND THAT HOLDERS OF IMPAIRED CLAIMS VOTE TO ACCEPT THE PLAN.**

The Debtor anticipates that the Voting Classes will vote to accept the Plan.  The Debtor reserves the right to modify the Plan in accordance with section 1127(a) of the Bankruptcy Code.

For a more detailed description of the requirements for acceptance of the Plan and of the criteria for confirmation notwithstanding rejection by certain classes, see Section VI of this Disclosure Statement entitled "*Confirmation Procedure*."

**C.    Additional Information.**

Attached as Annexes to this Disclosure Statement are copies of the following:

LANDAU
GOTTFRIED
& BERGER LLP

4

1.    The Plan (Exhibit A);

2.    Projected Available Cash Proceeds Analysis (Exhibit B);

3.    Hypothetical Chapter 7 Liquidation Analysis (Exhibit C);

4.    List of Pending Litigation (Exhibit D);

5.    Potential Preference Payments (Exhibit E);

6.    Potential Third Party Estate Causes of Action (Exhibit F); and

7    D&O Claims Complaint (Exhibit G).

Also accompanying this Disclosure Statement and its attendant exhibits, including the Plan, are copies of the following: (i) the Notice of the Order of the Bankruptcy Court approving this Disclosure Statement, and scheduling the confirmation hearing, the deadlines and procedures for voting, and for objecting to confirmation of the Plan, and related matters (the "Confirmation Notice"); and (ii) for each holder of an Allowed Claim in the Voting Classes, the form of ballot for casting an acceptance or rejection of the Plan (the "Ballot").

**D.    Disclaimer.**

The Bankruptcy Court has approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the condition of its books and records, to enable hypothetical, reasonable investors typical of the holders of impaired Claims to make an informed judgment as to whether to accept or reject the Plan.

**APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "COMMISSION") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR BY ANY STATE AUTHORITY UNDER ANY STATE SECURITIES OR "BLUE SKY" LAW, NOR HAS THE COMMISSION (OR ANY STATE AUTHORITY) PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.**

LANDAU
GOTTFRIED
& BERGER LLP

**THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR AND THE COMMITTEE, SOLELY AS TO THE D&O CLAIMS, FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE AT THE TIMES MADE, TO THE DEBTOR'S AND THE COMMITTEE'S KNOWLEDGE, INFORMATION, AND BELIEF. HOWEVER, NOTHING CONTAINED HEREIN SHALL BE DEEMED TO BE AN ADMISSION OR A DECLARATION AGAINST INTEREST BY THE DEBTOR OR THE COMMITTEE FOR PURPOSES OF ANY EXISTING OR FUTURE LITIGATION AGAINST THE DEBTOR OR ITS ESTATE OR THE COMMITTEE.**

**EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN, NOTHING CONTAINED HEREIN SHALL BE ATTRIBUTABLE TO OR IS DERIVED FROM OR REPRESENTED TO BE ACCURATE BY THE DEBTOR, THE COMMITTEE, OR BY ANY OF THEIR ADVISORS. NOR HAS THE DEBTOR, COMMITTEE OR ANY SUCH ADVISOR INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH HEREIN.**

**ALTHOUGH THE DEBTOR'S AND THE COMMITTEE'S PROFESSIONAL ADVISORS HAVE ASSISTED IN THE PREPARATION OF THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, AND ACCOUNTING DATA PROVIDED BY THE DEBTOR, THEY HAVE NOT INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH HEREIN AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF.**

After carefully reviewing this Disclosure Statement and the Plan, including the respective exhibits, each holder of an impaired Claim in the Voting Classes should decide whether to accept or reject the Plan and should indicate its vote on the enclosed Ballot and return it in the envelope provided.

LANDAU
GOTTFRIED
& BERGER LLP

E.    **Balloting.**

**TO BE COUNTED, YOUR BALLOT MUST BE COMPLETELY FILLED IN, SIGNED, AND TRANSMITTED IN THE MANNER SPECIFIED IN THE BALLOT SO THAT IT IS RECEIVED BY THE VOTING DEADLINE SPECIFIED IN THE BALLOT. PLEASE CAREFULLY FOLLOW ALL INSTRUCTIONS CONTAINED IN THE BALLOT. ANY BALLOTS RECEIVED WHICH DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR WHICH INDICATE BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN, OR WHICH OTHERWISE DO NOT FULLY COMPLY WITH THE BALLOT INSTRUCTIONS, WILL NOT BE COUNTED.  DO NOT RETURN YOUR SECURITIES WITH YOUR BALLOT.**

If you have any questions about the procedure for voting, or if you did not receive a Ballot, received a damaged Ballot, or have lost your Ballot, or if you would like any additional copies of this Disclosure Statement, please write to the Debtor's Ballot Tabulator, Bankruptcy Management Corporation ("BMC") 1330 East Franklin Avenue, El Segundo, California 90245 or call (310) 321-5555.

F.    Confirmation Hearing.

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan (the "Confirmation Hearing") on the date and at the place specified in the Confirmation Notice accompanying this Disclosure Statement.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed on or before the date specified, and in the manner described, in the Confirmation Notice.  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing or at any subsequent continued Confirmation Hearing.

**II.    SUMMARY**

The following is a summary of certain information contained elsewhere in this Disclosure Statement.  Reference is made to, and this Summary is qualified in its entirety by reference to, the

LANDAU
GOTTFRIED
& BERGER LLP

more detailed information contained herein and in the exhibits hereto.  Holders of impaired Claims

are urged to read this Disclosure Statement, the Plan and their exhibits in their entirety.

**A.    The Debtor.**

The Debtor, a California corporation, was a bank holding company incorporated in

California in 1988 and was previously registered under the Bank Holding Company Act of 1956,

as amended. The Debtor's principal business was to serve as the holding company for its wholly-

owned subsidiary, Vineyard Bank, National Association (the "Bank") and other banking or

banking-related subsidiaries.  The Bank was the Debtor's principal asset.

**B.    Overview Of The Plan.**

THE FOLLOWING OVERVIEW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE

TO THE PLAN, WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u>.  IN THE EVENT OF ANY

INCONSISTENCY, THE PLAN WILL CONTROL.

The Plan provides for the liquidation of substantially all of the assets of the Debtor and the

distribution of the Available Cash to holders of Allowed Claims, consistent with the priority

provisions of the Bankruptcy Code, in accordance with the Plan.  The Plan does not provide for

any distribution to holders of Allowed Equity Interests unless and until holders of Allowed Class 4

Claims have been paid in full – which, as set forth in the projections attached as <u>Exhibit B</u> hereto,

is not projected to occur.

**C.    Recommendation.**

The Debtor and the Committee believe that the Plan provides the best feasible recoveries to

holders of impaired Claims and is in the best interests of such holders.  ACCORDINGLY, THE

DEBTOR AND THE COMMITTEE RECOMMEND THAT ALL SUCH HOLDERS ACCEPT

THE PLAN.

**III.    BACKGROUND**

As more fully described below, the Plan provides that all assets of the Estate remaining on

the Effective Date will vest in the Liquidating Trust.  The Available Cash will be distributed to the

Debtor's creditors by the Liquidating  Trustee in accordance with applicable provisions of the

Bankruptcy Code and in accordance with the Plan, and the Liquidating Trustee will be appointed

to, among other things, handle prosecution of any and all potential claims that may bring cash into

the Liquidating Trust, and sell any other assets that may have value, bring any potential avoidance

actions, and object to any claims.

### A.    The Debtor's Business.

Prior to the closure of the Bank by the Office of the Comptroller of the Currency ("OCC")

and the appointment of the Federal Deposit Insurance Corporation ("FDIC") as a receiver for the

Bank's assets and liabilities in July 2009, the Debtor's primary business was to serve as a holding

company for the Bank.  The Bank was a commercial bank operating in California, in the counties

of Orange, Los Angeles, Marin, Riverside, San Bernardino and San Diego and had sixteen full-

service branches in the cities of Chino, Corona, Covina, Crestline, Diamond Bar, Irvine, Irwindale,

Lake Arrowhead, La Verne, Manhattan Beach, Rancho Cucamonga, San Diego, San Dimas, San

Rafael, Upland and Walnut.  The Bank was originally organized as a national banking association

under federal law and commenced operations under the name Vineyard National Bank in 1981.  In

August 2001, the Bank changed its name to Vineyard Bank and converted its charter to a

California-chartered commercial bank which, among other things, provided it with increased legal

lending limits.  On May 11, 2006, the Bank was converted back to a national bank under the name

Vineyard Bank, National Association.  As a national bank, the Bank operated under the

supervision of the OCC and deposit accounts at the Bank were insured by the FDIC up to the

maximum amount permitted by law.  As a bank holding company, the Debtor's primary regulator

was the Board of Governors of the Federal Reserve System ("FRB").

In addition to the Bank, the Debtor previously owned two consolidated operating

subsidiaries, 1031 Exchange Advantage, Inc. and 1031 Funding & Reverse Corp. (collectively, the

"Exchange Companies"), which acted as qualified intermediaries under Section 1031 of the

Internal Revenue Code of 1986.  The Exchange Companies were acquired in December 2007.  In

order to eliminate operating losses associated with the Exchange Companies, among other reasons,

the Debtor sold the Exchange Companies back to the original seller in September 2008.

Other than the business conducted by the Bank and the Exchange Companies, the Debtor

did not own or engage in any other operating businesses. As a legal entity separate and distinct

LANDAU
GOTTFRIED
& BERGER LLP

from its subsidiaries, the Debtor's principal source of funds was dividends that were paid by the Bank.

**B.     The Debtor's Financing.**

**1.     Statutory Business Trusts**

Between December 2001 and May 2006, the Debtor raised approximately $115 million of capital through ten (10) Statutory Business Trusts.  Information regarding each of the Statutory Business Trusts is set forth in the table below:

| Statutory Business Trust Name: | Trustee: | Indenture Information: | Dated: | Debenture Principal Amount |
|---|---|---|---|---|
| VST I - Vineyard Statutory Trust I | U.S. Bank | Indenture – Floating Rate Junior Subordinated Deferrable Interest Debentures – Due 2031 | 12/18/2001 | $12,372,000 |
| VST II -Vineyard Statutory Trust II | Wilmington Trust | Indenture – Floating Rate Junior Subordinated Deferrable Interest Debt Securities Due 2033 | 12/19/2002 | $5,155,000 |
| VST III – Vineyard Statutory Trust III | Wilmington Trust | Indenture – Floating Rate Junior Subordinated Debt Securities Due 2033 | 9/25/03 | $10,310,000 |
| VST IV – Vineyard Statutory Trust IV | Wilmington Trust | Indenture – Floating Rate Junior Subordinated Debt Securities Due 2034 | 12/19/03 | $10,310,000 |
| VST V – Vineyard Statutory Trust V | BNYMTC | Indenture – Junior Subordinated Debt Securities Due 2034 | 3/25/04 | $10,310,000 |
| VST VI – Vineyard Statutory Trust VI | BNYMTC | Indenture - Indenture – Floating Rate Junior Subordinated Debt Securities Due 2034 | 5/18/04 | $12,372,000 |
| VST VII – Vineyard Statutory Trust VII | Wells Fargo | Indenture - Indenture – Floating Rate Junior Subordinated Debt Securities Due 2034 | 12/22/04 | $10,310,000 |
| VST VIII – Vineyard Statutory Trust VIII | Wilmington Trust | Indenture - Indenture – Floating Rate Junior Subordinated Debt Securities Due 2034 | 4/15/05 | $10,310,000 |
| VST IX – Vineyard Statutory Trust IX | Wilmington Trust | Indenture - Indenture – Floating Rate Junior Subordinated Debt | 8/19/05 | $15,464,000 |

LANDAU
GOTTFRIED
& BERGER LLP

Case 6:09-bk-26401-RN    Doc 91    Filed 01/06/10    Entered 01/06/10 15:10:03    Desc
Main Document    Page 17 of 174

| Statutory Business Trust Name: | Trustee: | Indenture Information: | Dated: | Debenture Principal Amount |
|---|---|---|---|---|
| | | Securities Due 2034 | | |
| VST XI – Vineyard Statutory Trust XI | Wilmington Trust | Indenture - Indenture – Floating Rate Junior Subordinated Debt Securities Due 2034 | 5/16/06 | $18,557,000 |

The Debtor sponsored the Statutory Business Trusts for the purpose of issuing trust preferred securities. The Statutory Business Trusts sold the trust preferred securities to investors and then used the proceeds of the sale of the trust preferred securities to purchase from the Debtor junior subordinated deferrable interest debentures (the "Debt Securities") pursuant to the Statutory Trust Indentures. The Debt Securities are held of record in the name of the respective Statutory Trust Trustees in trust for the benefit of their respective Statutory Business Trusts. Interest payments on the Debt Securities paid by the Debtor to the Statutory Trust Trustees were used to fund the Statutory Business Trust's distributions to the Trust Securities.[1] The Debtor executed guarantees for the trust preferred security holders of each Statutory Business Trust that guaranteed that if the Debtor made an interest payment to the Statutory Trust Trustees owing under the Debt Securities, the Debtor guaranteed that the Statutory Trust Trustee would pay the dividend to the holders of the trust preferred securities.

The Statutory Business Trusts issued two types of trust preferred securities: (i) Capital Securities and (ii) Common Securities (collectively, the "Trust Preferred Securities"). The Debtor owns 100% of the Common Securities issued by each of the Statutory Business Trusts, which Common Securities equal an approximately 3% minority interest in the Statutory Business Trusts. The holders of Capital Securities own the remaining majority interest in the respective Statutory Business Trusts.

Upon an Event of Default (as defined in the respective Statutory Business Trusts), the rights of the holders of Common Securities to receive payments of distributions from the Statutory

---

[1] The interest rate under the Debt Securities is based on a 3 month LIBOR index plus the following margin: 3.06% under VST I, 3.35% under VST II, 3.05% under VST III, 2.85% under VST IV, 2.85% under VST V, 2.85% under VST VI, 2.00% under VST VII, 2.25% under VST VIII, 1.70% under VST IX, and 1.60% under VST XI.

LANDAU
GOTTFRIED
& BERGER LLP

1   Business Trusts are subordinated to the rights of the holders of the Capital Securities to receive the

2   same.[2]  Upon the filing of the Chapter 11 Case by the Debtor, the Statutory Trust Trustees are

3   required to dissolve the Trust as expeditiously as the Statutory Trust Trustee determines is

4   practical and liquidate the assets owned by the Statutory Business Trust.[3]

5          Article XV of each of the Statutory Trust Indentures provides that payment due on the Debt

6   Securities is subordinated and junior in right of payment to the prior payment in full of all Senior

7   Indebtedness (as defined in each of the Statutory Trust Indentures) of the Debtor, whether

8   outstanding on the date of the Statutory Trust Indenture or thereafter incurred.  To the extent the

9   Statutory Trust Trustees receive a distribution prior to Senior Indebtedness being paid in full, the

10  Statutory Trust Trustees are required to hold the distribution in trust for the Senior Indebtedness;

11  provided, however, the subordination provisions do not apply to the Statutory Trust Trustees'

12  Claims for the reasonable fees, expenses, disbursements and advances (including the reasonable

13  compensation, expenses and disbursements of their respective agents and counsel) incurred by the

14  Statutory Trust Trustees.

15         The cash raised by the Statutory Business Trusts was typically down-streamed by the

16  Debtor to the Bank to provide adequate capital to support the Bank's strategic plan initiatives,

17  including facilitating organic growth, the acquisition of Rancho Bank, a California-chartered

18  commercial bank ("Rancho Bank"), fulfilling regulatory capital requirements, and providing

19  capital and liquidity for general operating purposes.

20              **2.      Junior Subordinated Indenture Unrelated to Statutory Business Trusts**

21         In or about December 2002, to raise additional capital, the Debtor issued Floating Rate

22  Junior Subordinated Debentures Due December 26, 2017 (the "Debentures Due 2017") in the

23  aggregate principal amount of $5,000,000 and U.S. Bank is the trustee.  The Debentures Due 2017

24  bear a floating rate of interest of 3.05% over the three month LIBOR and required quarterly

25  interest payments.  Like the Statutory Trust Indentures, Article XV of the Junior Subordinated

26  Indenture provides that that payment due on the Debentures Due 2017 is subordinated and junior

27

28  [2]      *See* Annex 1 to the Statutory Business Trusts, Paragraph 9.
    [3]      *See* Annex 1 to the Statutory Business Trusts, Paragraph 3.

in right of payment to the prior payment in full of all Senior Indebtedness (as defined in the Junior Subordinated Indenture) of the Debtor, whether outstanding on the date of the Junior Subordinated Indenture or thereafter incurred.  To the extent the Junior Subordinated Indenture Trustee receives a distribution prior to Senior Indebtedness being paid in full, the Junior Subordinated Indenture Trustee is required to hold the distribution in trust for the Senior Indebtedness; provided, however, the subordination provisions do not apply to the Junior Subordinated Indenture Trustee's Claims for the reasonable fees, expenses, disbursements and advances (including the reasonable compensation, expenses and disbursements of their respective agents and counsel) incurred by the Junior Subordinated Indenture Trustee.

Like the proceeds from the Statutory Trust Indentures, these funds were also down-streamed to the Bank to support the Bank's strategic plan initiatives.

### 3.    Senior Secured Lender - FTBN

On or about March 17, 2006, the Debtor and First Tennessee Bank, National Association ("FTBN") entered into a Loan Agreement (the "Loan Agreement")) wherein FTBN committed to make a revolving loan in the amount of Seventy Million Dollars ($70,000,000).  The Debtor executed a Promissory Note on March 17, 2006 evidencing the loan ("Loan"), which Note was amended and restated on March 29, 2007 (the "Note").  The original Maturity Date (as defined in the Loan Agreement) for the Loan was one year from the date that the Note was executed.  The Maturity Date was ultimately extended to May 22, 2009 pursuant to the Modification Agreements (as defined below). The Note was secured by a first priority security interest in all 1,218,700 of issued and outstanding shares of common stock (the "Pledged Shares") in Debtor's wholly-owned subsidiary, the Bank, pursuant to the Pledge and Security Agreement executed by Debtor on March 17, 2006 (the "Pledge Agreement" together with the Loan Agreement, Note, and the eight Modification Agreements[4] are herein referred to collectively as the "Loan Documents).  The Loan Documents provide that interest accrued on the Note at an annual variable rate equal to LIBOR

---

[4]    Between June 2006 and April 2009, the Debtor and FTBN entered into eight (8) modification agreements ("Modification Agreements"), which among other things, extended the Maturity Date several times, amended certain terms in the Loan Documents, and extended waivers of various covenants within the Loan Documents.

plus 3.5% per annum. The outstanding principal and interest on the Loan as of the Petition Date was approximately $50,998,707.21.

As a result of the closure of the Bank by the OCC and the appointment of the FDIC as the receiver for all assets and liabilities of the Bank, the Pledged Shares are likely valueless and therefore the debt owed by the Debtor under the Loan will be treated under the Plan as fully unsecured.

### 4.    Investment Interests

The Debtor was formed as a bank holding company to provide additional flexibility to the organization through the ability to serve a broader geographic area, expand its product offerings, access capital markets through the ability to issue debt and other financial instruments, and to gain certain tax benefits. Upon its formation in 1988 it acquired all of the issued and outstanding securities of the Bank.

The Debtor's VNBC Common Stock and VNBC Preferred Class D Stock are publicly held and the Debtor is subject to the reporting requirements of the Securities Exchange Act of 1934, as amended. The VNBC Common Stock was traded on NASDAQ until it was delisted in the second quarter of 2009. Thereafter, the VNBC Common Stock traded in the over-the-counter market through the Pink OTC Markets, Inc. (also known as the "Pink Sheets") under the ticker symbol "VNBC-PK". It continues to trade post petition in the over-the-counter market through the Pink Sheets, however, the symbol has now changed to "VNBCQ-PK" to indicate that the Debtor filed bankruptcy. The Debtor's VNBC Preferred Class D Stock traded on NYSE AMEX (formerly AMEX) until it was delisted from trading in the second quarter of 2009. It now trades in the over-the-counter market through the Pink Sheets under the ticker symbol "VNBAQ".

### (a)    Preferred Stock Interests

The Debtor raised approximately $31.6 million through the issuance of Preferred Stock Interests. The Debtor's Preferred Stock Interests include VNBC Preferred Class C Stock and VNBC Preferred Class D Stock. As of the Petition Date, approximately 10,000 shares of VNBC Preferred Class C Stock and 2,300,000 shares of VNBC Preferred Class D Stock were issued and outstanding. The VNBC Preferred Class C Stock and VNBC Preferred Class D Stock (a) rank

senior to the Debtor's VNBC Common Stock and (b) are on parity with each other.  There are no Equity Interests (as defined in the Plan) of the Debtor which rank senior to the VNBC Preferred Class C Stock and VNBC Preferred Class D Stock.

Each of the VNBC Preferred Class C Stock and VNBC Preferred Class D Stock has rights, preferences and privileges which are superior to the VNBC Common Stock, including, dividend and liquidation preferences.  However, neither the VNBC Preferred Class C Stock nor the VNBC Preferred Class D Stock is convertible or exchangeable into any other property or securities of the Debtor.

Holders of the VNBC Preferred Class C Stock and VNBC Preferred Class D Stock have no voting rights except to the extent required by law or as otherwise expressly provided in the Debtor's Articles of Incorporation (the "Articles").  Under the Articles, holders of VNBC Preferred Class C Stock and VNBC Preferred Class D Stock, voting together as a class, have the right to elect two (2) directors if the preferred dividends have not been paid for either four (4) dividend periods with respect to the VNBC Preferred Class C Stock or six (6) dividend periods with respect to the VNBC Preferred Class D Stock.  Further, the consent of the holders of the VNBC Preferred Class C Stock and VNBC Preferred Class D Stock, as applicable, must be obtained if any amendment, authorization, issuance or other action would expand or create an equity security with rights, preferences and privileges which are superior to the Preferred Stock Interests or which would otherwise materially and adversely affect the rights, preferences and privileges of the Preferred Stock Interests, as applicable.

Holders of VNBC Preferred Class C Stock are entitled to receive a non-cumulative, quarterly, cash dividend at a floating rate per annum equal to 3-month LIBOR plus 3.8%.  Holders of VNBC Preferred Class D Stock are entitled to receive a non-cumulative, quarterly cash dividend at an annual amount equal to $0.75 per share.

In liquidation, the preference of the VNBC Preferred Class C Stock, after payment or provision for payment of all debts and liabilities of the Debtor and the rights of any senior equity securities, is an amount equal to the liquidation preference of $1,000.00 per share, plus (i) all accrued but unpaid dividends for the then current dividend period until the date of payment in such

dividend period, and (ii) all accrued but unpaid dividends that have been declared with respect to one or more prior dividend periods (but without accumulation of any previously undeclared and unpaid dividends for prior dividend periods), before any distributions to the holders of the Debtor's VNBC Common Stock or any equity securities ranking, as to liquidation, junior to the VNBC Preferred Class C Stock.

In liquidation, the preference of the VNBC Preferred Class D Stock, after payment or provision for payment of all debts and liabilities of the Debtor and the rights of any senior equity securities, is an amount equal to the liquidation preference of $10.00 per share (subject to equitable adjustments for splits, combinations or reclassification of the VNBC Preferred Class D Stock), plus all accrued but unpaid dividends from the last dividend period, without interest to the date fixed for such liquidation, before any distributions to the holders of the Debtor's VNBC Common Stock or any equity securities ranking, as to liquidation, junior to the VNBC Preferred Class D Stock.

If the legally available assets for distribution are insufficient to make full payment to the holders of the Preferred Stock Interests, then the holders of the Preferred Stock Interests share ratably in such distributions.  The holders of Preferred Stock Interests are not receiving any distribution under the Plan and therefore are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

### (b)    VNBC Common Stock

The Debtor raised approximately $89,474,237 through the sale and issuance of VNBC Common Stock.[5] As of September 30, 2008, the Debtor had issued and outstanding approximately 9,893,978 shares of VNBC Common Stock.[6]  Except as otherwise provided under the law, the VNBC Common Stock has no special rights, preferences or privileges.  In liquidation, if there are any assets remaining of the Debtor legally available for distribution to stockholders after payment or provision for payment of all debts and liabilities of the Debtor, the order of priority is:  (a) the

---

[5]    Net of 1,892,965 treasury shares repurchased at an aggregate cost of $32,565,752.
[6]    The number of shares of VNBC Common Stock does not include treasury stock, unvested restricted stock, and unexercised warrants.

holders of the VNBC Preferred Class C Stock to the extent of their liquidation preference (provided, however, if the assets are insufficient to pay the VNBC Preferred Class D Stock, payment is made ratably with the VNBC Preferred Class D Stock); (b) the holders of the VNBC Preferred Class D Stock to the extent of their liquidation preference; and (c) all remaining assets are distributed to the holders of VNBC Common Stock.  The VNBC Common Stock holders are not receiving any distribution under the Plan and therefore are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

### (c)    Warrants

In connection with the sale and issuance of VNBC Common Stock to institutional investors in a private placement on June 18, 2004, the Debtor granted the institutional investors warrants ("Warrants") to purchase 168,000 additional shares of VNBC Common Stock at an exercise price of $23.81 per share.  The Warrants expire on June 11, 2011.  The Warrants are out of the money based on a VNBC Common Stock price of $0.06 per share as of the close of trading on September 24, 2009.  The holders of Warrants are not receiving any distribution under the Plan and therefore are deemed to reject the Plan.

### C.    Events Leading Up to Bankruptcy.

### 1.    Overall Business Erosion

Under the direction of Norman Morales, the former President and Chief Executive Officer and a former director of the Debtor and the Bank from 2000 to 2008, the Debtor's business strategy focused on growing the Bank's loan portfolio primarily through higher yielding loans generated through its luxury home construction, tract construction and commercial construction and commercial real estate specialty lending groups.  Because these specialty lending groups focused principally on loan origination, the business generated by these groups generally took the form of discrete loan transactions which generally did not carry with them the other portions of the borrower's banking relationship, including their deposit relationship.  Loan origination growth through the specialty lending groups contributed to high concentrations of construction and commercial real estate loans as a percentage of total loans and as a percentage of capital. The pace of loan originations outstripped the Bank's ability to generate core deposits to fund all of its

1    lending activities.  To bridge its funding gap, the Bank relied on higher cost deposits, including

2    promotional money market accounts and certificates of deposit, and alternative funding sources,

3    including Federal Home Loan Bank ("FHLB") borrowings.

4        Further, to provide additional capital and liquidity to fund the Bank's growth, the Debtor,

5    as the parent of the Bank, incurred debt in the form of the Loan from FTBN and subordinated debt

6    and hybrid instruments such as the Debt Securities under the Statutory Trust Indentures and the

7    Debentures under the Junior Subordinated Indenture.  This capital and funding strategy was

8    designed by the Debtor and the Bank and was employed to fuel their growth over a period of

9    approximately seven (7) years.  As the Debtor and the Bank's balance sheets grew, so did their

10    exposure to the risk of an economic downturn.

11        The Debtor believes that the erosion of the national economy and local real estate market

12    in 2007 occurred faster and more steeply than many had predicted.  Specifically, the Debtor

13    believes that the national economic conditions, and more particularly, the economic conditions of

14    the Southern California real estate market, caused the Bank to suffer substantial losses in its loan

15    portfolio.  The Debtor also believes that the losses sustained by the Debtor and the Bank were the

16    result of a number of issues, including, but not limited to, the following:  significant write-downs

17    of assets (including other real estate owned ("OREO"), goodwill and deferred tax assets),

18    increased provisioning for loan losses, declining profitability due to net interest margin

19    compression, and increased operational expenses associated with deteriorating asset quality.

20        The Debtor contends that in September 2007 the prior Board of Directors of the Debtor and

21    the Bank instructed management to re-evaluate and recommend such actions deemed necessary or

22    advisable to adjust the Debtor and the Bank's overall risk profile in order to better address the

23    competitive operating environment which may arise due to changes in general economic

24    conditions and market circumstances.  Further, that the result was the development of an action

25    plan to reduce overall enterprise risk in the Debtor and the Bank.

26

27

28

LANDAU
GOTTFRIED
& BERGER LLP

### 2.    Resignation of Directorship and Termination of CEO of Bank and Debtor

On or about January 24, 2008, the Debtor announced that Mr. Morales agreed to resign as a director and that his employment as President and Chief Executive Officer of both the Debtor and the Bank was terminated.

### 3.    Consent Solicitation & Proxy Contest

After the resignation and termination of Mr. Morales, Mr. Morales and Jon Salmanson, one of the Debtor's shareholders, launched a consent solicitation and proxy contest in February 2008 in order to amend the Debtor's Bylaws and replace all the directors on the Board with an alternative slate of directors. The proxy contest and related events continued until approximately August 4, 2008, when Mr. Morales announced that he was unable to obtain regulatory approval from the OCC and FRB to serve as a director or officer of the Bank and Debtor, respectively, Mr. Morales withdrew his candidacy as a director, and a Board comprised of a majority of candidates from the alternative slate of directors was elected at the annual meeting of shareholders.

### 4.    Regulatory Actions By OCC Impacting the Bank

On May 5, 2008, the Bank was informed in writing by the OCC that, as a result of an examination, the Bank had been designated to be in a "troubled condition" for purposes of Section 914 of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("Section 914"). As a result of this designation, the Bank was not allowed to appoint any new director or senior executive officer or change the responsibilities of any current senior executive officers without providing the OCC with 90 days prior written notice. Such appointment or change in responsibilities could be disapproved by the OCC. In addition, the Bank was not allowed to make indemnification or severance payments to, or enter into agreements providing for such indemnification or severance payments with, institution-affiliated parties, which included key employees and directors of the Bank, without complying with certain statutory restrictions including prior approval of the OCC and FDIC.

1   On July 22, 2008, the OCC and the Bank entered into a Consent Order requiring the Bank

2   to take a number of actions, including, reducing the credit risk in its loan portfolio, increasing its

3   reserves against loan losses, and strengthening its overall capital position by complying with

4   enhanced capital requirements.

5   **5.    Regulatory Action by FRB Impacting Debtor**

6   On May 20, 2008, the FRB notified the Debtor that, as a result of an off-site review, the

7   Debtor had been designated to be in a "troubled condition" for purposes of Section 914.  Upon

8   such designation, the Debtor was subject to the similar restrictions affecting the Bank related to the

9   appointment and change in responsibilities of directors and officers and indemnification and

10  severance payments.  In addition, the FRB advised the Debtor that in light of the Debtor's

11  obligation to serve as a source of financial strength to the Bank, the Debtor could not make

12  payments to third parties, including, without limitation, dividend payments to the holders of its

13  VNBC Common Stock and Preferred Stock Interests, payments of interest and principal to its

14  creditors, and payments for certain other operating expenses, without prior FRB approval.

15  On September 23, 2008, the FRB and the Debtor entered into a Written Agreement

16  requiring the Debtor to take, and refrain from taking, a number of actions to ensure the Debtor

17  served as a source of financial strength to the Bank.  Those actions included, without limitation,

18  raising additional regulatory capital to ensure that the Bank complied with the enhanced regulatory

19  capital requirements of the Consent Order, not make payments to third parties (including, without

20  limitation, dividend payments to the holders of its common stock and preferred stock, payments of

21  interest and principal to its creditors), and refraining from the acceptance of dividends and other

22  payments from the Bank.

23  **6.    Slate of New Directors for Debtor and the Bank**

24  On August 11, 2008, following the Debtor's annual meeting of shareholders, it announced

25  that five (5) new directors from the alternative slate, Douglas Kratz, Glen Terry, Cynthia Harriss,

26  Lester Strong and Harice "Dev" Ogle, and two existing directors, David Buxbaum and Charles

27  Keagle, had been elected to its Board. On August 20, 2008, Ms. Harriss resigned from the Board

28  of the Debtor and the Board appointed Perry Hansen, Chairman of the Board of the Bank, to serve

LANDAU
GOTTFRIED
& BERGER LLP

1  as a director of the Debtor, subject to regulatory approval. In addition, the Board appointed James

2  LeSieur, the former Chairman of the Board and former interim President and Chief Executive

3  Officer, to serve as a director, subject to regulatory approval.  On September 12, 2008, the new

4  Board appointed Glen Terry as President and Chief Executive Officer of the Debtor and the Bank,

5  subject to regulatory approval.  Regulatory approval was subsequently obtained for each of these

6  parties to serve in their respective capacities.

7         The biographies provided by such individuals includes the following experience:

8              a.     Glen Terry.  Mr. Terry is a career banking executive who previously held

9  positions of President and Chief Executive Officer and served on the boards of four regional

10  community banks in Northern California—The Vintage Bank (Napa), Solano Bank (Vacaville),

11  Napa Valley Bank (Napa) and Tri Valley Bank (San Ramon).  His career also included senior

12  positions in multi-billion dollar regional and interstate banks. At Napa Valley Bank, Mr. Terry

13  engineered the company's restructuring, managed full compliance with and ultimate removal of a

14  regulatory cease and desist order, substantially reduced troubled assets and significantly improved

15  the profitability of the institution. In 1996, Napa Valley Bank was merged into Westamerica Bank.

16              b.     Douglas Kratz and Perry Hansen.  In 1985, Mr. Kratz was appointed

17  President and Chief Executive Officer of Financial Services Corporation of the Midwest

18  ("FSCM") and a director of its subsidiary bank, The Rock Island Bank, Rock Island, Illinois. Also

19  in 1985, Mr. Hansen was appointed to the board of directors of FSCM and as Chairman and Chief

20  Executive Officer of The Rock Island Bank.  At the time Messrs. Kratz and Hansen joined FSCM

21  and The Rock Island Bank, both entities were under regulatory sanctions from the FRB.  However,

22  within 18 months the sanctions were lifted from both FSCM and The Rock Island Bank.  Both

23  Messrs. Kratz and Hansen remained involved for approximately fourteen (14) years until the

24  combined entities, with consolidated assets of almost $600 million, were sold.  In late 2000 and

25  early 2001, Messrs. Kratz and Hansen initiated a similar turnaround and recapitalization of Second

26  Mid-America Bancorp, Inc. and its subsidiary, First Illinois National Bank, by merging the

27  troubled entities with and into newly formed and well capitalized entities, National Bancshares,

28

1    Inc. and its subsidiary, THE National Bank, Bettendorf, Iowa.  The combined entities have

2    consolidated assets over $1 billion.

3                    c.    James LeSieur.  In 1991, Mr. LeSieur was appointed President and Chief

4    Executive Officer of Sunwest Bank, Tustin, California just as Southern California was entering a

5    severe economic downturn.  Sunwest Bank was operating under regulatory sanctions at the time

6    and ultimately was placed under a cease and desist order by the FDIC.  Without the ability to

7    attract additional capital at that time through its parent, West Coast Bancorp, Mr. LeSieur led

8    Sunwest Bank's return to profitability by resolving asset quality problems, consolidating

9    operations, selling assets to generate capital and effectively downsizing and reorganizing the

10    organization.  Following Sunwest Bank's return to profitability, West Coast Bancorp was able to

11    downstream capital to Sunwest Bank and ultimately the order was lifted.  Following the lifting of

12    the order in the mid 1990's, Mr. LeSieur led the organic profitable growth of Sunwest Bank from

13    approximately $110 million in assets to more than $250 million by the end of 2002.

14                    **7.    Restructuring by New Board of Directors of Debtor and Bank**

15            Under the direction of the new Board of Directors, the Debtor and the Bank furthered the

16    risk mitigation plan initiated by the prior Board and developed additional strategies in an attempt

17    to strengthen the capital and liquidity of the Debtor and the Bank, restore profitability and,

18    thereafter, grow responsibly.  These plans and strategies included, among other things, the

19    following objectives:

20                    a.    **Improving Asset Quality**.  Among other things, the Bank expanded the

21    Special Assets Group which was formed in early 2008 and conducted additional evaluations of the

22    Bank's loan portfolio and intensified its monitoring in an effort to maintain a full understanding of

23    the market value of collateral underpinning the loans.  If the collateral value of any loan was

24    considered compromised or if the full collectability of principal and interest was considered

25    impaired, strategies and action plans were implemented in an attempt to correct the impairment of

26    the loan.  Those strategies and action plans included, but were not limited to, restructuring the loan

27    to effect a workout, foreclosing upon and liquidating the collateral securing the loan and selling the

28

LANDAU
GOTTFRIED
& BERGER LLP

22

1  loan to reduce exposure to loss.  However, there continued to be significant increases in the Bank's

2  non-performing loan portfolio and its other real estate owned.

3          **b.**      **Termination of Lending; Capital and Liquidity Preservation; Loan**

4  **Portfolio Diversification.**  The Debtor contends that the Bank took a number of actions in 2007

5  through 2009 to address its loan portfolio issues and by mid 2008, the Bank ceased the origination

6  of new luxury home construction, tract construction and commercial construction loans and, with

7  the exception of certain renewals of existing credits in narrow asset categories, in early 2008

8  curtailed other loan originations.  During this time, the Bank enhanced collection efforts to pursue

9  pay-downs and pay-offs of existing credits, the workouts and loans sales conducted through the

10  Special Assets Group.  The Bank was able to reduce its balance sheet which alleviated some, but

11  not all, of the pressure on its capital ratios and liquidity.  These actions also started to change the

12  composition of the loan portfolio as construction loans as a percentage of all assets began to

13  shrink.  Market conditions continued to impact the Bank's construction and commercial real estate

14  loan portfolio and began to impact other portions of the loan portfolio, including business and

15  personal lines of credit.  As a result, the Bank continued to experience significant increases in its

16  non-performing and non-accrual loans which out-stripped its ability to absorb further write-offs,

17  decreases in income,  increased operating costs, and increased losses.

18          **c.**      **Liquidity Stabilization.**  As addressed in more detail under "Regulatory

19  Action By OCC Impacting the Bank" above, in August 2008 the Bank entered into a Consent

20  Order with the OCC.  One of the impacts of the Consent Order was that the Bank was

21  automatically subject to 12 C.F.R. 337.6 (the "Deposit Statute"), which restricted the Bank from

22  receiving, renewing or rolling-over brokered deposits and imposed a maximum permissible rate

23  that the Bank could offer on its other deposit products.  Based in part upon information received

24  from customers at the time of the withdrawal, the Debtor believes that negative publicity resulting

25  from the Bank and the Debtor's financial results and the financial results of other financial

26  institutions, together with the seizure of IndyMac Bank based in Pasadena, California by federal

27  regulators in July 2008, contributed to an increase of customer deposit withdrawals and affected

28

the Bank's liquidity and its ability to meet its obligations as they became due.  The following activities and actions impacted the Bank's ability to generate deposits and additional liquidity:

        **(i)**    **Brokered Deposits**.  During the second quarter of 2008, the Bank obtained $266.3 million in brokered deposits which offset the $226.9 million in run-off of savings, NOW and money market deposit accounts.  However, as a result of the Deposit Statute and other regulatory limitations, the Bank could no longer accept, renew or rollover brokered deposits unless it received a waiver from the FDIC.  The Bank requested a waiver from the FDIC, but it was not granted and the Bank was unable to employ the use of brokered deposits as a source of liquidity.

        **(ii)**    **Federal Home Loan Bank**.  Effective on or about April 21, 2008, the FHLB reduced the Bank's borrowing capacity from 40% to 30% of the Bank's total assets.  Further, the Bank's borrowing availability was limited to the amount of eligible collateral that can be pledged to secure that borrowing facility.  As a result of prior draws against and continued reliance on this facility, as of August 31, 2008, the Bank had substantially exhausted its additional availability under the FHLB borrowing facility.  Further, as the advances came due and were repaid to the FHLB, the FHLB was not obligated to re-lend the funds to the Bank.

        **(iii)**    **Other Unsecured Correspondent Facilities**.  As of August 31, 2008, neither the Debtor nor the Bank had unsecured correspondent banking facilities with borrowing availability.

        **(iv)**    **Federal Reserve "Down-Stream" Requirement**.  On July 31, 2008, the FRB notified the Debtor that it must serve as a source of financial strength to the Bank and as such, required that management perform an analysis of the cash needs for the Debtor through October 31, 2008.  The FRB further required that any amounts not required for the Debtor's operations be contributed to the Bank to support its operational needs.

        **(v)**    **Federal Reserve Discount Window Facility.**  On August 1, 2008, the Bank entered into an intercreditor agreement with the FHLB and the FRB whereby certain eligible loans pledged to the FRB, and agreed to by the FHLB, could be utilized to support any advances from the Federal Reserve Discount Window.  The Federal Reserve Discount Window facility was in addition to and supplemented the borrowing facility previously established with the

1  FHLB.  The Bank pledged loans with an aggregate principal balance of over $400 million which

2  could be used by the Federal Reserve Discount Window in determining an available amount to the

3  Bank; however, the Federal Reserve Discount Window is not obligated to lend on any collateral

4  deposited.  In September 2008 the Bank borrowed approximately $20 million from the Federal

5  Reserve Discount Window to bridge a short term funding deficit.  The loan was repaid on

6  schedule.  Thereafter, the Bank increased its reliance on a promotional deposit campaign in

7  compliance with the Deposit Statute to meet its liquidity needs.

8               **(vi)**     **Promotional Certificates of Deposit**.  In or about July 2008, the

9  Debtor believes that due in part to the continued deposit run-off and the inability to obtain a

10  brokered deposit waiver from the FDIC, the Bank accelerated its marketing of promotional

11  certificates of deposit ("Promotional CDs").  The deposit rates that were offered by the Bank were

12  in compliance with the regulatory requirements of the OCC and the FDIC, including the Deposit

13  Statute.

14               **(vii)**     **Liquidity Position at Bank Closure**.  As addressed above, during

15  this period the Bank had limited alternative means of generating necessary liquidity.  Therefore,

16  while the funds originated through the Promotional CDs were at a higher cost, the Bank's liquidity

17  stabilized and at the time of its closure by the OCC on July 17, 2009 the Bank had a liquidity

18  cushion which exceeded $100 million (i.e. a positive Federal Funds Sold position).

19           **d.**     **Cost Reduction**.  The Debtor's efforts to reduce expenses included, but were

20  not limited to:

21               **(i)**     **Layoffs and Operating Cost Reduction**.  The Bank eliminated staff

22  and reduced or eliminated other operating expenses.

23               **(ii)**     **Divestiture of Exchange Companies**.  On September 9, 2008, the

24  Debtor entered into an agreement to sell two of its consolidated operating subsidiaries, the

25  Exchange Companies, back to their previous owner.  The Debtor originally acquired the Exchange

26  Companies, which act as qualified intermediaries under Section 1031 of the Internal Revenue

27  Code, in December 2007, in order to provide a source of low-cost deposits for the Bank.  However,

28  the erosion in the real estate market negatively impacted the businesses of the Exchange

LANDAU
GOTTFRIED
& BERGER LLP

Companies, causing the Debtor to assist with funding of the Exchange Companies operating

expenses and the Exchange Companies reduced the amount of the lower cost deposits held by the

Exchange Companies at the Bank.  In exchange for the forgiveness of debt owed by the Exchange

Companies to the Debtor totaling approximately $644,000 and a payment by the Debtor to the

Exchange Companies in the amount of $72,000, the employment agreement with the previous

owner and the earn-out provisions under the original sale agreement were terminated.

**(iii)** **<u>Non-Qualified Deferred Compensation Plan Termination</u>**.  In

order to save the costs associated with plan administration and matching contributions, and to

retain critical employees otherwise seeking immediate distributions under the plan through

voluntary termination, on August 20, 2008, the Board of Directors of the Bank, as the plan

administrator, terminated the Bank's Non-Qualified Deferred Compensation Plan. While

termination of the plan required aggregate distributions totaling approximately $3.4 million from

plan assets, the plan assets were held outside the Bank in investments designated by the plan

participants and did not affect the Bank's liquidity.

The Debtor did not modify, amend, terminate, make distributions or otherwise disturb the

Directors Deferred Compensation Plan (the assets of which consisted of cash held by the Debtor)

and each of the former directors that participated in that plan are now unsecured creditors of the

estate.

However, notwithstanding the efforts described above by the Board and management ,the

problems in the Bank's loan portfolio continued to increase and caused the Bank's losses to

accelerate because of increases in the provisioning for loan losses, increases in the costs associated

with problem loan and OREO resolution, and decreases in income as a result of non-performing

and non-accrual loans.  As a result, although the Bank was taking steps to reduce costs within its

control, those measures could not effectively offset the losses, cost increases and capital erosion

arising from the problems in the Bank's loan and OREO portfolio.

**8.**    **Efforts by the Debtor to Raise Capital and Seek Strategic Alternatives**

In 2007, the Debtor commenced its capital raising efforts and the development of strategic

alternatives.  In April 2008, the prior Board engaged Sandler O'Neill & Partners, L.P. as its

investment bankers to assist in the Debtor's capital raising efforts.  In August 2008, the new Board engaged Friedman, Billings, Ramsey & Co. and Howe, Barnes, Hoefer & Arnett as its investment bankers to either raise capital for the Debtor or sell the Bank.  On or about November 13, 2008, the Debtor announced the execution of an agreement for the sale of the Bank to Vineyard Bancshares, Inc. ("VBI"), a bank holding company formed by the Debtor's Chairman of the Board of Directors, Douglas Kratz.  The transaction with VBI was contingent on the ability of VBI to raise $125 million in new capital, an amount at the time considered sufficient to acquire the Bank from the Debtor and fulfill the regulatory capital requirements of the Bank.

In connection with the capital raising efforts and the potential sale of the Bank to VBI, the Debtor also took the following actions:

(a)    **Line of Credit Modifications and Event of Default**.  As of approximately August 31, 2008, the Debtor had approximately $48.3 million in principal outstanding under the secured line of credit under the FTBN Loan which was secured by the Pledged Shares of the VNBC Common Stock.  As reflected in section III.B.3 above, on several occasions over the term of the FTBN Loan the Debtor had been in default due to non-compliance with certain financial and operating covenants, which were waived pursuant to the Modification Agreements.  Moreover, in connection with its capital raising efforts, the Debtor negotiated a discounted payoff of the line of credit conditioned upon the successful completion of the capital raise.

(b)    **Discounted Payoff on Indentures, VNBC Preferred Class C Stock**.  In addition to the discounted payoff of the FTBN line of credit, the Debtor negotiated a discounted payoff under a portion of the obligations under the Statutory Trust Indentures and VNBC Preferred Class C Stock conditioned upon the successful completion of the capital raise.

(c)    **NASDAQ Waiver**.  The issuance of the investment units contemplated under the capital raise would have generally required approval by the Debtor's shareholders pursuant to the rules of the NASDAQ Stock Market ("NASDAQ").  However, NASDAQ rules provide for an exception in a case where the delay involved in securing shareholder approval for the issuance would seriously jeopardize the financial viability of a company.  In accordance with this exception, the Debtor's Board expressly approved the Debtor's intended use of the exception

and the Debtor intended to mail a notice to shareholders and file a public notice explaining its

reliance on the exception for the issuance of the investment units.

The Debtor contends that despite these efforts of the Board and management, the Debtor was

unable to raise capital or sell the Bank and on May 28, 2009, the Debtor announced that the

proposed transaction with VBI had been terminated.  The inability of the Debtor to raise capital or to

otherwise implement other strategic alternatives to enhance the financial position of the Bank,

including, without limitation, the sale of the Bank, caused the Bank and the Debtor to remain in non-

compliance with each of the Consent Order and Written Agreement, particularly as it related to the

inability to raise capital and comply with the capital requirements imposed on the Bank and the

Debtor.  The Bank was closed by the OCC on July 17, 2009 and the FDIC was appointed as the

receiver.  On that same date, the FDIC facilitated the acquisition of most of the assets and liabilities

of the Bank by California Bank & Trust.  Thereafter, the Debtor filed bankruptcy on July 21, 2009.

**D.    Debtor In Possession Administration.**

The Debtor commenced its Chapter 11 Case on the Petition Date to implement the

liquidation of the Debtor's assets and operations.  The Debtor has taken the following steps to

efficiently administer its Chapter 11 Case to date:

**1.    Employment Applications.**

On the Petition Date, the Debtor filed applications to employ Landau & Berger, LLP

("L&B") as its bankruptcy counsel and Manatt, Phelps & Phillips, LLP ("Manatt") as its special

corporate, banking and litigation counsel. By Orders entered on August 26, 2009 (Docket No. 30)

and September 1, 2009 (Docket No. 35) respectively, the Bankruptcy Court approved the

employment by the Debtor of both L&B and Manatt.

**2.    Motion to Reject Certain Executory Contracts and Unexpired Leases.**

On or about July 23, 2009, the Debtor filed a *Motion To Approve Rejection Of (1) Two*

*Unexpired Non-Residential Real Property Leases And (2) One Executory Employment Agreement*

("Rejection Motion'") (Docket No. 12).  An Order approving the Rejection Motion was entered by

the Bankruptcy Court on September 4, 2009 granting retroactive rejection as of July 23, 2009

(Docket No. 36) of two commercial office leases; and an employment agreement with the then

1    current President and Chief Executive Officer of the Debtor, Glen C. Terry (the "Terry

2    Employment Agreement").  In connection with the rejection of the Terry Employment Agreement,

3    the Court also authorized the transfer of approximately $90,000 in funds at City National Bank

4    ("CNB") into the Debtor's debtor-in-possession operating account.  The funds had been placed in

5    the CNB account by the Bank in connection with the Terry Employment Agreement.  Because the

6    account at CNB is in the name of the Bank, the Debtor has been working through the

7    administrative process with the FDIC for the release of that portion of the funds representing

8    Debtor's pro rata share of the account.  If the use of that process breaks down or fails to cause the

9    release of the funds, the Debtor is prepared to file a turnover motion with the Bankruptcy Court.

10    The first commercial lease rejected was for two non-residential office suites located at 8105

11    Irvine Center Drive, Suites 600 and 650, Irvine, California 92618.  One suite was an administrative

12    office used by both the Bank and the Debtor and the second suite was used as a Bank branch.

13    After the OCC closed the Bank and appointed the FDIC as receiver on July 17, 2009, the Debtor

14    was required to vacate these leased premises.  The second commercial lease rejected was for a

15    non-residential office building located at 1016 Irwin Street, San Rafael, California 94901.

16    **3.    Motion to Wind-Down Employee Stock Ownership Plan.**

17    On or about September 8, 2009, the Debtor filed its *Motion Pursuant To Sections 105 And*

18    *363(B) Of The Bankruptcy Code For Entry Of An Order (1) Approving The Use Of Certain Estate*

19    *Funds To Terminate* The Debtor's *Employee Stock Ownership Plan, (2) Authorizing Debtor To*

20    *Forgive, Discharge And Cancel The Promissory Note Executed By The Employee Stock Ownership*

21    *Plan Trust, And (3) Granting Such Other And Further Related Relief* (Docket No. 38) ("ESOP

22    Motion").  As of the date of this filing, the Bankruptcy Court had not approved the ESOP Motion.

23    The Debtor was the plan sponsor of an Employee Stock Ownership Plan ("ESOP") for

24    employees of both the Debtor and the Bank and the Debtor's Board administered the ESOP

25    ("ESOP Committee") with the aid of the ESOP trustee, First Bankers Trust Services, Inc. ("FBTS"

26    or "Trustee").  All of the ESOP assets were held in a segregated trust fund for the benefit of the

27    ESOP participants (the "ESOP Trust").

28

LANDAU
GOTTFRIED
& BERGER LLP

As a means to fund the ESOP Trust's purchase of 298,000 shares of common stock in the Debtor ("Shares") for allocation to employee participant accounts, the ESOP Trust entered into a loan agreement on behalf of the ESOP with TIB The Independent Bankers Bank (the "TIB Loan"). On or about December 10, 2004, the ESOP Trust entered into a Loan Agreement with the Debtor to borrow approximately $6,855,638.46 from the Debtor (the "ESOP Loan") pursuant to a Promissory Note to repay the TIB Loan in full. The ESOP Loan was secured by the Shares and such Shares were placed in a suspense account maintained by the ESOP Trust for the benefit of the Debtor.

As of the Petition Date, and as reflected on Schedule B of the Debtor's Schedules of Assets and Liabilities, the balance of the ESOP Loan was $4,528,187. Of the original 298,000 Shares held in the suspense account by the ESOP Trust as collateral for the ESOP Loan, only approximately 202,996 Shares remained as collateral in the suspense account as property of the Debtor's estate on the Petition Date, and such Shares have been liquidated to preserve value for the Debtor's estate. The net sale proceeds from the sale of the 202,996 Shares was approximately $5,650.11 (the "Debtor Suspense Account Cash"). By the ESOP Motion, the Debtor sought court approval to use the Debtor Suspense Account Cash to partially fund the wind-down and termination of the ESOP and to cancel, forgive and discharge the ESOP Loan since the ESOP Loan would not be re-paid.

### 4.    Bar Date Motion.

On or about August 28, 2009, the Debtor filed the *Notice Of Motion And Motion For Entry Of An Order (I) Establishing Bar Dates For Filing Proofs Of Claim Or Interest; And (Ii) Approving The Form And Manner Of Notice Thereof* (Docket No.31), amended by the Notice of Errata (Docket No. 32)("Bar Date Motion"). Pursuant to an Order of the Bankruptcy Court entered on November 12, 2009 [Docket No. 72], the Bar Date Motion was approved and the Bar Date for filing proofs of claim was fixed as January 7, 2010 (the "Bar Date"). The last date for governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim is January 18, 2010. The *Notice Of Bar Date For Filing Proofs Of Claim Or Interest Against*

1   *Debtor And Debtor-In-Possession Vineyard National Bancorp* was served on all creditors, equity

2   holders and other parties-in-interest.

3           **5.      Insurance Refunds**

4           Commencing on Petition Date, the Debtor, through its insurance broker, arranged for a

5   reduction in coverage under its Workers Compensation Insurance Policy and its Commercial

6   Package Policy (which includes general liability and personal property coverage) to recognize the

7   termination of employment of all employees of the Bank and the loss of all premises owned or

8   leased by the Bank upon the closure of the Bank by the OCC.  As a result of the reduction in

9   coverage, each of the Workers Compensation Insurance Policy and the Commercial Package

10  Policy are paid in full and will expire on February 1, 2010.  Further, the Debtor received a refund

11  check in the amount of $23,483.04 with respect to the Commercial Package Policy and has

12  received $36,748.60 with respect to the Workers Compensation Insurance Policy.  The Debtor also

13  expects to receive a small refund due to the termination of a pre-petition Kidnap and Ransom

14  policy, in the approximate amount of $1,208.00.

15          Additional monies may be due the Debtor in connection with Fidelity Bond #461PB0564

16  ("Fidelity Bond"), which the carrier purported to terminate due to the Bank's closure prior to the

17  Petition Date.  The Debtor disputes the carrier's right to effect a termination of the Debtor's

18  coverage as an insured under the Fidelity Bond based solely on the Bank's closure, and the Debtor

19  accordingly reserves, in full, all of its rights and remedies with respect thereto.  In the event that

20  the purported termination were to be determined to be valid as to the Debtor, such termination

21  would result in a Cancellation Return Premium of $20,505.00 coming due.

22          **6.      Formation of the Committee.**

23          On or about August 12, 2009, pursuant to the Notice of Appointment of Committee of

24  Unsecured Creditors filed with the Bankruptcy Court (Docket No. 24), the OUST formed a three

25  person unsecured creditors committee in this Chapter 11 Case composed of three Statutory Trust

26  Trustees. On September 10, 2009, the OUST filed an Amended Notice of Appointment of

27  Committee of Unsecured Creditors (Docket No. 41) and added two more members to the

28  Committee as follows: (i)  the Debtor's one secured creditor, FTBN, and (ii)  a former vendor that

1    provided market data to the Debtor called The Concord Group.  The members of the Committee

2    are:  (1) Wilmington Trust, (2) BNYMTC (3) U.S. Bank, (4) FTBN; and (5) The Concord Group.

3    The Committee retained Winston & Strawn, LLP as its counsel, and on December 7, 2009 the

4    Court entered its Order Granting Application to Employ Winston & Strawn LLP as Counsel to

5    Creditors' Committee (Docket No. 78).

6                    **7.      Schedules and Statement of Financial Affairs.**

7            On the Petition Date, the Debtor filed its Schedules and Statement of Financial Affairs with

8    the Bankruptcy Court.

9                    **8.      Motion to Vest the Prosecution of Certain Litigation in the Committee**

10           On September 23, 2009, the Committee filed the *Motion for Order Vesting Official*

11   *Committee of Unsecured Creditors With Authority and Standing To Investigate, Bring, Maintain*

12   *and Settle Claims* (Docket No. 47)(collectively the "Committee Standing Motion"), seeking,

13   among other things, a Court order granting and vesting the Committee with authority and standing

14   to investigate, bring, maintain and settle to the fullest extent, any and all claims, causes of actions,

15   rights, obligations, offsets and objections held by the Debtor and its estate (i) against its respective

16   directors, officers, and shareholders; and (ii) any "Claims" as defined in the Debtor's Fidelity

17   Bond insurance policy (collectively, the "D&O Claims").  The Committee thereafter supplemented

18   the Committee Standing Motion by filing with the Bankruptcy Court, and serving, its *Supplement*

19   *to Motion for Order Vesting Official Committee of Unsecured Creditors With Authority and*

20   *Standing to Investigate, Bring, Maintain and Settle Claims* [Docket No. 50] ("Supplement").

21           On October 6, 2009, the Debtor filed with the Bankruptcy Court and served its *Debtor and*

22   *Debtor-In-Possession Vineyard National Bancorp's Statement Regarding Motion for Order*

23   *Vesting Official Committee of* Unsecured *Creditors With Authority and Standing to Investigate,*

24   *Bring, Maintain and Settle Claims* [Docket No. 58] ("Debtor's Statement").  On October 2, 2009,

25   the Committee filed its proposed Order granting the relief sought in the Claims Investigation

26   Motion [Docket No. 60] ("Proposed Committee Order").  On October 12, 2009, the Debtor, by its

27   *Notice of Lodgment of Debtor and Debtor-In-Possession Vineyard National Bancorp's Competing*

28   *Order Granting Motion for Order Vesting Official Committee of Unsecured Creditors With*

LANDAU
GOTTFRIED
& BERGER LLP                                    32

*Authority and Standing to Investigate, Bring, Maintain and Settle Claims* [Docket No. 61]

("Debtor's Proposed Order"), the Debtor submitted to the Court its own proposed order granting

the Claims Investigation Motion.

By Order entered on October 23, 2009, the Bankruptcy Court approved the Committee

Standing Motion (the "Committee Standing Order").  The Court did not adopt the provisions

sought by the Debtor in the Debtor's Proposed Order, thus requiring, *inter alia*, that the Debtor

turn over to the Committee regulatory documents that would otherwise be subject to requirements

of confidentiality imposed by applicable federal law and regulation, subject to the Committee

thereafter complying with such requirements.

### 9.    Tax Audit and Refunds.

In connection with an audit of the Debtor's federal income tax returns for the 2008 tax year

conducted by the Internal Revenue Service ("IRS"), it has come to the Debtor's attention that it may be

eligible to use a change in the tax law promulgated under Revenue Procedure 2009-52 permitting

companies to carry back Net Operating Losses ("NOL") and Alternative Minimum Tax Net Operating

Losses ("ATNOL") incurred in either the 2008 or 2009 tax years for a period of 5 years versus the 2

year period under the old rule.  As the Debtor has previously received a refund in connection with its

2008 federal income tax returns based on an NOL carry back to the 2007 and 2006 tax years under the

old rule, if the 2008 tax year is elected under the new rule the Debtor would be able to seek an

additional refund related to losses incurred in 2008 by carrying them back to the 2005, 2004 and 2003

tax years.  Based on preliminary estimates the amount of the additional refund attributable to a carry

back of the 2008 NOL to those tax years is approximately $21,800,000.  The amount of such refund is

not certain and some or all of the refund may be claimed by the FDIC as Receiver for the Bank.

Further, there can be no guaranty that the refund will be allowed by the IRS in full or in part, or that

the Debtor, as opposed to the FDIC as Receiver for the Bank, will receive any, or any material portion

of, any such refund.  By separate Application (the "VTD Application"), the Debtor will seek the

Court's approval to engage the services of Vavrinek, Trine, Day & Co., LLP ("VTD"), to assist with

the IRS audit and preserving the potential refund for the Liquidating Trustee on behalf of the Debtor's

estate.

LANDAU
GOTTFRIED
& BERGER LLP

33

1    The Debtor has also been notified by the IRS that it may be entitled to a refund of

2  approximately $19,804.52 attributable to federal employment tax overpayments reported on Form

3  941 for the September 30, 2009 tax period.

4    The amount of such refund is not certain and some or all of the refund may be owed to the

5  FDIC as Receiver for the Bank.  Further, there can be no guaranty that the refund will be allowed

6  by the IRS in full or in part, or that the Debtor, as opposed to the FDIC as Receiver for the Bank,

7  will receive any, or any material portion of, any such refund.

8    The Debtor has also been notified by the State of California Franchise Tax Board ("FTB")

9  of an audit by the FTB of the Debtor's California state income tax returns for the 2005 through

10  2007 tax years.  By the VTD Application, the Debtor will seek the Court's approval to engage the

11  services of VTD the Debtor's prior auditors for the tax years in question, to assist with the audit by

12  the FTB.  There can be no assurance that the audit by the FTB will or will not result in any

13  additional state income tax liability for the tax years in question.  .

14    **E.    Prosecution of Estate Causes Of Action and D&O Claims.**

15    **1.    Estate Causes of Action Against Third Parties.**

16    The Debtor and its professionals have made a diligent effort to identify in Exhibit "D" to

17  this Disclosure Statement, all Estate Causes of Action against third parties other than

18  preference/fraudulent transfer actions, objections to Claims and the D&O Claims.    No reliance

19  should be placed on the fact that a particular Estate Cause of Action is or is not identified in

20  Exhibits "D" and "F" because the lists are non-exclusive and may be amended prior to the

21  Confirmation Date to provide for additional disclosures.  The Liquidating Trustee or the Post-

22  Confirmation Committee may seek to investigate, file and prosecute Estate Causes of Action after

23  the Effective Date of the Plan, whether or not the Estate Causes of Action are identified in the

24  Disclosure Statement.  As reflected in Section V.B.3 of the Plan, on the Effective Date, any and all

25  Estate Causes of Action the Estate may have against any third parties shall be vested in the

26  Liquidating Trust and Section V.B.4 of the Plan provides that the Liquidating Trustee has the

27  authority to prosecute these Estate Causes of Action.

28

###### 2.    Committee's Investigation of Claims Against Directors, Officers, and Shareholders and Complaint

Pursuant to the Committee Standing Order, the Committee has standing to investigate and bring D&O Claims against the Debtor's directors, officers, and shareholders.  Pursuant to the Committee Standing Order, the Committee was "granted and vested with authority and standing to investigate, bring, maintain and settle to the fullest extent, without further Order of the Court any and all claims, causes of actions, rights, obligations, offsets, setoffs, and objections held by [Vineyard National Bancorp] and its estate against their respective directors, officers and shareholders….as a derivative action on behalf of the Debtor and/or the Debtor's estate, for the benefit of the Debtor's creditors, shareholders and other parties in interest."

Since the Court issued the Committee Standing Order, the Debtor is informed that the Committee's professionals investigated specific transactions identified in the Debtor's and the Bank's board minutes and financial records and interviewed some of the Debtor's officers and a director about the Debtor's business affairs and the selected transactions.  The Debtor was further informed that the Committee's professionals did so in order to evaluate whether the Debtor had potential claims against its officers and directors arising out of their management or oversight of the Debtor and its primary asset, the Bank.  Based on this information, the Committee has informed the Debtor that it intends to commence an action against some of the Debtor's current and former directors and officers in that capacity prior to the end of December 2009.

The Committee intends to allege the following potential D&O Claims in its complaint against the current and former directors and officers of the Debtor.  A copy of the complaint is attached hereto as Exhibit "G" and includes, but is not limited to, the following potential D&O Claims:

a.    The Debtor may have potential D&O Claims against some of its directors and officers for allegedly arranging unsafe and imprudent lending practices, failing to implement sufficient quality controls, and failing to exercise adequate oversight in connection therewith, in breach of their fiduciary duties.  The Debtor's directors' and officers' actions and inactions were

1    allegedly a substantial factor in the Debtor's and the Bank's loan losses and the Debtor's loss of

2    over $100 million.

3            b.      The Debtor may have potential D&O Claims against some of its directors

4    and officers for their acquisition of entities, including Rancho Bank and the Exchange Companies,

5    for a price that allegedly exceeded the value of these entities without conducting sufficient due

6    diligence into their actual value and these acquisitions were allegedly a substantial factor in over

7    $65 million worth of losses the Debtor suffered and the Debtor's loss of over $100 million.

8            c.      The Debtor may have potential D&O Claims against some of its directors

9    and officers for authorizing the payment of dividends that were allegedly improper under

10   applicable corporate laws or fraudulent conveyance laws and were allegedly a substantial factor in

11   over $7 million worth of losses the Debtor suffered and the Debtor's loss over $100 million.

12           d.      The Debtor may have potential D&O Claims against some of its directors

13   and officers for allegedly paying Morales over a million dollars in improper separation payments,

14   which Morales also allegedly improperly negotiated, when they could have paid him nothing and

15   these separation payments were allegedly a substantial factor in over $1.3 million worth of losses

16   and other damages the Debtor suffered.

17           e.      The Debtor may have potential D&O Claims against Morales for allegedly

18   using company funds improperly and causing the directors of the Debtor to pay for a costly

19   investigation into his misconduct.  The cost of this investigation was allegedly a substantial factor

20   in the hundreds of thousands of dollars worth of losses and other damages the Debtor suffered.

21           f.      The Debtor may have potential D&O Claims against some of its directors

22   for allegedly funding a costly investigation into Morales' improper use of company funds for

23   personal enjoyment, and the cost of this investigation was allegedly a substantial factor in

24   hundreds of thousands of dollars worth of losses and other damages the Debtor suffered.

25           The Committee states that its investigation is still ongoing and that the Committee may

26   have additional claims against the Debtor's directors, officers and shareholders that are not

27   described above, including but not limited to potential claims based upon any loss or damage

28   suffered by the Debtor, including but not limited to diminution in the value of the Debtor's stock in

Vineyard Bank, N.A. caused by losses or damages suffered by Vineyard Bank, N.A., and potential

claims based upon any other breach of duty or other wrongful act or breach of contract committed

by the Debtor's directors, officers and/or shareholders.  The Committee contends that the claims in

the D&O Claims Complaint are insured under the Debtor's and the directors' and officers'

insurance policies for 2008 and 2009.

The Plan provides that, after the Effective Date, the Liquidating Trustee will investigate,

prosecute, settle, or otherwise resolve all D&O Claims against the Debtor's officers, directors and

shareholders, including the foregoing D&O Claims, as the assignee and transferee of the

Committee's rights under the Committee Standing Order with respect to such D&O Claims for the

benefit of the Beneficiaries of the Liquidating Trust.  No reliance should be placed on the fact that

a particular D&O Claim is or is not identified in this Disclosure Statement or on Exhibit "G" as

additional D&O Claims may be added or amended prior to the Confirmation Date to provide for

additional disclosures or thereafter pursuant to applicable law in any legal proceeding.  The

Liquidating Trustee or the Post-Confirmation Committee may seek to investigate, file and

prosecute D&O Claims after the Effective Date of the Plan, whether or not the D&O Claims are

identified in the Disclosure Statement.

### 3.    Recovery of Preferential or Fraudulent Transfers.

The Liquidating Trustee will investigate whether certain prepetition payments to creditors

may be recovered pursuant to sections 544, 547, 548 and 550 of the Bankruptcy Code or

applicable State law.  Exhibit "E" to the Disclosure Statement lists and/or identifies (i) all

payments to creditors made within ninety days of the Petition Date, (ii) all payments to insiders

made within one year of the Petition Date, and (iii) all distributions given to an insider of the

Debtor, including compensation in any form, bonuses, loans, stock, redemptions, and options

exercised.  Each transfer listed therein and all other prepetition transfers and obligations of the

Debtor will be evaluated to determine whether the transfer or obligation is avoidable on any

grounds.  Any creditor or party in interest that received a transfer from the Debtor within four

years prior to the Petition Date or in whose favor the Debtor incurred an obligation may be the

subject of an Estate Causes of Action on account of such transfer or obligation if grounds exist to

LANDAU
GOTTFRIED
& BERGER LLP

1    avoid the transfer or obligation.  The Liquidating Trustee has the authority to prosecute preferential

2    and fraudulent transfers.  See Section V.B.3 of the Plan.

3                        **4.        Objections to Claims.**

4            To date, the Debtor has not filed any objections to Claims.  As set forth in Section V.B.3 of

5    the Plan, after the Effective Date, the Liquidating Trustee has the authority to object, prosecute,

6    and settle Claims.

7    **IV.       THE PLAN OF REORGANIZATION**

8            A DETAILED CHART SETTING FORTH EACH CLASS DESIGNATED UNDER THE

9    PLAN, THE PROPOSED TREATMENT UNDER THE PLAN OF EACH CLASS, THE

10   PROJECTED RECOVERY UNDER THE PLAN FOR EACH CLASS, AND WHETHER A

11   CLASS IS ENTITLED TO VOTE, IS SET FORTH AT THE OUTSET OF THIS DISCLOSURE

12   STATEMENT.  See Plan Summary.

13           The Plan envisions a liquidation of all remaining assets of the Debtor's Estate by the

14   Liquidating Trustee.  The assets of the Estate will vest in the Liquidating Trust upon the Effective

15   Date and will be distributed consistent with the Bankruptcy Code priority scheme and in

16   accordance with the terms of the Plan and the Liquidating Trust Agreement.

17           The Debtor and the Committee believe that through the Plan: (x) holders of impaired

18   unsecured Claims will obtain a greater recovery than would be available if the Debtor's assets

19   were liquidated in any other manner under the Bankruptcy Code or if any other feasible

20   alternatives were pursued; and (y) the value of the assets of the Estate will be maximized by

21   converting the assets of the Estate into Cash in the most efficient and economical manner.  THE

22   DEBTOR AND THE COMMITTEE BELIEVE THAT THE PLAN PROVIDES THE BEST

23   FEASIBLE RECOVERIES TO THE HOLDERS OF IMPAIRED CLAIMS AND THAT

24   ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF SUCH HOLDERS.  THE

25   DEBTOR AND THE COMMITTEE THEREFORE RECOMMEND THAT HOLDERS OF

26   IMPAIRED CLAIMS ACCEPT THE PLAN.

27           In accordance with the Bankruptcy Code, the Plan classifies Claims and Equity Interests

28   separately and provides, separately for each Class, that Holders of Claims or Equity Interests in the

LANDAU
GOTTFRIED
& BERGER LLP

38

Class will receive various types of consideration, thereby giving effect to the different rights of the holders in each Class.

In general, under the Plan, on the Effective Date, all of the Estate's assets will vest in the Liquidating Trust and the Allowed Administrative Expenses, Allowed Priority Tax Claims, and the Allowed Class 1 Claims and Allowed Class 2 Claims will receive payment from the Liquidating Trustee in full in Cash or as otherwise noted in the Plan.

Each Holder of an Allowed Class 3 Claims will receive, as soon as practicable in the discretion of the Liquidating Trustee a Pro Rata Share of the Available Cash (the "Initial Class 3 Distribution"). In addition, after the Initial Class 3 Distribution but prior to the Final Distribution Date, the Disbursing Agent shall, but is not required, to make Pro Rata interim distributions (the "Interim Distributions") of Available Cash to the Holders of Allowed Class 3 Claims, when, in the discretion of the Liquidating Trustee, the Liquidating Trust has sufficient Available Cash to make such Interim Distributions. Pro Rata distributions relating to Disputed Claims will be placed in the Disputed Claims Reserve. Based upon the Debtor's estimate of the total General Unsecured Claims in Class 3 of approximately $54,043,491 and the Debtor's estimate of the Available Cash, the Trustee estimates that holders of Allowed Claims in Class 3 will receive a percentage recovery of approximately 2.0% of the face amount of their Allowed Claims.[7] The actual percentage recovery will vary depending upon, among other things, the actual amount of Allowed Claims and the actual amount of Available Cash realized, such that the actual recovery may be different than the Debtor's estimate. Based upon the Debtor's estimates, the Available Cash are not sufficient to pay the Allowed Class 3 Claims in full. See Exhibit "B" to this Disclosure Statement.

Class 4 Claims are unsecured claims. Class 4 consists of the Indenture Trustee Claims that may be contractually or otherwise subordinate to the Allowed FTBN Claim and/or other Class 4 Claims and unpaid Indenture Trustee Fees. Subject to Section II.C(4)(c) and the provisions of the Plan related to the payment of the Indenture Trustee Fees, each Holder of a Class 4 Claim shall be allocated a Pro Rata share of each Distribution available to Holders of Class 3 Claims; provided,

---

[7] This estimate does not take into account any proceeds of, or costs of recovery of, the Debtor's Tax Refund Claims, Estate Causes of Action or D&O Claims, all of which remain unknown at this time.

however, that the amount of distributions to Holders of Allowed Class 4 Claims shall be paid (i) first on account of unpaid Indenture Trustee Fees, including Indenture Trustee fees accrued prior to the Petition Date, in an amount estimated to be $100,000 to $120,000, and (ii) second on account of the Allowed FTBN Claim, until such time as the Allowed FTBN Claim is satisfied in full, after which time distributions to Holders of Allowed Indenture Trustee Claims shall be made.  Based upon the Debtor's estimates, it is unlikely the Senior Indebtedness in Class 3 will be paid in full and therefore a distribution to holders of Allowed Indenture Trustee Claims, subject to Section II.C.(4)(c) of the Plan, is not expected.

Holders of Allowed Preferred Stock Interests in Class 5 are junior in priority to Allowed Class 4 Claims, and will not receive a distribution under the Plan unless and until the Holders of Allowed Class 4 Claims are paid in full.  Since no distribution is expected to be made on account of subordinated Allowed Trustee Indenture Claims, Allowed Preferred Stock Interests in Class 5 will receive nothing on account of their interests under the Plan, and such Preferred Stock Interests will be deemed cancelled upon confirmation of the Plan.

Holders of Allowed VNBC Common Stock Interests in Class 6 are junior in priority to Allowed Class 5 Preferred Stock Interests and will not receive a distribution under the Plan unless and until the Holders of Allowed Class 5 Claims are paid in full.  Since no distribution is expected to be made on account of Allowed Class 5 Preferred Stock Interests, Allowed VNB Common Stock Interests in Class 6 will receive nothing on account of their interests under the Plan, and such VNB Common Stock Interests will be deemed cancelled upon confirmation of the Plan.

THE SUMMARY OF THE PLAN SET FORTH HEREIN IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN, THE TERMS OF WHICH ARE CONTROLLING.  The Plan is attached hereto as Exhibit A and forms a part of this Disclosure Statement.

**A.    Summary Of Certain Other Provisions Of The Plan.**

      **1.    Executory Contracts and Unexpired Leases.**

Subject to the approval of the Bankruptcy Court, the Bankruptcy Code empowers the Debtor to assume, assume and assign, or reject executory contracts and unexpired leases.  As a

general matter, an "executory contract" is a contract under which material performance remains due by each party. If an executory contract or unexpired lease is rejected by the Debtor, the other party to the agreement may file a Claim for any damages incurred by reason of the rejection. In the case of rejection of employment agreements and leases of real property, such damage Claims are subject to certain limitations imposed by the Bankruptcy Code. If an executory contract or unexpired lease is assumed, the debtor generally has the obligation to perform its obligations thereunder in accordance with the terms of such agreement. If an executory contract is assumed and assigned, the assignee generally has the obligation to perform the obligations of the debtor thereunder in accordance with the terms of such agreement.

Section VIII of the Plan discusses the assumption and rejection of executory contracts in further detail. Executory contracts and unexpired leases to be assumed pursuant to the Plan and the projected Cure Payments, if any, are listed in Exhibit 1 to the Plan. The procedures for disputing a Cure Payment or objecting to the assumption of such executory contracts or unexpired leases are discussed in further detail in Section VIII.B. of the Plan. The Debtor reserves the right to delete any contract or lease from Exhibit 1 to the Plan, thereby rejecting the contract or lease, up to and including the hearing on confirmation of the Plan, by filing with the Bankruptcy Court an amended Exhibit 1 to the Plan and by giving notice to counsel for the Committee and counsel for the non-debtor party to the contract or lease.

All executory contracts and unexpired leases which have not previously been rejected, which are not specifically assumed, either pursuant to the Plan or by separate order in the Chapter 11 Case, or which are not the subject of a motion to assume pending on the Effective Date, are deemed rejected pursuant to the Plan as of the Effective Date (or as of such earlier date as announced by the Debtor at the Confirmation Hearing). Exhibit 2 to the Plan contains a nonexclusive list of executory contracts and unexpired leases to be rejected under the Plan. Section VIII.D sets forth the procedures for filing a Claim arising from the rejection of an executory contract or unexpired lease.

LANDAU
GOTTFRIED
& BERGER LLP

All Allowed Claims arising from the rejection of executory contracts or unexpired leases, whether under the Plan or by separate proceeding, will be treated as Allowed Class 3 Claims under the Plan.

**2.      Means Of Implementation.**

**(a)      From the Confirmation Date to the Effective Date.**

Although the Plan will become effective only on the Effective Date, on and after the Confirmation Date and until the Effective Date, the Debtor and/or the Committee, as appropriate, shall take or cause to be taken all actions which are necessary or appropriate to enable the Plan to become effective on the Effective Date and to implement and perform the Plan on and after the Effective Date.

**(b)      Vesting of Assets.**

Unless otherwise expressly provided under the Plan, on the Effective Date, the Debtor's Assets, including all of the Estate Causes of Action and the D&O Claims, will vest in the Liquidating Trust free and clear of all claims, liens, encumbrances, charges and other interests, subject to the provisions of the Plan.  On and after the Effective Date, the transfer of the Debtors' Assets from the Estate to the Liquidating Trust will be deemed final and irrevocable and distributions may be made from the Liquidating Trust.

In connection with the foregoing:

(i)      On the Effective Date, the appointment of the Liquidating Trustee shall become effective and the Liquidating Trustee shall begin to administer the Liquidating Trust pursuant to the terms of the Liquidating Trust Agreement and the Plan and may use, acquire and dispose of property of the Liquidating Trusts free of any restrictions imposed under the Bankruptcy Code.

(ii)      The Confirmation Order will provide the Liquidating Trustee with express authority to convey, transfer and assign any and all of the Liquidating Trust Assets and to take all actions necessary to effectuate same and to prosecute any and all Estate Causes of Action and the D&O Claims, and

LANDAU
GOTTFRIED
& BERGER LLP

42

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(iii)    As of the Effective Date, the Liquidating Trust Assets will be free and clear of all liens, claims and interests of holders of Claims and Equity Interests, except as otherwise provided in the Plan.

**(c)      Establishment of the Liquidating Trust.**

On the Effective Date the Liquidating Trust Agreement will become effective, establishing the Liquidating Trust.  The Liquidating Trust is organized and established as a trust for the benefit of the Beneficiaries and is intended to qualify as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d).  As of the Effective Date, the Liquidating Trustee will be responsible for liquidating the assets of the Liquidating Trust.  The Liquidating Trustee shall commence his duties as Liquidating Trustee on the Effective Date for the purpose of carrying out all responsibilities and making distributions provided for under the Plan and Liquidating Trust Agreement.

**(i)      Beneficiaries.**

In accordance with Treasury Regulation Section 301.7701-4(d), the beneficiaries ("Beneficiaries") of the Liquidating Trust will be the Holders of all Allowed Claims against and, to the extent Allowed Claims are paid in full with interest, Allowed Interests in the Debtor.  The Holders of Allowed Claims will receive an allocation of the Liquidating Trust Assets as provided for in the Plan and the Liquidating Trust Agreement.  The Beneficiaries of the Liquidating Trust shall be treated as the grantors and owners of such beneficiaries' respective portion of the Liquidating Trust.

**(ii)      Implementation of the Liquidating Trust.**

On the Effective Date, the Debtor, on behalf of the Estate, and the Liquidating Trustee will be authorized and directed to, and will execute the Liquidating Trust Agreement in substantially the form attached as Exhibit "3" to the Plan, take all such actions as required to transfer from the Debtor and the Estate the Debtor's Assets (except as specifically set forth herein).  From and after the Effective Date, the Liquidating Trustee will be authorized to, and will take all such actions as required to implement the Liquidating Trust Agreement and the provisions of the Plan as are contemplated to be implemented by the Liquidating Trustee, including, without limitation, directing Distributions to Holders of Allowed Claims, objecting to Claims, prosecuting or

1    otherwise resolving Estate Causes of Action and D&O Claims, and causing Distributions from the

2    Liquidating Trusts to be made to the Beneficiaries.

3    **(iii)    Transfer of Debtor's Assets.**

4    On the Effective Date, pursuant to the Plan and sections 1123, 1141 and 1146(a) of the

5    Bankruptcy Code, the Debtor is authorized and directed to transfer, grant, assign, convey, set over,

6    and deliver to the Liquidating Trustee all of that Debtor's and its Estate's right, title and interest in

7    and to its Assets, including all Estate Causes of Action (and the Committee as to the D&O

8    Claims), free and clear of all liens, Claims, encumbrances or interests of any kind in such property,

9    except as otherwise expressly provided in the Plan.  To the extent required to implement the

10    transfer of the Debtor's Assets from the Debtor and its Estate to the Liquidating Trust, all Persons

11    will cooperate with the Debtor and the Estate to assist the Debtor and the Estate to implement said

12    transfers.

13    **(iv)    Representative of the Estate.**

14    The Liquidating Trustee will be appointed as the representative of the Estate pursuant to

15    sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code and as such will be vested with

16    the authority and power (subject to the Liquidating Trust Agreement) to inter alia: (i) object to

17    Claims against and Equity Interests in the Debtors; (ii) administer, investigate, prosecute, settle

18    and abandon all Estate Causes of Action and D&O Claims assigned to the Liquidating Trust; (iii)

19    make Distributions provided for in the Plan, including, but not limited to, on account of Allowed

20    Claims; and (iv) take such action as required to administer, wind-down, and close the Chapter 11

21    Case.  As the representative of the Estate, the Liquidating Trustee will be vested  with all of the

22    rights and powers of the Debtor and the Estate (including the Committee under the Committee

23    Standing Order) with respect to all Estate Causes of Action and D&O Claims assigned and

24    transferred to the Liquidating Trust, and the Liquidating Trustee will be substituted in place of the

25    Debtor, the Estate and the Committee, as applicable, as the party in interest in all such litigation

26    pending as of the Effective Date.

27    ///

28

LANDAU
GOTTFRIED
& BERGER LLP

**3.    No Liability of Liquidating Trustee or Post-Confirmation Committee.**

To the maximum extent permitted by law, the Liquidating Trustee, its employees, officers, directors, agents, members, or representatives, or professionals employed or retained by the Liquidating Trustee (the "Liquidating Trustee's Agents"), the members of the Post-Confirmation Committee (as defined below), and their employees, officers, directors, agents, members, or representatives, or professionals employed or retained, will not have or incur liability to any Person for an act taken or omission made in good faith in connection with or related to the administration of the Liquidating Trust Assets, the implementation of the Plan and the Distributions made thereunder or Distributions made under the Liquidating Trust Agreement. The Liquidating Trustee, the Liquidating Trustee's Agents, the members of the Post-Confirmation Committee, and their employees, officers, directors, agents, members, or representatives, or professionals employed or retained will in all respects be entitled to reasonably rely on the advice of counsel with respect to their duties and responsibilities under the Plan and the Liquidating Trust Agreement. Entry of the Confirmation Order constitutes a judicial determination that the exculpation provision contained in Section XI.A of the Plan is necessary to, inter alia, facilitate Confirmation and feasibility and to minimize potential claims arising after the Effective Date for indemnity, reimbursement or contribution from the Estate, or the Liquidating Trust, or their respective property. The Confirmation Order's approval of the Plan will also constitutes a res judicata determination of the matters included in the exculpation provisions of the Plan. Notwithstanding the foregoing, nothing herein or in Section XI.A of the Plan will alter any provision in the Liquidating Trust Agreement that provides for the potential liability of the Liquidating Trustee to any Person.

**4.    Prosecution Of Estate Causes Of Action and D&O Claims By The Liquidating Trustee or the Post-Confirmation Committee.**

Pursuant to the Confirmation Order, on the Effective Date, the Debtor and (with respect to the D&O Claims) the Committee, irrevocably assign, transfer and convey to the Liquidating Trust all property of the Estate, including, but not limited to, all Estate Causes of Action and the D&O Claims. Subject to the provisions of Section V.B.1 of the Plan, the Liquidating Trustee shall have

the power and authority to prosecute, compromise or otherwise resolve any and all such Estate

Causes of Action and D&O Claims, with all recoveries derived therefrom to be included within

Available Cash..

Therefore, the Estate Causes of Action described in <u>Exhibit E</u> (potential preference

payments), <u>Exhibit</u> F (litigation against third parties and D&O Claims), Exhibit G (potential D&O

Claims) and the pending litigation claims described on <u>Exhibit D</u> will be investigated and may be

prosecuted by the Liquidating Trustee thereafter.  Additionally, the Liquidating Trustee will

investigate and may object to Claims after the Effective Date.  The Debtor, and its Professional

Persons have made a diligent effort to identify in <u>Exhibits</u> D, E and F to this Disclosure Statement,

all Estate Causes of Action (other than objections to Claims) and, with the Committee, as to D&O

Claims.  However, no reliance should be placed on the fact that a particular Estate Cause of Action

or D&O Claim is or is not identified in <u>Exhibits</u> D, E, F or G.  The Post-Confirmation Committee

or the Liquidating Trustee may seek to investigate, file and prosecute Estate Causes of Action or

D&O Claims after the Effective Date of the Plan, whether or not the Estate Causes of Action or

D&O Claims are identified in the Disclosure Statement.

Neither the Debtor, the Committee, nor the Liquidating Trustee waives, relinquishes, or

abandons any right or cause of action which constitutes property of the Debtor's Estate, whether or

not such right or cause of action is an Estate Cause of Action or D&O Claim, has been listed or

referred to in the Schedules or in this Disclosure Statement and whether or not such right or cause

of action is currently known to the Debtor or the Liquidating Trustee.  The Debtor submits that the

reservation of Estate Causes of Action and D&O Claims herein is sufficient to preserve such Estate

Causes of Action and D&O Claims and shall not give rise to any release, waiver, extinguishment,

forfeiture or other impairment of any Estate Cause of Action or D&O Claim against any party, nor

shall same subject the Estate, the Committee, or the Liquidating Trustee to any claims or defenses

of res judicata, equitable estoppel or any other similar doctrines or theories in connection with any

of the D&O Claims or Estate Causes of Action.

///

LANDAU
GOTTFRIED
& BERGER LLP

**(a)    Issuance And Execution Of Plan Related Documents And Corporate Action.**

Pursuant to Section V.B.F of the Plan, as of the Effective Date, the Liquidating Trustee will be authorized to execute such amendments, modifications, supplements, and other documents as provided for in the Plan. From and after the Effective Date, the Debtor shall be dissolved and the Liquidating Trustee shall be authorized to take all action necessary to dissolve the Debtor. On the Effective Date, the employment, retention, appointment and authority of all Officers, Directors, Employees and Professionals of the Debtor and the Committee shall be deemed to terminate.

**(b)    Cancellation/Surrender of Debentures and Related Agreements.**

As of the Effective Date, (a) the Indentures, Declarations of Trust, Debentures, Trust Securities and Guarantee Agreements shall be terminated, and neither the Debtor nor the other parties thereto shall have any further rights or obligations thereunder, except that each Indenture and each Declaration of Trust shall continue to be effective for the following: (a) allowing a holder of an Allowed Class 4 Claim, including the Indenture Trustees and Statutory Business Trustees, holders of Debenture and Capital Securities to receive a distribution provided for under this Plan and the provisions related to distributions in such documents; (b) the right of an Indenture Trustee to exercise a charging lien against the recovery otherwise due to a holder of an Allowed Class 4 Claim as provided for under the Indentures for the payment of any Indenture Trustee Fees that remain outstanding, or for indemnification as provided under the Indenture and/or Declaration of Trust; and (c) the right of an Indenture Trustee to continue to serve on the Post-Confirmation Committee after the Effective Date and to be compensated therefor pursuant to the terms of the Indentures. Notwithstanding the termination of the Indentures and Declarations of Trust, the provisions of such documents shall govern the relationships of the Indenture Trustees and holders of the Debentures, and the Statutory Trustees and the holders of the Capital Securities, respectively.

Following the Effective Date, holders of Allowed Class 4 Claims will receive from the Indenture Trustees or their designees specific instructions regarding the time and manner in which the Debentures are to be surrendered. Pending such surrender, such Debentures will be deemed

cancelled and shall represent only the right to receive the distributions to which the holder is entitled

under this Plan.

### 5.    Provision For Allowance Of the Indenture Trustee Claims.

As set forth in further detail in Section IV.A. of the Plan, a beneficial owner of the

Debentures of record as of January 22, 2010 (the "Record Date") shall, for purposes of

distributions under the Plan, be deemed to have an Allowed Class 4 Claim for the outstanding

principal amount of the Debentures owned by such beneficial owner plus accrued and unpaid

interest as of the Petition Date, and need not file a proof of claim with respect thereto, subject to

the aggregate amount of Allowed Class 4 Claims as provided for in the Plan.

With respect to distributions to be made to holders of the Debentures classified in Class 4,

the Indenture Trustees shall (i) be the Disbursing Agent, (ii) receive the consideration to be paid to

holders of Indenture Securities under the Indentures as Indenture Trustees for the respective

Indentures which are classified as Allowed Class 4 Claims; (iii) be responsible for making

distributions to holders of Allowed Class 4 Claims arising from such Debentures; and (iv) be

authorized to deduct the Indenture Trustee Claims from the consideration provided to holders of

Allowed Class 4 Claims to the extent so provided for in the Indentures.

### 6.    Establishment Of The Post-Confirmation Committee.

As set forth in Section VI of the Plan, until the Effective Date, the Committee shall

continue in existence.  As of Effective Date, the Committee shall terminate and disband.   As

provided in the Plan and Liquidating Trust Agreement, as of the Effective Date, there will be

formed a committee for the Liquidating Trust (the "Post-Confirmation Committee") that will have

consultation, approval and information rights with respect to the Liquidating Trust as set forth in

the Liquidating Trust Agreement.  The members of the Post-Confirmation Committee will be those

members of the Committee who wish to continue to serve.  Ten days prior to the Confirmation

Hearing, the Committee shall file with the Bankruptcy Court and serve on those requesting notice

pursuant to Bankruptcy Rule 2002 a notice of the selection of the Post-Confirmation Committee

members, which notice will name the members of the Post-Confirmation Committee.

As set for the in Section VI.B of the Plan, the Post-Confirmation Committee will prescribe their own rules of procedure and bylaws; provided, however, that such rules of procedure and bylaws will not be inconsistent with the terms of the Plan or the Liquidating Trust Agreement. Pursuant to Section II.F.2 of the Liquidating Trust Agreement, the Plan Trustee will consult with the Post-Confirmation Committee on all material matters including but not limited to:  (a)  the investment of cash and cash equivalents constituting Liquidating Trust Assets that do not comply with Section 345 of the Bankruptcy Code;  (b)  the purchase of proposed policies of insurance insuring the Liquidating Trust Assets or providing insurance coverage for the Trustee, Post-Confirmation Committee and their respective agents and representatives against claims and losses;  (c)  settlements of Claims, Estate Causes of Action or D&O Claims where the amount in controversy equals or exceeds $250,000; (d)  the employment of professionals to assist the Trustee with respect to its responsibilities; (e)  expenditures or the incurrence of liabilities or expenses by the Trustee or Liquidating Trust to any one vendor other than the Trustee's professionals exceeding $50,000 in a single transaction or $150,000 in a series of related transactions; (f)  the abandonment of material assets by the Trustee; and (g)  Claims and the pursuit of Estate Causes of Action or D&O Claims. Additionally, pursuant to Section II.F.3 of the Liquidating Trust Agreement, the Post-Confirmation Committee shall have the absolute right and power to determine the following; (a) to negotiate all modifications to the terms of the employment of the Trustee; (b) to require, at its discretion, the Trustee to post a bond or provide evidence of adequate insurance to ensure the faithful performance of the Trustee's obligations hereunder; and (c) to select a successor Trustee when a successor is required hereunder; and (d) to approve amendments to or waivers of any provisions of this Agreement.

Except for the reimbursement of reasonable actual costs and expenses in connection with their duties as members of the Post-Confirmation Committee, the members of the Post-Confirmation Committee will serve without compensation.  Reasonable expenses incurred by members of the Post-Confirmation Committee may be paid by the Liquidating Trust, as appropriate, without need for Bankruptcy Court approval.  Reasonable expense may include reimbursement of the fees and costs of attorneys to each member, including the payment of

Indenture Trustee Fees as provided for in the Plan, subject to such parameters as determined by the Post-Confirmation Committee and which parameters are agreed to by the Liquidating Trustee.

The Post-Confirmation Committee will have no authority to employ, at the expense of the Liquidating Trust, counsel or any other professionals, except upon petition to and approval by the Bankruptcy Court for cause shown.  The Post-Confirmation Committee and its members will not be liable for any act any member may do or fail to do as a member of the Post-Confirmation Committee while acting in good faith and in the exercise of the member's best judgment.  No member of the Post-Confirmation Committee will be liable in any event for claims, liabilities or damages unless they arise from such member's personal gross negligence or willful misconduct.

## 7.    Resolution of Disputed Claims.

As set forth in Section IV of the Plan, after the Effective Date and subject to the provisions of the Plan and Liquidating Trust Agreement, the Liquidating Trustee will review all Claims and determine if any grounds exist to object to such Claims.  Only Allowed Claims will be paid. Distributions relating to Disputed Claims will be placed into the Disputed Claims Reserve until such time as such Disputed Claim is adjudicated or otherwise settled.  Any Disputed Claim that becomes an Allowed Claim after the Effective Date will be paid from the Disputed Claims Reserve.  If such Disputed Claim fails to become an Allowed Claim, money placed in the Disputed Claims Reserve on behalf of such Disputed Claim shall be deemed to be Available Cash and shall be distributed to holders of Allowed Class 3 Claims, and if appropriate under the Plan, Allowed Class 4 Claims.

Additionally, any Claims filed by the Debtor's officer and directors seeking indemnification from the Debtor pursuant to employment agreements, by-laws or otherwise, shall be channeled, subject to any defenses thereto and 11 U.S.C. 510(b) & (c), to the Debtor's applicable 2008 and 2009 directors' and officers' insurance policies including but not limited to: (a) Lexington Directors and Officers Insurance and Company Reimbursement Policy, Policy No. 001621301; (b) XL Specialty Insurance Excess Directors and Officers, Policy No. ELU109215-08; (c) AIG (National Fire) Executive Liability, Policy No. 734-17-82; (d) AIG (National Fire) Executive Liability, Policy No. 00-734-17-82, (e) St. Paul (Traveler's) SelectOne for Community

LANDAU
GOTTFRIED
& BERGER LLP

1  Banks, Policy No. EC06100041, and (f) St. Paul (Traveler's) SelectOne for Community Banks,

2  Policy No. EC06100041.

3                   **8.       Distributions Under The Plan.**

4                        **(a)       General Provisions.**

5          Except as otherwise provided herein, or as may be ordered by the Bankruptcy Court,

6  distributions to be made on the Effective Date on account of Allowed Claims, other than Allowed

7  Class 3 Claims and Allowed Class 4 Claims, shall be made on the Effective Date or as soon as

8  practicable thereafter.  Each Holder of an Allowed Class 3 Claim shall receive, as soon as

9  practicable in the discretion of the Liquidating Trustee, a Pro Rata Share of the Available Cash (the

10  "Initial Class 3 Distribution").  Each Holder of a Class 4 Claim shall be allocated a Pro Rata share

11  of each Distribution available to Holders of Class 3 Claims; provided, however, that the amount of

12  distributions to Holders of Allowed Class 4 Claims, subject to Section II.C(4)(c), shall be paid (i)

13  first on account of unpaid Indenture Trustee Fees, and (ii) second on account of the Allowed

14  FTBN Claim, until such time as the Allowed FTBN Claim is satisfied in full, after which time

15  distributions to Holders of Allowed Indenture Trustee Claims shall be made.  Notwithstanding the

16  above, no distributions will be made on a Claim unless it is an Allowed Claim or in the case of a

17  Disputed Claim an order of the Bankruptcy Court has been entered estimating the Claim for

18  purposes of distribution; and, provided further, however, distributions on Allowed Claims may be

19  delayed as a result of, or the allowance or estimation of, Disputed Claims, or the expiration of time

20  for filing a proof of claim.

21                   **(b)       Delivery of Distributions, Address of Holder.**

22          For purposes of all notices and distributions under the Plan, the Liquidating Trustee shall

23  be entitled to rely on the name and address of the Holder of each Claim as shown on, and

24  distributions to Holders of Allowed Claims shall be made by regular U.S. first class mail to, the

25  following addresses: (a) at the addresses set forth in the proofs of Claim Filed by such Holders; (b)

26  at the addresses set forth in any written notices of address change delivered to the Debtor or to the

27  Liquidating Trustee after the date on which any related proof of Claim was Filed; or (c) the address

28  reflected on the Schedules if no proof of Claim or proof of Equity Interest is Filed and the Debtor

1    or the Liquidating Trustee has not received a written notice of a change of address.  The

2    Liquidating Trustee shall be under no duty to attempt to locate Holders of Allowed Claims who are

3    entitled to unclaimed distributions.

4                    **(c)    Record Date.**

5            Pursuant to Bankruptcy Rule 3021, on the Record Date, the transfer ledgers for the

6    Indentures and the Equity Interests shall be closed, and there shall be no further changes in the

7    holders of record of such securities.  The Liquidating Trustee shall not recognize any transfer of

8    such securities occurring after the Record Date, but shall instead be entitled to recognize and deal

9    for all purposes with only those holders of record stated on the applicable transfer ledgers as of the

10    Record Date.

11                **9.    Conditions Precedent.**

12            The Plan provides that it will not become effective until the Confirmation Order has been

13    entered on the docket of the Bankruptcy Court and no stay of the Confirmation Order is in effect,

14    unless this condition has been waived in writing by the Liquidating Trustee.

15                **10.    Retention Of Jurisdiction.**

16            The Plan provides for the retention by the Bankruptcy Court of jurisdiction over the

17    Chapter 11 Case as specified in the Plan.

18                **11.    Effective Date.**

19            The Effective Date is the first date that the Plan becomes effective under Section IX.A. of

20    the Plan.

21            **12.    Amendment, Modification Or Revocation Of The Plan.**

22            Prior to the Effective Date, the Plan may be altered, amended, or modified pursuant to

23    section 1127 of the Bankruptcy Code solely upon the mutual agreement between the Debtor and

24    the Committee, unless the other party has withdrawn as a proponent of the Plan.  After the

25    Effective Date, the Liquidating Trustee shall have the sole authority and power to alter, amend, or

26    modify the Plan pursuant to section 1127 of the Bankruptcy Code.

27            The Debtor and the Committee reserve the right to jointly revoke or withdraw the Plan

28    prior to the Confirmation Date.  If the Debtor or the Committee withdraws as a proponent of the

1    Plan prior to the Confirmation Date, the other may seek approval as the sole proponent of the Plan.

2    If the Debtor and Committee jointly revoke the Plan prior to the Confirmation Date or if the

3    Confirmation Date or the Effective Date does not occur, then the Plan shall be deemed null and

4    void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of

5    any claims by or against the Debtor or its Estate or any other person or to prejudice in any manner

6    the rights of the Debtor, the Debtor or its Estate or any person in any further proceedings involving

7    the Debtor.

8                    **13.    Post Confirmation Notice.**

9            From and after the Effective Date, any person who desires notice of any pleading or

10    document filed in the Bankruptcy Court, or any hearing in the Bankruptcy Court, or other matter as

11    to which the Bankruptcy Code requires notice to be provided, shall file a request for post-

12    confirmation notice and shall serve the request on the Liquidating Trustee; provided, however, the

13    OUST, counsel to the Debtor and the Committee shall be deemed to have requested post-

14    confirmation notice.

15    **V.    EFFECT OF PLAN CONFIRMATION**

16            **A.    Preservation of Rights of Action.**

17            Except to the extent any rights, claims, causes of action, defenses, and counterclaims are

18    expressly and specifically released in connection with the Plan or in any settlement agreement

19    approved during the Chapter 11 Case: (i) any and all Estate Causes of Action and D&O Claims

20    vesting with the Liquidating Trust under the Plan shall remain Liquidating Trust Assets, whether

21    or not litigation relating thereto is pending on the Effective Date, and whether or not any such

22    Estate Causes of Action or D&O Claims have been listed or referred to in this Plan, this Disclosure

23    Statement, or any other document filed with the Bankruptcy Court, and (ii) except with respect to

24    requirements affecting the Debtor under the Committee Standing Order, neither the Debtor's

25    Estate nor the Committee waives, releases, relinquishes forfeits, or abandons (nor shall either be

26    estopped or otherwise precluded or impaired from asserting) any D&O Claim or Estate Cause of

27    Action that constitutes property of the Debtor's Estate: (a) whether or not such D&O Claim or

28    Estate Cause of Action has been listed or referred to in the Plan, this Disclosure Statement, or any

other document filed with the Bankruptcy Court, (b) whether or not such Estate Cause of Action or D&O Claim is currently known to the Debtor, the Committee or the Liquidating Trustee, and (c) whether or not a defendant in any litigation relating to such Estate Cause of Action or D&O Claim filed a proof of claim in the Chapter 11 Case, filed a notice of appearance or any other pleading or notice in the Chapter 11 Case, voted for or against this Plan, or received or retained any consideration under this Plan.

**B.    No Liability For Solicitation Or Participation.**

As specified in section 1125(e) of the Bankruptcy Code, persons who solicit acceptances or rejections of the Plan and/or who participate in the offer, issuance, sale, or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, are not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

**VI.    CONFIRMATION PROCEDURE**

HOLDERS OF IMPAIRED CLAIMS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN (INCLUDING THE EXHIBITS THERETO) IN ITS ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

In order for the Plan to be confirmed by the Bankruptcy Court, all of the applicable requirements of section 1129 of the Bankruptcy Code must be met.  These include, among others, the requirements that the Plan: (i) is accepted by all impaired classes of Claims; (ii) is feasible; and (iii) is in the "best interest" of Holders of Claims and Equity Interests in each class impaired under the Plan.

The Plan and the Disclosure Statement were filed with the Bankruptcy Court and, after notice and a hearing, the Bankruptcy Court approved the Disclosure Statement.  The Plan, the Disclosure Statement, Ballots, and other solicitation materials approved by the Bankruptcy Court were distributed to all known holders of impaired Claims in the Voting Classes.  A Confirmation Hearing with respect to the Plan is scheduled to commence as set forth in the Confirmation Notice included in the solicitation materials and served on all creditors and parties in interest.  At the

confirmation hearing, the Debtor will request the Bankruptcy Court to confirm the Plan on the

basis that all confirmation requirements have been satisfied.

### A.    Voting; Acceptance.

Any Holder of a Claim in an impaired Class is entitled to vote if either (i) such Holder's

Claim has been scheduled by the Debtor in the Schedules filed with the Bankruptcy Court

(provided that such Claim has not been scheduled as disputed, contingent, unknown, or

unliquidated), or (ii) such Holder has filed a proof of Claim on or before the deadline previously

fixed by the Bankruptcy Court and such Claim is deemed allowed pursuant to section 502 of the

Bankruptcy Code or has been allowed by the Bankruptcy Court, unless such Claim has been

disallowed for voting purposes by the Bankruptcy Court, or is allowed under the Plan.  The Record

Date for determining which Holders of the Debentures and Trust Securities is a "Record Holder,"

will be January 22, 2010.  A vote may be disregarded if the Bankruptcy Court determines, after

notice and a hearing, that an acceptance or rejection was not solicited or procured or made in good

faith or in accordance with the provisions of the Bankruptcy Code.

The Voting Classes of Claims will be deemed to have accepted the Plan if the Plan is

accepted by Holders of at least two-thirds in dollar amount and more than one-half in number of

the Claims of such Class (excluding certain Claims designated under section 1126(e) of the

Bankruptcy Code) that will have voted to accept or reject the Plan.

THE INDENTURE TRUSTEES ARE NOT PERMITTED TO VOTE ON BEHALF OF

THE HOLDERS OF THE DEBENTURES.  FOR PURPOSES OF VOTING, THE BENEFICIAL

HOLDER OF A CAPITAL SECURITY AND A DEBENTURE DUE 2017 SHALL BE

TREATED AS THE HOLDER OF ITS RESPECTIVE SHARE OF INDENTURE TRUSTEE

CLAIMS AND SHALL BE ENTITLED TO VOTE WITH RESPECT TO THE PLAN.

CONSEQUENTLY, THE DEBTOR WILL SEND A BALLOT DIRECTLY TO SUCH

BENEFICIAL HOLDER AND SUCH BENEFICIAL HOLDER MUST SUBMIT ITS OWN

BALLOT IN ACCORDANCE WITH THE TERMS OF THE RELEVANT INDENTURES IN

ORDER FOR ITS VOTE TO COUNT.

LANDAU
GOTTFRIED
& BERGER LLP

1    Classes 3 and 4 are the only Voting Classes because Classes 1 and 2 are not impaired and

2   therefore are deemed to accept the Plan and Classes 5 and 6 are impaired but deemed to reject the Plan

3   because they will not receive a distribution under the Plan.

4         **B.    Confirmation Hearing.**

5         Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to

6   hold a hearing on confirmation of the Plan (the "Confirmation Hearing").  The Confirmation

7   Hearing may be postponed from time to time by the Bankruptcy Court without further notice

8   except for an announcement of the postponement made at the Confirmation Hearing.  Section

9   1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of

10  the Plan.  Objections must be made in writing, specifying in detail the name and address of the

11  person or entity objecting, the grounds for the objection, and the nature and amount of the Claim or

12  Equity Interest held by the objector, and otherwise complying with the requirements of the

13  Bankruptcy Rules and Local Bankruptcy Rules.  Objections must be filed and served pursuant to

14  the Confirmation Notice in the manner set forth therein, on or before the time and date designated

15  in the Confirmation Notice as being the last date for serving and filing objections to confirmation

16  of the Plan.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND

17  FILED IN ACCORDANCE WITH THE CONFIRMATION NOTICE, IT MAY NOT BE

18  CONSIDERED BY THE BANKRUPTCY COURT.  AS SET FORTH IN THE

19  CONFIRMATION NOTICE, THE BANKRUPTCY COURT MAY NOT CONSIDER ANY

20  OBJECTIONS THAT ARE NOT TIMELY RAISED.

21       At the Confirmation Hearing, the Bankruptcy Court will determine, among other things,

22  whether the following confirmation requirements specified in section 1129 of the Bankruptcy

23  Code have been satisfied:

24             1.    The Plan complies with the applicable provisions of the Bankruptcy Code.

25             2.    The Debtor has complied with the applicable provisions of the Bankruptcy

26  Code.

27             3.    The Plan has been proposed in good faith and not by any means proscribed

28  by law.

1    4.    Any payment made or promised by the Debtor for services or for costs and

2    expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and

3    incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such

4    payment made before the confirmation of the Plan is reasonable or, if such payment is to be fixed

5    after the confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court

6    as reasonable.

7    5.    The Debtor has disclosed the identity and affiliations of any individual

8    proposed to serve, after confirmation of the Plan, as a director or officer of the Debtor, and the

9    appointment to, or continuance in, such office of such individual is consistent with the interests of

10   creditors and with public policy, and the Debtor has disclosed the identity of any insider that will

11   be employed or retained by the Debtor and the nature of any compensation for such insider.

12   6.    Each Holder of an impaired Claim and each Holder of Equity Interests

13   either has accepted the Plan or will receive or retain under the Plan on account of such Holder's

14   Claims or Equity Interests, as the case may be, property of a value, as of the Effective Date, that is

15   not less than the amount that such entity would receive or retain if the Debtor's Estate were

16   liquidated on such date under chapter 7 of the Bankruptcy Code.  See Section VI.D of the

17   Disclosure Statement entitled "Best Interests Test."

18   7.    Unless the Debtor proposes a nonconsensual plan of liquidation, each class

19   of Claims or Equity Interests has either accepted the Plan or is not impaired under the Plan.

20   8.    Except to the extent that the holder of a particular Claim has agreed to a

21   different treatment of such Claim, the Plan provides that Administrative Expenses and Other

22   Priority Claims will be paid in full on the Effective Date and that holders of Priority Tax Claims

23   will receive on account of such Claims payment in full on the Effective Date equal to the allowed

24   amount of such Claims.

25   9.    At least one impaired class of Claims has accepted the Plan, determined

26   without including any acceptance of the Plan by any insider holding a Claim in such class.

27   10.    The Plan contemplates the disposition of all of the assets of the Estate and

28   the distribution of the proceeds therefrom to holders of Allowed Claims and Allowed Equity

1    Interests in order of priority and as provided for in the Plan.  See Section VI.C of the Disclosure

2    Statement entitled "Feasibility."

3         The Debtor and the Committee believe that, upon acceptance of the Plan by the Voting

4    Classes, the Plan will satisfy all the statutory requirements of Chapter 11 of the Bankruptcy Code,

5    that the Debtor has complied or will have complied with all of the requirements of Chapter 11, and

6    that the Plan is being proposed and will be submitted to the Bankruptcy Court in good faith.

7         **C.    Feasibility.**

8         The Bankruptcy Code requires that, in order for the Plan to be confirmed by the

9    Bankruptcy Court, it must be demonstrated that consummation of the Plan is not likely to be

10   followed by the liquidation or the need for further financial reorganization of the Debtor, unless a

11   liquidation is contemplated by the Plan.  Here, the Plan contemplates the orderly sale or disposition

12   of all of the assets of the Debtor and the distribution of the proceeds therefrom in accordance with

13   the Plan.  The Debtor has prepared a Projection of the Available Cash (see <u>Exhibit</u> B hereto).

14   <u>Exhibit</u> B includes a detailed schedule of the sources and uses of Cash and property at the assumed

15   Effective Date.  The aggregate amount of cash required to be distributed (or reserved) under the

16   Plan as of the Effective Date is set forth in <u>Exhibit</u> B hereto.  The sources of funds for such cash

17   payments will be cash on hand at the Effective Date.  The Debtor believes that, based upon the

18   assumptions made, such available funds will be adequate to fund the Plan.

19        **D.    Best Interests Test.**

20        As referred to in subparagraph 6 of Section VI.B. above, confirmation of the Plan requires

21   that each Holder of an impaired Claim and each Holder of Equity Interests either (a) accepts the

22   Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date, that is

23   not less than the value such Holder would receive or retain if the Debtor's Estate were liquidated

24   under chapter 7 of the Bankruptcy Code.

25        The Debtor has determined that confirmation of the Plan will provide each Holder of a

26   Claim and each Holder of Equity Interests with a recovery that is not less than that which it would

27   receive pursuant to a liquidation of the Debtor under chapter 7 of the Bankruptcy Code.  This

28

LANDAU
GOTTFRIED
& BERGER LLP

determination is based upon a consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to such Holders.

Conversion of this case to one under chapter 7 at this stage would simply add another layer of administrative expenses which would only serve to diminish the distributions to all creditors in this case.  In a chapter 7 case, the chapter 7 trustee will incur fees and expenses of professionals that will be paid prior to any chapter 11 Claims.  Accordingly, the distributions to creditors will likely be larger under the Plan.  Moreover, initial distributions to creditors contemplated by the terms of the Debtor's Plan will be made quicker than any likely distribution that would be made by a Chapter 7 Trustee because a Chapter 7 Trustee will need an undetermined period of time to investigate and comprehend the assets, liabilities, and asserted Claims against the Debtor's Estate.

Based on the foregoing, the Debtor believes that the Plan satisfies the Best Interest Test and represents a preferred alternative to the costs and delays attendant to a chapter 7 case and the appointment of a chapter 7 trustee therein.

**E.    Risks.**

Because the final amount of monies that will be collected and the final amount of Allowed Administrative, Priority, Secured, General Unsecured Claims, and Indenture Trustee Claims have not yet been determined, the amounts for distribution to holders of Allowed Class 3 Claims and Allowed Class 4 Claims and the percentage that each holder of Allowed Class 3 Claims and Allowed Class 4 Claims may receive on account of its Allowed Claim could be less than the percentage estimated herein.

**VII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN OF REORGANIZATION**

The Debtor believes that the Plan affords Holders of Claims and Equity Interests the potential for the greatest feasible realization out of the Debtor's assets, and, therefore, is in the best interest of such holders.  The Debtor has considered alternatives to the Plan such as a liquidation in the context of a chapter 7 case.  In the opinion of the Debtor, such alternatives would not afford Holders of Claims or Equity Interests a return greater than that achieved under the Plan.

**A.    Liquidation Under Chapter 7.**

1    If no plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter

2    7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate

3    the Debtor's assets for distribution to creditors in accordance with the priorities established by the

4    Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the

5    recovery by holders of Claims and Equity Interests is set forth in Section VI.D of the Disclosure

6    Statement entitled "Best Interests Test."

7    **B.    Alternative Plan Of Liquidation.**

8    If the Plan is not confirmed, the Debtor could attempt to formulate a different plan.  With

9    respect to an alternative plan, the Debtor has explored various other alternatives in connection with

10   the extensive negotiation process involved in the formulation and development of the Plan, but

11   concluded that the Plan provides the best feasible recoveries attainable under the circumstances.

12   The Plan provides for an orderly disposition of the assets of the Estate on a timetable, and on

13   terms, which maximizes the value of the Estate.  Any alternative, liquidation under chapter 11 or

14   under chapter 7, is likely to result in a lower recovery.

15   THE DEBTOR AND THE COMMITTEE BELIEVE THAT CONFIRMATION AND

16   IMPLEMENTATION OF THE PLAN IS PREFERABLE TO ANY OF THE ALTERNATIVES

17   DESCRIBED HEREIN BECAUSE IT IS EXPECTED TO PROVIDE GREATER RECOVERIES

18   AND INVOLVE LESS DELAY AND UNCERTAINTY AND LOWER ADMINISTRATIVE

19   COSTS.

20   **VIII.   VOTING PROCEDURES**

21   The Debtor is providing copies of the Confirmation Notice, this Disclosure Statement, the

22   Plan, and/or Ballots or master ballots ("Master Ballots"), as applicable, to all known Holders of

23   impaired Claims in the Voting Classes, including registered holders as of the Record Date of the

24   Debentures (or, if applicable, to those holders who are listed as participants in a clearing agency's

25   position).  Registered holders may include brokerage firms, commercial banks, trust companies, or

26   other nominees (the "Nominees").  If such Nominees do not hold for their own account, they

27   should follow the procedures described in Section VIII.B below.  Any beneficial owner who has

28   not received a Ballot should contact such owner's Nominees, or write to the Debtor's Ballot

LANDAU
GOTTFRIED
& BERGER LLP

Tabulator.  Ballots must be returned to the Ballot Tabulator by no later than the Voting Deadline set forth in the Ballot.

### A.    Procedures For Tabulation Of Votes On The Plan.

Solely for purposes of voting to accept or reject the Plan, and not for the purpose of the allowance of, or distribution on account of, a Claim and without prejudice to the rights of the Debtor in any other context, the Debtor proposes that each Claim within the Voting Classes that is entitled to vote to accept or reject the Plan be temporarily allowed in accordance with the following rules (collectively, the "Tabulation Rules"):

1.    Ballots and Master Ballots that (a) fail to indicate an acceptance or rejection on the Ballot; or (b) indicate both an acceptance or rejection on the same Ballot, will not be accepted or counted by the Debtor in connection with the Debtor's request for confirmation of the Plan;

2.    Creditors shall not split their vote within a Claim; thus, each creditor shall be deemed to have voted the full amount of its Claims either to accept or reject the Plan;

3.    Original executed Ballot or Master Ballot is required.  Delivery of a Ballot or Master Ballot by facsimile, email or any other electronic means will not be accepted;

4.    If multiple Ballots or Master Ballots are received from or on behalf of an individual holder of a claim with respect to the same Claims prior to the Voting Deadline, the last Ballot timely received will be deemed to reflect the voter's intent and to supersede and revoke any prior Ballot;

5.    If a Claim for which a proof of claim has been timely filed is marked as contingent, unliquidated or disputed on the face of the proof of Claim, such Claim will be temporarily allowed for voting purposes in the amount of $1.00, unless otherwise ordered by the Court, after notice and a hearing;

6.    If a proof of Claim has been filed but such Claim is considered by the Debtor to be a Disputed Claim, such Disputed Claim will not be counted for purposes of voting on the Plan if the Debtor files an objection to such Disputed Claim no later than fourteen (14) days prior to the Voting Deadline, unless an order of the Bankruptcy Court is entered after notice and a

hearing temporarily allowing the Disputed Claim for voting purposes under Bankruptcy Rule 3018(a);

       7.    If a Claim holder identifies a Claim amount on its Ballot that is less than the amount otherwise calculated in accordance with the Tabulation Rules, the Claim will be temporarily allowed for voting purposes in the lesser amount identified on such Ballot; and

       8.    If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing.

      **B.**    **Special Provisions With Respect To Voting By Beneficial Owners Of The Indenture Securities.**

As stated above, the Indenture Trustees are not permitted to vote on behalf of the beneficial holders of the Debentures. Accordingly, the Debtor shall retain an appropriate noticing agent to (a) provide such beneficial holders (or their Nominees, if held in "street name") with copies of the Disclosure Statement, the Plan, Confirmation Notice and the Ballot ("Solicitation Package"), and (b) request that such Nominees (if held in "street name") distribute to such beneficial holders the Solicitation Package , and (c) such holders shall vote on the Plan in accordance with the terms of the relevant Indentures.

**IX.**    **CERTAIN FEDERAL INCOME TAX CONSEQUENCES**

    **A.**    **Introduction.**

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Holders of Class 3 Claims and Class 4 Claims. The following summary does not address the federal income tax consequences to Holders of any other Claims and Claims that are not Impaired by the Plan, or to Holders of Equity Interest. The following summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could

significantly affect the federal income tax consequences described below.  Further, any discussion

of the Liquidating Trust and the powers, obligations and/or actions of the Litigating Trustee that

may be set forth below is subject to the applicable provisions of the Plan and the Liquidating Trust

Agreement; if and to the extent that there is any inconsistency between such discussion on the one

hand and the Plan and the Liquidating Trust Agreement on the other hand, the terms of the latter

documents shall control.  Holders of Claims and Equity Interests should read the Plan and the

Liquidating Trust Agreement in their entirety.

        The federal income tax consequences of the Plan are complex and are subject to significant

uncertainties.  The Debtor has not requested a ruling from the IRS or an opinion of counsel with

respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the

interpretation that the IRS or a reviewing court might adopt.  In addition, this summary does not

address foreign, state or local tax consequences of the Plan, nor does it purport to address the

federal income tax consequences of the Plan to special classes of taxpayers (such as foreign

taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small

business investment companies, regulated investment companies, tax-exempt organizations,

investors in pass-through entities, Holders that hold Claims as part of a hedge, straddle or

conversion transaction, Holders who acquired their Claims as compensation, and Holders who do

not hold their Claims as capital assets).

        ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME

TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A

SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE

INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR

INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT

THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX

CONSEQUENCES APPLICABLE UNDER THE PLAN.

        TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, WE

INFORM YOU THAT (A) ANY WRITTEN UNITED STATES FEDERAL TAX ADVICE

CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENT) IS

LANDAU
GOTTFRIED
& BERGER LLP

1    NOT INTENDED AND WAS NOT WRITTEN TO BE USED, AND CANNOT BE USED, FOR

2    THE PURPOSE OF AVOIDING UNITED STATES FEDERAL TAX PENALTIES, (B) ANY

3    SUCH ADVICE WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF

4    THE TRANSACTION OR MATTER ADDRESSED HEREIN AND (C) ALL HOLDERS OF

5    CLAIMS AND/OR EQUITY INTEREST SHOULD SEEK ADVICE BASED ON THEIR

6    PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

7           **B.      Consequences to the Debtor**

8           As discussed below, under the Plan, the Debtor will be treated for U.S. federal income tax

9    purposes as transferring the Assets directly to the Holders of Allowed Class 3 Claims and Class 4

10   Claims, who will then be treated as transferring such assets to the Liquidating Trusts.

11   Accordingly, the Debtor's transfer of Assets may result in the Debtor recognizing gain or income,

12   depending in part on the value of such assets on the Effective Date and the adjusted basis of such

13   assets on the Effective Date.

14          **C.      Consequences to Holders of General Unsecured Claims**

15                 **1.      Recognition of Gain or Loss Generally**

16          Pursuant to the Plan, on the Effective Date, each Holder of an Allowed Class 3 Claim and

17   Class 4 Claim will receive an interest in the Liquidating Trust, which is a beneficial interest in the

18   Liquidating Trust, entitling the holder thereof to distributions from the Liquidating Trust as

19   provided for in the Plan and in the Liquidating Trust Agreement.  Except to the extent that the

20   holder of a Class 3 Claim, Class 4 Claim or beneficial interest agrees to a different treatment, said

21   Persons will receive on account of their Allowed Class 3 or 4 Claim, in full and complete

22   satisfaction thereof, from the Liquidating Trust, one or more Pro Rata Distributions of the

23   Available Cash based upon the amount of the respective Holder's Allowed Claim.  In general, each

24   holder of an Allowed Claim will recognize gain or loss in an amount equal to the difference

25   between (i) the sum of the amount of any Cash and the fair market value of any other property

26   (including, as discussed below, its undivided interest in the Liquidating Trust Assets) that such

27   holder receives in satisfaction of its Claim (other than in respect of any Claim for accrued but

28   unpaid interest, and excluding any portion required to be treated as imputed interest due to the

post-Effective Date Distribution of such consideration upon the resolution of Disputed Claims),

and (ii) such Holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid

interest).  For a discussion of the U.S. federal income tax consequences of any Claim for accrued

interest, see Section 2 below.

        As discussed below, the Liquidating Trust has been structured to qualify as a "grantor

trust" for U.S. federal income tax purposes.  Accordingly, each holder of an Allowed Claim

receiving a beneficial interest in the Liquidating Trust will be treated for U.S. federal income tax

purposes as directly receiving and as a direct owner of its allocable percentage of the Liquidating

Trust Assets (see section 3 below).  As set forth in the Liquidating Trust Agreement, as soon as

practicable after the Effective Date, and thereafter as may be required, the Liquidating Trustee (if

reasonably deemed necessary or desirable by the Liquidating Trustee) will make or have caused to

be made a good faith valuation of the Liquidating Trust Assets of the Liquidating Trust, and all

parties, including the Holders of Class 3 Claims, must consistently use such valuation for all

federal income tax purposes.

        Due to the possibility that a holder of an interest in the Liquidating Trust may receive more

than one Distribution subsequent to the Effective Date (due to the subsequent disallowance of

certain Disputed Claims or unclaimed Distributions), the imputed interest provisions of the IRC

may apply to treat a portion of such later Distributions to such holders as imputed interest.  In

addition, it is possible that any loss realized by a Holder in satisfaction of an Allowed Claim may

be deferred until all subsequent Distributions relating to Disputed Claims are determinable, and

that a portion of any gain realized may be deferred under the "installment method" of reporting.

Holders are urged to consult their tax advisors regarding the possibility for deferral, and the

potential ability to elect out of the installment method of reporting any gain realized in respect of

their Claims.

        After the Effective Date, any amount that a Holder receives as a Distribution from the

Liquidating Trust in respect of its beneficial interest therein (other than as a result of the

subsequent disallowance of Disputed Claims) should not be included for federal income tax

purposes in the Holder's amount realized in respect of its Allowed Claim, but should be separately

treated as a distribution received in respect of such Holder's beneficial (ownership) interest in the Liquidating Trust.

Where a Holder recognizes gain or loss in respect of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long it has been so held, whether the Holder had acquired the Claim at a market discount, and whether and to what extent the Holder had previously claimed a bad debt deduction.  A Holder that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC.  Under those rules, assuming that the Holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

In general, a Holder's tax basis in any beneficial interest received (and undivided interest in the Liquidation Trust Assets deemed owned) will equal the fair market value of its proportionate share of the Liquidating Trust Assets on the Effective Date.  The holding period for such assets generally will begin the day following the Effective Date.

## 2. Distributions in Payment of Accrued but Unpaid Interest

Distributions to any Holder of an Allowed Claim will be allocated first to the original principal portion of such Claim as determined for federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the portion of such Claim representing accrued but unpaid interest.  However, there is no assurance that the IRS would respect such allocation for federal income tax purposes.

To the extent a Holder of debt receives an amount of Cash or property in satisfaction of interest accrued during its holding period, such Holder generally recognizes taxable interest income in such amount (if not previously included in the Holder's gross income).  Conversely, a Holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.  Each Holder is urged to consult its tax advisor

1  regarding the allocation of consideration and the deductibility of unpaid interest for U.S. federal

2  income tax purposes.

3         **3.**      **Tax Treatment of the Liquidating Trust and Holders of Interests Therein**

4  On the Effective Date, the Liquidating Trust will be established for the benefit of Holders

5  of all Allowed Class 3 and Class 4 Claims and, to the extent all Allowed Claims are paid in full

6  with interest, Allowed Interests.  The Liquidating Trust is intended to qualify as a liquidating trust

7  for federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity but

8  rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity).

9  However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as

10  a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2

11  C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a

12  liquidating trust under a chapter 11 plan.  The Liquidating Trusts have been structured with the

13  intention of complying with such general criteria.  Pursuant to the Plan, and in conformity with

14  Revenue Procedure 94-45, all parties (including the Debtor, the Liquidating Trustee, and the

15  Beneficiaries of the Liquidating Trusts) are required for federal income tax purposes to treat the

16  Liquidating Trusts as grantor trusts of which the Persons receiving interests therein are the owners

17  and grantors.  The following discussion assumes that the Liquidating Trusts will be so respected

18  for U.S. federal income tax purposes.  However, no ruling has been requested from the IRS and no

19  opinion of counsel has been requested concerning the tax status of the Liquidating Trust as a

20  grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary

21  position.  If the IRS were to challenge successfully such classification, the federal income tax

22  consequences to the Liquidating Trust and the Beneficiaries could vary from those discussed

23  herein.

24  For all U.S. federal income tax purposes, all parties (including the Debtor, the Liquidating

25  Trustee, and the Beneficiaries) must treat the transfer of the Liquidating Trusts Assets to the

26  Liquidating Trust, in accordance with the terms of the Plan and the Liquidating Trusts Agreement,

27  as a transfer of such Liquidating Trusts Assets directly to the Beneficiaries, followed by such

28  Beneficiaries' transfer of the Liquidating Trust Assets to the Liquidating Trust.  Consistent

therewith, all parties must treat the Liquidating Trust as a grantor trust of which the Beneficiaries are the owners and grantors.  Thus, such Beneficiaries will be treated as the direct owners of their respective undivided interests in the Liquidating Trust Assets for all U.S. federal income tax purposes.  Each such Person will have a tax basis in its proportionate share of the Liquidating Trust Assets deemed owned equal to the fair market value thereof on the Effective Date.  As set forth in the Liquidating Trust Agreement, as soon as practicable after the Effective Date, and thereafter as may be required, the Liquidating Trustee will (if reasonably deemed necessary or desirable by the Liquidating Trustee) make or have caused to be made a good faith valuation of the Liquidating Trust Assets, and all parties, including the Beneficiaries, must consistently use such valuation for all federal income tax purposes.

Accordingly, except as discussed below (in connection with pending Disputed Claims), each holder of a Class 3 Claim and Class 4 Claim receiving a beneficial interest in the Liquidating Trust will be required to report on its U.S. federal income tax return its allocable share of any income, gain, loss, deduction, or credit recognized or incurred by the Liquidating Trusts, in accordance with its relative beneficial interest.   The character of items of income, deduction, and credit to any holder and the ability of such holder to benefit from any deduction or losses may depend on the particular situation of such holder.

The U.S. federal income tax reporting obligations of a Holder are not dependent upon the Liquidating Trust distributing any Cash or other proceeds.  Therefore, a Holder may incur a federal income tax liability with respect to its allocable share of the income of the Liquidating Trust regardless of the fact that the Holder has not received any prior or concurrent Distribution.  Other than in respect of Cash retained on account of Disputed Claims and subsequently distributed, the Liquidating Trust's Distribution of Cash to Beneficiaries generally will not be taxable to said Beneficiaries because they already are regarded for federal income tax purposes as owning the underlying Liquidating Trust Assets.

Subject to the Liquidating Trust Agreement, absent definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating

LANDAU
GOTTFRIED
& BERGER LLP

Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee will:

(i)      treat all Liquidating Trust Assets of each Liquidating Trust allocable to, or retained on account of, Disputed Claims, as a discrete trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of each Disputed Claim, in accordance with the trust provisions of the Code (sections 641 et seq. of the Code);

(ii)      treat as taxable income or loss of these separate trusts with respect to any given taxable year the portion of the taxable income or loss of the Liquidating Trust that would have been allocated to the holders of such Disputed Claims had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved);

(iii)      treat as a distribution from these separate trusts any increased amounts distributed by the Liquidating Trust as a result of any Disputed Claim resolved earlier in the taxable year, to the extent such distribution relates to taxable income or loss of these separate trusts determined in accordance with the provisions hereof, and

(iv)      to the extent permitted by applicable law, report consistently for state and local income tax purposes.

In addition, pursuant to the Liquidating Trust Agreement, all Beneficiaries are required to report consistently with such treatment.  Accordingly, subject to issuance of definitive guidance, the Liquidating Trustee will report on the basis that any amounts earned by these separate trusts and any taxable income of the Liquidating Trust allocable to them are subject to a separate entity level tax, except to the extent such earnings are distributed during the same taxable year.  Any amounts earned by or attributable to the separate trusts and distributed to a Beneficiary during the same taxable year will be includible in such Beneficiary's gross income.

### 4.    Withholding

All Distributions to Holders of Allowed Class 3 Claims and Class 4 Claims are subject to any applicable tax withholding, including employment tax withholding.  Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be

LANDAU
GOTTFRIED
& BERGER LLP

subject to "backup withholding" at the then applicable withholding rate (currently 28%).  Backup

withholding generally applies if the Holder (a) fails to furnish its social security number or other

taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report

interest or dividends, or (d) under certain circumstances, fails to provide a certified statement,

signed under penalty of perjury, that the TIN provided is its correct number and that it is not

subject to backup withholding.  Backup withholding is not an additional tax but merely an advance

payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons

are exempt from backup withholding, including, in certain circumstances, corporations and

financial institutions.

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL

PURPOSES ONLY.  ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO

CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL

AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## X.    FEES AND EXPENSES

The expenses of seeking acceptances of the Plan and of other aspects of Plan proceedings

have been and will be borne by the Debtor's Estate.  The solicitation has been and is being made

principally by mail.  Arrangements also have been or will be made with brokerage houses and

other custodians, nominees, and fiduciaries to forward this Disclosure Statement, Ballots, and

other pertinent materials to the beneficial holders of the Indenture Securities.  The Debtor has

reimbursed and will reimburse such forwarding agents for reasonable out-of-pocket expenses

incurred by them, but no compensation has been or will be paid for their services.

In addition to the foregoing, the estate is obligated to pay fees and reimburse expenses for the

various professionals employed in connection with the Chapter 11 Case to the extent such fees and

expenses are allowed by the Bankruptcy Court.

## XI.    SUMMARY OF ADDITIONAL SOURCES OF INFORMATION

Additional sources of information regarding the Debtor's Estate and documents relating to

the Plan are available to holders of Claims and Equity Interests.  The following is a summary of

certain documents and the places they can be reviewed or obtained:

LANDAU
GOTTFRIED
& BERGER LLP

1          A.      Both prior to and after the Petition Date, the Debtor filed documents with

2   the SEC in accordance with the informational requirements of the 1934 Act.  Copies of such

3   material can be obtained from the Public Reference Section of the Commission at 450 Fifth Street,

4   NW, Washington, D.C. 20549, at prescribed rates.  Certain of such material may be accessible via

5   online computer.

6          B.      Orders of the Bankruptcy Court and related papers pertaining to transactions

7   outside of the Debtor's ordinary course of business may be inspected at the office of the Clerk of

8   the Bankruptcy Court located at 3420 Twelfth Street, Riverside, California 92501-3819.

9          C.      The Debtor's Schedules of Assets and Liabilities, Statement of Affairs, List

10  of Old Equity Security Holders, and Schedules of Executory Contracts and Unexpired Leases, as

11  amended, may be inspected at the office of the Clerk of the Bankruptcy Court located at 3420

12  Twelfth Street, Riverside, California 92501-3819.

13         D.      Periodic post-petition financial reports as filed with the OUST may be

14  inspected at the Office of the OUST located at 3685 Main Street, Suite 300, Riverside, California

15  92501.

16  ///

17  ///

18  ///

19  ///

20  ///

21

22

23

24

25

26

27

28

## XII.    RECOMMENDATION AND CONCLUSION

The Debtor and the Committee believe that confirmation and implementation of the Plan are preferable to any of the feasible alternatives because the Plan will provide substantially greater recoveries for holders of Claims.  Accordingly, the Debtor and the Committee urge holders of Claims in the Voting Classes to accept the Plan.

DATED: _1/6/2010_

DEBTOR AND DEBTOR-IN-POSSESSION
VINEYARD NATIONAL BANCORP

By: _____
Donald H. Pelgrim, Jr.
Executive Vice President and Chief
Administrative Officer

**SUBMITTED BY:**

LANDAU GOTTFRIED & BERGER LLP

By: _____
JON L.R. DALBERG
Attorneys for Debtor Vineyard National Bancorp

**EXHIBITS TO DISCLOSURE STATEMENT**

Exhibit "A" -  PLAN

Exhibit "B" -  PROJECTED AVAILABLE CASH ANALYSIS

Exhibit "C" -  HYPOTHETICAL CHAPTER 7 LIQUIDATION ANALYSIS

Exhibit "D" -  LIST OF PENDING LITIGATION CLAIMS

Exhibit "E"-   POTENTIAL PREFERENCE PAYMENTS

Exhibit "F" -  POTENTIAL THIRD PARTY ESTATE CAUSES OF ACTION

Exhibit "G" -  D&O CLAIMS COMPLAINT

LANDAU
GOTTFRIED &
BERGER LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT "A"**

**PLAN**

(See attached)

LANDAU
GOTTFRIED &
BERGER LLP

JON L. R. DALBERG (State Bar No. 128259)
RODGER M. LANDAU (State Bar No. 151456)
SHARON M. KOPMAN (State Bar No. 164449)
LANDAU GOTTFRIED & BERGER LLP
1801 Century Park East, Suite 1460
Los Angeles, California  90067
Telephone: (310) 557-0050
Facsimile: (310) 557-0056
jdalberg@lgbfirm.com
rlandau@lgbfirm.com
skopman@lgbfirm.com

Counsel for Vineyard National Bancorp

ROBERT A. JULIAN (State Bar No. 88469)
TODD J. DRESSEL (State Bar No. 220812)
WINSTON & STRAWN LLP
101 California Street, 39th Floor
San Francisco, California 94111-5802
Telephone No.: (415) 591-1000
Facsimile No.: (415) 591-1400
rjulian@winston.com
tdressel@winston.com

Counsel for the Official Committee of
Unsecured Creditors

UNITED STATES BANKRUPTCY COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

RIVERSIDE DIVISION

| | |
|---|---|
| In re<br><br>VINEYARD NATIONAL BANCORP,<br><br>        Debtor. | Case No.  6:09-bk-26401-RN<br><br>Chapter 11<br><br>**JOINT PLAN OF LIQUIDATION OF DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS** |

**TABLE OF CONTENTS**

Page

I.      DEFINITIONS AND RULES OF CONSTRUCTION .................................................. 1

        A.      Defined Terms. .......................................................................................... 1

        B.      Other Terms. ............................................................................................ 14

        C.      Computation of Time. ............................................................................. 14

        D.      Exhibits. ................................................................................................... 14

II.     CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
        INTERESTS ....................................................................................................... 14

        A.      Summary. ................................................................................................. 14

        B.      Unclassified Claims. ............................................................................... 15

                1.      Administrative Expense Claims. ................................................... 15

                        (a)     General. ............................................................................. 15

                        (b)     Deadlines For Filing Claims For Administrative Expenses. .......... 15

                                (i)     Pre-Effective Date Claims and Expenses. ........................... 15

                                (ii)    Indenture Trustee Fees. .................................................... 16

                                (iii)   Tax Claims. .................................................................... 17

                2.      Priority Tax Claims. ..................................................................... 17

        C.      Classification and Treatment ................................................................... 18

                1.      Class 1:  Other Priority Claims. ................................................... 18

                2.      Class 2:  Secured Claims. ............................................................. 18

                3.      Class 3:  General Unsecured Claims. ............................................ 18

                4.      Class 4:  Holders of Indenture Trustee Claims ............................ 19

                5.      Class 5:  Preferred Stock Interests. .............................................. 21

                6.      Class 6:  VNBC Common Stock Interests .................................... 21

III.    ACCEPTANCE OR REJECTION OF THE PLAN .................................................. 21

        A.      Voting Classes. ........................................................................................ 21

        B.      Voting Rights Of Holders Of Disputed Claims. ...................................... 21

# TABLE OF CONTENTS (CONT'D)

Page

C.  Acceptance By Impaired Classes..........................................................................22

D.  Presumed Acceptance Of The Plan.......................................................................22

IV.  PROVISIONS FOR TREATMENT OF DISPUTED, CONTINGENT, OR UNLIQUIDATED CLAIMS AND ADMINISTRATIVE EXPENSES...............................................................................................................22

A.  Allowance Of Claims Of Holders Of Record Of Indentures................................22

B.  Resolution Of Disputed Claims. ...........................................................................23

C.  Reserve for Disputed Claims. ...............................................................................23

V.  IMPLEMENTATION OF THE PLAN ............................................................................24

A.  Vesting Of Assets. ................................................................................................24

B.  Establishment of the Liquidating Trust.................................................................24

  1.  Beneficiaries. .............................................................................................25

  2.  Implementation of the Liquidating Trust...................................................25

  3.  Transfer of Debtor's Assets. ......................................................................25

  4.  Representative of the Estate. ......................................................................26

  5.  No Liability of Liquidating Trustee or Post-Confirmation Committee......26

  6.  Provisions Relating to Federal Income Tax Compliance. .........................27

C.  Prosecution Of Estate Causes Of Action\D&O Claims By The Liquidating Trustee or the Post- Confirmation Committee.......................................................27

D.  Issuance And Execution Of Plan Related Documents...........................................28

E.  Cancellation/Surrender of the Debentures And Related Agreements....................28

F.  Dissolution of the Debtor and Termination of Current Officers, Directors, Employees and Counsel. ......................................................................................29

VI.  THE COMMITTEE AND THE POST-CONFIRMATION COMMITTEE .....................29

A.  Establishment of Post-Confirmation Committee. .................................................30

B.  Governance. ..........................................................................................................30

C.  Compensation. ......................................................................................................30

D.  Professionals. ........................................................................................................31

# TABLE OF CONTENTS (CONT'D)

**Page**

E.  Limitation of Liability .......................................................................................31

F.  Dissolution. .......................................................................................................31

VII.  DISTRIBUTIONS UNDER THE PLAN. .....................................................................31

A.  In General. .........................................................................................................31

B.  Manner Of Payment Under The Plan. ...............................................................32

C.  Manner Of Distribution Of Other Property. .....................................................32

D.  Setoffs. ...............................................................................................................32

E.  Distribution Of Unclaimed Property. ................................................................32

F.  De Minimis Distributions. .................................................................................32

G.  Record Date. ......................................................................................................32

H.  Saturday, Sunday, Or Legal Holiday. ...............................................................33

1.  Delivery Of Distributions, Address Of Holder. ....................................33

VIII.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......................................33

A.  Assumption. .......................................................................................................33

B.  Assumption And Cure Payment Objection. .......................................................33

C.  Rejection. ...........................................................................................................35

D.  General. ..............................................................................................................35

E.  Insurance Policies ..............................................................................................35

IX.  EFFECTIVENESS OF THE PLAN ..............................................................................36

A.  Conditions Precedent. ........................................................................................36

B.  Notice Of Effective Date. ..................................................................................36

X.  RETENTION OF JURISDICTION ...............................................................................36

XI.  LIMITATION OF LIABILITY, RELEASES AND INJUNCTION ...............................38

A.  Exculpation. .......................................................................................................38

B.  Injunction Enjoining Holders of Claims against Debtor ...................................38

C.  Nondischarge of the Debtor. ..............................................................................39

**TABLE OF CONTENTS (CONT'D)**

**Page**

XII.  MISCELLANEOUS PROVISIONS .................................................................................. 39

    A.  Payment Of Statutory Fees. ........................................................................... 39

    B.  Preservation Of Rights Of Action. ................................................................. 40

    C.  Headings. ....................................................................................................... 40

    D.  Binding Effect. ............................................................................................... 41

    E.  Revocation Or Withdrawal. ........................................................................... 41

        1.  Right To Revoke. ................................................................................ 41

        2.  Effect Of Withdrawal Or Revocation. ................................................ 41

    F.  Governing Law. .............................................................................................. 41

    G.  Withholding, Reporting, And Payment Of Taxes. .......................................... 41

    H.  Other Documents And Actions. ...................................................................... 42

    I.  Modification Of The Plan. .............................................................................. 42

    J.  Notices. ........................................................................................................... 42

    K.  Severability of Plan Provisions. ..................................................................... 43

    L.  Successors And Assigns. ................................................................................. 43

    M.  Post-Confirmation Notice. ............................................................................. 43

1    Debtor and Debtor-in-Possession Vineyard National Bancorp ("Debtor") and Official

2    Committee of Unsecured Creditors (the "Committee") jointly propose the following Plan of

3    Liquidation (along with any amendments, supplements or exhibits hereto, collectively, the "Plan")

4    pursuant to section 1121(a) of the Bankruptcy Code for resolution of all Claims against and interests

5    in the Debtor and its Estate.  The Disclosure Statement In Support of the Debtor's and Official

6    Committee of Unsecured Creditors' Joint Plan of Liquidation (the "Disclosure Statement"), which

7    accompanies the Plan, discusses the Debtor's history, business, contracts, leases, results of

8    operations, resolution of material disputes, significant potential litigation, financial projections for

9    the liquidation and distribution of Debtor's remaining assets, and contains a summary and discussion

10    of the Plan.  Holders of Claims are encouraged to read the Disclosure Statement before voting to

11    accept or reject the Plan.

12    The Debtor and the Committee are joint proponents of the Plan.  The Debtor, following

13    solicitation, will seek the Bankruptcy Court's confirmation of the Plan.  No solicitation materials

14    other than the Disclosure Statement and any schedules, exhibits or letters attached thereto or

15    referenced therein have been authorized by the Debtor, the Committee or the Bankruptcy Court for

16    use in soliciting acceptances or rejections of the Plan.

17    **I.    DEFINITIONS AND RULES OF CONSTRUCTION**

18    **A.    Defined Terms.**

19    As used herein, the following terms have the respective meanings specified below (such

20    meanings to be equally applicable to both the singular and plural, and masculine and feminine forms

21    of the terms defined):

22    1.    "Administrative Claims Reserve" means Cash to be set aside for, and in an amount

23    sufficient to effect, payment of all Allowed Administrative Expenses, including all accrued

24    professional fee and expense claims, arising on or before the Effective Date and remaining to be paid

25    after the Effective Date.

26    2.    "Administrative Expense" means any cost or expense of administration of the

27    Chapter 11 Case under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without

28    limitation, any actual and necessary post-petition expenses of preserving the Estate, any actual and

1

EXHIBIT A

80

necessary post-petition expenses of administering and liquidating the Estate, all compensation or

reimbursement of expenses to the extent allowed by the Bankruptcy Court under sections 330, 331,

or 503 of the Bankruptcy Code, and any fees or charges assessed against the Estate under section

1930 of title 28 of the United States Code.

3.      "Allowed Claim" means, except as otherwise allowed or otherwise provided herein, a

Claim, proof of which was timely and properly filed or, if no proof of claim was filed, which has

been or hereafter is listed on the Debtor's Schedules as liquidated in amount and not disputed or

contingent, and, in either case, as to which no objection to the allowance thereof has been interposed.

Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Claim" shall not

include interest on such Claim accruing after the Petition Date.

4.      "Allowed Class ____ Claim" means an Allowed Claim in the Class specified.

5.      "Allowed FTBN Claim" means the deficiency on FTBN's secured claim.

6.      "Available Cash" means the Cash in the Liquidating Trust that is not otherwise

designated by the Liquidating Trustee as Cash to be used to satisfy Allowed Administrative Claims,

Allowed Priority Tax Claims, Allowed Secured Claims, Allowed Priority Non-Tax Claims, and

expenses of the Liquidating Trust or otherwise subject to a reserve established by the Liquidating

Trustee.

7.      "Assets" means all assets of the Debtor's Estate including "property of the estate" as

described in section 541 of the Bankruptcy Code and shall, without limitation, include Cash, Estate

Causes of Action, D&O Claims, securities, proceeds of insurance and insurance policies, all rights

and interests, all real and personal property, and all files, books and records of the Estate.

8.      "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1330,

as amended.

9.      "Bankruptcy Court" means the United States Bankruptcy Court for the Central

District of California, Riverside Division or, in the event such court ceases to exercise jurisdiction

over the Chapter 11 Case, such other court that exercises jurisdiction over the Chapter 11 Case.

10.      "Bankruptcy Rules" means, collectively, (i) the Federal Rules of Bankruptcy

Procedure, as amended from time to time, as applicable to the Chapter 11 Case, and (ii) the Local

1    Bankruptcy Rules applicable to cases pending before the Bankruptcy Court, as now in effect or

2    hereafter amended.

3         11.    "Bar Date Order" means the Order entered by the Bankruptcy Court on November 12,

4    2009,  approving the Debtor's *Notice Of Motion And Motion For Entry Of An Order (I) Establishing*

5    *Bar Dates For Filing Proofs Of Claim; And (Ii) Approving The Form And Manner Of Notice*

6    *Thereof* (Docket No. 72).

7         12.    "Beneficiaries" means the Holders of Claims or Equity Interests who are the

8    beneficiaries of the Liquidating Trust.

9         13.    "BNYMTC" means The Bank of New York Mellon Trust Company, N.A. in its

10    capacity as the Trustee of certain Statutory Trust Indentures.

11         14.    "Business Day" means any day which is not a Saturday, a Sunday, or a "legal

12    holiday" as defined in Bankruptcy Rule 9006(a).

13         15.    "Capital Securities" means those certain Capital Securities issued by the respective

14    Statutory Business Trusts.

15         16.    "Capital Security Holders" means the holders of Capital Securities.

16         17.    "Cash" means cash or cash equivalents.

17         18.    "Chapter 11 Case" means the case under chapter 11 of the Bankruptcy Code,

18    commenced by the Debtor on the Petition Date, styled "*In re Vineyard National Bancorp*" and

19    assigned Case No. 6:09-bk-26401-RN.

20         19.    "Claim" means (a) any right to payment from the Debtor's Estate, whether or not

21    such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured,

22    disputed, undisputed, legal, equitable, secured, or unsecured, or (b) any right to an equitable remedy

23    for breach of performance if such breach gives rise to a right of payment from the Debtor's Estate,

24    whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured,

25    unmatured, disputed, undisputed, secured, or unsecured.

26         20.    "Claims Bar Date" means January 7, 2010, which is the general deadline set pursuant

27    to the Bar Date Order or, in the case of a governmental unit under 11 U.S.C. § 502(b)(9), January 18,

28    2010.

21.     "Class" means one of the Classes of Claims or Classes of Equity Interests designated in Section II of the Plan.

22.     "Committee" means the Official Committee of General Unsecured Creditors as appointed pursuant to section 1102 of the Bankruptcy Code by the Office of the United States Trustee to serve in the Chapter 11 Case pursuant to the Notice of Appointment of Committee dated August 12, 2009 (Docket No. 24), as amended by the Notice dated September 10, 2009 (Docket No.41).

23.     "Committee Standing Order" means the *Order Vesting Official Committee of Unsecured Creditors with* Authority *and Standing to Investigate, Bring, Maintain and Settle Claims* entered on the docket of the Chapter 11 Case by the Bankruptcy Court on October 23, 2009 (Docket # 65).

24.     "Common Securities" means those certain Common Securities issued by each Statutory Business Trust.

25.     "Confirmation Date" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

26.     "Confirmation Hearing" means the hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of the Plan.

27.     "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

28.     "D&O Claims" means any and all causes of action or claims, whether known or unknown, liquidated or unliquidated, disputed or undisputed, fixed or contingent, against present and/or former officers, directors and shareholders of the Debtor or the Debtor's Estate relating to any matter, fact, circumstance, act, omission or other thing, the authority and standing to investigate, bring, maintain and settle to the fullest extent of such causes of action or claims were authorized and vested with the Committee pursuant to the Committee Standing Order, including, without limitation, the claims set forth in the "D&O Claims Complaint"

29.     "D&O Claims Complaint" means that certain Complaint for Avoidance of Fraudulent Transfers, Damages and Equitable Relief, a copy of which is attached as Exhibit "G" to the

4
EXHIBIT A
83

Disclosure Statement, as the same may be amended from time to time.

30.    "Debentures" means those debt securities issued pursuant to the Indentures.

31.    "Debtor" means Vineyard National Bancorp, a California corporation.

32.    "Debtor in Possession" means the Debtor when it is acting in the capacity of representative of the Estate in the Chapter 11 Case.

33.    "Declaration of Trusts" means collectively the VST I Declaration of Trust, VST II Declaration of Trust, VST III Declaration of Trust, VST IV Declaration of Trust, VST V Declaration of Trust, VST VI Declaration of Trust, VST VII Declaration of Trust, VST VIII Declaration of Trust, VST IX Declaration of Trust, and VST XI Declaration of Trust.

34.    "Disbursing Agent" means the Liquidating Trustee or any entity selected by the Liquidating Trustee to act as its agent in conducting the disbursements to Holders of Allowed Claims pursuant to the Liquidating Trust Agreement; provided, however, with respect to the distributions to be made to holders of Allowed Class 4 Claims, the respective Indenture Trustees shall be the Disbursing Agent.

35.    "Disclosure Statement" means that certain document entitled "*Disclosure Statement, Filed in Support of The Joint Plan of Liquidation of Debtor and Official Committee of Unsecured Creditors*" filed in the Chapter 11 Case, including the exhibits attached thereto, either in its present form or as it may be amended, modified or supplemented from time to time.

36.    "Disputed Claim" means any Claim (i) which is listed in the Schedules as unliquidated, disputed, contingent, and/or unknown and for which no proof of Claim has been filed; (ii) as to which a Proof of Claim has been filed and the dollar amount of such Claim is not specified in a fixed amount; or (iii) as to which the Debtor or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Plan and/or any order of the Bankruptcy Court, which objection or request for estimation has not been withdrawn or determined by a Final Order.

37.    "Disputed Claims Reserve" means the Cash to be set aside for, and in an amount sufficient to pay the required distribution under the Plan to, all Disputed Claims which have not been finally adjudicated as of the Effective Date and which may become Allowed Claims prior to the

Final Distribution Date.

38.    "Distribution(s)" means any transfer under the Plan of Cash or other property or instruments to a Holder of an Allowed Claim.

39.    "Effective Date" means the first date that the Plan becomes effective as provided under Section IX.A of the Plan.

40.    "Equity Interests" means any equity interest in the Debtor represented by VNBC Preferred Class C Stock, VNBC Preferred Class D Stock and VNBC Common Stock Interests.

41.    "Estate" shall mean with respect to the Debtor, the estate created by section 541(a) of the Bankruptcy Code upon the Petition Date.

42.    "Estate Cause of Action" shall mean any and all manner of causes of action, claims, obligations, suits, debts, judgments, demands, rights of offset or recoupment, damages (actual, compensatory or punitive), counterclaims or affirmative defenses,  whatsoever, whether in law or in equity including, but not limited to, the claims arising under or pursuant to sections 541 through 551, inclusive, and section 553, of the Bankruptcy Code, and objections to filed proofs of Claim but excluding the D&O Claims.

43.    "File," "Filed," "Files," or "Filing" means properly and timely filed with the Bankruptcy Court in the Chapter 11 Case, as reflected on the official docket of the Bankruptcy Court for the Chapter 11 Case, served on Persons, as such filing and service are required pursuant to the Bankruptcy Code, Bankruptcy Rules and/or order of the Bankruptcy Court.

44.    "Final Distribution Date" means the first Business Day on which any and all Disputed Claims have been resolved pursuant to a Final Order and all interests of the Estate in property and all Claims, Estate Causes of Action, D&O Claims and other rights to payment existing in favor of the Estate have been liquidated, reduced to Cash, and distributed *Pro Rata* to holders of Allowed Claims.

45.    "Final Order" means an order or judgment of the Bankruptcy Court or other applicable court as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending; or as to which any right to appeal, reargue, rehear, or

1    petition for certiorari shall have been waived in writing in form and substance satisfactory to the

2    Debtor and the Committee prior to the Effective Date, or the Liquidating Trustee after the Effective

3    Date, respectively, or, in the event that an appeal, writ of certiorari, reargument or rehearing thereof

4    has been sought, such order or judgment of the Bankruptcy Court or other applicable court shall

5    have been affirmed by the highest court to which such order or judgment was appealed or from

6    which reargument or rehearing was sought, or certiorari shall have been denied, and the time to take

7    any further appeal, petition for certiorari or move for reargument or rehearing shall have expired.

8        46.    "FTBN" means the first priority, senior secured lender, First Tennessee Bank,

9    National Association.

10        47.    "General Unsecured Claim" means any Claim that is not an Administrative Expense,

11    Priority Tax Claim or a Claim classified in Classes 1, 2 and 4.  General Unsecured Claims, include,

12    without limitation, unsecured obligations owing to vendors, deferred compensation claims by former

13    directors, the Allowed FTBN Claim, and unsecured Claims arising from the rejection of executory

14    contracts and unexpired leases.

15        48.    "Guarantee Agreements" means each of the Guarantee Agreements executed by and

16    between the Debtor and the respective Guarantee Trustees on behalf of the Capital Security Holders

17    of the respective Statutory Business Trusts.

18        49.    "Guarantee Trustees" means, collectively, the trustees of the ten (10) Guarantee

19    Agreements, including, U.S. Bank, Wilmington Trust, BNYMTC, and Wells Fargo.

20        50.    "Holder" means the owner of a Claim or Equity Interest against the Debtor.

21        51.    "Indentures" means, collectively, the Statutory Trust Indentures and the Junior

22    Subordinated Indenture.

23        52.    "Indenture Trustee Claims" means the Claims of the Indenture Trustees arising under

24    the Statutory Trust Indentures and the Junior Subordinated Indenture, respectively, including but not

25    limited to any Claim arising under any of the Guarantee Agreements or in any way arising from or

26    associated with the transactions relating to the issuance contemplated by and referred to in the

27    Statutory Trust Indentures and the Junior Subordinated Indenture, but excluding the Indenture

28    Trustee Fees.

53.    "Indenture Trustee Fees" means the claims for payment of the reasonable expenses, disbursements and advances (including the reasonable compensation, expenses and disbursements of their respective agents and counsel) incurred by the Indenture Trustees, whether accrued prior to or after the Petition Date, or prior to or after the Effective Date.

54.    "Indenture Trustees" means, collectively, the Statutory Trust Trustees and the Junior Subordinated Indenture Trustee.

55.    "Junior Subordinated Indenture" means the Indenture dated as of December 19, 2002 between Debtor and the Junior Subordinated Indenture Trustee authorizing the issuance of the Junior Subordinated Debentures Due December 26, 2017. .

56.    "Junior Subordinated Indenture Trustee" means U.S. Bank as successor Trustee to State Street Bank under the Junior Subordinated Indenture.

57.    "Liquidating Trust" means the trust created pursuant to the Plan, Confirmation Order, and the Liquidating Trust Agreement, and created for the benefit of Holders of all Allowed Claims. Except as otherwise expressly provided in the Plan, all of the Assets of the Debtors will be transferred to the Liquidating Trust on the Effective Date of the Plan.  The Liquidating Trust will continue and conclude the liquidation of such assets and the Debtor, including the resolution of all Estate Causes of Action and the D&O Claims, and make Distributions to the Holders of Allowed Claims and pay the expenses of the Liquidating Trust, all as provided in the Plan.

58.    "Liquidating Trust Agreement" means that certain liquidating trust agreement by and between the Debtor and the Liquidating Trustee to be entered into pursuant to the Plan and the Confirmation Order, substantially in the form included in Exhibit "3", as may be amended from time to time.

59.    "Liquidating Trust Assets" means any and all Assets of the Debtor and Estate, including Cash, Estate Causes of Action, D&O Claims, and other personal and real property, all of which shall be transferred or assigned to the Liquidating Trust on the Effective Date of the Plan, free and clear of any liens or claims that might otherwise have existed in favor of any party.

60.    "Liquidating Trustee" means Bradley D. Sharp of Development Specialists, Inc., or any other person approved by the Court as Liquidating Trustee, and any successor trustee(s)

1    appointed pursuant to the Liquidating Trust Agreement, that has the powers and responsibilities set

2    forth in the Plan, the Confirmation Order and the Liquidating Trust Agreement and in such capacity

3    shall act as a liquidator of the Debtor and its assets for the benefit of Holders of Allowed Claims

4    and Allowed Equity Interests.  Whenever the Liquidating Trustee is referred to herein, all such

5    references are qualified by the Liquidating Trustee's powers, rights and obligations as set forth in

6    the Liquidating Trust Agreement.

7         61.    "Other Priority Claim" means any Claim accorded priority in right of payment under

8    section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative

9    Expense.

10        62.    "Person" means any individual, corporation general partnership, limited partnership,

11   association, joint stock company, joint venture, estate, trust, government or any political

12   subdivision, governmental unit, official committee appointed by the Office of the United States

13   Trustee, unofficial committee of creditors, or other entity.

14        63.    "Petition Date" means July 21, 2009, the date on which the Debtor filed its voluntary

15   petition commencing the Chapter 11 Case.

16        64.    "Plan" means this chapter 11 plan of liquidation, including all exhibits hereto, either

17   in their present form or as they may be altered, amended, or modified from time to time.

18        65.    "Post-Confirmation Committee" shall have the meaning set forth in Section VI A.

19        66.    "Preferred Stock Interests" means VNBC Preferred Class C Stock and VNBC

20   Preferred Class D Stock.

21        67.    "Priority Tax Claim" means a Claim of a governmental unit of the kind specified in

22   section 507(a)(8) of the Bankruptcy Code.

23        68.    "Professional Person" means for purposes of this Plan, any professional person

24   employed by the Debtor or the Committee pursuant to sections 327 or 1103 of the Bankruptcy

25   Code.

26        69.    "Pro Rata," "Pro Rata Share," and "Pro Rata Basis" means, at any time, the

27   proportion that the face amount of a Claim in a particular Class or Classes bears to the aggregate

28   face amount of all Claims (including Disputed Claims, but excluding disallowed Claims) in such

Class or Classes; and "face amount," as used herein, means (a) when used in reference to a Disputed or disallowed Claim, the full stated liquidated amount claimed by the claimholder in any proof of claim timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicably bankruptcy law; and (b) when used in reference to an Allowed Claim, the allowed amount of such Claim.

70.     "Schedules" means the schedules of assets and liabilities, list of equity security holders, and statement of financial affairs filed by the Debtor as required by section 521(a)(1) of the Bankruptcy Code, Bankruptcy Rules 1007(a)(1) and(3) and (b)(1), and Official Bankruptcy Form Nos. 6 and 7, as amended from time to time.

71.     "Secured Claim" means (i) a Claim against the Debtor to the extent of the value, as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code, of any interest in property of the Estate securing such Claim, and (ii) the Indenture Trustee Claims to the extent of the lien of the Indenture Trustees under the Indentures on the proceeds distributed to holders of the Indentures under the Plan.

72.     "State Street Bank" means State Street Bank & Trust Co. of Connecticut, N.A. as former trustee under certain of the Statutory Trust Indentures until the assets of such entity were acquired by U.S. Bank in January 2003.

73.     "Statutory Business Trusts" means collectively VST I, VST II, VST III, VST IV, VST V, VST VI, VST VII, VST VIII, VST IX, and VST XI.

74.     "Statutory Trust Indentures" means (i) the Indenture between Debtor and trustee U.S. Bank (successor to State Street Bank), dated December 18, 2001, authorizing the issuance of Floating Rate Junior Subordinated Deferrable Interest Debentures due 2031; (ii) the Indenture between Debtor and trustee Wilmington Trust, dated December 19, 2002, authorizing the issuance of Floating Rate Junior Subordinated Debt Securities due 2033; (iii) the Indenture between Debtor and trustee Wilmington Trust, dated September 25, 2003, authorizing the issuance of Floating Rate Junior Subordinated Debt Securities due 2033; (iv) the Indenture between Debtor and trustee Wilmington Trust, dated December 19, 2003, authorizing the issuance of Floating Rate Junior Subordinated Debt Securities due 2034; (v) the Indenture between Debtor and trustee JP Morgan

Chase Bank, succeeded by BNYMTC, dated March 25, 2004, authorizing the issuance of Junior

Subordinated Debt Securities due April 6, 2034; (vi) the Indenture between Debtor and trustee JP

Morgan Chase Bank, succeeded by BNYMTC, dated May 18, 2004, authorizing the issuance of

Junior Subordinated Debt Securities due July 23, 2034; (vii) the Indenture between Debtor and

trustee Wells Fargo Bank, N.A., dated December 22, 2004, authorizing the issuance of Floating

Rate Junior Subordinated Debt Securities due 2034; (viii) the Indenture between Debtor and trustee

Wilmington Trust, dated April 15, 2005, authorizing the issuance of Floating Rate Junior

Subordinated Debt Securities due 2035; (ix) the Indenture between Debtor and trustee Wilmington

Trust, dated August 19, 2005, authorizing the issuance of Floating Rate Junior Subordinated Debt

Securities due 2035; and (x) the Indenture between Debtor and trustee Wilmington Trust, dated

May 16, 2006, authorizing the issuance of Floating Rate Junior Subordinated Debt Securities due

2036.

75.    "Statutory Trust Trustees" means collectively the trustees of the ten (10) Statutory

Business Trusts, including, U.S. Bank (successor to State Street Bank), Wilmington Trust,

BNYMTC (as successor trustee to JP Morgan Chase Bank), and Wells Fargo (as successor trustee

to Wells Fargo Bank, N.A.).

76.    "Taxes" means all income, gaming, franchises, excise, sales, use, employment,

withholding, property, payroll or other taxes, assessments, or governmental charges, together with

any interest, penalties, additions to tax, fines, and similar amounts relating thereto, imposed or

collected by any federal, state, local or foreign governmental authority.

77.    "Trust Securities" means the Capital Securities and the Common Securities issued

by each Statutory Business Trust.

78.    "U.S. Bank" means U.S. Bank, National Association in its capacity as the Trustee of

certain Statutory Trust Indentures and the Junior Subordinated Indenture.

79.    "VNBC Common Stock Interests" means the shares of common stock of the Debtor

issued and outstanding prior to the Effective Date, and all rights and interests arising thereunder or

in connection therewith.

80.    "VNBC Preferred Class C Stock" means the shares of Preferred Class C Stock of the

11
EXHIBIT A
90

1   Debtor issued and outstanding prior to the Effective Date, and all rights and interests arising

2   thereunder or in connection therewith.

3        81.    "VNBC Preferred Class D Stock" means the shares of Preferred Class D Stock of the

4   Debtor issued and outstanding prior to the Effective Date, and all rights and interests arising

5   thereunder or in connection therewith.

6        82.    "VST I" means the Vineyard Statutory Trust I established by the VST I Declaration

7   of Trust.

8        83.    "VST I Declaration of Trust" means the Amended & Restated Declaration of Trust,

9   dated and effective as of December 18, 2001, by and among, Debtor as sponsor, U.S. Bank (as

10  successor to State Street Bank), as trustee, and administrators Norman Morales and Sara Ahern.

11       84.    "VST II" means the Vineyard Statutory Trust II established by the VST II

12  Declaration of Trust.

13       85.    "VST II Declaration of Trust" means the Amended And Restated Declaration Of

14  Trust, dated and effective as of December 19, 2002, by and among, the Debtor as sponsor, the

15  Wilmington Trust as trustee, and Norman Morales and Gordon Fong as administrators.

16       86.    "VST III" means the Vineyard Statutory Trust III established by the VST III

17  Declaration of Trust.

18       87.    "VST III Declaration of Trust" means the Amended And Restated Declaration Of

19  Trust, dated and effective as of September 25, 2003, by and among, the Debtor as sponsor,

20  Wilmington Trust as trustee, and Norman Morales, Gordon Fong, and Richard Hagan as

21  administrators.

22       88.    "VST IV" means the Vineyard Statutory Trust IV established by the VST IV

23  Declaration of Trust.

24       89.    "VST IV Declaration of Trust" means the Amended And Restated Declaration Of

25  Trust, dated and effective as of December 19, 2003, by and among, the Debtor as sponsor,

26  Wilmington Trust as trustee, and Norman Morales, Gordon Fong, and Richard Hagan as

27  administrators.

28       90.    "VST V" means the Vineyard Statutory Trust V established by the VST V

1  Declaration of Trust.

2      91.    "VST V Declaration of Trust" means the Amended And Restated Declaration Of

3  Trust, dated and effective as of December 19, 2003, by and among, the Debtor as sponsor,

4  JPMorgan Chase Bank, succeeded by BNYMTC, as trustee, and Norman Morales and Gordon Fong

5  as administrators.

6      92.    "VST VI" means the Vineyard Statutory Trust VI established by the VST VI

7  Declaration of Trust.

8      93.    "VST VI Declaration of Trust" means the Amended And Restated Declaration Of

9  Trust, dated and effective as of May 18, 2004, by and among, the Debtor as sponsor, JPMorgan

10  Chase Bank, succeeded by BNYMTC, as trustee, and Norman Morales and Gordon Fong as

11  administrators.

12      94.    "VST VII" means the Vineyard Statutory Trust VII established by the VST VII

13  Declaration of Trust.

14      95.    "VST VII Declaration of Trust" means the Amended And Restated Declaration Of

15  Trust, dated and effective as of December 22, 2004, by and among, the Debtor as sponsor, Wells

16  Fargo as trustee, and Norman Morales and Gordon Fong as administrators.

17      96.    "VST VIII" means the Vineyard Statutory Trust VIII established by the VST VIII

18  Declaration of Trust.

19      97.    "VST VIII Declaration of Trust" means the Amended And Restated Declaration Of

20  Trust, dated and effective as of April 15, 2005, by and among, the Debtor as sponsor, Wilmington

21  Trust as trustee, and Norman Morales, Gordon Fong and Richard Hagan as administrators.

22      98.    "VST  IX" means the Vineyard Statutory Trust IX established by the VST IX

23  Declaration of Trust.

24      99.    "VST IX Declaration of Trust" means the Amended And Restated Declaration Of

25  Trust, dated and effective as of August 19, 2005, by and among, the Debtor as sponsor, Wilmington

26  Trust as trustee, and Norman Morales and Gordon Fong as administrators.

27      100.    "VST XI" means the Vineyard Statutory Trust XI established by the VST XI

28  Declaration of Trust.

101.    "VST XI Declaration of Trust" means the Amended And Restated Declaration Of Trust, dated and effective as of May 16, 2006, by and among, the Debtor as sponsor, Wilmington Trust as trustee, and Norman Morales and Gordon Fong as administrators.

102.    "Wells Fargo" means the Wells Fargo Delaware Trust Company in its capacity as the Trustee of certain Statutory Trust Indentures.

103.    "Wilmington Trust" means the Wilmington Trust Company in its capacity as the Trustee of certain of the Statutory Trust Indentures.

**B.    Other Terms.**

The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.  A term used herein that is not defined herein shall have the meaning ascribed to that term, if any, in the Bankruptcy Code or Bankruptcy Rules and shall be construed in accordance with the rules of construction thereunder.

**C.    Computation of Time.**

In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

**D.    Exhibits.**

All exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full herein.

**II.    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS**

**A.    Summary.**

The chart below summarizes the classes of Claims and Equity Interests for all purposes, including voting, confirmation, and distribution pursuant to the Plan:

| CLASS | STATUS |
|---|---|
| Class 1: Other Priority Claims | Unimpaired - not entitled to vote |
| Class 2: Secured Claims | Unimpaired -  not entitled to vote |

| CLASS | STATUS |
|---|---|
| Class 3: General Unsecured Claims | Impaired – entitled to vote |
| Class 4: Subordinated Claims of Holders of Indenture Trustee Claims and Unpaid Indenture Trustee Fees | Impaired – entitled to vote |
| Class 5: Preferred Stock Interests | Impaired – deemed to reject |
| Class 6: Common Stock Interests | Impaired – deemed to reject |

**B.    Unclassified Claims.**

**1.    Administrative Expense Claims.**

**(a)    General.**

Subject to the allowance procedures and deadlines provided herein, the Disbursing Agent shall pay to each holder of an Allowed Administrative Expense, on account of the Allowed Administrative Expense, and in full satisfaction thereof, Cash equal to the amount of such Allowed Administrative Expense, unless the holder agrees to other treatment.  Except as otherwise provided herein or a prior order of the Bankruptcy Court: (i) payment of an Administrative Expense that is an Allowed Claim as of the Effective Date shall be made on the later of the Effective Date or the date such payment would have become due for payment of such Allowed Administrative Expense in the absence of the Chapter 11 Case, whether pursuant to contract or applicable nonbankruptcy law; and (ii) payment of an Administrative Expense that becomes an Allowed Claim following the Effective Date shall be made on or before (a) the date that is thirty (30) days after an order deeming such Administrative Expense an Allowed Claim becomes a Final Order, or (b) the Final Distribution Date, whichever is earlier.

**(b)    Deadlines For Filing Claims For Administrative Expenses.**

**(i)    Pre-Effective Date Claims and Expenses.**

All applications for final compensation of Professional Persons for services rendered and for reimbursement of expenses incurred on or before the Effective Date and all other requests for payment of Administrative Expenses incurred before the Effective Date pursuant to Bankruptcy

15
EXHIBIT A
94

1    Code sections 327, 328, 330, 331, 503(b), 507(a)(1) or 1103 (except only for post-petition

2    obligations incurred through the Effective Date in the ordinary course of Debtor's post-petition

3    business and obligations under section 1930 of title 28 of the United States Code) shall be filed no

4    later than the first Business Day that is not less than forty-five (45) days after the Effective Date (the

5    "Administrative Expense Claims Bar Date").  Professional Persons and others that do not File such

6    requests on or before the Administrative Expense Claims Bar Date shall be barred from asserting

7    such Claims against the Liquidating Trust, the Liquidating Trustee, or any other Person or entity, or

8    any of their respective property.  Objections to applications of Professional Persons or others for

9    compensation or reimbursement of expenses must be Filed and served on the Liquidating Trustee

10   and its counsel, as well as the Professional Persons and others to whose application the objection is

11   addressed, in accordance with the Bankruptcy Code, the Bankruptcy Rules or pursuant to any other

12   procedure set forth by an order of the Bankruptcy Court.  From and after the Effective Date the

13   Liquidating Trustee will comply with such reporting requirements, and payment of quarterly fees to

14   the Office of the United States Trustee as required by applicable law.

15                     **(ii)    Indenture Trustee Fees.**

16            Fees Accrued During the Chapter 11 Case:  Each of the Indenture Trustees shall serve on or

17   before the Administrative Expense Claims Bar Date a statement of its Indenture Trustee Fees

18   accrued from the Petition Date through the Effective Date on the Liquidating Trustee and its counsel,

19   the United States Trustee, each member of the Post-Confirmation Committee and FTBN and its

20   counsel.  Indenture Trustees that do not serve such statements on or before the Administrative

21   Expense Claims Bar Date shall be barred from asserting such Claims against the Estate, the

22   Liquidating Trust, and the Liquidating Trustee.  Unless a written objection is made to the

23   reasonableness of such fees within fifteen (15) days after receipt of such statement, the Liquidating

24   Trustee shall promptly pay the Indenture Trustee Fees, without the necessity or requirement of the

25   Indenture Trustees to file any applications with the Bankruptcy Court therefor.  Any such objection

26   made to any Indenture Trustee Fees shall be resolved by the Bankruptcy Court, provided the

27   Liquidating Trustee shall be authorized and directed to pay the Indenture Trustee Fees to the extent

28   not objected to in accordance with this Section.

1    <u>Fees Accrued After the Effective Date</u>:  Following the Effective Date, each of the Indenture

2    Trustees shall serve monthly statements of its Indenture Trustee Fees accrued after the Effective

3    Date on the Liquidating Trustee and its counsel, each member of the Post-Confirmation Committee,

4    the United States Trustee and FTBN and its counsel.  Unless a written objection is made to the

5    reasonableness of such fees within fifteen (15) days after receipt of each such statement, the

6    Liquidating Trustee shall promptly pay the submitted Indenture Trustee Fees.  Any such objection

7    made to any Indenture Trustees Fees shall be resolved by the Bankruptcy Court, provided the

8    Liquidating Trustee shall be authorized and directed to pay the Indenture Trustee Fees to the extent

9    not objected to in accordance with this Section.

10                          **(iii)    Tax Claims.**

11          All requests for payment of Claims by a governmental unit (as defined under section 101(27)

12   of the Bankruptcy Code) for taxes (and for interest and/or penalties related to such taxes) for any tax

13   year or period, all or any portion of which occurs or falls within the period from and including the

14   Petition Date through and including the Effective Date, and for which no bar date has otherwise been

15   previously established, must be Filed on or before the later of: (a) sixty (60) days following the

16   Effective Date; or (b) ninety (90) days following the filing of the tax return for such taxes for such

17   tax year or period with the applicable governmental unit.  Any holder of a Claim for taxes is required

18   to File a request for a payment of the post-petition taxes and other monies due related to such taxes.

19   Any holder of a Claim for taxes which does not File such a Claim by the applicable bar date shall be

20   forever barred from asserting any such Claim against any of the Estate, the Liquidating Agent or

21   their respective property, whether any such Claim is deemed to arise prior to, on, or subsequent to

22   the Effective Date, and shall receive no distribution under the Plan or otherwise on account of such

23   Claim.

24                  **2.      Priority Tax Claims.**

25          Except as otherwise agreed to by the parties, or ordered by the Court, as soon as practicable

26   after the Effective Date, each holder of an unpaid Allowed Priority Tax Claim shall receive payment

27   in full in an amount equal to the Allowed Priority Tax Claim.

28

C.    **Classification and Treatment**

    1.    **Class 1:  Other Priority Claims.**

        (a)    Classification:  Class 1 consists of all Claims entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, except Priority Tax Claims and Administrative Expenses.

        (b)    Treatment:  The Debtor estimates the Allowed Class 1 Claims to be zero.  The Liquidating Trustee shall pay all Allowed Claims in this class in full, in Cash, on the later of: (i) the Effective Date; and (ii) the date on which an order allowing such Claim becomes a Final Order, and in each case or as soon thereafter as is practicable.  Class 1 is not impaired, and the holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.

    2.    **Class 2:  Secured Claims.**

        (a)    Classification:  Class 2 consists of Secured Claims.

        (b)    Treatment:  The Debtor estimates the Allowed Class 2 Claims to be zero.  To the extent any Allowed Class 2 Claims exist, holders of Allowed Class 2 Claims shall receive payment in full in Cash or of Property of the amount of their respective Allowed Secured Claims.  Distributions to holders of Allowed Class 2 Claims shall occur on the later of the Effective Date if such Secured Claim is deemed to be an Allowed Claim or the first Business Day that is at least thirty (30) days from the date the Secured Claim becomes an Allowed Claim.  Class 2 is not impaired, and the holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

    3.    **Class 3:  General Unsecured Claims.**

        (a)    Classification.  Class 3 consists of General Unsecured Claims.

        (b)    Treatment.  Each Holder of an Allowed Class 3 Claim shall receive, as soon as practicable in the discretion of the Liquidating Trustee, in full satisfaction thereof, unless such Holder agrees to accept lesser treatment of such Claim, a Pro Rata Share of the Available Cash (the "Initial Class 3 Distribution").  In addition, after the Initial Class 3 Distribution but prior to the Final Distribution Date, the Disbursing Agent shall, but is not required, to make Pro Rata interim distributions (the "Interim Distributions") of Available Cash to the Holders of Allowed Class 3 Claims, when, in the discretion of the Liquidating Trustee, the Liquidating Trust has sufficient

1    Available Cash to make such Interim Distributions.  Finally, on the Final Distribution Date, each

2    Holder of an Allowed Class 3 Claim shall receive a Pro Rata share of the Available Cash remaining

3    in the Liquidating Trust.  Class 3 is impaired, and the Holders of Allowed Class 3 Claims are entitled

4    to vote to accept or reject the Plan.

5                    **4.        Class 4:  Holders of Indenture Trustee Claims**

6                    (a)      Classification:  Class 4 consists of the Indenture Trustee Claims that

7    may be contractually or otherwise subordinate to the Allowed FTBN Claim and/or other Class 4

8    Claims and Indenture Trustee Fees accrued prior to the Petition Date.

9                    (b)      Treatment:  Subject to Section II.C(4)(c) and the provisions of this

10   Plan related to the payment of the Indenture Trustee Fees, each Holder of a Class 4 Claim shall be

11   allocated a Pro Rata share of each Distribution available to Holders of Class 3 Claims; provided,

12   however, that the amount of distributions to Holders of Allowed Class 4 Claims shall be paid (i) first

13   on account of unpaid Indenture Trustee Fees, including Allowed Indenture Trustee Fees accrued

14   prior to the Petition Date, and (ii) second on account of the Allowed FTBN Claim, until such time as

15   the Allowed FTBN Claim is satisfied in full, after which time distributions to Holders of Allowed

16   Indenture Trustee Claims shall be made.  Class 4 is impaired, and the Holders of Allowed Class 4

17   Claims are entitled to vote to accept or reject the Plan.

18                   (c)      Priority Challenge Process:  Any challenges to the priority treatment of

19   the Allowed FTBN Claim or any other Class  Claim shall be resolved pursuant to the following

20   process:

21                           There will be a rebuttable presumption that the Allowed FTBN Claim is prior to and

22                   superior to all of the Indenture Trustee Claims.  There will also be a rebuttable presumption

23                   that all of the Indenture Trustee Claims are of equal priority.

24                           Within fifteen (15) days after the Effective Date, the Liquidating Trustee will

25                   establish an on-line document room (the "Document Room").  The Liquidating Trustee shall

26                   provide all Holders of Indenture Trustee Claims, FTBN and the members of the Post-

27                   Confirmation Committee notice of and access procedures to the Document Room when

28                   available.

1    Within fifteen (15) days after receiving notice of and access to the Document Room,

2    FTBN will deposit in the Document Room true and correct copies of all of its loan

3    documents, including but not limited to copies of any subordination or other agreements

4    governing the priority or subordination of its Claims (the "FTBN Documents").

5    Within the later of (i) forty-five (45) days after the Effective Date or (ii) fifteen (15)

6    days after the FTBN Documents are placed into the Document Room, any Person that seeks

7    to challenge the rebuttable presumptions stated above shall (i) provide written notice of such

8    challenge including a description of each basis for challenging priority to the Liquidating

9    Trustee, all members of the Post –Confirmation Committee and to the parties of the

10   presumed priority that is being challenged ("Priority Notice"), and (ii) deposit into the

11   Document Room true and correct copies of all of its loan documents, including but not

12   limited to copies of any subordination or other agreements governing the priority or

13   subordination of its Claims.

14   If the Holder whose Claim priority is challenged under a Priority Notice has not

15   already done so, it shall deposit into the Document Room true and correct copies of all of its

16   loan documents, including but not limited to copies of any subordination or other agreements

17   governing the priority or subordination of its Claims within fifteen (15) days after receiving

18   the Priority Notice.

19   For the thirty (30) days following each Priority Notice, the parties involved will work

20   in good faith to resolve the issue of priority (the "Settlement Period").

21   If, following the Settlement Period, the parties are unable to resolve the Priority

22   Notice, the Person challenging priority shall commence an adversary proceeding pursuant to

23   Bankruptcy Rules 7001, et seq., with the Bankruptcy Court within thirty (30) days.  If no

24   adversary proceeding is commenced within thirty (30) days, the related Priority Notice will

25   be deemed withdrawn and the Person challenging priority shall be forever barred from

26   challenging the priority raised in the Priority Notice.

27   All discussions during the Settlement Period shall be deemed privileged settlement

28   discussions pursuant to Federal Rule of Evidence 408 and can not be used in any proceeding.

Additionally, the submission of correspondence or other documents into the Document Room by any Person shall not waive or otherwise amend that Person's claim of right or privilege related to any correspondence or other documents placed in the Document Room.

      **5.**      **Class 5:  Preferred Stock Interests.**

      (a)      <u>Classification</u>:  Class 5 consists of the Preferred Equity Interests in the Debtor.

      (b)      <u>Treatment</u>:  As of the Effective Date, each holder of record of an Allowed Preferred Equity Interest shall not receive a distribution under the Plan and all Preferred Equity Interests will be deemed cancelled and void.  Class 5 is Impaired, but because no distributions shall be made to holders of Interests in Class 5, such holders are deemed conclusively to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Therefore the holders of Interests in Class 5 are not entitled to vote to accept or reject the Plan.

      **6.**      **Class 6:  VNBC Common Stock Interests**

      (a)      <u>Classification</u>:  Class 6 consists of VNBC Common Stock Interests in the Debtor.

      (b)      <u>Treatment</u>:  As of the Effective Date, each holder of record of an Allowed Common Stock Interest shall not receive a distribution under the Plan and all VNBC Common Stock Interests will be deemed to be cancelled and void.  Class 6 is Impaired, but because no distributions shall be made to holders of Interests in Class 6, such holders are deemed conclusively to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Therefore the holders of Interests in Class 6 are not entitled to vote to accept or reject the Plan.

**III.**      **ACCEPTANCE OR REJECTION OF THE PLAN**

      **A.**      **Voting Classes.**

      Each holder of an Allowed Claim in Classes 3 and 4 shall be entitled to vote to accept or reject the Plan.

      **B.**      **Voting Rights Of Holders Of Disputed Claims.**

      A Disputed Claim will not be counted for purposes of voting on the Plan to the extent it is disputed, provided an objection to such Claim has been filed no later than fourteen (14) days prior to

1    the deadline for casting ballots on the Plan, unless an order of the Bankruptcy Court is entered after

2    notice and a hearing temporarily allowing the Disputed Claim for voting purposes under Bankruptcy

3    Rule 3018(a).

4    **C.    Acceptance By Impaired Classes.**

5    An impaired class of Claims shall have accepted the Plan if (i) the holders (other than any

6    holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar

7    amount of the Allowed Claims actually voting in such class have voted to accept the Plan and (ii)

8    more than one-half in number of the holders (other than any holder designated under section 1126(e)

9    of the Bankruptcy Code) of such Allowed Claims actually voting in such Class have voted to accept

10    the Plan.

11    **D.    Presumed Acceptance Of The Plan.**

12    Classes 1 and 2 are unimpaired under the Plan and, therefore, are conclusively presumed by

13    the Bankruptcy Code to accept the Plan.

14

15    **IV.    PROVISIONS FOR TREATMENT OF DISPUTED, CONTINGENT, OR
UNLIQUIDATED CLAIMS AND ADMINISTRATIVE EXPENSES**

16    **A.    Allowance Of Claims Of Holders Of Record Of Indentures.**

17    A beneficial owner of Debentures of record as of January 22, 2010 (the "Record Date") shall,

18    for purposes of distributions under the Plan, be deemed to have an Allowed Class 4 Claim for the

19    outstanding principal amount of the Debentures owned by such beneficial owner plus accrued and

20    unpaid interest as of the Petition Date, and need not file a proof of claim with respect thereto.

21    In the event any Person that is neither the record holder as of the Record Date of the

22    Indentures, nor the beneficial owner with respect thereto, shall file a proof of right to record status

23    pursuant to Bankruptcy Rule 3003(d), the Liquidating Trustee shall establish such reserve, if any, as

24    may be ordered by the Bankruptcy Court on account of any objection thereto.  Such reserve shall be

25    held in trust for the holder of such Disputed Claim.  To the extent such Disputed Claim is

26    disallowed, any reserve pertaining to such Disputed Claim shall be distributed to all holders of

27    Allowed Class 4 Claims on a Pro Rata basis.

28    With respect to distributions to be made to Holders of Debentures classified in Class 4, the

Indenture Trustees for the respective Indentures shall (i) be the Disbursing Agent, (ii) receive the consideration to be paid to Holders of the Debentures as Indenture Trustees for the Debentures which are classified as Allowed Class 4 Claims; (iii) be responsible for making distributions to Holders of Allowed Class 4 Claims arising from such Debentures in accordance with the terms of this Plan and the Indentures; and (iv) be authorized to deduct the Indenture Trustee Claims from the consideration provided to holders of Allowed Class 4 Claims to the extent so provided for in the Indentures.

The Statutory Business Trustees shall be responsible for making distributions to Holders of record of the Capital Securities as of the Record Date in accordance with the Declaration of Trusts.

**B.    Resolution Of Disputed Claims.**

As of the Effective Date, and subject to the provisions of this Plan, the Liquidating Trustee shall have sole authority for investigating, administering, monitoring, implementing, litigating and settling all Disputed Claims.  From and after the Effective Date, the Liquidating Trustee shall have the sole and exclusive right to make and file, and to prosecute, objections to Claims, including, but not limited to, Administrative Expenses and Priority Tax Claims.  All objections shall be served upon the Holder of the Claim to which the objection is made.

**C.    Reserve for Disputed Claims.**

To the extent such a Disputed Claim ultimately is disallowed or allowed in an amount less than the amount of Cash that has been reserved, the resulting surplus Cash shall be allocated among holders of Allowed Claims in the Class in which the Disputed Claim was classified as provided in the Plan.

Cash which would be issued and distributed on account of holders of Disputed Claims, in the event that such Disputed Claims become Allowed Claims, shall instead be placed in the Disputed Claims Reserve maintained by the Liquidating Trustee.  Such Cash in the Disputed Claims Reserve will be reserved for the benefit of holders of such Disputed Claims pending determination of their entitlement thereto.  Unless the Bankruptcy Court orders otherwise, the Liquidating Trustee will reserve Pro Rata distributions for such Disputed Claims based upon the full amount of the Disputed Claims.  No reserve shall be required for any Disputed Claim to the extent of any effective insurance

1    coverage therefore.  Such Cash so reserved shall be distributed by the Liquidating Trustee to the

2    holder of a Disputed Claim to the extent that such Disputed Claim becomes an Allowed Claim

3    pursuant to a Final Order.

4        Prior to or on the Final Distribution Date, the Liquidating Trustee shall make all distributions

5    on account of any Disputed Claim that has become an Allowed Claim and remains unpaid as of the

6    Final Distribution Date.

7    **V.    IMPLEMENTATION OF THE PLAN**

8        **A.    Vesting Of Assets.**

9        Unless otherwise expressly provided under this Plan, on the Effective Date, the Debtor's

10   Assets, including all of the Estate Causes of Action and the D&O Claims, will vest in the

11   Liquidating Trust free and clear of all claims, liens, encumbrances, charges and other interests,

12   subject to the provisions of the Plan.  On and after the Effective Date, the transfer of the Debtors'

13   Assets from the Estate to the Liquidating Trust will be deemed final and irrevocable and

14   distributions may be made from the Liquidating Trust.

15       In connection with the foregoing:

16       (i)    On the Effective Date, the appointment of the Liquidating Trustee shall become

17   effective and the Liquidating Trustee shall begin to administer the Liquidating Trust pursuant to the

18   terms of the Liquidating Trust Agreement and the Plan and may use, acquire and dispose of property

19   of the Liquidating Trusts free of any restrictions imposed under the Bankruptcy Code.

20       (ii)    The Confirmation Order will provide the Liquidating Trustee with express authority

21   to convey, transfer and assign any and all of the Liquidating Trust Assets and to take all actions

22   necessary to effectuate same and to prosecute any and all Estate Causes of Action and the D&O

23   Claims.

24       (iii)    As of the Effective Date, the Liquidating Trust Assets will be free and clear of all

25   liens, claims and interests of holders of Claims and Equity Interests, except as otherwise provided in

26   the Plan.

27       **B.    Establishment of the Liquidating Trust.**

28       On the Effective Date the Liquidating Trust Agreement will become effective, and, if not

previously signed, the Debtor and the Liquidating Trustee will execute the Liquidating Trust

Agreement.  The Liquidating Trust is organized and established as a trust for the benefit of the

Beneficiaries, as defined below, and is intended to qualify as a liquidating trust within the meaning

of Treasury Regulation Section 301.7701-4(d).

### 1.    Beneficiaries.

In accordance with Treasury Regulation Section 301.7701-4(d), the beneficiaries

("Beneficiaries") of the Liquidating Trust will be the Holders of all Allowed Claims against the

Debtor.  The Holders of Allowed Claims will receive an allocation of the Liquidating Trust Assets as

provided for in the Plan and the Liquidating Trust Agreement.  The Beneficiaries of the Liquidating

Trust shall be treated as the grantors and owners of such beneficiaries' respective portion of the

Liquidating Trust.

### 2.    Implementation of the Liquidating Trust.

On the Effective Date, the Debtor, on behalf of the Estate, and the Liquidating Trustee will

be authorized and directed to, and will execute the Liquidating Trust Agreement in substantially the

form attached as Exhibit "3" to the Plan, take all such actions as required to transfer from the Debtor

and the Estate the Debtor's Assets (except as specifically set forth herein).  From and after the

Effective Date, the Liquidating Trustee will be authorized to, and will take all such actions as

required to implement the Liquidating Trust Agreement and the provisions of the Plan as are

contemplated to be implemented by the Liquidating Trustee, including, without limitation, directing

Distributions to Holders of Allowed Claims, objecting to Claims, prosecuting or otherwise resolving

Estate Causes of Action and D&O Claims, and causing Distributions from the Liquidating Trusts to

be made to the Beneficiaries.

### 3.    Transfer of Debtor's Assets.

On the Effective Date, pursuant to the Plan and sections 1123, 1141 and 1146(a) of the

Bankruptcy Code, the Debtor and the Committee is authorized and directed to transfer, grant, assign,

convey, set over, and deliver to the Liquidating Trustee all of the Debtor's and its Estate's right, title

and interest in and to its Assets, including all Estate Causes of Action (and all rights title and interest

of the Committee as to the D&O Claims), free and clear of all liens, Claims, encumbrances or

1   interests of any kind in such property, except as otherwise expressly provided in the Plan.  To the

2   extent required to implement the transfer of the Debtor's Assets from the Debtor and its Estate to the

3   Liquidating Trust, all Persons will cooperate with the Debtor and the Estate to assist the Debtor and

4   the Estate to implement said transfers.

5                **4.      Representative of the Estate.**

6         The Liquidating Trustee will be appointed as the representative of the Estate pursuant to

7   sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code and as such will be vested with the

8   authority and power (subject to the Liquidating Trust Agreement) to inter alia: (i) object to Claims

9   against and Equity Interests in the Debtors; (ii) administer, investigate, prosecute, settle and abandon

10  all Estate Causes of Action and D&O Claims assigned to the Liquidating Trust; (iii) make

11  Distributions provided for in the Plan, including, but not limited to, on account of Allowed Claims;

12  and (iv) take such action as required to administer, wind-down, and close the Chapter 11 Case.  As

13  the representative of the Estate, the Liquidating Trustee will be vested with all of the rights and

14  powers of the Debtor and the Estate (including the Committee under the Committee Standing Order)

15  with respect to all Estate Causes of Action and D&O Claims assigned and transferred to the

16  Liquidating Trust, and the Liquidating Trustee will be substituted in place of the Debtor, the Estate

17  and the Committee, as applicable, as the party in interest in all such litigation pending as of the

18  Effective Date.

19               **5.      No Liability of Liquidating Trustee or Post-Confirmation Committee.**

20        To the maximum extent permitted by law, the Liquidating Trustee, its employees, officers,

21  directors, agents, members, or representatives, or professionals employed or retained by the

22  Liquidating Trustee (the "Liquidating Trustee's Agents"), the members of the Post-Confirmation

23  Committee (as defined below), and their employees, officers, directors, agents, members, or

24  representatives, or professionals employed or retained, will not have or incur liability to any Person

25  for an act taken or omission made in good faith in connection with or related to the administration of

26  the Liquidating Trust Assets, the implementation of the Plan and the Distributions made thereunder

27  or Distributions made under the Liquidating Trust Agreement.  The Liquidating Trustee, the

28  Liquidating Trustee's Agents, the members of the Post-Confirmation Committee, and their

1   employees, officers, directors, agents, members, or representatives, or professionals employed or

2   retained will in all respects be entitled to reasonably rely on the advice of counsel with respect to

3   their duties and responsibilities under the Plan and the Liquidating Trust Agreement.  Entry of the

4   Confirmation Order constitutes a judicial determination that the exculpation provision contained in

5   Section XI.A of the Plan is necessary to, inter alia, facilitate Confirmation and feasibility and to

6   minimize potential claims arising after the Effective Date for indemnity, reimbursement or

7   contribution from the Estate, or the Liquidating Trust, or their respective property.  The

8   Confirmation Order's approval of the Plan will also constitutes a res judicata determination of the

9   matters included in the exculpation provisions of the Plan.  Notwithstanding the foregoing, nothing

10  herein or in Section XI.A of the Plan will alter any provision in the Liquidating Trust Agreement that

11  provides for the potential liability of the Liquidating Trustee to any Person.

12          **6.      Provisions Relating to Federal Income Tax Compliance.**

13          A transfer to the Liquidating Trust shall be treated for all purposes of the Internal Revenue

14  Code of 1986, as amended (the "Internal Revenue Code"), as a transfer to creditors to the extent

15  creditors are Beneficiaries.  For example, such treatment shall apply for purposes of Internal

16  Revenue Code sections 61(a)(12), 483, 1001, 1012 and 1274.  Any such transfer shall be treated for

17  federal income tax purposes as a deemed transfer to the beneficiary-creditors followed by a deemed

18  transfer by the beneficiary-creditors to the Liquidating Trusts.  The beneficiaries of the Liquidating

19  Trusts shall be treated for federal income tax purposes as the grantors and deemed owners of the

20  Liquidating Trusts.

21

22          **C.      Prosecution Of Estate Causes Of Action\D&O Claims By The Liquidating
                Trustee or the Post- Confirmation Committee.**

23          Pursuant to the Confirmation Order, on the Effective Date, the Debtor irrevocably assigns,

24  transfers and conveys to the Liquidating Trustee, the right to manage and control all property of the

25  Estate, including, but not limited to, all Estate Causes of Action.  Pursuant to the Confirmation

26  Order, on the Effective Date, the Committee irrevocably transfers, assigns and conveys to the

27  Liquidating Trustee all of the Committee's authority and standing under the Committee Standing

28  Order with respect to the D&O Claims.  The Liquidating Trustee shall also be deemed the successor

1   to, assignee of and transferee of the Committee under the Committee Standing Order granting and

2   vesting the Committee with authority and standing to investigate, bring, maintain and settle to the

3   fullest extent the D&O Claims.  Subject to the provisions of Section V.B.4 of this Plan and Section

4   II.F of the Liquidating Trust Agreement, the Liquidating Trustee shall have the power and authority

5   to prosecute, compromise or otherwise resolve any and all such Estate Causes of Action and D&O

6   Claims, with all recoveries derived therefrom to be included within the Liquidating Trust Assets.

7           Notwithstanding the foregoing, in the event that the Liquidating Trustee elects not to

8   prosecute, compromise or otherwise resolve an Estate Cause of Action or D&O Claim, the Post-

9   Confirmation Committee shall have the full power and authority to prosecute, compromise or

10  otherwise resolve such Estate Cause of Action and/or D&O Claim, with all recoveries derived

11  therefrom to be included within the Liquidating Trust Assets.  The Liquidating Trustee/Post-

12  Confirmation Committee shall have the authority to assert any D&O Claim against the Debtor's

13  officers, directors and/or shareholders in state court, Federal court or the Bankruptcy Court, or in any

14  other forum that they choose in they absolute discretion.  It is the intention of this Plan that the

15  Liquidating Trustee pursue the Estate Causes of Action and the D&O Claims.

16          **D.    Issuance And Execution Of Plan Related Documents.**

17          In connection with the transactions contemplated to implement the Plan, the Debtor and the

18  Liquidating Trustee will execute certain documents.  As of the Effective Date, the Debtor and/or the

19  Liquidating Trustee will execute such amendments, modifications, supplements, and other

20  documents as provided for in the Plan.  The Debtor and/or the Liquidating Trustee are authorized to

21  execute such amendments, modifications, supplements and other documents as provided for in the

22  Plan without any further corporate action, and upon such execution, such amendments,

23  modifications, supplements and other documents as provided for in the Plan shall be deemed binding

24  upon the Debtor and/or the Liquidating Trustee and such other parties as applicable.

25          **E.    Cancellation/Surrender of the Debentures And Related Agreements.**

26          As of the Effective Date, (a) the Indentures, Declarations of Trust, Debentures, Trust

27  Securities and Guarantee Agreements shall be terminated, and neither the Debtor nor the other

28  parties thereto shall have any further rights or obligations thereunder, except that each Indenture and

each Declaration of Trust shall continue to be effective for the following:  (a) allowing a holder of an

Allowed Class 4 Claim, including the Indenture Trustees and Statutory Business Trustees, holders of

Debenture and Capital Securities to receive a distribution provided for under this Plan and the

provisions related to distributions in such documents; (b) the right of an Indenture Trustee to

exercise a charging lien against the recovery otherwise due to a holder of an Allowed Class 4 Claim

as provided for under the Indentures for the payment of any Indenture Trustee Fees that remain

outstanding, or for indemnification as provided under the Indenture and/or Declaration of Trust; and

(c) the right of an Indenture Trustee to continue to serve on the Post-Confirmation Committee after

the Effective Date and to be compensated therefor pursuant to the terms of the Indentures.

Notwithstanding the termination of the Indentures and Declarations of Trust, the provisions of such

documents shall govern the relationships of the Indenture Trustees and holders of the Debentures,

and the Statutory Trustees and the holders of the Capital Securities, respectively.

Following the Effective Date, holders of Allowed Class 4 Claims will receive from the

Indenture Trustees or their designees specific instructions regarding the time and manner in which

the Debentures are to be surrendered.  Pending such surrender, such Debentures will be deemed

cancelled and shall represent only the right to receive the distributions to which the holder is entitled

under this Plan.

### F.    Dissolution of the Debtor and Termination of Current Officers, Directors, Employees and Counsel.

From and after the Effective Date, the Debtor shall be dissolved and the Liquidating Trustee

shall be authorized to take all action necessary to dissolve the Debtor.  On the Effective Date, the

employment, retention, appointment and authority of all Officers, Directors, Employees and

Professionals of the Debtor and the Committee shall be deemed to terminate.

## VI.    THE COMMITTEE AND THE POST-CONFIRMATION COMMITTEE

Until the Effective Date, the Committee shall continue in existence.  As of Effective Date,

the Committee shall terminate and disband and the members of the Committee and the Committee

shall be released and discharged of and from all further authority, duties, responsibilities and

obligations related to and arising from their service as Committee members.

A.      **Establishment of Post-Confirmation Committee.**

As provided herein and in the Liquidating Trust Agreement, as of the Effective Date, there will be formed a committee for the Liquidating Trust (the "Post-Confirmation Committee") that will have consultation, approval and information rights with respect to the Liquidating Trust as set forth in the Liquidating Trust Agreement.  The members of the Post-Confirmation Committee will be those members of the Committee who wish to continue to serve.  Ten days prior to the Confirmation Hearing, the Committee shall file with the Bankruptcy Court and serve on those requesting notice pursuant to Bankruptcy Rule 2002 a notice of the selection of the Post-Confirmation Committee members, which notice will name the members of the Post-Confirmation Committee.

B.      **Governance.**

The Post-Confirmation Committee will prescribe their own rules of procedure and bylaws; provided, however, that such rules of procedure and bylaws will not be inconsistent with the terms of the Plan or the Liquidating Trust Agreement.  If a Post-Confirmation Committee member assigns its Claim in full or releases the Debtor or Liquidating Trust from payment of the balance of its Claim, such act will constitute a resignation from the Post-Confirmation Committee.  Until a vacancy on the Post-Confirmation Committee is filled, the Post-Confirmation Committee will function in its reduced number.  The Post-Confirmation Committee rules of procedure may provide that, in the event any member of the Post-Confirmation Committee resigns or otherwise is unable to serve subsequent to the Effective Date, the Post-Confirmation Committee may appoint a replacement that holds, to the greatest extent practicable, an Allowed Claim of the same type and nature and against the Debtor and has the capacity and competency to serve in place of the resigned or deceased member without approval by the Bankruptcy Court.

C.      **Compensation.**

Except for the reimbursement of reasonable actual costs and expenses in connection with their duties as members of the Post-Confirmation Committee, the members of the Post-Confirmation Committee will serve without compensation.  Reasonable expenses incurred by members of the Post-Confirmation Committee may be paid by the Liquidating Trust, as appropriate, without need for Bankruptcy Court approval.  Reasonable expense may include reimbursement of the fees and

1    costs of attorneys to each member, subject to such parameters as determined by the Post-

2    Confirmation Committee and which parameters are agreed to by the Liquidating Trustee.

3    **D.    Professionals.**

4    The Post-Confirmation Committee will have no authority to employ, at the expense of the

5    Liquidating Trust, counsel or any other professionals, except upon petition to and approval by the

6    Bankruptcy Court for cause shown.

7    **E.    Limitation of Liability.**

8    The Post-Confirmation Committee and its members will not be liable for any act any member

9    may do or fail to do as a member of the Post-Confirmation Committee while acting in good faith and

10    in the exercise of the member's best judgment.  No member of the Post-Confirmation Committee

11    will be liable in any event for claims, liabilities or damages unless they arise from such member's

12    personal gross negligence or willful misconduct.

13    **F.    Dissolution.**

14    The Post-Confirmation Committee shall be dissolved upon the earlier of (i) the date on which

15    its membership consists of only a single Person and (ii) the date on which the Final Decree has been

16    entered and is no longer subject to appeal.  The Post-Confirmation Committee may voluntarily

17    dissolve itself upon ten (10) days notice to the Liquidating Trustee, the United States Trustee, and

18    the Bankruptcy Court.  Upon its dissolution, the Post-Confirmation Committee shall have no further

19    duties, responsibilities, or powers under this Plan or otherwise.

20    **VII.    DISTRIBUTIONS UNDER THE PLAN.**

21    **A.    In General.**

22    Except as otherwise provided herein, or as may be ordered by the Bankruptcy Court,

23    Distributions to be made on account of Allowed Claims, other than Allowed Class 3 Claims and

24    Allowed Class 4 Claims, shall be made on the Effective Date.  The dates for Distributions by the

25    Liquidating Trust on account of Allowed Class 3 Claims and Class 4 Claims shall be selected by the

26    Liquidating Trustee, after consultation with the Post-Confirmation Committee.  Such Distributions

27    shall be made as soon as practicable after the Effective Date.

28

**B.    Manner Of Payment Under The Plan.**

Any payment of Cash made by the Liquidating Trustee pursuant to the Plan may be made either by check drawn on a domestic bank or by wire transfer from a domestic bank, at the option of the Liquidating Trustee.

**C.    Manner Of Distribution Of Other Property.**

Any distribution under the Plan of property other than Cash shall be made by the Liquidating Trustee in accordance with the terms of the Plan.

**D.    Setoffs.**

The Liquidating Trustee may set off against any Claim and the payments to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever that the Debtor's Estate or Liquidating Trust may have against the holder of such Claim; provided that neither the failure to effect such set off nor the allowance of any Claim that otherwise would be subject to set off, shall constitute a waiver or release by the Debtor's Estate or Liquidating Trust of any such claim the Debtor's Estate or Liquidating Trust may have against such holder.

**E.    Distribution Of Unclaimed Property.**

Except as otherwise provided in the Plan, any distribution of property (Cash or otherwise) under the Plan which is unclaimed after the later of (i) one year following the Effective Date or (ii) ninety (90) days after such distribution has been remitted to the Holder of the Allowed Claim, shall be deemed Available Cash and distributed as provided for under the Plan.

**F.    De Minimis Distributions.**

No cash payment of less than fifty dollars ($50.00) shall be made by the Liquidating Trustee to any holder of a Claim unless a request therefor is made in writing to the Liquidating Agent.

**G.    Record Date.**

On the Record Date, as defined in Section IV.A above, the transfer ledgers for the Debentures and the Equity Interests shall be closed, and there shall be no further changes in the holders of record of such securities.  The Liquidating Trustee shall not recognize any transfer of such securities occurring after the Record Date, but shall instead be entitled to recognize and deal for all purposes with only those holders of record stated on the applicable transfer ledgers as of the

32
EXHIBIT A
111

1  Record Date.

2  **H.    Saturday, Sunday, Or Legal Holiday.**

3  If any payment or act under the Plan is required to be made or performed on a date that is not

4  a Business Day, then the making of such payment or the performance of such act may be completed

5  on the next succeeding Business Day, but shall be deemed to have been completed as of the required

6  date.

7  **1.    Delivery Of Distributions, Address Of Holder.**

8  For purposes of all notices and distributions under this Plan, the Liquidating Trustee shall be

9  entitled to rely on the name and address of the holder of each Claim as shown on, and distributions

10  to holders of Allowed Claims shall be made by regular U.S. first class mail to, the following

11  addresses:  (a) the address set forth on in the proofs of Claim Filed by such holders; (b) the address

12  set forth in any written notice of address change delivered by the holder to the Debtor or Liquidating

13  Trustee after the date on which any related proof of Claim was Filed, or (c) the address reflected on

14  the Schedules if no proof of Claim or proof of Equity Interest is Filed and the Debtor or Liquidating

15  Trustee has not received a written notice of a change of address.  The Liquidating Trustee shall be

16  under no duty to attempt to locate holders of Allowed Claims who are entitled to unclaimed

17  distributions.

18  **VIII.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

19  **A.    Assumption.**

20  Effective upon the Effective Date, the Debtor hereby assumes those executory contracts and

21  unexpired leases which are listed in Exhibit "1" to the Plan.  Pursuant to this Plan, the Debtor will

22  also assume the executory contracts and unexpired leases that are the subject of any specific order of

23  the Bankruptcy Court.  The Debtor reserves the right to delete any contract or lease from Exhibit

24  "1", to the Plan, thereby rejecting the contract or lease, up until the hearing on confirmation of the

25  Plan by filing with the Bankruptcy Court an amended Exhibit "1", to the Plan and by giving notice

26  to counsel for the Committee and counsel for the non-debtor party to the contract or lease.

27  **B.    Assumption And Cure Payment Objection.**

28  Exhibit "1" to the Plan specifies the amount (the "Cure Payment"), if any, that the Debtor

1    believes must be tendered on the Effective Date, in order to provide cure and compensation in

2    accordance with sections 365(b)(1)(A) & (B) of the Bankruptcy Code.  The deadline for any

3    objections to the Cure Payment amounts set forth in Exhibit "1" shall be the date for filing

4    objections to the Plan, and no other objections to such Cure Payment will be timely.  In the event

5    that any party to a listed contract or lease on Exhibit "1" contends that the Cure Payment amount so

6    listed is incorrect, such party must file with the Bankruptcy Court and serve upon counsel for the

7    Debtor and the Committee a written statement and an accompanying declaration in support thereof

8    specifying the amounts allegedly owing under sections 365(b)(1)(A) & (B) of the Bankruptcy Code

9    no later than the date fixed for filing objections to the confirmation of the Plan.  Failure to timely file

10   and serve such statement shall result in the determination that the Debtor's tender of the Cure

11   Payment, as specified in Exhibit "1", on the Effective Date, shall provide cure and compensation for

12   any and all defaults and unpaid obligations under such assumed executory contract or unexpired

13   lease.

14        In the event that any party to a listed contract or lease specified in Exhibit "1" objects to the

15   proposed assumption by the Debtor, such party must file with the Bankruptcy Court and serve upon

16   counsel for the Debtor and the Committee a written statement and an accompanying declaration in

17   support thereof no later than the date fixed for filing objections to the confirmation of the Plan.

18   Failure timely to file and serve such statement shall result in the determination that the assumption is

19   appropriate.

20        The Debtor and the Committee reserve the right to respond to any objection filed by any

21   party to an executory contract or unexpired lease under this paragraph and/or to reject any executory

22   contract or unexpired lease or assume such contract or unexpired lease by complying with section

23   365(b) of the Bankruptcy Code.  To the extent the Debtor disagrees with any objection filed by any

24   party to an executory contract or unexpired lease under this paragraph, the Debtor will request that

25   the Bankruptcy Court declare that the Cure Payment is as stated by the Debtor, and that the proposed

26   assumption is appropriate, and any disputes shall be resolved by the Bankruptcy Court.

27        Entry of the Confirmation Order shall constitute approval of the assumptions under the Plan

28   pursuant to section 365 of the Bankruptcy Code.  All Cure Payments which may be required by

section 365(b)(1) of the Bankruptcy Code shall be made on the Effective Date or as soon thereafter

as is practicable or as may otherwise be agreed by the parties to any particular contracts or leases.

### C.    Rejection.

With the exception of those executory contracts and unexpired leases that have been

previously assumed, assumed pursuant to Section VIII.A, above, or rejected by order of the

Bankruptcy Court pursuant to Bankruptcy Code section 365, as of the Effective Date, the Debtor

shall reject, pursuant to Bankruptcy Code section 365, all other executory contracts and unexpired

leases. Exhibit "2" to the Plan is a non-exclusive list of rejected contracts.

### D.    General.

Inclusion of a matter in Exhibit "1" or "2" does not constitute an admission by the Debtor

that an executory contract or unexpired lease exists, is valid or is an executory contract or unexpired

lease.  As a matter of prudence, Exhibits "1" and "2" include contracts and leases which may have

previously been rejected or canceled or assigned or which may have expired.  Entry of the

Confirmation Order shall constitute approval of the rejections under the Plan pursuant to section

365(a) of the Bankruptcy Code.

All Allowed Claims arising from the rejection of executory contracts or unexpired leases,

whether under the Plan or by separate proceeding, shall be treated as Class 3 Claims under the Plan.

All Claims arising from the rejection of executory contracts or unexpired leases, whether

under the Plan or by separate proceeding, must be filed with the Bankruptcy Court on or before such

date as the Bankruptcy Court has fixed pursuant to the Bar Date Order with respect to Claims arising

from the rejection of specified executory contracts and unexpired leases, or, if rejected pursuant to

the Plan, on or before the day that is 30 days after the Effective Date or, if such day is not a Business

Day, the first Business Day occurring thereafter.  Any such Claims which are not filed within such

time will be forever barred from assertion against the Debtor's Estate, the Debtor, the Liquidating

Agent, and the Estate's property.

### E.    Insurance Policies

For the avoidance of doubt, the Debtor's rights with respect to all insurance policies under

which the Debtors may be beneficiaries (including all insurance policies that may have expired prior

to the Petition Date, all insurance policies in existence on the Petition Date, all insurance policies

entered into by the Debtor after the Petition Date, and all insurance policies under which the Debtor

holds rights to make, amend, prosecute and benefit from claims), are retained and will be transferred

or assigned to the Liquidating Trust pursuant to this Plan.  Notwithstanding any provision providing

for the rejection of executory contracts, any insurance policy that is deemed to be an executory

contract shall neither be rejected nor assumed by operation of this Plan and shall be the subject of a

specific motion by the Liquidating Trustee who shall retain the right to assume or reject any such

executory contracts pursuant to and subject to the provisions of Section 365 of the Bankruptcy Code

following the Effective Date.

## IX.    EFFECTIVENESS OF THE PLAN

### A.    Conditions Precedent.

The Effective Date shall not occur until the Confirmation Order has been entered on the

docket of the Bankruptcy Court and no stay of the Confirmation Order is in effect, unless this

condition has been waived in writing by the Debtor and the Committee.

### B.    Notice Of Effective Date.

As soon as practicable after the Effective Date has occurred, the Debtor shall file with the

Bankruptcy Court an informational notice specifying the Effective Date, as a matter of record.

## X.    RETENTION OF JURISDICTION

This Plan shall not in any way limit the Court's post-confirmation jurisdiction as provided

under the Bankruptcy Code.  The Bankruptcy Court will retain and have exclusive jurisdiction to the

fullest extent permissible over any proceeding (i) arising under the Bankruptcy Code or (ii) arising in

or related to the Chapter 11 Case or the Plan, including but not limited to the following:

A.    To hear and determine pending motions for the assumption, assumption and

assignment, or rejection of executory contracts or unexpired leases, if any are pending as of the

Effective Date, the determination of any cure payments related thereto, and the allowance or

disallowance of Claims resulting therefrom;

B.    To hear and determine pending motions for sale of assets outside the ordinary course

of business pursuant to section 363 of the Bankruptcy Code, if any are pending as of the Effective

Date;

C.    To determine any and all adversary proceedings, applications, motions, and contested matters instituted prior to the closing of the Chapter 11 Case;

D.    To ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

E.    To hear and determine any objections to Administrative Expenses and to Proofs of Claims filed both before and after the Effective Date, and to allow or disallow any Disputed Claim in whole or in part;

F.    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

G.    To issue orders in aid of execution of the Plan and to issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or its execution or implementation by any entity;

H.    To consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

I.    To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331, and 503(b) of the Bankruptcy Code;

J.    To hear and determine any disputes arising in connection with the interpretation, implementation, execution, or enforcement of the Plan, the Confirmation Order, the Committee Standing Order or any other order of the Bankruptcy Court;

K.    To hear or determine any action to recover assets of the Estate, wherever located, including any and all Estate Causes of Action and D&O Claims;

L.    To hear and determine any actions or matters related to Estate Causes of Action and D&O Claims, whether or not such actions or matters are pending on the Effective Date;

M.    To hear and determine any matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

N.    To hear any other matter not inconsistent with the Bankruptcy Code;

1       O.     To hear any other matter deemed relevant by the Court; and

2       P.     To enter a Final Decree closing the Chapter 11 Case.

3   **XI.    LIMITATION OF LIABILITY, RELEASES AND INJUNCTION**

4       **A.    Exculpation.**

5          Except as otherwise provided by the Plan or the Confirmation Order, on the Effective Date,

6   the Debtor, the Committee, each of the members of the Committee, the Indenture Trustees and their

7   respective officers, directors, employees, representatives, counsel, financial advisors or other agents

8   and their successors or assigns shall be deemed released by each of them against the other, and by all

9   Holders of Claims or Equity Interests, of and from any Claims, obligations, rights, causes of action

10   and liabilities for any act or omission in connection with, or arising out of, the Chapter 11 Case,

11   including, without limiting the generality of the foregoing, all sales of assets of the Debtor's Estate,

12   the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the pursuit of

13   confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the

14   property to be distributed under the Plan, except for acts or omissions which constitute willful

15   misconduct or gross negligence, and all such Persons, in all respects shall be entitled to rely upon the

16   advice of counsel with respect to their duties and responsibilities under the Plan and under the

17   Bankruptcy Code.  Notwithstanding the foregoing, this provision of the Plan is not intended to waive

18   or release any cause of action based on prepetition actions or conduct, including but not limited to

19   any Estate Causes of Action or D&O Claims.

20       **B.    Injunction Enjoining Holders of Claims against Debtor.**

21          The Plan is the sole means for resolving, paying or otherwise dealing with Claims and Equity

22   Interests.  To that end, except as expressly provided in the Plan, at all times on and after the

23   Effective Date, all Persons who have been, are, or may be holders of Claims against or Interests in

24   the Debtor arising prior to the Effective Date, will be permanently enjoined from taking any of the

25   following actions, on account of any such Claim or Equity Interest, against the Debtor, its Estate, the

26   Liquidating Trust or its property (other than actions brought to enforce any rights or obligations

27   under the Plan):

28       (i)     commencing, conducting or continuing in any manner, directly or indirectly any suit,

1   action, or other proceeding of any kind against the Debtor, its Estate, the Liquidating Trust, or the

2   Liquidating Trustee, their successors, or their respective property or assets (including, without

3   limitation, all suits, actions, and proceedings that are pending as of the Effective Date which will be

4   deemed to be withdrawn or dismissed with prejudice);

5        (ii)    Enforcing, levying, attaching, executing, collecting, or otherwise recovering by any

6   manner or means whether directly or indirectly any judgment, award, decree, or order against the

7   Debtor, its Estate, the Liquidating Trust, or the Liquidating Trustee, their successors, or their

8   respective property or assets;

9        (iii)    creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any

10  lien, security interest or encumbrance against the Debtor, its Estate, the Liquidating Trust, or the

11  Liquidating Trustee, their successors, or their respective property or assets; and

12       (iv)    proceeding in any manner in any place whatsoever against the Debtor, its Estate, the

13  Liquidating Trust, or the Liquidating Trustee, their successors, or their respective property or assets,

14  that does not conform to or comply with the provisions of the Plan.

15       **C.**    **Nondischarge of the Debtor.**

16       In accordance with Bankruptcy Code section 1141(d)(3), the Confirmation Order will not

17  discharge Claims.  However, no Holder of a Claim may receive any payment from, or seek recourse

18  against, any assets that are to be distributed under the Plan other than assets required to be

19  distributed to that Holder pursuant to the Plan.  As of the Confirmation Date, all Persons are

20  enjoined from asserting against any property that is to be distributed under the Plan, any Claims,

21  rights, causes of action, liabilities, or Equity Interests based upon any act, omission, transaction, or

22  other activity that occurred before the Confirmation Date except as expressly provided in the Plan or

23  the Confirmation Order.

24  **XII.**    **MISCELLANEOUS PROVISIONS**

25       **A.**    **Payment Of Statutory Fees.**

26       All quarterly fees due and payable to the Office of the United States Trustee pursuant to

27  section 1930(a)(6) of title 28 of the United States Code shall be duly paid in full on or before the

28  Effective Date, as required by section 1129(a)(12) of the Bankruptcy Code.  The Liquidating Trust

shall be responsible for timely payment of such quarterly fees due and payable after the Effective

Date and until the Chapter 11 Case is closed, pursuant to section 1930(a)(6) of title 28 of the United

States Code, with respect to cash disbursements made by the Disbursing Agent under the Plan.  After

the Effective Date and until the Chapter 11 Case is closed, the Liquidating Trustee shall file with the

Office of the United States Trustee monthly financial reports specifying all disbursements made

pursuant to the Plan and shall make all payments based upon such disbursements as required by

applicable law.

      **B.**      **Preservation Of Rights Of Action.**

      Except to the extent any rights, claims, causes of action, defenses, and counterclaims are

expressly and specifically released in connection with this Plan or in any settlement agreement

approved during the Chapter 11 Case: (i) any and all Estate Causes of Action and D&O Claims

accruing to the Debtor's Estate shall vest in the Liquidating Trust on the Effective Date, whether or

not litigation relating thereto is pending on the Effective Date, and whether or not any such Estate

Causes of Action and/or D&O Claims have been listed or referred to in this Plan, the Disclosure

Statement, or any other document filed with the Bankruptcy Court, and (ii) the Debtor's Estate does

not waive, release, relinquish, forfeit, or abandon (nor shall it be estopped or otherwise precluded or

impaired from asserting) any Estate Cause of Action or D&O Claim that constitutes property of the

Debtor's Estate: (a) whether or not such Estate Cause of Action and/or D&O Claim has been listed or

referred to in this Plan, the Disclosure Statement, or any other document filed with the Bankruptcy

Court, (b) whether or not such Estate Cause of Action or D&O Claim is currently known to the

Debtor or the Liquidating Trustee, and (c) whether or not a defendant in any litigation relating to

such Estate Cause of Action and/or D&O Claim filed a proof of claim in the Chapter 11 Case, filed a

notice of appearance or any other pleading or notice in the Chapter 11 Case, voted for or against this

Plan, or received or retained any consideration under this Plan.

      **C.**      **Headings.**

      Headings are used in the Plan for convenience and reference only, and shall not constitute a

part of the Plan for any other purpose.

**D.      Binding Effect.**

The Plan shall be binding upon and inure to the benefit of the Debtor's Estate, holders of Claims, holders of Equity Interests, and their respective successors or assigns.

**E.      Revocation Or Withdrawal.**

**1.      Right To Revoke.**

The Debtor and the Committee reserve the right to jointly revoke or withdraw the Plan prior to the Confirmation Date.

**2.      Effect Of Withdrawal Or Revocation.**

If either the Debtor or the Committee withdraws as a proponent of the Plan prior to the Confirmation Date, the other may seek approval as the sole proponent of the Plan.  If the Debtor and Committee jointly revoke the Plan prior to the Confirmation Date or if the Confirmation Date or the Effective Date does not occur, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor or its Estate or any other person or to prejudice in any manner the rights of the Debtor, the Debtor or its Estate or any person in any further proceedings involving the Debtor.

**F.      Governing Law.**

Unless a rule of law or procedure is supplied by (i) federal law (including the Bankruptcy Code and Bankruptcy Rules), or (ii) an express choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with, this Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents and instruments executed in connection with this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of California without giving effect to the principles of conflict of laws thereof.

**G.      Withholding, Reporting, And Payment Of Taxes.**

In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Liquidating Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements.  The Liquidating

1  Trustee shall report and pay taxes on the income of the Liquidating Trust Assets, if any, as required

2  by applicable law.  In addition, to the extent required by applicable law, reported distributions from

3  such reserves shall include all interest and investment income, if any, attributable to the Cash or

4  property being distributed net of taxes which are, or are estimated to be, due and payable thereon.

5       **H.**    **Other Documents And Actions.**

6      The Debtor on and prior to the Effective Date and the Liquidating Trustee after the Effective

7  Date may execute such other documents and take such other actions as may be necessary or

8  appropriate to effectuate the transactions contemplated under this Plan.

9       **I.**    **Modification Of The Plan.**

10      Prior to the Effective Date, the Plan may be altered, amended, or modified pursuant to

11  section 1127 of the Bankruptcy Code solely upon the mutual agreement between the Debtor and the

12  Committee, unless the other party has withdrawn as a proponent of the Plan.  After the Effective

13  Date, the Liquidating Trustee shall have the sole authority and power to alter, amend, or modify the

14  Plan pursuant to section 1127 of the Bankruptcy Code.

15       **J.**    **Notices.**

16      Any notice to the Debtor, Liquidating Trustee, Committee, or United States Trustee required

17  or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail,

18  return receipt requested, postage prepaid, (b) hand delivery, or (c) reputable overnight delivery

19  service, freight prepaid, to be addressed as follows:

20  **Debtor**:
21  Vineyard National Bancorp
   4000 Barranca Parkway
22  Suite 250
   Irvine, CA 92604
23  Attention: Donald H. Pelgrim, Jr.

24  **With a copy to**:
   Landau Gottfried& Berger LLP
25  1801 Century Park East
   Suite 1460
26  Los Angeles, CA 90067
27  Attention: Jon L. Dalberg

28

**Liquidating Trustee**:
[TO COME]

**Committee Counsel**:
Winston & Strawn LLP
101 California Street, 39th Floor
San Francisco, California 94111-5802
Attention: Robert A. Julian, Esq./Todd J. Dressel, Esq.

**Office of the United States Trustee**:
United States Trustee
3685 Main Street Suite 300
Riverside, CA 92501
Attention: Timothy Farris

K.      **Severability of Plan Provisions.**

If, prior to Confirmation, any term or provision of the Plan does not govern the treatment of

Claims or Equity Interests, or is held by the Bankruptcy Court to be invalid, void or unenforceable,

the Bankruptcy Court shall have the power to alter and interpret such term(s) or provision(s) to make

it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the

term or provision held to be invalid, void or unenforceable, and such term or provision shall then be

applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation,

the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in

no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The

Confirmation Order shall constitute a judicial determination and shall provide that each term and

provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is

valid and enforceable pursuant to its terms.

L.      **Successors And Assigns.**

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be

binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and

assigns of such entity.

M.      **Post-Confirmation Notice.**

From and after the Effective Date, any person who desires notice of any pleading or

document filed in the Bankruptcy Court, or any hearing in the Bankruptcy Court, or other matter as

43
EXHIBIT A
122

1    to which the Bankruptcy Code requires notice to be provided, shall file a request for post-

2    confirmation notice and shall serve the request on the Liquidating Trustee; provided, however, the

3    United States Trustee shall be deemed to have requested post-confirmation notice.

4    DATED:                                          Respectfully submitted,

5                                                    VINEYARD NATIONAL BANCORP

6

7                                                    By:    _____
                                                           Donald H. Pelgrim
8                                                          Executive Vice President and Chief
                                                           Administrative Officer of Debtor
9                                                          Vineyard National Bancorp.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7    Presented By:

8    LANDAU GOTTFRIED & BERGER, LLP

9

10   By: _____

11        Jon L.R. Dalberg
         Attorneys for Vineyard National Bancorp

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS


By:    _____
        Julie J. Becker
        Chairperson,
        On Behalf of Wilmington Trust
        Company

45
EXHIBIT A
124

LIST OF EXHIBITS

Exhibit "1"     List of Executory Contracts Assumed

Exhibit "2"     List of Executory Contracts Rejected

Exhibit "3"     Liquidating Trust Agreement

1

## EXHIBIT "1" TO PLAN

2

### LIST OF ASSUMED CONTRACTS

3        Effective upon the Effective Date, the Debtor hereby assumes the following executory

4   contracts and unexpired leases, and will make the Cure Payments so specified.  Inclusion herein does

5   not constitute an admission by the Debtor that an executory contract or unexpired lease exists, is

6   valid or that it is an executory contract or lease.  As a matter of prudence, the following list includes

7   contracts and leases which may have previously been rejected or canceled or assigned or which may

8   have expired:

9

10   NONE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "2" TO PLAN

## LIST OF REJECTED CONTRACTS

Effective upon the Effective Date, the Debtor hereby rejects the following executory contracts and unexpired leases.  Inclusion herein does not constitute an admission by the Debtor that an executory contract or unexpired lease exists, is valid or that it is an executory contract or lease. Notwithstanding any failure to list an executory contract or unexpired lease on this Exhibit "2", the provisions of section VIII.C of the Plan operate to reject all executory contracts and unexpired leases that have not been previously assumed, assumed pursuant to Section VIII.A of the Plan, or rejected by order of the Bankruptcy Court pursuant to Bankruptcy Code section 365.  As a matter of prudence, the following list includes contracts and leases which may have previously been rejected or canceled or assigned or which may have expired:

| REF # | NAME | ADDRESS | AGREEMENT | DATE |
|-------|------|---------|-----------|------|
|       | Mini-U-Storage |  |  |  |
|       | Premier Office Lease |  |  |  |

# EXHIBIT "3" TO PLAN

## LIQUIDATING TRUST AGREEMENT

**LIQUIDATING TRUST AGREEMENT OF Vineyard national Bancorp**

**By and Between**

**Vineyard National Bancorp,**
**as Debtor and Debtor-in-possession**

**and**

**Bradley D. Sharp of Development Specialists, Inc.**
**as Trustee**

**Dated:  , 2010**

# TABLE OF CONTENTS

**PAGE**

Section I      TRUSTEE .................................................................2
    A.      Appointment ...................................................2
    B.      Generally ........................................................2
    C.      Scope of Authority ........................................3
    D.      Powers ............................................................3
    E.      Additional Powers .........................................5
    F.      Limitation of Trustee's Authority ...............6
    G.      Liability of Trustee ........................................7
    H.      Reliance by Trustee .......................................7
    I.      Authorization to Expend Liquidating Trust Assets .................7
    J.      Compensation of the Trustee ......................8
    K.      Exculpation; Indemnification .....................8
    L.      Bond ................................................................9
    M.      Confidentiality ..............................................9
    N.      Final Decree ..................................................9
    O.      Termination ....................................................9

Section II      THE LIQUIDATING TRUST ............................9
    A.      Transfer of Assets to Liquidating Trust ......9
    B.      Title to Assets .................................................9
    C.      Funding of Liquidating Trust ......................10
    D.      Valuation of Assets ......................................10
    E.      Termination of Liquidating Trust ...............10
    F.      Post-Confirmation Committee .....................10

Section III      BENEFICIARIES ...........................................13
    A.      Identification of Beneficiaries .....................13
    B.      Withholding ...................................................13
    C.      Tax Identification Numbers .........................14

Section IV      PURPOSE, AUTHORITY, LIMITATIONS, AND DISTRIBUTIONS ...............14
    A.      Purpose of the Liquidating Trust ................14
    B.      Resolution of Liquidating Trust Assets by the Trustee ...........14
    C.      Books and Records .......................................14
    D.      Disputed Claim Reserve ..............................15
    E.      Application of Liquidating Trust Assets ......15
    F.      Compliance with Laws ................................16

Section V      SUCCESSOR TRUSTEE .............................16
    A.      Removal .........................................................16
    B.      Resignation ....................................................16
    C.      Acceptance of Appointment by Successor Trustee ..................16

## TABLE OF CONTENTS (CONT'D)

**PAGE**

Section VI      REPORTING ...................................................................................................17
    A.      Tax and Other Reports ...............................................................................17
    B.      Federal Income Tax. ...................................................................................17
    C.      Other ...........................................................................................................18

Section VII     TRANSFER OF BENEFICIARY'S INTERESTS .....................................18
    A.      Transfer of Beneficial Interests .................................................................18

Section VIII    MISCELLANEOUS PROVISIONS ...........................................................18
    A.      Amendment; Waiver ...................................................................................18
    B.      Intention of Parties to Establish Grantor Trust .........................................18
    C.      Preservation of Privilege ............................................................................18
    D.      Cooperation .................................................................................................19
    E.      Laws as to Construction .............................................................................19
    F.      Severability .................................................................................................19
    G.      Notices ........................................................................................................19
    H.      Notices if to a Beneficiary .........................................................................20
    I.      Third-Party Beneficiary .............................................................................20
    J.      Headings .....................................................................................................20
    K.      Counterparts ...............................................................................................21

## LIQUIDATING TRUST AGREEMENT

THIS AGREEMENT is made this __ day of _____ 2010, by and between Vineyard National Bancorp (the "Debtor") and (ii) Bradley D. Sharp of Development Specialists, Inc. ("Sharp," and together with any successors, the "Trustee")[1] under the Plan (as defined below).

## R E C I T A L S:

A.      On July 21, 2009, the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California.

B.      On August 12, 2009, the Office of the United States Trustee (the "U.S. Trustee") appointed the members of the Official Committee of Unsecured Creditors and amended the same by Notice dated September 10, 2009 (the "Committee").

C.      By order, dated _____ __, 2010, the Bankruptcy Court confirmed the Joint Plan of Liquidation Of the Debtor and the Committee of Unsecured Creditors dated December __, 2009 (as same may have been or may be amended, the "Plan").

D.      The Liquidating Trust of Vineyard National Bancorp ("Liquidating Trust") is created on behalf of, and for the benefit of, the Holders of Allowed Claims of the Debtor (collectively, the "Beneficiaries"). As provided in the Plan, each Holder of an Allowed Class 3 Claim and Class 4 Claim shall receive a Distribution from Available Cash, on a *Pro Rata* basis, on account of its Allowed Claim pursuant to the terms of the Plan, in full satisfaction, discharge, exchange and release thereof, and upon payment by the Liquidating Trust of amounts due, if any, to a Holder of an Allowed Claim, any interest as a Beneficiary of the Liquidating Trust shall terminate and be of no further force and effect.

E.      The Liquidating Trust is created pursuant to, and to effectuate, the Plan for the primary purpose of liquidating the assets transferred to it (the "Liquidating Trust Assets") and otherwise administering the post-confirmation estate of the Debtor for the benefit of the Beneficiaries as a liquidating trust, in accordance with Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. The Trustee shall act as the liquidator of assets of the Liquidating Trust under this agreement.

F.      The Liquidating Trust provides that the Beneficiaries of the Liquidating Trust will be treated as the grantors of the Liquidating Trust and deemed owners of the

---

[1] As used in this Agreement, the term "Trustee" shall have the same meaning as the term "Liquidating Trustee" used in the Plan.

1

Liquidating Trust Assets.  This Liquidating Trust requires the Trustee to file returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation §1.671-4(a).

G.    The Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Beneficiaries treated as the grantors and owners of the trust.

H.    This Liquidating Trust provides for consistent valuations of the transferred property by the Trustee and Beneficiaries, and those valuations must be used for all federal income tax purposes.

I.    All of the Liquidating Trust's income and/or recoveries are to be treated as subject to tax on a current basis to the Beneficiaries who will be responsible for payment of any tax due.

J.    Subject to Section II(E) hereof, this Liquidating Trust contains a fixed determinable termination date that is not more than five years from the date of creation of the Liquidating Trust and that is reasonable based on all of the facts and circumstances.

K.    The investment powers of the Trustee are subject to section 345 of the Bankruptcy Code, except as may otherwise be ordered by the Bankruptcy Court and authorized by the Post-Effective Date Committee.

L.    Unless otherwise extended by the Post-Confirmation Committee, the Trustee is required to distribute at least annually to the Beneficiaries its net income plus net proceeds from the sale of assets, except that the Liquidating Trust may retain an amount of net proceeds or net income reasonably necessary to maintain the value of the Liquidating Trust Assets or to meet claims and contingent liabilities (including disputed claims) and to fund the operations of and pay the expenses of administration of the Liquidating Trust.

M.    Capitalized terms used herein without definition shall have the respective meanings assigned to such terms in the Plan.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein and in the Plan, the Debtor and the Trustee agree as follows:

## SECTION I

**TRUSTEEAppointment**[_____] has been selected to serve as the Trustee under the Plan, and [_____] hereby accepts such appointment and agrees to serve in such capacity, effective upon the Effective Date of the Plan.  A successor Trustee may be appointed by the Post-Confirmation Committee (as defined in Section I.F. below) in the event that the Trustee is removed or resigns pursuant to this Agreement or the Trustee becomes incapacitated or otherwise vacates the position, and if not so appointed within thirty (30) days, shall be appointed by the Bankruptcy Court.

**B.    Generally**The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purposes of the Liquidating Trust and not otherwise. The Trustee may deal with the Liquidating Trust Assets as permitted by the provisions hereof,

including as set forth in Section I.D.  The Trustee shall have the authority to bind the Liquidating Trust and for all purposes hereunder shall be acting in the capacity as Trustee and not individually.

C.    **Scope of Authority**The responsibilities and authority of the Trustee shall include: (a) liquidating the Liquidating Trust Assets, (b) liquidating and resolving the Estate Causes of Action and D&O Claims, (c) facilitating the prosecution or settlement of objections to and estimations of Claims, (d) calculating and implementing all distributions in accordance with the Plan, (e) filing all required tax returns and paying taxes and all other obligations on behalf of the Liquidating Trust from funds held by the Liquidating Trust, (f) periodic reporting to the Bankruptcy Court and parties in interest of the status of the Claims resolution process, distributions on Allowed Claims, and prosecution of Estate Causes of Action and D&O Claims, (g) managing the wind-down of the Debtor's operations, if any, and (h) such other responsibilities and powers as may be vested in the Trustee pursuant to the Plan or Bankruptcy Court order or not inconsistent therewith or as may be necessary and proper to carry out the provisions of the Plan.  The Trustee shall use reasonable best efforts to consult with the Post-Confirmation Committee.

D.    **Powers**The powers of the Trustee shall, without any further Bankruptcy Court approval (except as specifically required herein) and subject in all respects to the other terms and conditions of this Agreement, include (i) the power to invest funds in, and withdraw, make distributions and pay taxes and other obligations owed by the Liquidating Trust from funds held by the Trustee in accordance with the Plan, (ii) the power to deal with the Liquidating Trust Assets, (iii) the power to engage employees and professional persons to assist the Trustee with respect to its responsibilities, (iv) the power to litigate, compromise and settle Claims, Estate Causes of Action and D&O Claims on behalf of or against the Liquidating Trust, (v) the power to file pleadings and papers and seek relief before the Bankruptcy Court or other courts of competent jurisdiction, where appropriate, and (vi) such other powers as may be vested in or assumed by the Liquidating Trust or the Trustee pursuant to the Plan, Bankruptcy Court order or not inconsistent therewith or as may be necessary and proper to carry out the provisions of the Plan.  Except as expressly set forth in this Agreement, the Trustee shall have absolute discretion to pursue or not to pursue any and all Claims, Estate Causes of Action, D&O Claims or other matters, activities or things as it determines is in the best interests of the Beneficiaries and consistent with the purposes of the Liquidating Trust, and shall have no liability for the outcome of its decision, except as such decision may constitute an act of gross negligence, willful misconduct, or fraud.  The Trustee may incur reasonable and necessary expenses in liquidating and converting the Liquidating Trust Assets to cash, which shall be payable from the corpus of the Liquidating Trust.

1.    In connection with the administration of the Liquidating Trust, except as otherwise set forth in this Agreement or the Plan, the Trustee is authorized to perform any and all acts necessary and reasonable to accomplish the purposes of the Liquidating Trust.  Without limiting the foregoing, and subject in all respects to the other terms and conditions of this Agreement, the Trustee shall be expressly authorized, but shall not be required, to:

3

(1)     hold legal title to the Liquidating Trust Assets, any and all rights of the Beneficiaries in or arising from the Liquidating Trust Assets, including, but not limited to, the right to vote any claim or interest held by the Liquidating Trust Assets in a case under the Bankruptcy Code and receive any distribution therein;

(2)     protect and enforce the rights to the Liquidating Trust Assets vested in the Trustee by this Agreement by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable law and general principles of equity;

(3)     file objections, contest, settle, compromise, withdraw, litigate to judgment, adjust, arbitrate, sue on or defend, abandon, or otherwise deal with, in accordance with the terms set forth in Section IV.B hereof, the Estate Causes of Action, D&O Claims and any other claims in favor of or against the Liquidating Trust as the Trustee shall deem advisable;

(4)     establish and maintain accounts at banks and other financial institutions, in a clearly specified fiduciary capacity, in which the Liquidating Trust Assets or other cash and property of the Liquidating Trust may be deposited, and draw checks or make withdrawals from such accounts;

(5)     determine and satisfy any and all liabilities created, incurred or assumed by the Liquidating Trust;

(6)     pay all fees and expenses and make all other payments relating to the administration, management, maintenance, operation, preservation or liquidation of the Liquidating Trust Assets or pursuit of Estate Causes of Action and D&O Claims in accordance with the provisions of Section I.I hereof;

(7)     file, if necessary, any and all tax and information returns with respect to the Liquidating Trust and pay taxes properly payable by the Liquidating Trust, if any;

(8)     obtain insurance coverage with respect to the liabilities and obligations of the Trustee and the Liquidating Trust (in the form of an errors and omissions policy, fiduciary policy or otherwise); provided, however, the Liquidating Trust is a successor of the Debtor for the purposes of continuing to receive benefits under insurance policies entered into by the Debtor;

(9)     obtain insurance coverage with respect to real and personal property which may be or may become Liquidating Trust Assets, if any;

4

EXHIBIT A
135

(10)   retain and pay such law firms to aid the Trustee in the prosecution of any Estate Causes of Action and D&O Claim that constitute the Liquidating Trust Assets, and to perform such other functions as may be appropriate, including advising or assisting the Trustee in the discharge of its duty as Trustee. The Trustee may commit the Liquidating Trust to and shall pay such law firms compensation for services rendered and expenses incurred;

(11)   retain and pay a public accounting firm to perform such reviews and/or audits of the financial books and records of the Liquidating Trust and to prepare and file any tax returns or informational returns for the Liquidating Trust as may be required. The Trustee may commit the Liquidating Trust to and shall pay such accounting firm reasonable compensation for services rendered and expenses incurred;

(12)   retain and pay such third parties as necessary or appropriate to assist the Trustee in carrying out its powers and duties under this Agreement. The Trustee may commit the Liquidating Trust to and shall pay all such persons or entities compensation for services rendered and expenses incurred, as well as commit the Liquidating Trust to indemnify any such parties in connection with the performance of services on market terms, including an exception for such parties' losses occasioned or based upon such parties' gross negligence, willful misconduct, or fraud;

(13)   invest any moneys held as part of the Liquidating Trust Assets in accordance with the terms of Section I.F.2 hereof;

(14)   represent the interests of the Beneficiaries with respect to any matters relating to the Plan, this Agreement or the Liquidating Trust affecting the rights of such Beneficiaries;

(15)   take any and all actions necessary to dissolve the Debtor; and

(16)   engage in any transaction necessary or appropriate to the foregoing or to facilitate implementation of the Plan, including but not limited to, entering into, performing and exercising rights under contracts and leases on behalf of the Liquidating Trust.

**E.     Additional Powers** Except as otherwise set forth in this Agreement or in the Plan, and subject to the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, but without prior or further authorization, the Trustee may control and exercise authority over the Liquidating Trust Assets and over the protection, conservation and disposition thereof. No person dealing with the Liquidating Trust shall be obligated to inquire into the authority of the Trustee in connection with the protection, conservation or disposition of Liquidating Trust

Assets.  It is intended that a signed copy of this Agreement serve as adequate proof of the Trustee's authority to act if such proof is required for any reason by any third party.

      **F.**     **Limitation of Trustee's Authority**<u>No Trade or Business</u>The Trustee shall not and shall not be authorized to engage in any trade or business with respect to the Liquidating Trust Assets or any proceeds therefrom except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust and shall take such actions consistent with the prompt and orderly liquidation of the Liquidating Trust Assets as required by applicable law and consistent with the treatment of the Liquidating Trust as a liquidating trust under Treasury Regulation Section 301.7701-4(d).

           **2.**    <u>Investment and Safekeeping of Liquidating Trust Assets</u>All moneys and other assets received by the Liquidating Trust shall, until distributed or paid over as herein provided, be held in trust for the benefit of the Beneficiaries, but need not be segregated from other Liquidating Trust Assets, unless and to the extent required by law or by the Plan.  The Trustee shall be under no liability for interest or producing income on any moneys received by the Liquidating Trust hereunder and held for distribution or payment to the Beneficiaries, except as such interest shall actually be received by the Trustee.  Investments of any moneys held by the Liquidating Trust shall be administered in view of the manner in which individuals of ordinary prudence, discretion and judgment would act in the management of their own affairs; <u>provided, however,</u> that the right and power of the Trustee to invest the Liquidating Trust Assets, the proceeds thereof, or any income earned by the Liquidating Trust, shall be limited to the right and power to invest such assets (pending periodic distributions in accordance with Section IV.E hereof) in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary liquid investments, such as Treasury bills, except for such other investments as may be authorized by the Post-Confirmation Committee; and, <u>provided, further</u>, that the scope of any such permissible investments shall be limited to include only those investments (a) that are consistent with the provisions of section 345 of the Bankruptcy Code unless ordered otherwise by Bankruptcy Court and (b) that a liquidating trust, within the meaning of Treasury Regulation Section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

6

EXHIBIT A

**G.    Liability of Trustee** In no event shall the Trustee, the Trustee's employees, or any of the Trustee's professionals or representatives be held personally liable for any claim asserted against the Liquidating Trust, the Trustee, the Trustee's employees, or any of the Trustee's professionals or representatives, except to the extent occasioned by or based upon willful misconduct, gross negligence or fraud.  Specifically, the Trustee, the Trustee's employees, and any of the Trustee's professionals or representatives shall not be liable for any negligence or any error of judgment in either case made in good faith, or with respect to any action taken or omitted to be taken in good faith, except to the extent that the action taken or omitted to be taken by the Trustee, the Trustee's employees, or any of the Trustee's professionals or representatives are determined by a Final Order to be due to their own respective gross negligence, willful misconduct, or fraud.

**H.    Reliance by Trustee** Except as otherwise provided in Section I.F hereof:

1.    the Trustee may rely upon, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

2.    the Trustee may consult with legal counsel, financial or accounting advisors and other professionals to be selected by it, and the Trustee shall not be liable for any action taken or omitted to be taken by it in accordance with the advice thereof; and

3.    persons dealing with the Trustee shall look only to the Liquidating Trust Assets to satisfy any liability incurred by the Trustee to such person in carrying out the terms of this Agreement, and the Trustee shall have no personal obligation to satisfy any such liability, except to the extent such liability or obligation arises as a result of the gross negligence, willful misconduct, or fraud of the Trustee in which case the Liquidating Trust Assets shall not be subject to such claims or liabilities.

**I.    Authorization to Expend Liquidating Trust Assets** Subject to the restrictions imposed by the Post-Confirmation Committee, the Trustee may expend the assets of the Liquidating Trust (i) to pay expenses of administration of the Liquidating Trust (including, but not limited to, the fees and expenses of the Trustee and the Post-Confirmation Committee members, any taxes imposed on the Liquidating Trust or in respect of the assets of the Liquidating Trust, and fees and expenses in connection with litigation), and (ii) to satisfy other liabilities incurred or assumed by the Liquidating Trust (or to which the assets are otherwise subject) in accordance with this Agreement or the Plan.

**J.**   **Compensation of the Trustee**The Liquidating Trust shall reimburse the Trustee for the actual reasonable out-of-pocket expenses incurred by the Trustee, including, without limitation, necessary travel, lodging, postage, telephone and facsimile charges upon receipt of periodic billings.

2.   Subject to such adjustments as may be agreed to from time to time by the Post-Confirmation Committee and the Trustee, the Trustee and employees of the Trustee shall be entitled to receive compensation pursuant to that certain engagement letter attached hereto as Exhibit A for services rendered on behalf of Liquidating Trust.  Any change in compensation must first be approved by the Post-Confirmation Committee or be pursuant to an Order of the Bankruptcy Court following notice and opportunity to be heard.

3.   The Liquidating Trust Assets shall be subject to the claims of the Trustee, and the Trustee shall be entitled to reimburse itself out of any available cash in the Liquidating Trust, for its actual out-of-pocket expenses and against and from any and all loss, liability, expense, or damage which the Trustee may sustain in good faith and without willful misconduct, gross negligence, or fraud in the exercise and performance of any of the powers and duties of the Trustee.

4.   All compensation and other amounts payable to the Trustee shall be paid from the assets of the Liquidating Trust.  If the cash in the Liquidating Trust shall be insufficient to compensate and reimburse the Trustee, as the case may be, for any amounts to which it is entitled hereunder, then the Trustee is hereby authorized to reduce to cash in a commercially reasonable manner that portion of the Liquidating Trust Assets necessary so as to effect such compensation and reimbursement.

**K.**   **Exculpation; Indemnification**From and after the Effective Date, the Trustee, the Trustee's employees and each of their professionals and representatives (or their designees) shall be and hereby are exculpated by all Persons, including, without limitation, Holders of Claims and other parties in interest, from any and all claims, causes of action and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Trustee by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law or otherwise, except only for actions or omissions to act only to the extent determined by a Final Order to be due to their own respective gross negligence, willful misconduct, or fraud after the Effective Date.  No Holder of a Claim or other party in interest will have or be permitted to pursue any claim or cause of action against the Trustee, the Liquidating Trust or the employees, professionals or representatives of the Trustee for making payments in accordance with the Plan or for implementing the provisions of the Plan except in cases of gross negligence, willful misconduct, or fraud.  The Liquidating Trust shall indemnify, defend and hold harmless the Trustee, the Trustee's employees and any of their professionals or representatives from and against any and all claims, causes of action, liabilities, obligations, losses, damages or expenses (including attorneys' fees) (other than only to the extent determined

8

EXHIBIT A

by a Final Order to be due to their own respective gross negligence, willful misconduct, or fraud after the Effective Date) to the fullest extent permitted by applicable law and any obligations, liabilities or expenses incurred by any such persons or entities shall be payable from the Liquidating Trust Assets.  Any action taken or omitted to be taken with the approval of the Bankruptcy Court or the Post-Confirmation Committee will conclusively be deemed not to constitute gross negligence, willful misconduct, or fraud.

      **L.**      **Bond**If the Bankruptcy Court so orders, the Trustee shall serve with bond.

      **M.**      **Confidentiality**The Trustee shall, and shall cause its agents and representatives to, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity or matter to which any of the Liquidating Trust Assets relates or of which he has become aware in its capacity as Trustee.

      **N.**      **Final Decree**It shall be the duty of the Trustee to seek and obtain a final decree or decrees from the Bankruptcy Court upon full administration of the Liquidating Trust.

      **O.**      **Termination**The duties, responsibilities and powers of the Trustee will terminate on the date the Liquidating Trust is dissolved under applicable law in accordance with the Plan, or by an Order of the Bankruptcy Court or by entry of a final decree closing the Chapter 11 Case.

## SECTION II
## THE LIQUIDATING TRUST

      **A.**      **Transfer of Assets to Liquidating Trust**Pursuant to the Plan, the Debtor and the Trustee hereby establish, on behalf of the Beneficiaries, and the Debtor hereby transfers, assigns, and delivers to the Liquidating Trust, on behalf of the Beneficiaries, all right, title and interest in the Debtor's Assets, including but not limited to (a) all Available Cash, and (b) all claims and Estate Causes of Action of the Estate, including the D&O Claims that the Committee has been vested with authority to pursue and prosecute to the fullest extent by the Bankruptcy Court's "Order Vesting Official Committee of Unsecured Creditors with Authority and Standing to Investigate, Bring, Maintain and Settle Claims" entered on October 23, 2009.  The Trustee agrees to accept and hold the Liquidating Trust Assets for the Beneficiaries, subject to the terms of the Plan and this Agreement.

      **B.**      **Title to Assets**The transfer of the Debtor's assets to the Liquidating Trust (after taking into account any payment by the Debtor on the Effective Date to and/or full funding of the Allowed and projected Administrative Claims, Allowed Secured, Priority Tax and Priority Non-Tax Claims as well as postpetition fees and expenses) shall be made for the benefit of the holders of Allowed Class 3 and Class 4 Claims in accordance with the Plan.  The Payment of Distributions and the utilization of all Liquidating Trust Assets shall be made in accordance with the Plan.

      2.      For all federal income tax purposes, all parties (including, without limitation, the Debtor, the Trustee, and the Beneficiaries) shall treat the transfer of the Debtor's assets to the Liquidating Trust, as set forth in this

9

Section II.B, as a transfer of such assets to the Beneficiaries followed by a transfer of such assets by the Beneficiaries to the Liquidating Trust. Thus, the Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

**C.     Funding of Liquidating Trust**The Debtor shall, on the Effective Date, transfer to the Liquidating Trust on behalf of the Beneficiaries (in accordance with Section II.B hereof) any and all of the Debtor's real and personal property to form the Liquidating Trust Assets.  The Debtor shall have no further obligation to provide any funding with respect to the Liquidating Trust.

**D.     Valuation of Assets**As soon as practicable after the Effective Date, the Trustee shall apprise each of the Beneficiaries in writing of the value of the Liquidating Trust Assets by filing such valuation with the Bankruptcy Court.  The valuation shall be used consistently by all parties (including the Debtors, the Trustee and the Beneficiaries) for all federal income tax purposes.

**E.     Termination of Liquidating Trust**The Liquidating Trust will terminate no later than the fifth (5th) anniversary of the Effective Date; provided, however, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Liquidating Trust for a finite period if it is necessary to the liquidating purpose thereof.  Multiple extensions can be obtained. The Trustee shall not unduly prolong the duration of the Liquidating Trust and shall at all times endeavor to resolve, settle or otherwise dispose of all Claims, Estate Causes of Action and D&O Claims that constitute Liquidating Trust Assets and to effect the distribution of the Liquidating Trust Assets to the Beneficiaries in accordance with the terms hereof and terminate the Liquidating Trust in such time as calculated to maximize recoveries.  Prior to and upon termination of the Liquidating Trust, the Liquidating Trust Assets will be distributed to the Beneficiaries in accordance with their distribution rights under the Plan, subject to the provisions set forth herein.  If any distributions of the Liquidating Trust are not duly claimed then such distributions will be disposed of in accordance with the Plan.  Notwithstanding anything contained herein to the contrary, if the value of the Liquidating Trust Assets is less than the cost of postage and mailing for a distribution, the expense associated with seeking Court authority for a distribution and the expense of holding the estates open, the Trustee may contribute such assets to the charity of its choosing.

**F.     Post-Confirmation Committee**Post-Confirmation Committee Members.  The members of the Post-Confirmation Committee shall be comprised of the five members of the Committee as of the Effective Date, who are willing to serve in such capacity.  If a member of the Post-Confirmation Committee shall resign or be unable to serve, the remaining members shall be entitled, but not required, to select a replacement.  Any replacement member shall hold Claims of a type and against the same estates as close as possible to the claim held by the member being replaced.

10

2.    <u>Consultation with the Post-Confirmation Committee</u>.  The Trustee shall consult with the Post-Confirmation Committee on all material matters, including but not limited to the following:

(a)    the investment of cash and cash equivalents constituting Liquidating Trust Assets that do not comply with Section 345 of the Bankruptcy Code;

(b)    the purchase of proposed policies of insurance insuring the Liquidating Trust Assets or providing insurance coverage for the Trustee, Post-Confirmation Committee and their respective agents and representatives against claims and losses (which purchase is authorized hereunder);

(c)    settlements of Claims, Estate Causes of Action or D&O Claims where the amount in controversy equals or exceeds $250,000;

(d)    the employment of professionals to assist the Trustee with respect to its responsibilities;

(e)    expenditures or the incurrence of liabilities or expenses by the Trustee or Liquidating Trust to any one vendor other than the Trustee's professionals exceeding $50,000 in a single transaction or $150,000 in a series of related transactions;

(f)    the abandonment of material assets by the Trustee; and

(g)    Claims and the pursuit of Estate Causes of Action or D&O Claims.

3.    <u>Rights of the Post-Confirmation Committee</u>.  The Post-Confirmation Committee shall have the absolute right and power to determine the following:

(a)    to negotiate all modifications to the terms of the employment of the Trustee;

(b)    to require, at its discretion, the Trustee to post a bond or provide evidence of adequate insurance to ensure the faithful performance of the Trustee's obligations hereunder; and

(c)    to select a successor Trustee when a successor is required hereunder; and

(d)    to approve amendments to or waivers of any provisions of this Agreement.

11

EXHIBIT A

If the Trustee in good faith perceives a conflict between a provision of this Agreement and a direction by the Post-Confirmation Committee, the Trustee may promptly deliver a notice to the Post-Confirmation Committee requesting clarification and proposing a course of action to be taken by the Trustee.  If the Trustee does not receive a written response within three (3) business days after receipt of such notice by the Post-Effective Date Committee, the Trustee may take such actions as it deems advisable and consistent with the terms of the Plan and this Agreement.  In the event a response to such notice is timely received and a disagreement among the parties as to the correct course of action persists, the Trustee shall promptly seek resolution of such matter by the Bankruptcy Court.  In the event emergency action is required by the Trustee, and the Trustee is unable to provide three (3) business days prior written notice of a conflict, the Trustee is authorized to act notwithstanding the perceived conflict in order to avoid irreparable injury or harm to the Liquidating Trust Assets and its Beneficiaries and shall give such notice, if any, as may be practicable under the circumstances.

4.    <u>Bylaws</u>.  The Post-Confirmation Committee shall adopt its own bylaws.

5.    <u>Reporting</u>.  The Trustee shall submit such reports as it deems reasonable to the Post-Confirmation Committee (but at a minimum monthly), including, without limitation, reports on the commencement and prosecution of Estate Causes of Action and D&O Claims and the proceeds of liquidation of the Liquidating Trust Assets.  The Trustee shall also report to the Post-Confirmation Committee, at the request of any member of the Post-Confirmation Committee, on any matter that reasonably relates to the Liquidating Trust Assets; <u>provided</u>, <u>however</u>, that in providing such reports the Trustee shall take no action that will in any way infringe on attorney-client privilege or jeopardize the viability of on-going litigation by reporting on Estate Causes of Action or D&O Claims directly or indirectly to any interested parties that may be on the Post-Confirmation Committee.

6.    <u>Reimbursement of Committee Members</u>.  The Liquidating Trust may reimburse each member of the Post-Confirmation Committee for reasonable expenses, including out-of-pocket expenses relating to postage, telephone and facsimile charges for work performed on behalf of, or relating to the administration of, the Liquidating Trust or the Post-Confirmation Committee, the reasonable fees and expenses of counsel to any Member to the extent such fees are incurred in assisting the Member in performing its duties hereunder, and other necessary expenses.  All amounts payable pursuant to this paragraph 6 shall be paid from the Liquidating Trust Assets.  If the cash in the Liquidating Trust shall be insufficient to effect such reimbursement, then the Trustee is hereby authorized to reduce to cash in a commercially reasonably manner that

12

portion of the Liquidating Trust Assets necessary to effect such reimbursement. Any Member of the Post-Confirmation Committee may engage counsel to assist the Member in performing the Member's duties hereunder. The Post-Confirmation Committee shall not retain counsel for the Post-Confirmation Committee at the expense of the Trust unless pursuant to an order of the Court for cause shown.

7.    <u>Exculpation; Indemnification.</u>  From and after the Effective Date, the Post-Confirmation Committee members shall be and hereby are exculpated and released for acts in such capacity by all Entities, including, without limitation, holders of Claims and other parties in interest, from any and all claims, causes of action and other assertions of liability arising out of the discharge of the powers and duties conferred upon such members by the Plan, this Agreement or any Order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law or otherwise, except only for actions or omissions to act only to the extent determined by a Final Order to be due to their own respective gross negligence, willful misconduct, or fraud after the Effective Date. No holder of a Claim or other party in interest will have or be permitted to pursue any claim or cause of action against the Post-Confirmation Committee members for making a decision or casting a vote in implementing the provisions of the Plan or this Agreement. The Liquidating Trust shall indemnify, defend and hold harmless the Post-Confirmation Committee members from and against any and all claims, causes of action, liabilities, obligations, losses, damages or expenses (including attorneys' fees) (other than only to the extent determined by a Final Order to be due to their own respective gross negligence, willful misconduct, or fraud after the Effective Date) to the fullest extent permitted by applicable law and any obligations or liabilities incurred by any Post-Confirmation Committee member shall be paid from the Litigation Trust Assets.

## SECTION III
## BENEFICIARIES

**A.    Identification of Beneficiaries**In order to determine the actual names, addresses and tax identification numbers of the Beneficiaries, the Trustee shall be entitled to conclusively rely on the names, addresses and tax identification numbers set forth in the Debtor's (1) Schedules, (2) filed proofs of claim, or (3) books and records. Each Beneficiary's right to distribution from the Liquidating Trust, which is dependent upon such Beneficiary's classification under the Plan, shall be that accorded to such Beneficiary under the Plan. Each distribution by the Trustee to the Beneficiaries shall be made in accordance with the terms set forth herein.

**B.    Withholding**Unless otherwise permitted to be paid directly to a Beneficiary, the Trustee shall withhold from the amounts distributable to the Beneficiaries from the Liquidating

13

EXHIBIT A
144

Trust Assets at any time such sum or sums as may be required to be withheld under the income tax laws of the United States or of any state or political subdivision thereof.

      **C.**    **Tax Identification Numbers**The Trustee shall require any Beneficiary to furnish to the Trustee its Employer or Taxpayer Identification Number as assigned by the IRS and the Trustee may condition any distribution to any Beneficiary upon receipt of such identification number.  For the avoidance of doubt, the Trustee may request Bankruptcy Court authority to release funds set aside for distribution to Beneficiaries who have not provided proper tax identification numbers and make those funds available to remaining Beneficiaries.

**SECTION IV**
**PURPOSE, AUTHORITY, LIMITATIONS, AND DISTRIBUTIONS**

      **A.**    **Purpose of the Liquidating Trust**The Liquidating Trust shall be established for the primary purpose of liquidating its assets, in accordance with Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.  Accordingly, the Liquidating Trust shall, in an expeditious but orderly manner, liquidate and convert to cash the Liquidating Trust Assets, make timely distributions and not unduly prolong the duration of the Liquidating Trust.  The liquidation of the Liquidating Trust Assets may be accomplished either through the prosecution, compromise and settlement, abandonment or dismissal of any or all claims, rights or causes of action, or otherwise.

      **B.**    **Resolution of Liquidating Trust Assets by the Trustee**The Trustee shall be empowered to and, in its discretion (subject to the provisions hereof, including the requirement to consult with the Post-Confirmation Committee), may take all appropriate action with respect to the prosecution, settlement or other resolution of Claims, Estate Causes of Action and D&O Claims constituting the Liquidating Trust Assets.  The Trustee shall deal with all collections and settlements within the normal course of its duties.

      2.    Notwithstanding anything contained in this Agreement to the contrary, the Liquidating Trust may, but is not required to, submit a proposed settlement of Claims or Estate Causes of Action to the Bankruptcy Court or such other court of competent jurisdiction for its approval.   Any proposed settlement of a D&O Claim, however, must be submitted to the Bankruptcy Court for approval.

      **C.**    **Books and Records**On behalf of the Liquidating Trust, the Trustee shall maintain, in respect of the Liquidating Trust and the Beneficiaries, books and records relating to the assets and income of the Liquidating Trust and the payment of expenses of, and liabilities of, claims against or assumed by, the Liquidating Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof in accordance with Section VI hereof and to comply with applicable provisions of law.  Except as provided in

14

**EXHIBIT A**
145

Section VI.A hereof, nothing in this Agreement requires the Liquidating Trust or the Trustee to file any accounting or seek approval of any court with respect to the administration of the Liquidating Trust, or as a condition for making any payment or distribution out of the Liquidating Trust Assets. Beneficiaries shall have the right upon thirty (30) days' prior written notice delivered to the Trustee to inspect such books and records, provided that, if so requested, such Beneficiary shall have entered into a confidentiality agreement satisfactory in form and substance to the Trustee.

**D.    Disputed Claim Reserve**The Trustee shall maintain, in accordance with the Trustee's powers and responsibilities under the Plan and this Agreement, a reserve for any distributable amounts to be set aside on account of Disputed Claims. Such amounts (net of any expenses, including any taxes, of the escrow relating thereto) shall be distributed, as provided herein and in the Plan, as such Disputed Claims are resolved. If a Holder's Disputed Claim is resolved and becomes an Allowed Claim, the Holder shall become a Beneficiary, the amounts previously reserved on account of the Holder's Disputed Claims shall be distributed as provided herein and in the Plan, and the Holder shall receive the same percentage recovery as Holders of Allowed Claims in the same Class as if the Holder's Allowed Claim was an Allowed Claim as of the Effective Date of the Plan.

**E.    Application of Liquidating Trust Assets**Assuming Holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Claims, and Allowed Priority Non-Tax Claims have been paid or adequate reserves have been established to pay such claims, the Trustee shall apply all Liquidating Trust Assets, and any proceeds therefrom, as follows:

> 1.    Following the Effective Date, subject in all respects to the terms of the Plan, the Liquidating Trust shall apply all cash constituting Liquidating Trust Assets and any proceeds therefrom in the order and reflecting the priorities set forth below:

**FIRST**, to pay all the costs and expenses of the Liquidating Trust including, without limitation, the post-confirmation fees and expenses and any and all costs, expenses and liabilities incurred by the Trustee (including its professionals and advisors) in connection with the performance of duties under this Liquidating Trust Agreement as well as the costs, expenses and liabilities of the members of the Post-Confirmation Committee as permitted herein.

**SECOND,** to the Beneficiaries in accordance with the Plan.

Notwithstanding anything to the contrary in this Section IV, prior to making any distribution pursuant to Paragraph SECOND hereof, the Trustee may retain such amounts (i) to pay estimated expenses of administration (including, but not limited to, the fees and expenses of the Trustee and Post-Confirmation Committee, any taxes imposed on the Liquidating Trust or in respect of the assets of the Liquidating Trust, and fees and expenses in connection with litigation), (ii) to satisfy other liabilities incurred or assumed by the Liquidating Trust (or to which the assets are otherwise subject), all for the term of the Liquidating Trust and in accordance with this Agreement or the Plan, and (iii) to satisfy the

15

post-confirmation fees and expenses detailed in the Plan; provided, however, that, from the net amount distributable, the Trustee may reserve, in accordance with the provisions of Section IV.E hereof, such amounts as would be distributable in respect of Disputed Claims (treating such Claims for this purpose, as if they were Allowed Claims).

       2.   <u>Distribution</u>.   Subject to the provisions of Section IV.D hereof, the Liquidating Trust shall distribute to the holders of Allowed Claims all net cash recoveries plus all net cash proceeds from the liquidation of the Liquidating Trust Assets (including as cash for this purpose, all cash equivalents) at such time intervals as decided by the Liquidating Trust in accordance with the terms of the Plan, provided that the Liquidating Trust shall make distributions no less frequently than on an annual basis unless otherwise agreed by the Post-Confirmation Committee.

     **F.**    **Compliance with Laws**Any and all distributions of Liquidating Trust Assets shall be in compliance with applicable laws, including, but not limited to, applicable federal and state securities laws.

**SECTION V**
**SUCCESSOR TRUSTEE**

     **A.**    **Removal**The Trustee may be removed by the Post-Confirmation Committee (i) by a majority vote of the Post-Effective Date Committee if the Trustee is removed for cause or (ii) by a unanimous vote of the Post-Effective Date Committee if the Trustee is removed for any other reason.

     **B.**    **Resignation**The Trustee may resign by giving not less than thirty (30) days' prior written notice thereof to the Bankruptcy Court.  Such resignation shall become effective on the later to occur of (i) the date specified in such notice and (ii) the selection of a successor and the acceptance by such successor of such appointment.

     **C.**    **Acceptance of Appointment by Successor Trustee**Any successor Trustee shall be chosen by the Post-Confirmation Committee.  Any successor Trustee appointed hereunder shall execute an instrument accepting such appointment hereunder and shall file such acceptance with the Liquidating Trust records.  If required, a successor should post a bond or provide evidence of insurance adequate to ensure the performance of the obligations of the successor hereunder.  Thereupon, such successor Trustee shall, without any further act, become vested with all the estate's properties, rights, powers, trusts and duties of its predecessor in the Liquidating Trust with like effect as if originally named herein; provided, however, that a removed or resigning Trustee shall, nevertheless, when requested in writing by the successor Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Trustee under the Liquidating Trust all the estates, properties, rights, powers, and trusts of such predecessor Trustee.

16

EXHIBIT A
147

## SECTION VI
## REPORTING

**A.     Tax and Other Reports** As soon as practicable after the end of each calendar year or as reasonably requested by the Post-Confirmation Committee, and as soon as practicable upon termination of the Liquidating Trust, the Trustee shall submit to the Bankruptcy Court and Post-Confirmation Committee a written report including: (i) financial statements of the Liquidating Trust at the end of such calendar year or period and the receipts and disbursements of the Liquidating Trust for such period; (ii) a description of any action taken by the Trustee in the performance of its duties which materially and adversely affects the Liquidating Trust and of which notice has not previously been given to the Beneficiaries, and (iii) subject to Section VI.B, a separate statement for each Beneficiary setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct all such holders to report such items on their federal income tax returns.   The Trustee shall promptly submit additional reports to the Bankruptcy Court and Post-Confirmation Committee whenever an adverse material event or change occurs which affects either the Liquidating Trust or the rights of the Beneficiaries hereunder.

**B.     Federal Income Tax.**

1.     Grantor Trust Status.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Trustee of a private letter ruling if the Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Trustee), the Trustee shall file returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a).

2.     Allocations of Liquidating Trust Taxable Income. Subject to the provisions of Section VI.B.1 hereof, allocations of Liquidating Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restriction on distributions described herein) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all of its other assets (valued for this purpose at their tax book value) to Beneficiaries (treating to the extent determined by the Trustee in its sole discretion, any holder of a Disputed Claim, for this purpose, as a current Beneficiary entitled to distributions), taking into account all prior and concurrent distributions from the Liquidating Trust (including all distributions held in reserve pending the resolution of Disputed Claims). Similarly, taxable losses of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets.  The tax book value of the Liquidating Trust Assets for this purpose shall equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Liquidating Trust, adjusted

17

in either case in accordance with tax accounting principles prescribed by the Internal Revenue Code, the regulations and other applicable administrative and judicial authorities and pronouncements.

**C.    Other**The Trustee shall also file (or cause to be filed) any other statements, returns or disclosures relating to the Liquidating Trust, that are required to be filed by any governmental unit or under applicable law, guidelines, rules and regulations.

## SECTION VII
## TRANSFER OF BENEFICIARY'S INTERESTS

**A.    Transfer of Beneficial Interests**The interests of the Beneficiaries in the Liquidating Trust, which are reflected only on the records of the Liquidating Trust maintained by the Trustee shall be transferable after written notice to the Trustee only:  (a) pursuant to applicable laws of descent and distribution (in the case of a deceased individual Beneficiary); (b) by operation of law; or (c) by any other method that complies with applicable securities and tax laws and does not result in an adverse consequence to the Liquidating Trust.  The Trustee shall not be required to record any transfer in favor of any transferee which, in the sole discretion of the Trustee, is or might be construed to be ambiguous or to create uncertainty as to the holder of the interest in the Liquidating Trust.  Until a transfer is in fact recorded on the books and records maintained by the Trustee for the purpose of identifying Beneficiaries, the Trustee, whether or not in receipt of documents of transfer or other documents relating to the transfer, may nevertheless make distributions and send communications to Beneficiaries, as though it has no notice of any such transfer, and in so doing the Trustee shall be fully protected and incur no liability to any purported transferee or any other Person.

## SECTION VIII
## MISCELLANEOUS PROVISIONS

**A.    Amendment; Waiver**This Agreement cannot be amended or waived in a material manner without a majority vote of the Post-Confirmation Committee (with the Trustee breaking the vote in case of a tie, as applicable) provided, however, that no change shall be made to this Agreement that would adversely affect the federal income tax status of the Liquidating Trust as a "grantor trust" in accordance with Section VI.B.

**B.    Intention of Parties to Establish Grantor Trust**This Agreement is intended to create a grantor trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as a grantor trust.

**C.    Preservation of Privilege**In connection with the rights, claims, and causes of action that constitute the Liquidating Trust Assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Liquidating Trust shall vest in the Liquidating Trust

18

and its representatives, and the Debtor and the Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges.  The Trustee and Post-Confirmation Committee shall be deemed to have a joint and common interest and, as such, communications among the Trustee and Post-Confirmation Committee shall be protected from disclosure.

**D.    Cooperation**The Debtor shall provide the Trustee with copies of such of its books and records as are reasonably available to it and that the Trustee shall reasonably require for the purpose of performing the Trustee's duties and exercising its powers hereunder.

**E.    Laws as to Construction**This Agreement shall be governed by and construed in accordance with the laws of the State of California, without giving effect to rules governing the conflict of law.  In the case of a conflict between the Plan and this Agreement, the Plan shall control.

**F.    Severability**If any provision of this Agreement or the application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law unless the Agreement, as modified, will no longer effectuate the intent of the parties hereto in all material respects.

**G.    Notices**Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the person for whom such notice is intended at such address as set forth below or such other address as filed with the Bankruptcy Court:

| | |
|---|---|
| **If to the Debtor:** | **With a copy to:** |
| Vineyard National Bancorp | Landau Gottfried & Berger LLP |
| 4000 Barranca Parkway | 1801 Century Park East |
| Suite 250 | Suite 1460 |
| Irvine, California  92604 | Los Angeles, California  90067 |
| Attn:  Donald H. Pelgrim, Jr. | Attn:  Jon L.R. Dalberg |
| **If to the Liquidating Trust or Trustee:** | **With a copy to:** |

19

EXHIBIT A

150

**If to the Post-Confirmation Committee:**

**Committee Member:**                    **With a copy to:**


**Committee Member:**                    **With a copy to:**


**Committee Member:**                    **With a copy to:**


**Committee Member:**                    **With a copy to:**


**Committee Member:**                    **With a copy to:**


     **H.**     **Notices if to a Beneficiary**Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the person for whom such notice is intended to the name and address set forth on the Debtor's Schedules or such Beneficiary's proof of claim, such other notice filed with the Bankruptcy Court and the Liquidating Trust or such other means reasonably calculated to apprise the Beneficiary.

     **I.**     **Third-Party Beneficiary**There shall be no third-party beneficiaries of this Liquidating Trust except as expressly set forth herein.  The Post-Confirmation Committee shall be an express third-party beneficiary hereof.

     **J.**     **Headings**The section headings contained in this Liquidating Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

20

**K.     Counterparts** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument.  A facsimile copy of a signature page is the equivalent of an original signature page.

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

DEBTOR:  VINEYARD NATIONAL BANCORP

By:     _____
        Donald H. Pelgrim, Jr.
        Executive Vice President and Chief Administrative
        Officer


TRUSTEE:

By:     _____
        . Bradley D. Sharp
        Development Specialists, Inc.

SF:269895.1

21

1

**EXHIBIT "B"**

2

**PROJECTED AVAILABLE CASH ANALYSIS**

3

4

(See attached)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT "B"

**Projected Cash as of Confirmation**

**Vineyard National Bancorp**

|  | Note | Dec-09 | Jan-10 | Feb-10 | Mar-10 | LOW TOTAL | HIGH TOTAL |  |
|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 1 | 1,898,267 | 1,648,141 | 1,534,325 | 1,376,611 | 1,898,267 | 1,898,267 |  |
| **Income** |  |  |  |  |  |  |  |  |
| Insurance Policy Refunds (due) | 2 | - | 1,208 | - | - | 1,208 | 1,208 |  |
| Employment Contract Deposit Recovery | 3 | - | 42,690 | - | - | 42,690 | 42,690 |  |
| Preference Recoveries | 4 | - | - | - | - | - | - | Unknown |
| D&O Claims and Estate Cause of Action | 5 | - | - | - | - | - | - | Unknown |
| IRS Refund for 2008 or 2009 NOL | 6 | - | - | - | - | - | - | Unknown |
| **Total Income** |  | - | 43,898 | - | - | 43,898 | 43,898 |  |
| **Expenses** |  |  |  |  |  |  |  |  |
| United States Trustee Fee |  | 975 | - | - | 975 | 1,950 | 1,950 |  |
| Legal-Bankruptcy Counsel (debtor) | 7 | 116,437 | 25,000 | 25,000 | 25,000 | 191,437 | 203,155 |  |
| Legal-Special Counsel (debtor) | 8 | - | - | - | 20,000 | 20,000 | 21,224 |  |
| Legal-Creditors Committee Counsel | 9 | 100,000 | 100,000 | 100,000 | 100,000 | 400,000 | 424,483 |  |
| Allowed Indenture Trustee Fees (est) | 10 | - | - | - | 120,000 | 120,000 | 127,345 |  |
| Other Professional Fees | 11 | 1,000 | 1,000 | 1,000 | 1,000 | 4,000 | 4,245 |  |
| Salaries & Employer Taxes |  | 28,000 | 28,000 | 28,000 | 28,000 | 112,000 | 112,000 |  |
| Controller/Accounting Services |  | 1,500 | 1,500 | 1,500 | 1,500 | 6,000 | 6,367 |  |
| Rent & Utilities |  | 2,039 | 2,039 | 2,039 | 2,039 | 8,156 | 8,655 |  |
| Office Supplies |  | 100 | 100 | 100 | 100 | 400 | 424 |  |
| Postage & Courier |  | 50 | 50 | 50 | 50 | 200 | 212 |  |
| Travel Expenses | 12 | 25 | 25 | 25 | 25 | 100 | 106 |  |
| **Total Expenses** |  | 250,126 | 157,714 | 157,714 | 298,689 | 864,243 | 910,167 |  |
| **Net Cash Flow** |  | (250,126) | (113,816) | (157,714) | (298,689) | (820,345) | (866,269) |  |
| **Ending Cash Balance** |  | 1,648,141 | 1,534,325 | 1,376,611 | 1,077,922 | 1,077,922 | 1,031,998 |  |

**Note    Description**

1    Beginning Cash Balance for December is based on the ending cash balance in the November Monthly Operating Report filed December 15, 2009.

2    Due to the cancellation of the Kidnap & Ransom policy, a refund of approximately $1,208.00 is due. That refund is potentially subject to allocation between the Debtor and the FDIC as Receiver for Vineyard Bank In addition to the refund under the Kidnap & Ransom policy, an additional refund of approximately $20,505.00 may be due as a result of the cancellation of the Financial Institution Bond by the carrier. The Debtor believes that its coverage under the Financial Institution Bond may not be terminated by the carrier and therefore may reject the receipt of the refund and otherwise seek to preserve its rights under the Financial Institution Bond. See Article III(D)(5) of the Disclosure Statement for further information.

3    Debtors pro-rata share of the $180,000 deposit under Glenn Terry's employment contract as the former President & CEO is approximately $90,000. Pursuant to a motion granted on September 4, 2009 (Docket No. 36) the contract was rejected and the Debtor was permitted to remove the funds from City National Bank. However, as the account was vested in the name of Vineyard Bank, the Debtor had been working through the administrative process for the release of funds with the FDIC. The Debtor previously received refunds of $23,483.04 under the package policy and $36,748.60 under the workers compensation policy which were subject to allocation between Vineyard Bank (or the FDIC as receiver for Vineyard Bank) and the Debtor. As a result the Debtor and the FDIC have agreed in principal to offset of the FDIC's share of the insurance refunds against the $90,000 owed the Debtor in the City National Bank account, which is anticipated to result in a net payment of approximately $42,690.00 to the Debtor.

4    The amount of the potential recoveries are unknown. See Exhibit E to the Disclosure Statement for more information.

5    The value of the potential claims are unknown. They include D&O Claims and any Estate Cause of Action (each as defined in the Plan). The Creditors Committee filed suit against certain directors and officers on December 21, 2009.

6    Pursuant to Revenue Ruling 2009-52, the Debtor may be able to carry back Net Operating Losses for a period of 5 years resulting in an additional tax refund of approximately $21.8 million. Any such refund may be subject to allocation between the FDIC, as Receiver for Vineyard Bank, and the Debtor. See Article III, Section (D)(9) of the Disclosure Statement for more information.

7    Estimates provided by Landau & Berger, LLP, as bankruptcy counsel. The December 2009 figure includes (i) $26,286.18 in accrued, unpaid fees for October 2009 (or $43,117.92 less the remainder of the retainer of $16,831.74), (ii) $65,151.18 in accrued, unpaid fees for November 2009, plus (iii) a fee estimate of $25,000 per month through the end of March (or a total of an additional $100,000).

8    Estimates provided by Landau & Berger, LLP on behalf of Manatt, Phelps & Phillips, LLP, as special counsel. The estimate is for an additional $20,000 above the remaining retainer of $109,973.01 as of the end of November 2009.

9    Estimates provided by Landau & Berger, LLP based on discussions with Winston & Strawn, LLP, Creditors Committee Counsel. The estimate is for total fees of $249,000, which was straight lined over the 4 month period.

10    Allowed Indenture Trustee Fees (as defined in the Plan). The estimate range provided by Winston & Strawn, LLP, as Creditors Committee counsel, was approximately $100,000 to $120,000. See the Plan.

11    Includes the cost of SEC filings through Vintage Filings and transfer agent costs through Computershare

12    Includes the cost of mileage and parking related to hearings in Riverside

**EXHIBIT B**
**153**

1

**EXHIBIT "C"**

2

**HYPOTHETICAL CHAPTER 7 LIQUIDATION ANALYSIS**

3

4

(See attached)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LANDAU
GOTTFRIED &
BERGER LLP

**Exhibit C**
**Chapter 7 Liquidation Analysis - Cash Flow Basis**

Vineyard National Bancorp

| | Note | LOW TOTAL | HIGH TOTAL | |
|---|---|---|---|---|
| Beginning Cash Balance as of March 31, 2010 | 1 | 1,031,998 | 1,077,922 | |
| **Income** | | | | |
| Insurance Policy Refunds | 2 | - | - | Unknown |
| Preference Recoveries | 3 | - | - | Unknown |
| Creditor Committee Claims | 4 | - | - | Unknown |
| IRS Refund for 2008 or 2009 NOL | 5 | - | - | Unknown |
| Total Income | | - | - | |
| **Expenses** | | | | |
| United States Trustee Fee | 6 | 1,950 | 1,950 | |
| CH 7 Trustee Fees; pursuant to 11 U.S.C. Section 326(a) | 7 | 60,118 | 60,118 | |
| CH 7 Trustee Counsel | 8 | 150,000 | 200,000 | |
| CH 7 Trustee Costs of Administration | 8 | 20,000 | 25,000 | |
| Sub-Total CH 7 Administration Expenses | | 232,068 | 287,068 | |
| Net Cash Flow | | (232,068) | (287,068) | |
| Available for Distribution | | 799,930 | 790,854 | |

| Distribution Analysis - Chapter 7 | | LOW Remaining Balance | LOW Amount Distributed | LOW Distribution Ratio | HIGH Remaining Balance | HIGH Amount Distributed | HIGH Distribution Ratio |
|---|---|---|---|---|---|---|---|
| Class 1 - Other Priority Claims | 9 | - | 799,930 | - | 0.000% | 790,854 | - | 0.000% |
| Class 2 - Secured Claims | 10 | - | 799,930 | - | 0.000% | 790,854 | - | 0.000% |
| Class 3 - General Unsecured Claims | 11 | 54,043,791 | - | 799,930 | 1.480% | - | 790,854 | 1.463% |
| Class 4 - Indenture Claims | 12 | 127,667,964 | - | - | 0.000% | - | - | 0.000% |

**Note    Description**
1   Assumes ending cash as of March 31, 2010.  See "Ending Cash Balance" on Exhibit B
2   An additional refund of approximately $20,505.00 may be due as a result of the cancellation of the Financial Institution Bond by the carrier.  The Debtor believes that its coverage under the Financial Institution Bond may not be terminated by the carrier and therefore may reject the receipt of the refund and otherwise seek to preserve its rights under the Financial Institution Bond.  See Article III(D)(5) of the Disclosure Statement for further information.
3   The amount of the potential recoveries are unknown.  See Exhibit E to the Disclosure Statement for more information.
4   The value of the potential claims are unknown.  They include D&O Claims and any Estate Cause of Action (each as defined in the Plan).  The Creditors Committee filed suit against certain directors and officers on December 21, 2009.
5   Pursuant to Revenue Ruling 2009-52, the Debtor may be able to carry back Net Operating Losses for a period of 5 years resulting in an additional tax refund of approximately $21.8 million.  Any such refund may be subject to allocation between the FDIC, as Receiver for Vineyard Bank, and the Debtor.  See Article III, Section (D)(9) of the Disclosure Statement for more information.
6   Assumes $975 per quarter for 2 quarters
7   Statutory fees pursuant to 11 U.S.C. Section 326(a)
8   Estimates provided by Landau & Berger, LLP
9   Assumes -0- other priority claims
10   As described in the Plan, there are -0- secured claims
11   As of the Petition Date, assumes a total of $54,043,791 in general unsecured claims, of which $50,825,395.68 consists of amounts owed to First Tennessee Bank
12   As of the Petition Date, assumes a total of $127,667,964 owed to indenture holders

**EXHBIT C**
**154**

# EXHIBIT "D"

## LIST OF PENDING LITIGATION

None

LANDAU
GOTTFRIED &
BERGER LLP

1

**EXHIBIT "E"**

2

**POTENTIAL PREFERENCE PAYMENTS**

3

4

(See attached)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit E**

**Potential Preference Payments**

**I.    Payments to creditors made within ninety days of the Petition Date**

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS/ TRANSFERS | AMOUNT PAID OR VALUE OF TRANSFERS | AMOUNT STILL OWING |
|---|---|---|---|
| FIRST BANKERS TRUST SERVICES 2321 Kochs Lane, PO Box 4005 Quincy, IL 62305-4005 | 5/20/09 | $6,134.20 | $0.00 |
| HOGAN & HARTSON LLP Columbia Square, 555 Thirteenth Street, NW Washington, DC 20004 | 4/10/09 | $17,957.24 | $0.00 |
| HOGAN & HARTSON LLP Columbia Square 555 Thirteenth Street, NW Washington, DC 20004 | 4/10/09 | $28,996.74 | $0.00 |
| HOGAN & HARTSON LLP Columbia Square 555 Thirteenth Street, NW Washington, DC 20004 | 4/28/09 | $45,774.21 | $0.00 |
| HOGAN & HARTSON LLP Columbia Square 555 Thirteenth Street, NW Washington, DC 20004 | 4/28/09 | $25,388.09 | $0.00 |
| HOGAN & HARTSON LLP Columbia Square 555 Thirteenth Street, NW Washington, DC 20004 | 4/28/09 | $12,959.30 | $0.00 |
| HOGAN & HARTSON LLP Columbia Square 555 Thirteenth Street, NW Washington, DC 20004 | 4/28/09 | $9,754.13 | $0.00 |
| HOGAN & HARTSON LLP Columbia Square 555 Thirteenth Street, NW Washington, DC 20004 | 6/17/09 | $29,654.47 | $0.00 |
| R.K.SCHAAF & ASSOCIATES 21650 Oxnard Street, Suite 1450 Woodland Hills, CA 91367 | 5/20/09 | $12,670.00 | $0.00 |
| HOGAN & HARTSON LLP Columbia Square 555 Thirteenth Street, NW Washington, DC 20004 | 6/29/09 | $12,491.77 | $0.00 |
| Premier Office Centers, LLC 2102 Business Center Drive Irvine, CA 92612 | 7/7/09 | $5,256.62 | $0.00 |

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS/ TRANSFERS | AMOUNT PAID OR VALUE OF TRANSFERS | AMOUNT STILL OWING |
|---|---|---|---|
| HOGAN & HARTSON LLP<br>Columbia Square<br>555 Thirteenth Street, NW<br>Washington, DC 20004 | 7/16/09 | $23,878.85 | $0.00 |
| HOGAN & HARTSON LLP<br>Columbia Square<br>555 Thirteenth Street, NW<br>Washington, DC 20004 | 7/17/09 | $27,617.50 | $0.00 |

## II.    Payments to insiders made within one year of the Petition Date*

| NAME AND ADDRESS OF CREDITOR AND RELATIONSHIP TO DEBTOR | DATE OF PAYMENT | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|
| Charles Keagle<br>8651 Madrone Avenue<br>Rancho Cucamonga, CA 91730<br>  Former Director | 7/7/08 | $4,500.00 | $0.00 |
| Charles Keagle<br>8651 Madrone Avenue<br>Rancho Cucamonga, CA 91730<br>  Former Director | 7/10/08 | $4,500.00 | $0.00 |
| Charles Keagle<br>8651 Madrone Avenue<br>Rancho Cucamonga, CA 91730<br>  Former Director | 8/13/08 | $4,500.00 | $320,856.70 |
| David Buxbaum<br>414 Yale Avenue<br>Claremont, CA 91711<br>  Director | 7/7/08 | $4,500.00 | $0.00 |
| David Buxbaum<br>414 Yale Avenue<br>Claremont, CA 91711<br>  Director | 7/10/08 | $4,500.00 | $0.00 |
| David Buxbaum<br>414 Yale Avenue<br>Claremont, CA 91711<br>  Director | 8/13/08 | $4,500.00 | $26,643.60 |
| Frank Alvarez<br>1080 W. 22nd Street<br>Upland, CA 91784<br>  Former Director | 7/7/08 | $4,500.00 | $0.00 |
| Frank Alvarez<br>1080 W. 22nd Street<br>Upland, CA 91784<br>  Former Director | 7/10/08 | $4,500.00 | $0.00 |
| Frank Alvarez<br>1080 W. 22nd Street<br>Upland, CA 91784<br>  Former Director | 8/13/08 | $4,500.00 | $435,329.98 |

EXHIBIT E
157

| NAME AND ADDRESS OF CREDITOR AND RELATIONSHIP TO DEBTOR | DATE OF PAYMENT | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|
| Candace Schaller<br>106 Harborwoods Place<br>Newport Beach, CA 92660<br>    Former employee | 5/21/09 | $6,500.00** | $0.00 |
| Yvonne Stroh<br>2098 Kelly Avenue<br>Upland, CA 91786<br>    Beneficiary of Deceased Former Director | 5/1/08 | $43,889.00 | $47,908.21 |
| Vineyard Bank, N.A.<br>1260 Corona Pointe Court<br>Corona, CA 92879 | 2/26/09 | $1,000,000.00 | $0.00 |

*See below regarding distribution and compensation to insiders in the 1 year period prior to the Petition Date
**Pro rata share of severance payment allocated to the Debtor.

## III.  Distributions given to an insider of the Debtor, including compensation in any form, bonuses, loans, stock, redemptions, and options exercised

| NAME AND ADDRESS OF CREDITOR AND RELATIONSHIP TO DEBTOR | DATE OF PAYMENT | TYPE OF PAYMENT | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|---|
| Glen C. Terry<br>18 Lighthouse Ct.<br>Napa, CA 94559<br>    Former President, CEO & Director | Various | Bancorp share of total estimated compensation (50%) | $216,000.00[a] | $0.00 |
| James G. LeSieur<br>5 Ironwood Drive<br>Newport Beach, CA 92660<br>    Former President, CEO, & Director<br>    Current CFO | Various | Bancorp share of total estimated compensation (25% in 2009; 50% in 2008) | $198,000.00[a] | $15,592.12[b] |
| Donald Pelgrim<br>26601 Avenida Veronica<br>Mission Viejo, CA 92691<br>    Chief Administrative Officer | Various | Bancorp share of total estimated compensation (10% in 2009; 30% in 2008) | $63,750.00[a] | $0.00 |
| Lucilio Manuel Borges Couto<br>9330 Burnet Ave<br>North Hills, CA 91343<br>    Former CCO & Chief Risk Officer | Various | Bancorp share of total estimated compensation (10%) | $18,233.00[c] | $0.00 |
| Gordon Fong<br>103 Ambiance<br>Irvine, CA 92603<br>    Former Chief Financial Officer | Various | Bancorp share of total estimated compensation (30%) | $40,625.00[d] | $0.00 |
| John Christoper Walsh<br>32451 Seven Seas Drive<br>Dana Point, CA 92629<br>    Former Chief Banking Officer | Various | Bancorp share of total estimated compensation (5%) | $5,250.00[e] | $0.00 |

| | | | | |
|---|---|---|---|---|
| Terra Hagel<br>47 Cambridge Court<br>Coto de Caza, CA 92679<br>  Former SVP, Secretary | Various | Bancorp share of total<br>estimated<br>compensation<br>(40%) | $61,750.00 [a] | $0.00 |
| Erica Douglas<br>97 Waterman<br>Irvine, CA 92602<br>  Former SVP, Finance | Various | Bancorp share of total<br>estimated<br>compensation<br>(15% in 2009; 20% in<br>2008) | $27,153.00 [a] | $0.00 |
| Scott Hinkle<br>1 Bay Drive<br>Laguna Beach, CA 92651<br>  Former AVP, Finance | Various | Bancorp share of total<br>estimated<br>compensation<br>(10% in 2009; 15% in<br>2008) | $11,695.00 [a] | $0.00 |
| Karyn Elkington<br>1703 N. Summer Avenue<br>Claremont, CA 91711<br>  Former SVP, Human Resources | Various | Bancorp share of total<br>estimated<br>compensation<br>(2% in 2009; 10% in<br>2008) | $13,660.00 [a] | $0.00 |
| Candace Schaller<br>106 Harborwoods Place<br>Newport Beach, CA 92660<br>  Former SVP, Director of Audit | Various | Bancorp share of total<br>estimated<br>compensation<br>(10% in 2009; 5% in<br>2008) | $10,867.00 [f] | $0.00 |
| Maureen Clark<br>5371 Brookhill Drive<br>Yorba Linda, CA 92886<br>  Former EVP, Chief Operating Officer | Various | Bancorp share of total<br>estimated<br>compensation<br>(-0-% in 2009; 10% in<br>2008) | $10,500.00 [g] | $0.00 |
| Jean Hurtik<br>31166 Flying Cloud Drive<br>Laguna Niguel, CA 92677<br>  Former AVP, Finance | Various | Bancorp share of total<br>estimated<br>compensation<br>(-0-% in 2009; 10% in<br>2008) | $6,650.00 [g] | $0.00 |
| Douglas Kratz<br>852 Middle Road<br>P.O. Box 1030<br>Bettendorf, IA 52722<br>  Chairman of the Board | Various | Bancorp share of total<br>estimated<br>compensation | $0.00 | $0.00 |
| Perry Hansen<br>852 Middle Road<br>P.O. Box 1030<br>Bettendorf, IA 52722<br>  Director | Various | Bancorp share of total<br>estimated<br>compensation | $0.00 | $0.00 |
| David Buxbaum<br>567 West 8th Street<br>Claremont, CA 91711<br>  Director | Various | Bancorp share of total<br>estimated<br>compensation | See above | See above |

EXHIBIT E

159

| | | | | |
|---|---|---|---|---|
| Harice "Dev" Ogle<br>858 Lunar Court<br>Rohnert Park, CA 94928<br>Former Director | Various | Bancorp share of total estimated compensation | $0.00 | $0.00 |
| Lester Strong<br>2886 Lorencita Drive<br>Santa Maria, CA 93455<br>Former Director | Various | Bancorp share of total estimated compensation | $0.00 | $0.00 |
| Charles Keagle<br>8651 Madrone Avenue<br>Rancho Cucamonga, CA 91730<br>Former Director | Various | Bancorp share of total estimated compensation | See above | See above |
| Frank Alvarez<br>1080 W. 22nd Street<br>Upland, CA 91784<br>Former Director | Various | Bancorp share of total estimated compensation | See above | See above |
| Joel Ravitz<br>11111 Santa Monica Blvd, Suite 1450<br>Los Angeles, CA 90025 | Various | Bancorp share of total estimated compensation | $0.00 | $634,537.95[b] |
| Robb Quincey<br>460 N. Euclid Avenue<br>Upland, CA 91786 | Various | Bancorp share of total estimated compensation | $0.00 | $141,789.83[b] |

[a] Estimated amount of compensation expenses allocated to the Debtor under an Intercompany Expense Sharing Agreement between the Debtor and the Bank (the "Expense Sharing Agreement") for the last 6 months of 2008 and the first 6 months of 2009. The amounts listed are the Debtor's pro rata share paid by Debtor under the agreement.

[b] Amount owed under the Directors Deferred Compensation Plan.

[c] Estimated amount of compensation expenses allocated to the Debtor under the Expense Sharing Agreement for the last 6 months of 2008 and through Mr. Couto's resignation on April 9, 2009.

[d] Estimated amount of compensation expenses allocated to the Debtor under the Expense Sharing Agreement for 5 months in 2008, through Mr. Fong's resignation on December 1, 2008.

[e] Estimated amount of compensation expenses allocated to the Debtor under the Expense Sharing Agreement for 4 months in 2008, through Mr. Walsh's resignation in November 2008.

[f] Estimated amount of compensation expenses allocated to the Debtor under the Expense Sharing Agreement for the last 6 months of 2008 and through Ms. Schaller's separation on May 22, 2009.

[g] Estimated amount of compensation expenses allocated to the Debtor under the Expense Sharing Agreement for the last 6 months of 2008. There was no allocation for Ms. Clark or Ms. Hurtik's services under the Expense Sharing Agreement for 2009.

Note that no allocation information was provided for the following individuals whose termination of employment was outside the 1 year period pre-petition:

- Rick Hagan, Executive Vice President, Chief Credit Officer and Chief Operating Officer.
- Michael Cain, Executive Vice President, Chief Lending Officer.
- Terry Snavely, Senior Vice President, Controller.

Further, no allocation was made for Marietta Hix, who merely provided administrative support to the board of the Debtor. If such allocation were made, the allocation would be $5,640.00 based on a 15% allocation for 2008 and $-0- for 2009 as there was no percentage of compensation allocated for Ms. Hix under the Expense Sharing Agreement for 2009.

EXHIBIT E
160

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT "F"**

**POTENTIAL THIRD PARTY ESTATE CAUSES OF ACTION**

Potential Third Party Estate Causes of Action

1.   Turn Over of Funds – City National Bank Account.  Potential motion or complaint to compel the turnover of approximately $90,000 in funds at City National Bank which were the subject of that certain *Motion To Approve Rejection Of (1) Two Unexpired Non-Residential Real Property Leases And (2) One Executory Employment Agreement* ("Rejection Motion'") filed on or about July 23, 2009, the Debtor filed a (Docket No. 12) and that certain Order approving the Rejection Motion entered by the Bankruptcy Court on September 4, 2009 (Docket No. 36).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT "G"**

**D&O CLAIMS COMPLAINT**

Any and all causes of action or claims, whether known or unknown, liquidated or unliquidated, disputed or undisputed, fixed or contingent, against present and/or former officers, directors and shareholders of the Debtor or the Debtor's Estate relating to any matter, fact, circumstance, act, omission or other thing, the authority and standing to investigate, bring, maintain and settle to the fullest extent of such causes of action or claims were authorized and vested with the Committee pursuant to the Committee Standing Order.

LANDAU
GOTTFRIED
& BERGER LLP

SF:270727.2

EXHIBIT G
162

| In re: VINEYARD NATIONAL BANCORP,<br><br>Debtor. | CHAPTER 11<br><br>CASE NUMBER 09-26401-RN |

### PROOF OF SERVICE OF DOCUMENT

I, Natalie M. Cereseto, am employed in the city and county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is: Landau Gottfried & Berger LLP, 1801 Century Park East, Suite 1460, Los Angeles, CA 90067.

A true and correct copy of the foregoing document described: **DISCLOSURE STATEMENT IN SUPPORT OF THE DEBTOR'S JOINT PLAN OF LIQUIDATION OF THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, DATED AS OF JANUARY 6, 2010** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On January 6, 2010, I checked the CM/ECF docket for this bankruptcy case and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

**Henkie F Barron** hbarron@winston.com, docketsf@winston.com
**Jeffrey W Broker** jbroker@brokerlaw.biz
**Jon L Dalberg** jdalberg@lgbfirm.com, mprokocki@lgbfirm.com
**Timothy J Farris** timothy.j.farris@usdoj.gov
**Jesse S Finlayson** jfinlayson@faw-law.com, wmills@faw-law.com
**Ivan L Kallick** ikallick@manatt.com, ihernandez@manatt.com
**Sharon M Kopman** skopman@lblawllp.com, skopman@lgbfirm.com;ncereseto@lgbfirm.com
**Rodger M Landau** rlandau@lblawllp.com, kmoss@lgbfirm.com
**Elizabeth A Lossing** elizabeth.lossing@usdoj.gov
**John W Mills** jmills@kilpatrickstockton.com
**Hydee J Mulichak** Hydee.Mulichak@sbgk.com
**Marie C Pollio** bankruptcy@goodwin.com
**Ramesh Singh** claims@recoverycorp.com
**United States Trustee (RS)** ustpregion16.rs.ecf@usdoj.gov      ☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On January 6, 2010, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**BY U.S. MAIL**
Honorable Richard M. Neiter
U.S. Bankruptcy Court
255 East Temple Street, Suite 1652
Los Angeles, CA 90012         ☒ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.
            ☐ Service information continued on attached page
I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| January 6, 2010 | Natalie M. Cereseto | NMCereseto |
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.
*January 2009*

**F 9013-3.1**

| In re: VINEYARD NATIONAL BANCORP, | | CHAPTER 11 |
|---|---|---|
| | Debtor. | CASE NUMBER 09-26401-RN |

**Additional Service Information (if needed):**

**II. SERVED BY U.S. MAIL**

**The United States Trustee**
Office of the United States Trustee
Attn: Timothy J Farris
3685 Main Street, Suite 300
Riverside, CA 92501

**Debtor**
Vineyard National Bancorp
4000 Barranca Parkway Suite 250
Irvine, CA 92604

**Counsel to Creditor's Committee**
Robert A. Julian, Esq.
Todd J. Dressel, Esq.
Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Henkie F Barron, Esq.
Eric E. Sagerman, Esq.
Winston & Strawn LLP
333 South Grand Avenue, 38th Floor
Los Angeles, California 90071

**Counsel for Secured Lender FTBN**
Leonard M. Shulman
Shulman, Hodges & Bastian LLP
26632 Towne Centre Drive, Suite 300
Foothill Ranch, CA 92610

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                    **F 9013-**
**3.1**