RODGER M. LANDAU (State Bar No. 151456)
JON L. R. DALBERG (State Bar No. 128259)
SHARON M. KOPMAN (State Bar No. 164449)
LANDAU GOTTFRIED & BERGER LLP

1801 Century Park East, Suite 1460
Los Angeles, California  90067
Telephone: (310) 557-0050
Facsimile: (310) 557-0056
jdalberg@lgbfirm.com
rlandau@lgbfirm.com
skopman@lgbfirm.com

Counsel for Vineyard National Bancorp

UNITED STATES BANKRUPTCY COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

RIVERSIDE DIVISION

| | |
|---|---|
| In re | Case No.  6:09-bk-26401-RN |
| VINEYARD NATIONAL BANCORP, | Chapter 11 |
| Debtor. | **REDLINED DISCLOSURE STATEMENT IN SUPPORT OF THE DEBTOR'S JOINT PLAN OF LIQUIDATION OF THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, DATED AS OF JANUARY 6, 2010** |
| | **Disclosure Statement Hearing** |
| | **Date:** ~~January 21~~February 2, 2010 |
| | **Time:**  2:00 p.m. |
| | **Place:**  Courtroom 301 |
| | 3420 Twelfth Street |
| | Riverside, CA 92501-3819 |
| | **Confirmation Hearing** |
| | **Date:** |
| | **Time:** |
| | **Place:** |

LANDAU
GOTTFRIED &
BERGER LLP

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....................................................................................................3

   A.   Section 1125 .............................................................................................3

   B.   Voting Classes. .........................................................................................4

   C.   Additional Information. ...........................................................................4

   D.   Disclaimer. ...............................................................................................5

   E.   Balloting ...................................................................................................7

II. SUMMARY ...........................................................................................................7

   A.   The Debtor. ..............................................................................................8

   B.   Overview Of The Plan. ............................................................................8

   C.   Recommendation. ....................................................................................8

III. BACKGROUND ....................................................................................................8

   A.   The Debtor's Business. ............................................................................9

   B.   The Debtor's Financing. ........................................................................10

       1.   Statutory Business Trusts .............................................................10

       2.   Junior Subordinated Indenture Unrelated to Statutory Business Trusts ...........................................................................................12

       3.   Senior Secured Lender - FTBN ...................................................13

       4.   Investment Interests .....................................................................14

           (a)   Preferred Stock Interests .................................................14

           (b)   VNBC Common Stock ....................................................16

           (c)   Warrants ..........................................................................17

   C.   Events Leading Up to Bankruptcy .........................................................17

       1.   Overall Business Erosion .............................................................17

       2.   Resignation of Directorship and Termination of CEO of Bank and Debtor .................................................................................19

       3.   Consent Solicitation & Proxy Contest .........................................19

       4.   Regulatory Actions By OCC Impacting the Bank .......................19

# TABLE OF CONTENTS (CONT'D)

**Page**

5.    Regulatory Action by FRB Impacting Debtor ........................................20

6.    Slate of New Directors for Debtor and the Bank ..................................20

7.    Restructuring by New Board of Directors of Debtor and Bank ..............22

8.    Efforts by the Debtor to Raise Capital and Seek Strategic
      Alternatives ........................................................................................27

D.    Debtor In Possession Administration ........................................................28

1.    Employment Applications. ....................................................................28

2.    Motion to Reject Certain Executory Contracts and Unexpired
      Leases. ...............................................................................................28

3.    Motion to Wind-Down Employee Stock Ownership Plan ......................29

4.    Bar Date Motion. .................................................................................33

5.    Insurance Refunds ...............................................................................33

6.    Formation of the Committee. ................................................................34

7.    Schedules and Statement of Financial Affairs. .....................................34

8.    Motion to Vest the Prosecution of Certain Litigation in the
      Committee ..........................................................................................34

9.    Tax Audit and Refunds. ........................................................................35

E.    Prosecution of Estate Causes Of Action and D&O Claims. .............................37

1.    Estate Causes of Action Against Third Parties. ....................................37

2.    Committee's Investigation of Claims Against Directors,
      Officers, and Shareholders and Complaint .........................................38

3.    Recovery of Preferential or Fraudulent Transfers. ...............................40

4.    Objections to Claims. ...........................................................................41

IV.    THE PLAN OF REORGANIZATION ..........................................................41

A.    Summary Of Certain Other Provisions Of The Plan. ...............................44

1.    Executory Contracts and Unexpired Leases. ........................................44

2.    Means Of Implementation. ...................................................................45

      (a)    From the Confirmation Date to the Effective Date ...................45

LANDAU
GOTTFRIED
& BERGER LLP

# TABLE OF CONTENTS (CONT'D)

**Page**

(b) Vesting of Assets. ..........................................................................45

(c) Establishment of the Liquidating Trust......................................47

    (i) Beneficiaries. ..................................................................47

    (ii) Implementation of the Liquidating Trust. ......................47

    (iii) Transfer of Debtor's Assets. ..........................................48

    (iv) Representative of the Estate............................................48

3. No Liability of Liquidating Trustee or Post-Confirmation Committee...........................................................................................49

4. Prosecution Of Estate Causes Of Action and D&O Claims By The Liquidating Trustee or the Post-Confirmation Committee. ...................49

(a) Issuance And Execution Of Plan Related Documents And Corporate Action....................................................................51

(b) Cancellation/Surrender of Debentures and Related Agreements. ........................................................................51

5. Provision For Allowance Of the Indenture Trustee Claims...................52

6. Establishment Of The Post-Confirmation Committee............................52

7. Resolution of Disputed Claims. ............................................................54

8. Distributions Under The Plan. ...............................................................55

(a) General Provisions. ..............................................................55

(b) Delivery of Distributions, Address of Holder............................55

(c) Record Date. .......................................................................56

9. Conditions Precedent. ...........................................................................56

10. Retention Of Jurisdiction. .....................................................................56

11. Effective Date. ......................................................................................56

12. Amendment, Modification Or Revocation Of The Plan.......................56

13. Post Confirmation Notice. .....................................................................57

V. EFFECT OF PLAN CONFIRMATION ...............................................................57

    A. Preservation of Rights of Action...........................................................57

# TABLE OF CONTENTS (CONT'D)

**Page**

B.    No Liability For Solicitation Or Participation. ...................................................58

VI.    CONFIRMATION PROCEDURE .................................................................58

A.    Voting; Acceptance....................................................................................59

B.    Confirmation Hearing. ...............................................................................60

C.    Feasibility...................................................................................................62

D.    Best Interests Test. .....................................................................................62

E.    Risks...........................................................................................................63

VII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
THE PLAN OF REORGANIZATION...........................................................63

A.    Liquidation Under Chapter 7. ....................................................................64

B.    Alternative Plan Of Liquidation.................................................................64

VIII.    VOTING PROCEDURES .............................................................................64

A.    Procedures For Tabulation Of Votes On The Plan. ...................................65

B.    Special Provisions With Respect To Voting By Beneficial Owners
Of The Indenture Securities; Instructions For Nominees. ..................66

IX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES............................66

A.    Introduction.................................................................................................66

B.    Consequences to the Debtor........................................................................68

C.    Consequences to Holders of General Unsecured Claims ...........................68

1.    Recognition of Gain or Loss Generally .............................................68

2.    Distributions in Payment of Accrued but Unpaid Interest.................70

3.    Tax Treatment of the Liquidating Trust and Holders of Interests
Therein .........................................................................................71

4.    Withholding .......................................................................................73

X.    FEES AND EXPENSES ................................................................................74

XI.    SUMMARY OF ADDITIONAL SOURCES OF INFORMATION.................75

XII.    RECOMMENDATION AND CONCLUSION................................................76

LANDAU
GOTTFRIED
& BERGER LLP

iv

# TABLE OF AUTHORITIES

Page(s)

**STATUTES**

Bankruptcy Code, 11 U.S.C.

§ 101 et seq. .................................................................................................3
§ 101(27) ....................................................................................................30
§ 345 ............................................................................................................3
§ 502 ............................................................................................................8
§ 544 ..........................................................................................................36
§ 547 ..........................................................................................................36
§ 548 ..........................................................................................................36
§ 550 ..........................................................................................................36
§ 1123 ........................................................................................................43
§ 1123(a)(5) ...............................................................................................43
§ 1123(a)(7) ...............................................................................................43
§ 1123(b)(3)(B) ..........................................................................................43
§ 1125 ..........................................................................................................3
§ 1125(e) ......................................................................................................7
§ 1126(e) ......................................................................................................9
§ 1126(g) ..............................................................................................16, 17
§ 1127 ..........................................................................................................6
§ 1127(a) ......................................................................................................4
§ 1128(a) ......................................................................................................9
§ 1128(b) ......................................................................................................9
§ 1129 ....................................................................................................8, 10
§ 1141 ........................................................................................................43
§ 1146 ........................................................................................................43

Bank Holding Company Act of 1956 ...........................................................7

Internal Revenue Code of 1986 ..................................................................17
§ 641 et seq. ...............................................................................................23
§ 1031 ..................................................................................................9, 25

Financial Institutions Reform, Recovery and Enforcement Act of 1989
§ 914 ..........................................................................................................19

**OTHER AUTHORITIES**

1994-2 C.B. 684 .........................................................................................21

12 C.F.R. 337.6 ....................................................................................23, 24

Treasury Regulation
§ 301.7701-4(d) ..........................................................................................42

LANDAU
GOTTFRIED &
BERGER LLP

# PLAN OVERVIEW

The Plan provides for the disposition of all assets of the Debtor's Estate through the establishment of a Liquidating Trust for the benefit of the Holders of Allowed Claims consistent with the priority provisions of the Bankruptcy Code, as provided for in the Debtor's Plan of Liquidation.  Remaining assets, to the extent not converted to cash or other proceeds as of the Effective Date, will be sold or otherwise disposed of after the Effective Date, with all net cash proceeds to be distributed to Holders of Allowed Claims as provided for in the Plan.

| Plan Summary | | | | |
|---|---|---|---|---|
| **Class** | **Treatment** | **Property Distributed** | **Recovery (approx.)** | **Voting Status** |
| **Class 1**: Other Priority Claims | Payment in Cash in full | Cash | 100% of Allowed Claim | Unimpaired - **not** entitled to vote (deemed to accept) |
| **Class 2**: Secured Claims | Retention of all legal, equitable and contractual rights | Cash and/or Property | 100% of Allowed Secured Claim | Unimpaired - **not** entitled to vote (deemed to accept) |
| **Class 3**: General Unsecured Claims | Pro Rata distribution of Available Cash in the Liquidating Trust | Cash | | Impaired - entitled to vote |
| **Class 4**: Subordinated Claims of Holders of Indenture Trustee Claims and Unpaid Indenture Trustee Fees | Each Holder of a Class 4 Claim shall be allocated a Pro Rata share of each Distribution available to Holders of Class 3 Claims; provided, however, that the amount of distributions to Holders of Allowed Class 4 Claims shall be paid (i) first on account of unpaid Indenture Trustee Fees, in an estimated amount of $100,000 to $120,000 and (ii) second on account of the Allowed FTBN Claim, until such time as the Allowed FTBN Claim is satisfied in full, after which time distributions to Holders of Allowed Indenture Trustee Claims shall be made.  The Plan further sets forth a process by which challenges to the priority accorded to the Allowed FTBN Claim or any other Class 4 Claim. Such process is more fully | Cash | | Impaired – entitled to vote |

| Plan Summary | | | | |
|---|---|---|---|---|
| **Class** | **Treatment** | **Property Distributed** | **Recovery (approx.)** | **Voting Status** |
| | described at Section II C 4 (c) of the Plan | | | |
| **Class 5**: Preferred Stock Interests | Receives no distribution under the Plan unless and until Class 4 is paid in full | N/A | N/A | Impaired - **not** entitled to vote (deemed to reject) |
| **Class 6**: VNBC Common Stock Interests | Receives no distribution under the Plan unless and until Class 5 is paid in full | N/A | N/A | Impaired - **not** entitled to vote (deemed to reject) |

## <u>Note Regarding Distributions</u>:

Distributions to holders of Administrative Expenses and Priority Tax Claims and holders of Claims in Classes 1 and 2 are anticipated to be made on the later of: (i) the Effective Date, or as soon as practicable thereafter; and (ii) as soon as practicable after the date the claim becomes an Allowed Claim.  Distributions to Holders of Allowed Claims in Class 3 will be conducted as soon as practicable after the Effective Date in the discretion of the Liquidating Trustee, <u>provided, however</u>, distributions could be delayed by reason of: (a) claims filed after the Effective Date (including claims arising from rejection of executory contracts and unexpired leases); (b) Disputed Claims (including Disputed Claims that are not liquidated); and (c) the Liquidating Trustee's evaluation of the Available Cash.  Distributions to holders of Allowed Claims in Class 4, subject to Section II.C(4)(c) and the provisions of the Plan related to the payment of the Indenture Trustee Fees, will be made at the same time as each Distribution to Holders of Allowed Class 3 Claims; provided, however, that the amount of distributions to Holders of Allowed Class 4 Claims shall be paid (i) first on account of unpaid Indenture Trustee Fees, and (ii) second on account of the Allowed FTBN Claim, until such time as the Allowed FTBN Claim is satisfied in full, after which time distributions to Holders of Allowed Indenture Trustee Claims shall be made, provided, however, distributions could be delayed by reason of: (a) claims filed after the Effective Date (including claims arising from rejection of executory contracts and unexpired leases); (b) Disputed Claims (including Disputed Claims that are not liquidated); and (c) the Liquidating Trustee's evaluation of the Available Cash.

LANDAU
GOTTFRIED
& BERGER LLP

## I.    INTRODUCTION

Vineyard National Bancorp, a California corporation ("VNBC," or the "Debtor"), filed a voluntary petition (the "Petition") under chapter 11 ("Chapter 11") of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), on July 21, 2009 (the "Petition Date"), thereby commencing the above-captioned Chapter 11 case (the "Chapter 11 Case"). VNBC has operated as a debtor-in-possession since the Petition Date. No trustee or examiner has been appointed. The Official Committee of Unsecured Creditors was appointed by the Office of the United States Trustee ("OUST") on August 12, 2009 and additional members were added on September 10, 2009 (collectively, the "Committee"). The Debtor has filed its "*Debtor's Plan of Liquidation*" on November 30, 2009. Subsequently, a consensual plan was reached between the Debtor and the Committee, the terms of which are included in the "*Joint Plan of Liquidating of the Debtor and the Official Committee of Unsecured Creditors*" (as the same may be modified, amended or supplemented, the "Plan"). The Plan envisions a liquidation of all the Debtor's remaining assets pursuant to the provisions of the Bankruptcy Code and in accordance with the terms of the Plan.

### A.    Section 1125.

This *Disclosure Statement In Support of the  Joint Plan of Liquidation of the Debtor and the Official Committee of Unsecured Creditors* (as the same may be modified, amended, or supplemented, the "Disclosure Statement") is submitted pursuant to section 1125 of the Bankruptcy Code to holders of impaired Claims in connection with the proceedings seeking confirmation of the Plan, which has been proposed by the Debtor and the Committee and filed with the Bankruptcy Court. A copy of the Plan is attached hereto as **Exhibit A**. Unless otherwise defined herein, all capitalized terms contained herein shall have the meanings ascribed to them in the Plan.

This Disclosure Statement sets forth information regarding, among other things, the history of the Debtor and its business, the filing of the Petition and the Plan, and alternatives thereto. Its purpose is to provide the holders of impaired Claims adequate information to assist them in making an informed decision regarding acceptance or rejection of the Plan. Each holder of an impaired Claim should read this Disclosure Statement (including its exhibits) and the Plan (including its exhibits) in their entirety and consider them with such holder's legal and financial advisors in

1    connection with the proceedings seeking confirmation of the Plan.  No person has been authorized

2    by the Debtor to utilize for purposes of solicitation any information concerning the Debtor or its

3    business other than the information contained or referred to herein.

4        **B.    Voting Classes.**

5        Pursuant to the Bankruptcy Code, each holder of an Allowed Claim in Classes 3 and 4 (the

6    "Voting Classes"), is entitled to vote on the Plan.  Holders of Allowed Claims in Classes 1 and 2

7    are presumed to accept the Plan pursuant to 1126(f) of the Bankruptcy Code because their Claims

8    are not impaired under the Plan.  Holders of Equity Interests in Classes 5 and 6 are presumed to

9    reject the Plan pursuant to 1126(g) of the Bankruptcy Code because they will not receive a

10   distribution under the Plan.  For a description of the Classes of Claims and of the Equity Interests

11   and their treatment under the Plan, see Section II of the Plan entitled "*Classification and Treatment*

12   *of Claims and Equity Interests.*"

13       Except as described below, the Plan may be confirmed only if accepted by the Voting

14   Classes.  The Bankruptcy Code defines "acceptance" with respect to a class of impaired Claims, as

15   acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of

16   the Allowed Claims in such class counting only those holders who cast Ballots (as defined below).

17       **THE DEBTOR AND THE COMMITTEE BELIEVE THAT THE PLAN PROVIDES**

18   **THE BEST FEASIBLE RECOVERIES TO THE HOLDERS OF IMPAIRED CLAIMS AND**

19   **THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF SUCH**

20   **HOLDERS.  THE DEBTOR AND THE COMMITTEE THEREFORE RECOMMEND THAT**

21   **HOLDERS OF IMPAIRED CLAIMS VOTE TO ACCEPT THE PLAN.**

22       The Debtor anticipates that the Voting Classes will vote to accept the Plan.  The Debtor

23   reserves the right to modify the Plan in accordance with section 1127(a) of the Bankruptcy Code.

24       For a more detailed description of the requirements for acceptance of the Plan and of the

25   criteria for confirmation notwithstanding rejection by certain classes, see Section VI of this

26   Disclosure Statement entitled "*Confirmation Procedure.*"

27       **C.    Additional Information.**

28       Attached as Annexes to this Disclosure Statement are copies of the following:

LANDAU
GOTTFRIED
& BERGER LLP

4

1.    The Plan (Exhibit A);

2.    Projected Available Cash Proceeds Analysis (Exhibit B);

3.    Hypothetical Chapter 7 Liquidation Analysis (Exhibit C);

4.    List of Pending Litigation (Exhibit D);

5.    Potential Preference Payments (Exhibit E);

6.    Potential Third Party Estate Causes of Action (Exhibit F); and

7    D&O Claims Complaint (Exhibit G).

Also accompanying this Disclosure Statement and its attendant exhibits, including the Plan, are copies of the following: (i) the Notice of the Order of the Bankruptcy Court approving this Disclosure Statement, and scheduling the confirmation hearing, the deadlines and procedures for voting, and for objecting to confirmation of the Plan, and related matters (the "Confirmation Notice"); and (ii) for each holder of an Allowed Claim in the Voting Classes, the form of ballot for casting an acceptance or rejection of the Plan (the "Ballot").

**D.    Disclaimer.**

The Bankruptcy Court has approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the condition of its books and records, to enable hypothetical, reasonable investors typical of the holders of impaired Claims to make an informed judgment as to whether to accept or reject the Plan.

**APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "COMMISSION") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR BY ANY STATE AUTHORITY UNDER ANY STATE SECURITIES OR "BLUE SKY" LAW, NOR HAS THE COMMISSION (OR ANY STATE AUTHORITY) PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.**

LANDAU
GOTTFRIED
& BERGER LLP

**THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR AND THE COMMITTEE, SOLELY AS TO THE D&O CLAIMS, FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE AT THE TIMES MADE, TO THE DEBTOR'S AND THE COMMITTEE'S KNOWLEDGE, INFORMATION, AND BELIEF.  HOWEVER, NOTHING CONTAINED HEREIN SHALL BE DEEMED TO BE AN ADMISSION OR A DECLARATION AGAINST INTEREST BY THE DEBTOR OR THE COMMITTEE FOR PURPOSES OF ANY EXISTING OR FUTURE LITIGATION AGAINST THE DEBTOR OR ITS ESTATE OR THE COMMITTEE.**

**EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN, NOTHING CONTAINED HEREIN SHALL BE ATTRIBUTABLE TO OR IS DERIVED FROM OR REPRESENTED TO BE ACCURATE BY THE DEBTOR, THE COMMITTEE, OR BY ANY OF THEIR ADVISORS.  NOR HAS THE DEBTOR, COMMITTEE OR ANY SUCH ADVISOR INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH HEREIN.**

**ALTHOUGH THE DEBTOR'S AND THE COMMITTEE'S PROFESSIONAL ADVISORS HAVE ASSISTED IN THE PREPARATION OF THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, AND ACCOUNTING DATA PROVIDED BY THE DEBTOR, THEY HAVE NOT INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH HEREIN AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF.**

After carefully reviewing this Disclosure Statement and the Plan, including the respective exhibits, each holder of an impaired Claim in the Voting Classes should decide whether to accept or reject the Plan and should indicate its vote on the enclosed Ballot and return it in the envelope provided.

LANDAU
GOTTFRIED
& BERGER LLP

**E.    Balloting.**

**TO BE COUNTED, YOUR BALLOT MUST BE COMPLETELY FILLED IN, SIGNED, AND TRANSMITTED IN THE MANNER SPECIFIED IN THE BALLOT SO THAT IT IS RECEIVED BY THE VOTING DEADLINE SPECIFIED IN THE BALLOT. PLEASE CAREFULLY FOLLOW ALL INSTRUCTIONS CONTAINED IN THE BALLOT. ANY BALLOTS RECEIVED WHICH DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR WHICH INDICATE BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN, OR WHICH OTHERWISE DO NOT FULLY COMPLY WITH THE BALLOT INSTRUCTIONS, WILL NOT BE COUNTED.  DO NOT RETURN YOUR SECURITIES WITH YOUR BALLOT.**

If you have any questions about the procedure for voting, or if you did not receive a Ballot, received a damaged Ballot, or have lost your Ballot, or if you would like any additional copies of this Disclosure Statement, please write to the Debtor's Ballot Tabulator, Bankruptcy Management Corporation ("BMC") 1330 East Franklin Avenue, El Segundo, California 90245 or call (310) 321-5555.

F.    <u>Confirmation Hearing</u>.

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan (the "Confirmation Hearing") on the date and at the place specified in the Confirmation Notice accompanying this Disclosure Statement.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed on or before the date specified, and in the manner described, in the Confirmation Notice.  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing or at any subsequent continued Confirmation Hearing.

**II.    SUMMARY**

The following is a summary of certain information contained elsewhere in this Disclosure Statement.  Reference is made to, and this Summary is qualified in its entirety by reference to, the

more detailed information contained herein and in the exhibits hereto.  Holders of impaired Claims are urged to read this Disclosure Statement, the Plan and their exhibits in their entirety.

**A.    The Debtor.**

The Debtor, a California corporation, was a bank holding company incorporated in California in 1988 and was previously registered under the Bank Holding Company Act of 1956, as amended. The Debtor's principal business was to serve as the holding company for its wholly-owned subsidiary, Vineyard Bank, National Association (the "Bank") and other banking or banking-related subsidiaries.  The Bank was the Debtor's principal asset.

**B.    Overview Of The Plan.**

THE FOLLOWING OVERVIEW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u>.  IN THE EVENT OF ANY INCONSISTENCY, THE PLAN WILL CONTROL.

The Plan provides for the liquidation of substantially all of the assets of the Debtor and the distribution of the Available Cash to holders of Allowed Claims, consistent with the priority provisions of the Bankruptcy Code, in accordance with the Plan.  The Plan does not provide for any distribution to holders of Allowed Equity Interests unless and until holders of Allowed Class 4 Claims have been paid in full – which, as set forth in the projections attached as <u>Exhibit B</u> hereto, is not projected to occur.

**C.    Recommendation.**

The Debtor and the Committee believe that the Plan provides the best feasible recoveries to holders of impaired Claims and is in the best interests of such holders.  ACCORDINGLY, THE DEBTOR AND THE COMMITTEE RECOMMEND THAT ALL SUCH HOLDERS ACCEPT THE PLAN.

**III.    BACKGROUND**

As more fully described below, the Plan provides that all assets of the Estate remaining on the Effective Date will vest in the Liquidating Trust.  The Available Cash will be distributed to the Debtor's creditors by the Liquidating  Trustee in accordance with applicable provisions of the Bankruptcy Code and in accordance with the Plan, and the Liquidating Trustee will be appointed

1  to, among other things, handle prosecution of any and all potential claims that may bring cash into

2  the Liquidating Trust, and sell any other assets that may have value, bring any potential avoidance

3  actions, and object to any claims.

4  **A.    The Debtor's Business.**

5  Prior to the closure of the Bank by the Office of the Comptroller of the Currency ("OCC")

6  and the appointment of the Federal Deposit Insurance Corporation ("FDIC") as a receiver for the

7  Bank's assets and liabilities in July 2009, the Debtor's primary business was to serve as a holding

8  company for the Bank.  The Bank was a commercial bank operating in California, in the counties

9  of Orange, Los Angeles, Marin, Riverside, San Bernardino and San Diego and had sixteen full-

10  service branches in the cities of Chino, Corona, Covina, Crestline, Diamond Bar, Irvine, Irwindale,

11  Lake Arrowhead, La Verne, Manhattan Beach, Rancho Cucamonga, San Diego, San Dimas, San

12  Rafael, Upland and Walnut.  The Bank was originally organized as a national banking association

13  under federal law and commenced operations under the name Vineyard National Bank in 1981.  In

14  August 2001, the Bank changed its name to Vineyard Bank and converted its charter to a

15  California-chartered commercial bank which, among other things, provided it with increased legal

16  lending limits.  On May 11, 2006, the Bank was converted back to a national bank under the name

17  Vineyard Bank, National Association.  As a national bank, the Bank operated under the

18  supervision of the OCC and deposit accounts at the Bank were insured by the FDIC up to the

19  maximum amount permitted by law.  As a bank holding company, the Debtor's primary regulator

20  was the Board of Governors of the Federal Reserve System ("FRB").

21  In addition to the Bank, the Debtor previously owned two consolidated operating

22  subsidiaries, 1031 Exchange Advantage, Inc. and 1031 Funding & Reverse Corp. (collectively, the

23  "Exchange Companies"), which acted as qualified intermediaries under Section 1031 of the

24  Internal Revenue Code of 1986.  The Exchange Companies were acquired in December 2007.  In

25  order to eliminate operating losses associated with the Exchange Companies, among other reasons,

26  the Debtor sold the Exchange Companies back to the original seller in September 2008.

27  Other than the business conducted by the Bank and the Exchange Companies, the Debtor

28  did not own or engage in any other operating businesses. As a legal entity separate and distinct

LANDAU
GOTTFRIED
& BERGER LLP

9

from its subsidiaries, the Debtor's principal source of funds was dividends that were paid by the Bank.

**B.    The Debtor's Financing.**

**1.    Statutory Business Trusts**

Between December 2001 and May 2006, the Debtor raised approximately $115 million of capital through ten (10) Statutory Business Trusts.  Information regarding each of the Statutory Business Trusts is set forth in the table below:

| Statutory Business Trust Name: | Trustee: | Indenture Information: | Dated: | Debenture Principal Amount |
|---|---|---|---|---|
| VST I - Vineyard Statutory Trust I | U.S. Bank | Indenture – Floating Rate Junior Subordinated Deferrable Interest Debentures – Due 2031 | 12/18/2001 | $12,372,000 |
| VST II -Vineyard Statutory Trust II | Wilmington Trust | Indenture – Floating Rate Junior Subordinated Deferrable Interest Debt Securities Due 2033 | 12/19/2002 | $5,155,000 |
| VST III – Vineyard Statutory Trust III | Wilmington Trust | Indenture – Floating Rate Junior Subordinated Debt Securities Due 2033 | 9/25/03 | $10,310,000 |
| VST IV – Vineyard Statutory Trust IV | Wilmington Trust | Indenture – Floating Rate Junior Subordinated Debt Securities Due 2034 | 12/19/03 | $10,310,000 |
| VST V – Vineyard Statutory Trust V | BNYMTC | Indenture – Junior Subordinated Debt Securities Due 2034 | 3/25/04 | $10,310,000 |
| VST VI – Vineyard Statutory Trust VI | BNYMTC | Indenture - Indenture – Floating Rate Junior Subordinated Debt Securities Due 2034 | 5/18/04 | $12,372,000 |
| VST VII – Vineyard Statutory Trust VII | Wells Fargo | Indenture - Indenture – Floating Rate Junior Subordinated Debt Securities Due 2034 | 12/22/04 | $10,310,000 |
| VST VIII – Vineyard Statutory Trust VIII | Wilmington Trust | Indenture - Indenture – Floating Rate Junior Subordinated Debt Securities Due 2034 | 4/15/05 | $10,310,000 |
| VST IX – Vineyard Statutory Trust IX | Wilmington Trust | Indenture - Indenture – Floating Rate Junior Subordinated Debt | 8/19/05 | $15,464,000 |

LANDAU
GOTTFRIED
& BERGER LLP

| Statutory Business Trust Name: | Trustee: | Indenture Information: | Dated: | Debenture Principal Amount |
|---|---|---|---|---|
| | | Securities Due 2034 | | |
| VST XI – Vineyard Statutory Trust XI | Wilmington Trust | Indenture - Indenture – Floating Rate Junior Subordinated Debt Securities Due 2034 | 5/16/06 | $18,557,000 |

The Debtor sponsored the Statutory Business Trusts for the purpose of issuing trust preferred securities. The Statutory Business Trusts sold the trust preferred securities to investors and then used the proceeds of the sale of the trust preferred securities to purchase from the Debtor junior subordinated deferrable interest debentures (the "Debt Securities") pursuant to the Statutory Trust Indentures. The Debt Securities are held of record in the name of the respective Statutory Trust Trustees in trust for the benefit of their respective Statutory Business Trusts. Interest payments on the Debt Securities paid by the Debtor to the Statutory Trust Trustees were used to fund the Statutory Business Trust's distributions to the Trust Securities.[1] The Debtor executed guarantees for the trust preferred security holders of each Statutory Business Trust that guaranteed that if the Debtor made an interest payment to the Statutory Trust Trustees owing under the Debt Securities, the Debtor guaranteed that the Statutory Trust Trustee would pay the dividend to the holders of the trust preferred securities.

The Statutory Business Trusts issued two types of trust preferred securities: (i) Capital Securities and (ii) Common Securities (collectively, the "Trust Preferred Securities"). The Debtor owns 100% of the Common Securities issued by each of the Statutory Business Trusts, which Common Securities equal an approximately 3% minority interest in the Statutory Business Trusts. The holders of Capital Securities own the remaining majority interest in the respective Statutory Business Trusts.

Upon an Event of Default (as defined in the respective Statutory Business Trusts), the rights of the holders of Common Securities to receive payments of distributions from the Statutory

---

[1]      The interest rate under the Debt Securities is based on a 3 month LIBOR index plus the following margin: 3.06% under VST I, 3.35% under VST II, 3.05% under VST III, 2.85% under VST IV, 2.85% under VST V, 2.85% under VST VI, 2.00% under VST VII, 2.25% under VST VIII, 1.70% under VST IX, and 1.60% under VST XI.

LANDAU
GOTTFRIED
& BERGER LLP

Business Trusts are subordinated to the rights of the holders of the Capital Securities to receive the same.[2]  Upon the filing of the Chapter 11 Case by the Debtor, the Statutory Trust Trustees are required to dissolve the Trust as expeditiously as the Statutory Trust Trustee determines is practical and liquidate the assets owned by the Statutory Business Trust.[3]

Article XV of each of the Statutory Trust Indentures provides that payment due on the Debt Securities is subordinated and junior in right of payment to the prior payment in full of all Senior Indebtedness (as defined in each of the Statutory Trust Indentures) of the Debtor, whether outstanding on the date of the Statutory Trust Indenture or thereafter incurred.  To the extent the Statutory Trust Trustees receive a distribution prior to Senior Indebtedness being paid in full, the Statutory Trust Trustees are required to hold the distribution in trust for the Senior Indebtedness; provided, however, the subordination provisions do not apply to the Statutory Trust Trustees' Claims for the reasonable fees, expenses, disbursements and advances (including the reasonable compensation, expenses and disbursements of their respective agents and counsel) incurred by the Statutory Trust Trustees.

The cash raised by the Statutory Business Trusts was typically down-streamed by the Debtor to the Bank to provide adequate capital to support the Bank's strategic plan initiatives, including facilitating organic growth, the acquisition of Rancho Bank, a California-chartered commercial bank ("Rancho Bank"), fulfilling regulatory capital requirements, and providing capital and liquidity for general operating purposes.

**2.    Junior Subordinated Indenture Unrelated to Statutory Business Trusts**

In or about December 2002, to raise additional capital, the Debtor issued Floating Rate Junior Subordinated Debentures Due December 26, 2017 (the "Debentures Due 2017") in the aggregate principal amount of $5,000,000 and U.S. Bank is the trustee.  The Debentures Due 2017 bear a floating rate of interest of 3.05% over the three month LIBOR and required quarterly interest payments.  Like the Statutory Trust Indentures, Article XV of the Junior Subordinated Indenture provides that that payment due on the Debentures Due 2017 is subordinated and junior

---

[2]    *See* Annex 1 to the Statutory Business Trusts, Paragraph 9.
[3]    *See* Annex 1 to the Statutory Business Trusts, Paragraph 3.

LANDAU
GOTTFRIED
& BERGER LLP

1    in right of payment to the prior payment in full of all Senior Indebtedness (as defined in the Junior

2    Subordinated Indenture) of the Debtor, whether outstanding on the date of the Junior Subordinated

3    Indenture or thereafter incurred.  To the extent the Junior Subordinated Indenture Trustee receives

4    a distribution prior to Senior Indebtedness being paid in full, the Junior Subordinated Indenture

5    Trustee is required to hold the distribution in trust for the Senior Indebtedness; provided, however,

6    the subordination provisions do not apply to the Junior Subordinated Indenture Trustee's Claims

7    for the reasonable fees, expenses, disbursements and advances (including the reasonable

8    compensation, expenses and disbursements of their respective agents and counsel) incurred by the

9    Junior Subordinated Indenture Trustee.

10       Like the proceeds from the Statutory Trust Indentures, these funds were also down-

11   streamed to the Bank to support the Bank's strategic plan initiatives.

### 3.    Senior Secured Lender - FTBN

13       On or about March 17, 2006, the Debtor and First Tennessee Bank, National Association

14   ("FTBN") entered into a Loan Agreement (the "Loan Agreement")) wherein FTBN committed to

15   make a revolving loan in the amount of Seventy Million Dollars ($70,000,000).  The Debtor

16   executed a Promissory Note on March 17, 2006 evidencing the loan ("Loan"), which Note was

17   amended and restated on March 29, 2007 (the "Note").  The original Maturity Date (as defined in

18   the Loan Agreement) for the Loan was one year from the date that the Note was executed.  The

19   Maturity Date was ultimately extended to May 22, 2009 pursuant to the Modification Agreements

20   (as defined below). The Note was secured by a first priority security interest in all 1,218,700 of

21   issued and outstanding shares of common stock (the "Pledged Shares") in Debtor's wholly-owned

22   subsidiary, the Bank, pursuant to the Pledge and Security Agreement executed by Debtor on

23   March 17, 2006 (the "Pledge Agreement" together with the Loan Agreement, Note, and the eight

24   Modification Agreements[4] are herein referred to collectively as the "Loan Documents).  The Loan

25   Documents provide that interest accrued on the Note at an annual variable rate equal to LIBOR

26

27   _____

    4       Between June 2006 and April 2009, the Debtor and FTBN entered into eight (8) modification agreements
("Modification Agreements"), which among other things, extended the Maturity Date several times, amended certain
28   terms in the Loan Documents, and extended waivers of various covenants within the Loan Documents.

1    plus 3.5% per annum.  The outstanding principal and interest on the Loan as of the Petition Date

2    was approximately $50,998,707.21.

3        As a result of the closure of the Bank by the OCC and the appointment of the FDIC as the

4    receiver for all assets and liabilities of the Bank, the Pledged Shares are likely valueless and

5    therefore the debt owed by the Debtor under the Loan will be treated under the Plan as fully

6    unsecured.

7            **4.    Investment Interests**

8        The Debtor was formed as a bank holding company to provide additional flexibility to the

9    organization through the ability to serve a broader geographic area, expand its product offerings,

10   access capital markets through the ability to issue debt and other financial instruments, and to gain

11   certain tax benefits.  Upon its formation in 1988 it acquired all of the issued and outstanding

12   securities of the Bank.

13       The Debtor's VNBC Common Stock and VNBC Preferred Class D Stock are publicly held

14   and the Debtor is subject to the reporting requirements of the Securities Exchange Act of 1934, as

15   amended.  The VNBC Common Stock was traded on NASDAQ until it was delisted in the second

16   quarter of 2009. Thereafter, the VNBC Common Stock traded in the over-the-counter market

17   through the Pink OTC Markets, Inc. (also known as the "Pink Sheets") under the ticker symbol

18   "VNBC-PK".  It continues to trade post petition in the over-the-counter market through the Pink

19   Sheets, however, the symbol has now changed to "VNBCQ-PK" to indicate that the Debtor filed

20   bankruptcy.  The Debtor's VNBC Preferred Class D Stock traded on NYSE AMEX (formerly

21   AMEX) until it was delisted from trading in the second quarter of 2009.  It now trades in the over-

22   the-counter market through the Pink Sheets under the ticker symbol "VNBAQ".

23           **(a)    Preferred Stock Interests**

24       The Debtor raised approximately $31.6 million through the issuance of Preferred Stock

25   Interests.  The Debtor's Preferred Stock Interests include VNBC Preferred Class C Stock and

26   VNBC Preferred Class D Stock.  As of the Petition Date, approximately 10,000 shares of VNBC

27   Preferred Class C Stock and 2,300,000 shares of VNBC Preferred Class D Stock were issued and

28   outstanding.  The VNBC Preferred Class C Stock and VNBC Preferred Class D Stock (a) rank

1  senior to the Debtor's VNBC Common Stock and (b) are on parity with each other.  There are no

2  Equity Interests (as defined in the Plan) of the Debtor which rank senior to the VNBC Preferred

3  Class C Stock and VNBC Preferred Class D Stock.

4          Each of the VNBC Preferred Class C Stock and VNBC Preferred Class D Stock has rights,

5  preferences and privileges which are superior to the VNBC Common Stock, including, dividend

6  and liquidation preferences.  However, neither the VNBC Preferred Class C Stock nor the VNBC

7  Preferred Class D Stock is convertible or exchangeable into any other property or securities of the

8  Debtor.

9          Holders of the VNBC Preferred Class C Stock and VNBC Preferred Class D Stock have no

10  voting rights except to the extent required by law or as otherwise expressly provided in the

11  Debtor's Articles of Incorporation (the "Articles").  Under the Articles, holders of VNBC Preferred

12  Class C Stock and VNBC Preferred Class D Stock, voting together as a class, have the right to

13  elect two (2) directors if the preferred dividends have not been paid for either four (4) dividend

14  periods with respect to the VNBC Preferred Class C Stock or six (6) dividend periods with respect

15  to the VNBC Preferred Class D Stock.  Further, the consent of the holders of the VNBC Preferred

16  Class C Stock and VNBC Preferred Class D Stock, as applicable, must be obtained if any

17  amendment, authorization, issuance or other action would expand or create an equity security with

18  rights, preferences and privileges which are superior to the Preferred Stock Interests or which

19  would otherwise materially and adversely affect the rights, preferences and privileges of the

20  Preferred Stock Interests, as applicable.

21          Holders of VNBC Preferred Class C Stock are entitled to receive a non-cumulative,

22  quarterly, cash dividend at a floating rate per annum equal to 3-month LIBOR plus 3.8%.  Holders

23  of VNBC Preferred Class D Stock are entitled to receive a non-cumulative, quarterly cash dividend

24  at an annual amount equal to $0.75 per share.

25          In liquidation, the preference of the VNBC Preferred Class C Stock, after payment or

26  provision for payment of all debts and liabilities of the Debtor and the rights of any senior equity

27  securities, is an amount equal to the liquidation preference of $1,000.00 per share, plus (i) all

28  accrued but unpaid dividends for the then current dividend period until the date of payment in such

1    dividend period, and (ii) all accrued but unpaid dividends that have been declared with respect to

2    one or more prior dividend periods (but without accumulation of any previously undeclared and

3    unpaid dividends for prior dividend periods), before any distributions to the holders of the Debtor's

4    VNBC Common Stock or any equity securities ranking, as to liquidation, junior to the VNBC

5    Preferred Class C Stock.

6         In liquidation, the preference of the VNBC Preferred Class D Stock, after payment or

7    provision for payment of all debts and liabilities of the Debtor and the rights of any senior equity

8    securities, is an amount equal to the liquidation preference of $10.00 per share (subject to equitable

9    adjustments for splits, combinations or reclassification of the VNBC Preferred Class D Stock),

10   plus all accrued but unpaid dividends from the last dividend period, without interest to the date

11   fixed for such liquidation, before any distributions to the holders of the Debtor's VNBC Common

12   Stock or any equity securities ranking, as to liquidation, junior to the VNBC Preferred Class D

13   Stock.

14        If the legally available assets for distribution are insufficient to make full payment to the

15   holders of the Preferred Stock Interests, then the holders of the Preferred Stock Interests share

16   ratably in such distributions.  The holders of Preferred Stock Interests are not receiving any

17   distribution under the Plan and therefore are deemed to reject the Plan pursuant to section 1126(g)

18   of the Bankruptcy Code.

19              **(b)    VNBC Common Stock**

20        The Debtor raised approximately $89,474,237 through the sale and issuance of VNBC

21   Common Stock.[5] As of September 30, 2008, the Debtor had issued and outstanding approximately

22   9,893,978 shares of VNBC Common Stock.[6]  Except as otherwise provided under the law, the

23   VNBC Common Stock has no special rights, preferences or privileges.  In liquidation, if there are

24   any assets remaining of the Debtor legally available for distribution to stockholders after payment

25   or provision for payment of all debts and liabilities of the Debtor, the order of priority is:  (a) the

26

27   [5]      Net of 1,892,965 treasury shares repurchased at an aggregate cost of $32,565,752.
     [6]      The number of shares of VNBC Common Stock does not include treasury stock, unvested restricted stock, and
28   unexercised warrants.

LANDAU
GOTTFRIED
& BERGER LLP                                             16

holders of the VNBC Preferred Class C Stock to the extent of their liquidation preference (provided, however, if the assets are insufficient to pay the VNBC Preferred Class D Stock, payment is made ratably with the VNBC Preferred Class D Stock); (b) the holders of the VNBC Preferred Class D Stock to the extent of their liquidation preference; and (c) all remaining assets are distributed to the holders of VNBC Common Stock.  The VNBC Common Stock holders are not receiving any distribution under the Plan and therefore are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

(c)    <strong>Warrants</strong>

In connection with the sale and issuance of VNBC Common Stock to institutional investors in a private placement on June 18, 2004, the Debtor granted the institutional investors warrants ("Warrants") to purchase 168,000 additional shares of VNBC Common Stock at an exercise price of $23.81 per share.  The Warrants expire on June 11, 2011.  The Warrants are out of the money based on a VNBC Common Stock price of $0.06 per share as of the close of trading on September 24, 2009.  The holders of Warrants are not receiving any distribution under the Plan and therefore are deemed to reject the Plan.

**C.    Events Leading Up to Bankruptcy.**

**1.    Overall Business Erosion**

Under the direction of Norman Morales, the former President and Chief Executive Officer and a former director of the Debtor and the Bank from 2000 to 2008, the Debtor's business strategy focused on growing the Bank's loan portfolio primarily through higher yielding loans generated through its luxury home construction, tract construction and commercial construction and commercial real estate specialty lending groups.  Because these specialty lending groups focused principally on loan origination, the business generated by these groups generally took the form of discrete loan transactions which generally did not carry with them the other portions of the borrower's banking relationship, including their deposit relationship.  Loan origination growth through the specialty lending groups contributed to high concentrations of construction and commercial real estate loans as a percentage of total loans and as a percentage of capital. The pace of loan originations outstripped the Bank's ability to generate core deposits to fund all of its

1    lending activities.  To bridge its funding gap, the Bank relied on higher cost deposits, including

2    promotional money market accounts and certificates of deposit, and alternative funding sources,

3    including Federal Home Loan Bank ("FHLB") borrowings.

4            Further, to provide additional capital and liquidity to fund the Bank's growth, the Debtor,

5    as the parent of the Bank, incurred debt in the form of the Loan from FTBN and subordinated debt

6    and hybrid instruments such as the Debt Securities under the Statutory Trust Indentures and the

7    Debentures under the Junior Subordinated Indenture.  This capital and funding strategy was

8    designed by the Debtor and the Bank and was employed to fuel their growth over a period of

9    approximately seven (7) years.  As the Debtor and the Bank's balance sheets grew, so did their

10    exposure to the risk of an economic downturn.

11            The Debtor believes that the erosion of the national economy and local real estate market

12    in 2007 occurred faster and more steeply than many had predicted.  Specifically, the Debtor

13    believes that the national economic conditions, and more particularly, the economic conditions of

14    the Southern California real estate market, caused the Bank to suffer substantial losses in its loan

15    portfolio.  The Debtor also believes that the losses sustained by the Debtor and the Bank were the

16    result of a number of issues, including, but not limited to, the following:  significant write-downs

17    of assets (including other real estate owned ("OREO"), goodwill and deferred tax assets),

18    increased provisioning for loan losses, declining profitability due to net interest margin

19    compression, and increased operational expenses associated with deteriorating asset quality.

20            The Debtor contends that in September 2007 the prior Board of Directors of the Debtor and

21    the Bank instructed management to re-evaluate and recommend such actions deemed necessary or

22    advisable to adjust the Debtor and the Bank's overall risk profile in order to better address the

23    competitive operating environment which may arise due to changes in general economic

24    conditions and market circumstances.  Further, that the result was the development of an action

25    plan to reduce overall enterprise risk in the Debtor and the Bank.

26

27

28

LANDAU
GOTTFRIED
& BERGER LLP

### 2.     Resignation of Directorship and Termination of CEO of Bank and Debtor

On or about January 24, 2008, the Debtor announced that Mr. Morales agreed to resign as a director and that his employment as President and Chief Executive Officer of both the Debtor and the Bank was terminated.

### 3.     Consent Solicitation & Proxy Contest

After the resignation and termination of Mr. Morales, Mr. Morales and Jon Salmanson, one of the Debtor's shareholders, launched a consent solicitation and proxy contest in February 2008 in order to amend the Debtor's Bylaws and replace all the directors on the Board with an alternative slate of directors.  The proxy contest and related events continued until approximately August 4, 2008, when Mr. Morales announced that he was unable to obtain regulatory approval from the OCC and FRB to serve as a director or officer of the Bank and Debtor, respectively, Mr. Morales withdrew his candidacy as a director, and a Board comprised of a majority of candidates from the alternative slate of directors was elected at the annual meeting of shareholders.

### 4.     Regulatory Actions By OCC Impacting the Bank

On May 5, 2008, the Bank was informed in writing by the OCC that, as a result of an examination, the Bank had been designated to be in a "troubled condition" for purposes of Section 914 of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("Section 914"). As a result of this designation, the Bank was not allowed to appoint any new director or senior executive officer or change the responsibilities of any current senior executive officers without providing the OCC with 90 days prior written notice.  Such appointment or change in responsibilities could be disapproved by the OCC.  In addition, the Bank was not allowed to make indemnification or severance payments to, or enter into agreements providing for such indemnification or severance payments with, institution-affiliated parties, which included key employees and directors of the Bank, without complying with certain statutory restrictions including prior approval of the OCC and FDIC.

1    On July 22, 2008, the OCC and the Bank entered into a Consent Order requiring the Bank

2    to take a number of actions, including, reducing the credit risk in its loan portfolio, increasing its

3    reserves against loan losses, and strengthening its overall capital position by complying with

4    enhanced capital requirements.

5              **5.    Regulatory Action by FRB Impacting Debtor**

6    On May 20, 2008, the FRB notified the Debtor that, as a result of an off-site review, the

7    Debtor had been designated to be in a "troubled condition" for purposes of Section 914.  Upon

8    such designation, the Debtor was subject to the similar restrictions affecting the Bank related to the

9    appointment and change in responsibilities of directors and officers and indemnification and

10    severance payments.  In addition, the FRB advised the Debtor that in light of the Debtor's

11    obligation to serve as a source of financial strength to the Bank, the Debtor could not make

12    payments to third parties, including, without limitation, dividend payments to the holders of its

13    VNBC Common Stock and Preferred Stock Interests, payments of interest and principal to its

14    creditors, and payments for certain other operating expenses, without prior FRB approval.

15    On September 23, 2008, the FRB and the Debtor entered into a Written Agreement

16    requiring the Debtor to take, and refrain from taking, a number of actions to ensure the Debtor

17    served as a source of financial strength to the Bank.  Those actions included, without limitation,

18    raising additional regulatory capital to ensure that the Bank complied with the enhanced regulatory

19    capital requirements of the Consent Order, not make payments to third parties (including, without

20    limitation, dividend payments to the holders of its common stock and preferred stock, payments of

21    interest and principal to its creditors), and refraining from the acceptance of dividends and other

22    payments from the Bank.

23              **6.    Slate of New Directors for Debtor and the Bank**

24    On August 11, 2008, following the Debtor's annual meeting of shareholders, it announced

25    that five (5) new directors from the alternative slate, Douglas Kratz, Glen Terry, Cynthia Harriss,

26    Lester Strong and Harice "Dev" Ogle, and two existing directors, David Buxbaum and Charles

27    Keagle, had been elected to its Board. On August 20, 2008, Ms. Harriss resigned from the Board

28    of the Debtor and the Board appointed Perry Hansen, Chairman of the Board of the Bank, to serve

LANDAU
GOTTFRIED
& BERGER LLP

1    as a director of the Debtor, subject to regulatory approval. In addition, the Board appointed James

2    LeSieur, the former Chairman of the Board and former interim President and Chief Executive

3    Officer, to serve as a director, subject to regulatory approval.  On September 12, 2008, the new

4    Board appointed Glen Terry as President and Chief Executive Officer of the Debtor and the Bank,

5    subject to regulatory approval.  Regulatory approval was subsequently obtained for each of these

6    parties to serve in their respective capacities.

7          The biographies provided by such individuals includes the following experience:

8          a.    Glen Terry.  Mr. Terry is a career banking executive who previously held

9    positions of President and Chief Executive Officer and served on the boards of four regional

10    community banks in Northern California—The Vintage Bank (Napa), Solano Bank (Vacaville),

11    Napa Valley Bank (Napa) and Tri Valley Bank (San Ramon).  His career also included senior

12    positions in multi-billion dollar regional and interstate banks. At Napa Valley Bank, Mr. Terry

13    engineered the company's restructuring, managed full compliance with and ultimate removal of a

14    regulatory cease and desist order, substantially reduced troubled assets and significantly improved

15    the profitability of the institution. In 1996, Napa Valley Bank was merged into Westamerica Bank.

16          b.    Douglas Kratz and Perry Hansen.  In 1985, Mr. Kratz was appointed

17    President and Chief Executive Officer of Financial Services Corporation of the Midwest

18    ("FSCM") and a director of its subsidiary bank, The Rock Island Bank, Rock Island, Illinois. Also

19    in 1985, Mr. Hansen was appointed to the board of directors of FSCM and as Chairman and Chief

20    Executive Officer of The Rock Island Bank.  At the time Messrs. Kratz and Hansen joined FSCM

21    and The Rock Island Bank, both entities were under regulatory sanctions from the FRB.  However,

22    within 18 months the sanctions were lifted from both FSCM and The Rock Island Bank.  Both

23    Messrs. Kratz and Hansen remained involved for approximately fourteen (14) years until the

24    combined entities, with consolidated assets of almost $600 million, were sold.  In late 2000 and

25    early 2001, Messrs. Kratz and Hansen initiated a similar turnaround and recapitalization of Second

26    Mid-America Bancorp, Inc. and its subsidiary, First Illinois National Bank, by merging the

27    troubled entities with and into newly formed and well capitalized entities, National Bancshares,

28

1    Inc. and its subsidiary, THE National Bank, Bettendorf, Iowa.  The combined entities have

2    consolidated assets over $1 billion.

3         c.    James LeSieur.  In 1991, Mr. LeSieur was appointed President and Chief

4    Executive Officer of Sunwest Bank, Tustin, California just as Southern California was entering a

5    severe economic downturn.  Sunwest Bank was operating under regulatory sanctions at the time

6    and ultimately was placed under a cease and desist order by the FDIC.  Without the ability to

7    attract additional capital at that time through its parent, West Coast Bancorp, Mr. LeSieur led

8    Sunwest Bank's return to profitability by resolving asset quality problems, consolidating

9    operations, selling assets to generate capital and effectively downsizing and reorganizing the

10   organization.  Following Sunwest Bank's return to profitability, West Coast Bancorp was able to

11   downstream capital to Sunwest Bank and ultimately the order was lifted.  Following the lifting of

12   the order in the mid 1990's, Mr. LeSieur led the organic profitable growth of Sunwest Bank from

13   approximately $110 million in assets to more than $250 million by the end of 2002.

14          **7.    Restructuring by New Board of Directors of Debtor and Bank**

15        Under the direction of the new Board of Directors, the Debtor and the Bank furthered the

16   risk mitigation plan initiated by the prior Board and developed additional strategies in an attempt

17   to strengthen the capital and liquidity of the Debtor and the Bank, restore profitability and,

18   thereafter, grow responsibly.  These plans and strategies included, among other things, the

19   following objectives:

20        a.    **Improving Asset Quality**.  Among other things, the Bank expanded the

21   Special Assets Group which was formed in early 2008 and conducted additional evaluations of the

22   Bank's loan portfolio and intensified its monitoring in an effort to maintain a full understanding of

23   the market value of collateral underpinning the loans.  If the collateral value of any loan was

24   considered compromised or if the full collectability of principal and interest was considered

25   impaired, strategies and action plans were implemented in an attempt to correct the impairment of

26   the loan.  Those strategies and action plans included, but were not limited to, restructuring the loan

27   to effect a workout, foreclosing upon and liquidating the collateral securing the loan and selling the

28

1  loan to reduce exposure to loss.  However, there continued to be significant increases in the Bank's

2  non-performing loan portfolio and its other real estate owned.

3      **b.      Termination of Lending; Capital and Liquidity Preservation; Loan**

4  **Portfolio Diversification.**  The Debtor contends that the Bank took a number of actions in 2007

5  through 2009 to address its loan portfolio issues and by mid 2008, the Bank ceased the origination

6  of new luxury home construction, tract construction and commercial construction loans and, with

7  the exception of certain renewals of existing credits in narrow asset categories, in early 2008

8  curtailed other loan originations.  During this time, the Bank enhanced collection efforts to pursue

9  pay-downs and pay-offs of existing credits, the workouts and loans sales conducted through the

10  Special Assets Group.  The Bank was able to reduce its balance sheet which alleviated some, but

11  not all, of the pressure on its capital ratios and liquidity.  These actions also started to change the

12  composition of the loan portfolio as construction loans as a percentage of all assets began to

13  shrink.  Market conditions continued to impact the Bank's construction and commercial real estate

14  loan portfolio and began to impact other portions of the loan portfolio, including business and

15  personal lines of credit.  As a result, the Bank continued to experience significant increases in its

16  non-performing and non-accrual loans which out-stripped its ability to absorb further write-offs,

17  decreases in income,  increased operating costs, and increased losses.

18      **c.      Liquidity Stabilization.**  As addressed in more detail under "Regulatory

19  Action By OCC Impacting the Bank" above, in August 2008 the Bank entered into a Consent

20  Order with the OCC.  One of the impacts of the Consent Order was that the Bank was

21  automatically subject to 12 C.F.R. 337.6 (the "Deposit Statute"), which restricted the Bank from

22  receiving, renewing or rolling-over brokered deposits[7] and imposed a maximum permissible rate

23  that the Bank could offer on its other deposit products.  Based in part upon information received

24  from customers at the time of the withdrawal, the Debtor believes that negative publicity resulting

25  

26  [7] The term "Brokered Deposits" includes those deposits where an intermediary facilitates the placement of deposits with

27  an institution and, in the case of an institution which is under a regulatory order, deposit products offering rates of interest (with respect to such deposits) which are significantly higher than the prevailing rates of interest on deposits offered by other insured depository institutions having the same type of charter in such depository institution's normal market area. *See* Section 337.6(b) of the FDIC's Rules and Regulations.

28  

LANDAU
GOTTFRIED
& BERGER LLP

23

from the Bank and the Debtor's financial results and the financial results of other financial

institutions, together with the seizure of IndyMac Bank based in Pasadena, California by federal

regulators in July 2008, contributed to an increase of customer deposit withdrawals and affected

the Bank's liquidity and its ability to meet its obligations as they became due.  The following

activities and actions impacted the Bank's ability to generate deposits and additional liquidity:

(i)      **Brokered Deposits**.  During the second quarter of 2008, the Bank

obtained $266.3 million in brokered deposits which offset the $226.9 million in run-off of savings,

NOW and money market deposit accounts.  However, as a result of the Deposit Statute and other

regulatory limitations, the Bank could no longer accept, renew or rollover brokered deposits unless

it received a waiver from the FDIC.  The Bank requested a waiver from the FDIC, but it was not

granted and the Bank was unable to employ the use of brokered deposits as a source of liquidity.

(ii)     **Federal Home Loan Bank**.  Effective on or about April 21, 2008,

the FHLB reduced the Bank's borrowing capacity from 40% to 30% of the Bank's total assets.

Further, the Bank's borrowing availability was limited to the amount of eligible collateral that can

be pledged to secure that borrowing facility.  As a result of prior draws against and continued

reliance on this facility, as of August 31, 2008, the Bank had substantially exhausted its additional

availability under the FHLB borrowing facility.  Further, as the advances came due and were

repaid to the FHLB, the FHLB was not obligated to re-lend the funds to the Bank.

(iii)    **Other Unsecured Correspondent Facilities**.  As of August 31,

2008, neither the Debtor nor the Bank had unsecured correspondent banking facilities with

borrowing availability.

(iv)     **Federal Reserve "Down-Stream" Requirement**.  On July 31,

2008, the FRB notified the Debtor that it must serve as a source of financial strength to the Bank

and as such, required that management perform an analysis of the cash needs for the Debtor

through October 31, 2008.  The FRB further required that any amounts not required for the

Debtor's operations be contributed to the Bank to support its operational needs.

(v)      **Federal Reserve Discount Window Facility.**  On August 1, 2008,

the Bank entered into an intercreditor agreement with the FHLB and the FRB whereby certain

LANDAU
GOTTFRIED
& BERGER LLP

eligible loans pledged to the FRB, and agreed to by the FHLB, could be utilized to support any advances from the Federal Reserve Discount Window.  The Federal Reserve Discount Window facility was in addition to and supplemented the borrowing facility previously established with the FHLB.  The Bank pledged loans with an aggregate principal balance of over $400 million which could be used by the Federal Reserve Discount Window in determining an available amount to the Bank; however, the Federal Reserve Discount Window is not obligated to lend on any collateral deposited.  In September 2008 the Bank borrowed approximately $20 million from the Federal Reserve Discount Window to bridge a short term funding deficit.  The loan was repaid on schedule.  Thereafter, the Bank increased its reliance on a promotional deposit campaign in compliance with the Deposit Statute to meet its liquidity needs.

        **(vi)**    **Promotional Certificates of Deposit**.  In or about July 2008, the Debtor believes that due in part to the continued deposit run-off and the inability to obtain a brokered deposit waiver from the FDIC, the Bank accelerated its marketing of promotional certificates of deposit ("Promotional CDs").  The deposit rates that were offered by the Bank were in compliance with the regulatory requirements of the OCC and the FDIC, including the Deposit Statute.

        **(vii)**    **Liquidity Position at Bank Closure**.  As addressed above, during this period the Bank had limited alternative means of generating necessary liquidity.  Therefore, while the funds originated through the Promotional CDs were at a higher cost, the Bank's liquidity stabilized and at the time of its closure by the OCC on July 17, 2009 the Bank had a liquidity cushion which exceeded $100 million (i.e. a positive Federal Funds Sold position).

        **d.**    **Cost Reduction**.  The Debtor's efforts to reduce expenses included, but were not limited to:

        **(i)**    **Layoffs and Operating Cost Reduction**.  The Bank eliminated staff and reduced or eliminated other operating expenses.

        **(ii)**    **Divestiture of Exchange Companies**.  On September 9, 2008, the Debtor entered into an agreement to sell two of its consolidated operating subsidiaries, the Exchange Companies, back to their previous owner.  The Debtor originally acquired the Exchange

1    Companies, which act as qualified intermediaries under Section 1031 of the Internal Revenue

2    Code, in December 2007, in order to provide a source of low-cost deposits for the Bank. However,

3    the erosion in the real estate market negatively impacted the businesses of the Exchange

4    Companies, causing the Debtor to assist with funding of the Exchange Companies operating

5    expenses and the Exchange Companies reduced the amount of the lower cost deposits held by the

6    Exchange Companies at the Bank. In exchange for the forgiveness of debt owed by the Exchange

7    Companies to the Debtor totaling approximately $644,000 and a payment by the Debtor to the

8    Exchange Companies in the amount of $72,000, the employment agreement with the previous

9    owner and the earn-out provisions under the original sale agreement were terminated.

10                    **(iii)    <u>Non-Qualified Deferred Compensation Plan Termination</u>**. In

11   order to save the costs associated with plan administration and matching contributions, and to

12   retain critical employees otherwise seeking immediate distributions under the plan through

13   voluntary termination, on August 20, 2008, the Board of Directors of the Bank, as the plan

14   administrator, terminated the Bank's Non-Qualified Deferred Compensation Plan. While

15   termination of the plan required aggregate distributions totaling approximately $3.4 million from

16   plan assets, the plan assets were held outside the Bank in investments designated by the plan

17   participants and did not affect the Bank's liquidity.

18           The Debtor did not modify, amend, terminate, make distributions or otherwise disturb the

19   Directors Deferred Compensation Plan (the assets of which consisted of cash held by the Debtor)

20   and each of the former directors that participated in that plan are now unsecured creditors of the

21   estate.

22           However, notwithstanding the efforts described above by the Board and management ,the

23   problems in the Bank's loan portfolio continued to increase and caused the Bank's losses to

24   accelerate because of increases in the provisioning for loan losses, increases in the costs associated

25   with problem loan and OREO resolution, and decreases in income as a result of non-performing

26   and non-accrual loans. As a result, although the Bank was taking steps to reduce costs within its

27   control, those measures could not effectively offset the losses, cost increases and capital erosion

28   arising from the problems in the Bank's loan and OREO portfolio.

1       **8.**    **Efforts by the Debtor to Raise Capital and Seek Strategic Alternatives**

2          In 2007, the Debtor commenced its capital raising efforts and the development of strategic

3  alternatives.  In April 2008, the prior Board engaged Sandler O'Neill & Partners, L.P. as its

4  investment bankers to assist in the Debtor's capital raising efforts.  In August 2008, the new Board

5  engaged Friedman, Billings, Ramsey & Co. and Howe, Barnes, Hoefer & Arnett as its investment

6  bankers to either raise capital for the Debtor or sell the Bank.  On or about November 13, 2008, the

7  Debtor announced the execution of an agreement for the sale of the Bank to Vineyard Bancshares,

8  Inc. ("VBI"), a bank holding company formed by the Debtor's Chairman of the Board of

9  Directors, Douglas Kratz.  The transaction with VBI was contingent on the ability of VBI to raise

10  $125 million in new capital, an amount at the time considered sufficient to acquire the Bank from

11  the Debtor and fulfill the regulatory capital requirements of the Bank.

12          In connection with the capital raising efforts and the potential sale of the Bank to VBI, the

13  Debtor also took the following actions:

14          **(a)**    **Line of Credit Modifications and Event of Default**.  As of approximately

15  August 31, 2008, the Debtor had approximately $48.3 million in principal outstanding under the

16  secured line of credit under the FTBN Loan which was secured by the Pledged Shares of the

17  VNBC Common Stock.  As reflected in section III.B.3 above, on several occasions over the term

18  of the FTBN Loan the Debtor had been in default due to non-compliance with certain financial and

19  operating covenants, which were waived pursuant to the Modification Agreements.  Moreover, in

20  connection with its capital raising efforts, the Debtor negotiated a discounted payoff of the line of

21  credit conditioned upon the successful completion of the capital raise.

22          **(b)**    **Discounted Payoff on Indentures, VNBC Preferred Class C Stock**.  In

23  addition to the discounted payoff of the FTBN line of credit, the Debtor negotiated a discounted

24  payoff under a portion of the obligations under the Statutory Trust Indentures and VNBC Preferred

25  Class C Stock conditioned upon the successful completion of the capital raise.

26          **(c)**    **NASDAQ Waiver**.  The issuance of the investment units contemplated

27  under the capital raise would have generally required approval by the Debtor's shareholders

28  pursuant to the rules of the NASDAQ Stock Market ("NASDAQ").  However, NASDAQ rules

1  provide for an exception in a case where the delay involved in securing shareholder approval for

2  the issuance would seriously jeopardize the financial viability of a company.  In accordance with

3  this exception, the Debtor's Board expressly approved the Debtor's intended use of the exception

4  and the Debtor intended to mail a notice to shareholders and file a public notice explaining its

5  reliance on the exception for the issuance of the investment units.

6  The Debtor contends that despite these efforts of the Board and management, the Debtor was

7  unable to raise capital or sell the Bank and on May 28, 2009, the Debtor announced that the

8  proposed transaction with VBI had been terminated.  The inability of the Debtor to raise capital or to

9  otherwise implement other strategic alternatives to enhance the financial position of the Bank,

10  including, without limitation, the sale of the Bank, caused the Bank and the Debtor to remain in non-

11  compliance with each of the Consent Order and Written Agreement, particularly as it related to the

12  inability to raise capital and comply with the capital requirements imposed on the Bank and the

13  Debtor.  The Bank was closed by the OCC on July 17, 2009 and the FDIC was appointed as the

14  receiver.  On that same date, the FDIC facilitated the acquisition of most of the assets and liabilities

15  of the Bank by California Bank & Trust.  Thereafter, the Debtor filed bankruptcy on July 21, 2009.

16  **D.    Debtor In Possession Administration.**

17  The Debtor commenced its Chapter 11 Case on the Petition Date to implement the

18  liquidation of the Debtor's assets and operations.  The Debtor has taken the following steps to

19  efficiently administer its Chapter 11 Case to date:

20  **1.    Employment Applications.**

21  On the Petition Date, the Debtor filed applications to employ Landau & Berger, LLP

22  ("L&B") as its bankruptcy counsel and Manatt, Phelps & Phillips, LLP ("Manatt") as its special

23  corporate, banking and litigation counsel. By Orders entered on August 26, 2009 (Docket No. 30)

24  and September 1, 2009 (Docket No. 35) respectively, the Bankruptcy Court approved the

25  employment by the Debtor of both L&B and Manatt.

26  **2.    Motion to Reject Certain Executory Contracts and Unexpired Leases.**

27  On or about July 23, 2009, the Debtor filed a *Motion To Approve Rejection Of (1) Two*

28  *Unexpired Non-Residential Real Property Leases And (2) One Executory Employment Agreement*

("Rejection Motion'") (Docket No. 12). An Order approving the Rejection Motion was entered by the Bankruptcy Court on September 4, 2009 granting retroactive rejection as of July 23, 2009 (Docket No. 36) of two commercial office leases; and an employment agreement with the then current President and Chief Executive Officer of the Debtor, Glen C. Terry (the "Terry Employment Agreement"). In connection with the rejection of the Terry Employment Agreement, the Court also authorized the transfer of approximately $90,000 in funds at City National Bank ("CNB") into the Debtor's debtor-in-possession operating account. The funds had been placed in the CNB account by the Bank in connection with the Terry Employment Agreement. Because the account at CNB is in the name of the Bank, the Debtor has been working through the administrative process with the FDIC for the release of that portion of the funds representing Debtor's pro rata share of the account. If the use of that process breaks down or fails to cause the release of the funds, the Debtor is prepared to file a turnover motion with the Bankruptcy Court.

The first commercial lease rejected was for two non-residential office suites located at 8105 Irvine Center Drive, Suites 600 and 650, Irvine, California 92618. One suite was an administrative office used by both the Bank and the Debtor and the second suite was used as a Bank branch. After the OCC closed the Bank and appointed the FDIC as receiver on July 17, 2009, the Debtor was required to vacate these leased premises. The second commercial lease rejected was for a non-residential office building located at 1016 Irwin Street, San Rafael, California 94901.

### 3. Motion to Wind-Down Employee Stock Ownership Plan.

The Debtor was the plan sponsor of an Employee Stock Ownership Plan ("ESOP") for employees of both the Debtor and the Bank and the Debtor's Board administered the ESOP ("ESOP Committee") with the aid of the ESOP trustee, First Bankers Trust Services, Inc. ("FBTS" or "Trustee"). All of the ESOP assets were held in a segregated trust fund for the benefit of the ESOP participants (the "ESOP Trust").

As a means to fund the ESOP Trust's purchase of 298,000 shares of common stock in the Debtor ("Shares") for allocation to employee participant accounts, the ESOP Trust entered into a

loan agreement on behalf of the ESOP with TIB The Independent Bankers Bank (the "TIB Loan"). On or about December 10, 2004, the ESOP Trust entered into a Loan Agreement with the Debtor to borrow approximately $6,855,638.46 from the Debtor (the "ESOP Loan") pursuant to a Promissory Note to repay the TIB Loan in full.  The ESOP Loan was secured by the Shares and such Shares were placed in a suspense account maintained by the ESOP Trust for the benefit of the Debtor.

On September 8, 2009, the Debtor filed its *Notice of Motion and Motion Pursuant to Sections 105 and 363(B) of the Bankruptcy Code for Entry of an Order (1) Approving the Use of Certain Estate Funds to Terminate the Debtors Employee Stock Ownership Plan, (2) Authorizing Debtor to Forgive, Discharge and Cancel the Promissory Note Executed by the Employee Stock Ownership Plan Trust, and (3) Granting Such Other and Further Related Relief; Memorandum of Points and Authorities in Support Thereof; and Declaration of Donald H. Pelgrim in Support Thereof* ("ESOP Motion") (Docket No. 40), seeking an order of the Court authorizing the Debtor to take certain steps to terminate its Employee Stock Ownership Plan ("ESOP"), which had become defunct as a result of the Bank being placed into FDIC receivership.  The ESOP Motion was unopposed, and on September 29, 2009, the Debtor filed a *Declaration of Non-Opposition* and related documents (Docket No. 55) seeking entry of an order granting the motion.

In December, 2009, the Court requested that a renewed and amended motion seeking authority to wind down the ESOP be brought, which would, inter alia, eliminate the Debtor's request for a release of the ESOP Trustees and provide evidence that the winding down of the ESOP would not occasion additional liability to the Debtor's estate.  On January 13, 2010, the Debtor filed its *Notice of Motion and Renewed and Amended Motion Pursuant to Sections 105 and 363(b) of the Bankruptcy Code for Entry of an Order (1) Approving the Use of Certain Estate Funds to Terminate the Debtor's Employee Stock Ownership Plan, (2) Authorizing Debtor to*

LANDAU
GOTTFRIED
& BERGER LLP

*Forgive, Discharge and Cancel the Promissory Note Executed by the Employee Stock Ownership Plan Trust, and (3) Granting Such Other and Further Related Relief; Memorandum of Points and Authorities in Support Thereof; and Declarations of Donald H. Pelgrim and John J. Heber in Support Thereof* ("Amended ESOP Motion") pursuant to Rule 9013-1(o)(1) of the Local Bankruptcy Rules of this Court ("Local Rules") (Docket No. 101).

As of the Petition Date, and as reflected on Schedule B of the Debtor's Schedules of Assets and Liabilities, the balance of the ESOP Loan was $4,528,187. Of the original 298,000 Shares held in the suspense account by the ESOP Trust as collateral for the ESOP Loan, only approximately 202,996 Shares remained as collateral in the suspense account as property of the Debtor's estate on the Petition Date, and such Shares have been liquidated to preserve value for the Debtor's estate. The net sale proceeds from the sale of the 202,996 Shares was approximately $5,650.11 (the "Debtor Suspense Account Cash"). By the ESOP Motion, the Debtor sought court approval to use the Debtor Suspense Account Cash to partially fund the wind-down and termination of the ESOP and to cancel, forgive and discharge the ESOP Loan since the ESOP Loan would not be re-paid.

Upon Court approval of the Amended ESOP Motion, the ESOP Committee will work together with the Trustee of the ESOP Trust to handle the wind-down and termination of the ESOP and to distribute the ESOP Trust assets. The administrative expenses arising from such efforts are estimated to total approximately $21,301.28.

The ESOP provides that the Debtor and Bank shall pay such administrative expenses and if they fail to do so, the Trustee shall pay such expenses out of the ESOP Trust. The Bank cannot repay any expenses considering it is in FDIC receivership and its assets have been sold to CB&T. Accordingly, upon entry of an order approving this Amended Motion, the Debtor intends to cover expenses of the wind-down and termination with cash from the ESOP Trust. After all expenses

associated with the wind-down and termination of the ESOP are paid, the Debtor estimates that a balance of approximately $30,709.40 will remain in the ESOP Trust, which funds are owned by the ESOP Trust, not the Debtor's estate.  That balance shall be distributed to the ESOP Trust beneficiaries as soon as reasonably practicable.

On or about September 8, 2009, the Debtor filed its *Motion Pursuant To Sections 105 And 363(B) Of The Bankruptcy Code For Entry Of An Order (1) Approving The Use Of Certain Estate Funds To Terminate* The Debtor's *Employee Stock Ownership Plan, (2) Authorizing Debtor To Forgive, Discharge And Cancel The Promissory Note Executed By The Employee Stock Ownership Plan Trust, And (3) Granting Such Other And Further Related Relief* (Docket No. 38) ("ESOP Motion").  As of the date of this filing, the Bankruptcy Court had not approved the ESOP Motion.

The Debtor was the plan sponsor of an Employee Stock Ownership Plan ("ESOP") for employees of both the Debtor and the Bank and the Debtor's Board administered the ESOP ("ESOP Committee") with the aid of the ESOP trustee, First Bankers Trust Services, Inc. ("FBTS" or "Trustee").  All of the ESOP assets were held in a segregated trust fund for the benefit of the ESOP participants (the "ESOP Trust").

As a means to fund the ESOP Trust's purchase of 298,000 shares of common stock in the Debtor ("Shares") for allocation to employee participant accounts, the ESOP Trust entered into a loan agreement on behalf of the ESOP with TIB The Independent Bankers Bank (the "TIB Loan").  On or about December 10, 2004, the ESOP Trust entered into a Loan Agreement with the Debtor to borrow approximately $6,855,638.46 from the Debtor (the "ESOP Loan") pursuant to a Promissory Note to repay the TIB Loan in full.  The ESOP Loan was secured by the Shares and such Shares were placed in a suspense account maintained by the ESOP Trust for the benefit of the Debtor.

As of the Petition Date, and as reflected on Schedule B of the Debtor's Schedules of Assets and Liabilities, the balance of the ESOP Loan was $4,528,187.  Of the original 298,000 Shares held in the suspense account by the ESOP Trust as collateral for the ESOP Loan, only approximately 202,996 Shares remained as collateral in the suspense account as property of the

1  Debtor's estate on the Petition Date, and such Shares have been liquidated to preserve value for the

2  Debtor's estate.  The net sale proceeds from the sale of the 202,996 Shares was approximately

3  $5,650.11 (the "Debtor Suspense Account Cash").  By the ESOP Motion, the Debtor sought court

4  approval to use the Debtor Suspense Account Cash to partially fund the wind-down and

5  termination of the ESOP and to cancel, forgive and discharge the ESOP Loan since the ESOP

6  Loan would not be re-paid.

7            **4.      Bar Date Motion.**

8            On or about August 28, 2009, the Debtor filed the *Notice Of Motion And Motion For Entry*

9  *Of An Order (I) Establishing Bar Dates For Filing Proofs Of Claim Or Interest; And (Ii)*

10  *Approving The Form And Manner Of Notice Thereof* (Docket No.31), amended by the Notice of

11  Errata (Docket No. 32)("Bar Date Motion").  Pursuant to an Order of the Bankruptcy Court

12  entered on November 12, 2009 [Docket No. 72], the Bar Date Motion was approved and the Bar

13  Date for filing proofs of claim was fixed as January 7, 2010 (the "Bar Date").  The last date for

14  governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim

15  is January 18, 2010.  The *Notice Of Bar Date For Filing Proofs Of Claim Or Interest Against*

16  *Debtor And Debtor-In-Possession Vineyard National Bancorp* was served on all creditors, equity

17  holders and other parties-in-interest.

18            **5.      Insurance Refunds**

19            Commencing on Petition Date, the Debtor, through its insurance broker, arranged for a

20  reduction in coverage under its Workers Compensation Insurance Policy and its Commercial

21  Package Policy (which includes general liability and personal property coverage) to recognize the

22  termination of employment of all employees of the Bank and the loss of all premises owned or

23  leased by the Bank upon the closure of the Bank by the OCC.  As a result of the reduction in

24  coverage, each of the Workers Compensation Insurance Policy and the Commercial Package

25  Policy are paid in full and will expire on February 1, 2010.  Further, the Debtor received a refund

26  check in the amount of $23,483.04 with respect to the Commercial Package Policy and has

27  received $36,748.60 with respect to the Workers Compensation Insurance Policy.  The Debtor also

28

LANDAU
GOTTFRIED
& BERGER LLP

1  expects to receive a small refund due to the termination of a pre-petition Kidnap and Ransom

2  policy, in the approximate amount of $1,208.00.

3       Additional monies may be due the Debtor in connection with Fidelity Bond #461PB0564

4  ("Fidelity Bond"), which the carrier purported to terminate due to the Bank's closure prior to the

5  Petition Date.  The Debtor disputes the carrier's right to effect a termination of the Debtor's

6  coverage as an insured under the Fidelity Bond based solely on the Bank's closure, and the Debtor

7  accordingly reserves, in full, all of its rights and remedies with respect thereto.  In the event that

8  the purported termination were to be determined to be valid as to the Debtor, such termination

9  would result in a Cancellation Return Premium of $20,505.00 coming due.

10            **6.    Formation of the Committee.**

11       On or about August 12, 2009, pursuant to the Notice of Appointment of Committee of

12  Unsecured Creditors filed with the Bankruptcy Court (Docket No. 24), the OUST formed a three

13  person unsecured creditors committee in this Chapter 11 Case composed of three Statutory Trust

14  Trustees. On September 10, 2009, the OUST filed an Amended Notice of Appointment of

15  Committee of Unsecured Creditors (Docket No. 41) and added two more members to the

16  Committee as follows: (i)  the Debtor's one secured creditor, FTBN, and (ii)  a former vendor that

17  provided market data to the Debtor called The Concord Group.  The members of the Committee

18  are:  (1) Wilmington Trust, (2) BNYMTC (3) U.S. Bank, (4) FTBN; and (5) The Concord Group.

19  The Committee retained Winston & Strawn, LLP as its counsel, and on December 7, 2009 the

20  Court entered its Order Granting Application to Employ Winston & Strawn LLP as Counsel to

21  Creditors' Committee (Docket No. 78).

22            **7.    Schedules and Statement of Financial Affairs.**

23       On the Petition Date, the Debtor filed its Schedules and Statement of Financial Affairs with

24  the Bankruptcy Court.

25            **8.    Motion to Vest the Prosecution of Certain Litigation in the Committee**

26       On September 23, 2009, the Committee filed the *Motion for Order Vesting Official*

27  *Committee of Unsecured Creditors With Authority and Standing To Investigate, Bring, Maintain*

28  *and Settle Claims* (Docket No. 47)(collectively the "Committee Standing Motion"), seeking,

LANDAU
GOTTFRIED
& BERGER LLP

34

1    among other things, a Court order granting and vesting the Committee with authority and standing

2    to investigate, bring, maintain and settle to the fullest extent, any and all claims, causes of actions,

3    rights, obligations, offsets and objections held by the Debtor and its estate (i) against its respective

4    directors, officers, and shareholders; and (ii) any "Claims" as defined in the Debtor's Fidelity

5    Bond insurance policy (collectively, the "D&O Claims").  The Committee thereafter supplemented

6    the Committee Standing Motion by filing with the Bankruptcy Court, and serving, its *Supplement*

7    *to Motion for Order Vesting Official Committee of Unsecured Creditors With Authority and*

8    *Standing to Investigate, Bring, Maintain and Settle Claims* [Docket No. 50] ("Supplement").

9    On October 6, 2009, the Debtor filed with the Bankruptcy Court and served its *Debtor and*

10    *Debtor-In-Possession Vineyard National Bancorp's Statement Regarding Motion for Order*

11    *Vesting Official Committee of* Unsecured *Creditors With Authority and Standing to Investigate,*

12    *Bring, Maintain and Settle Claims* [Docket No. 58] ("Debtor's Statement").  On October 2, 2009,

13    the Committee filed its proposed Order granting the relief sought in the Claims Investigation

14    Motion [Docket No. 60] ("Proposed Committee Order").  On October 12, 2009, the Debtor, by its

15    *Notice of Lodgment of Debtor and Debtor-In-Possession Vineyard National Bancorp's Competing*

16    *Order Granting Motion for Order Vesting Official Committee of Unsecured Creditors With*

17    *Authority and Standing to Investigate, Bring, Maintain and Settle Claims* [Docket No. 61]

18    ("Debtor's Proposed Order"), the Debtor submitted to the Court its own proposed order granting

19    the Claims Investigation Motion.

20    By Order entered on October 23, 2009, the Bankruptcy Court approved the Committee

21    Standing Motion (the "Committee Standing Order").  The Court did not adopt the provisions

22    sought by the Debtor in the Debtor's Proposed Order, thus requiring, *inter alia*, that the Debtor

23    turn over to the Committee regulatory documents that would otherwise be subject to requirements

24    of confidentiality imposed by applicable federal law and regulation, subject to the Committee

25    thereafter complying with such requirements.

26    **9.        Tax Audit and Refunds.**

27    In connection with an audit of the Debtor's federal income tax returns for the 2008 tax year

28    conducted by the Internal Revenue Service ("IRS"), it has come to the Debtor's attention that it may be

eligible to use a change in the tax law promulgated under Revenue Procedure 2009-52 permitting companies to carry back Net Operating Losses ("NOL") and Alternative Minimum Tax Net Operating Losses ("ATNOL") incurred in either the 2008 or 2009 tax years for a period of 5 years versus the 2 year period under the old rule.  As the Debtor has previously received a refund in connection with its 2008 federal income tax returns based on an NOL carry back to the 2007 and 2006 tax years under the old rule, if the 2008 tax year is elected under the new rule the Debtor would be able to seek an additional refund related to losses incurred in 2008 by carrying them back to the 2005, 2004 and 2003 tax years.  Based on preliminary estimates the amount of the additional refund attributable to a carry back of the 2008 NOL to those tax years is approximately $21,800,000.

The amount of such refund is not certain and some or all of the refund may be claimed by the FDIC as Receiver for the Bank.  The FDIC's basis for alleging a claim to the refund may include its assumption of certain rights and obligations as the Receiver for Vineyard Bank, including the right to receive any tax refunds allocable to Vineyard Bank.  Pursuant to regulatory requirements, Vineyard Bank and the Debtor entered into a Tax Sharing Agreement.  The Debtor and the Committee contend that pursuant to the Tax Sharing Agreement and applicable law, the Debtor owns all, or at least a portion, of any tax refunds.  Further, that if the Debtor is found to be the owner of any tax refund the FDIC may have a prepetition unsecured claim against the Debtor for its allocable share of such tax refunds.  The FDIC, however, contends that it, rather than the Debtor, owns such tax refunds. Further, there can be no guaranty that the refund will be allowed by the IRS in full or in part, or that the Debtor, as opposed to the FDIC as Receiver for the Bank, will receive any, or any material portion of, any such refund.  By separate Application (the "VTD Application"), the Debtor will seek the Court's approval to engage the services of Vavrinek, Trine, Day & Co., LLP ("VTD"), to assist with the IRS audit and preserving the potential refund for the Liquidating Trustee on behalf of the Debtor's estate.

There can be no guaranty that any refund will be allowed by the IRS in full or in part, or that the Debtor, as opposed to the FDIC as Receiver for the Bank, will receive any, or any material portion of, any such refund.

LANDAU
GOTTFRIED
& BERGER LLP

The Debtor has also been notified by the IRS that it may be entitled to a refund of approximately $19,804.52 attributable to federal employment tax overpayments reported on Form 941 for the September 30, 2009 tax period.

The amount of such refund is not certain and some or all of the refund may be owed to the FDIC as Receiver for the Bank.  Further, there can be no guaranty that the refund will be allowed by the IRS in full or in part, or that the Debtor, as opposed to the FDIC as Receiver for the Bank, will receive any, or any material portion of, any such refund.

The Debtor has also been notified by the State of California Franchise Tax Board ("FTB") of an audit by the FTB of the Debtor's California state income tax returns for the 2005 through 2007 tax years.  By the VTD Application, the Debtor will seek the Court's approval to engage the services of VTD the Debtor's prior auditors for the tax years in question, to assist with the audit by the FTB.  There can be no assurance that the audit by the FTB will or will not result in any additional state income tax liability for the tax years in question.

**10.    FDIC Proof of Claim.**

On January 15, 2010, the FDIC filed its Proof of Claim in the Debtor's Bankruptcy Case ("FDIC POC").  As filed, the FDIC POC is for an unliquidated amount and alleges both unsecured and priority claims.  A copy of the FDIC POC is attached hereto as Exhibit "H."

**E.    Prosecution of Estate Causes Of Action and D&O Claims.**

**1.    Estate Causes of Action Against Third Parties.**

The Debtor and its professionals have made a diligent effort to identify in Exhibit "D" to this Disclosure Statement, all Estate Causes of Action against third parties other than preference/fraudulent transfer actions, objections to Claims and the D&O Claims.  No reliance should be placed on the fact that a particular Estate Cause of Action is or is not identified in Exhibits "D" and "F" because the lists are non-exclusive and may be amended prior to the Confirmation Date to provide for additional disclosures.  The Liquidating Trustee or the Post-Confirmation Committee may seek to investigate, file and prosecute Estate Causes of Action after the Effective Date of the Plan, whether or not the Estate Causes of Action are identified in the

Disclosure Statement.  As reflected in Section V.B.3 of the Plan, on the Effective Date, any and all

Estate Causes of Action the Estate may have against any third parties shall be vested in the

Liquidating Trust and Section V.B.4 of the Plan provides that the Liquidating Trustee has the

authority to prosecute these Estate Causes of Action.

### 2.    Committee's Investigation of Claims Against Directors, Officers, and Shareholders and Complaint

Pursuant to the Committee Standing Order, the Committee has standing to investigate and

bring D&O Claims against the Debtor's directors, officers, and shareholders.  Pursuant to the

Committee Standing Order, the Committee was "granted and vested with authority and standing to

investigate, bring, maintain and settle to the fullest extent, without further Order of the Court any

and all claims, causes of actions, rights, obligations, offsets, setoffs, and objections held by

[Vineyard National Bancorp] and its estate against their respective directors, officers and

shareholders….as a derivative action on behalf of the Debtor and/or the Debtor's estate, for the

benefit of the Debtor's creditors, shareholders and other parties in interest."

Since the Court issued the Committee Standing Order, the Debtor is informed that the

Committee's professionals investigated specific transactions identified in the Debtor's and the

Bank's board minutes and financial records and interviewed some of the Debtor's officers and a

director about the Debtor's business affairs and the selected transactions.  The Debtor was further

informed that the Committee's professionals did so in order to evaluate whether the Debtor had

potential claims against its officers and directors arising out of their management or oversight of

the Debtor and its primary asset, the Bank.  Based on this information, the Committee has

informed the Debtor that it intends to commence an action against some of the Debtor's current

and former directors and officers in that capacity prior to the end of December 2009.

The Committee intends to allege the following potential D&O Claims in its complaint

against the current and former directors and officers of the Debtor.  A copy of the complaint is

attached hereto as Exhibit "G" and includes, but is not limited to, the following potential D&O

Claims:

1          a.      The Debtor may have potential D&O Claims against some of its directors

2   and officers for allegedly arranging unsafe and imprudent lending practices, failing to implement

3   sufficient quality controls, and failing to exercise adequate oversight in connection therewith, in

4   breach of their fiduciary duties.  The Debtor's directors' and officers' actions and inactions were

5   allegedly a substantial factor in the Debtor's and the Bank's loan losses and the Debtor's loss of

6   over $100 million.

7          b.      The Debtor may have potential D&O Claims against some of its directors

8   and officers for their acquisition of entities, including Rancho Bank and the Exchange Companies,

9   for a price that allegedly exceeded the value of these entities without conducting sufficient due

10  diligence into their actual value and these acquisitions were allegedly a substantial factor in over

11  $65 million worth of losses the Debtor suffered and the Debtor's loss of over $100 million.

12         c.      The Debtor may have potential D&O Claims against some of its directors

13  and officers for authorizing the payment of dividends that were allegedly improper under

14  applicable corporate laws or fraudulent conveyance laws and were allegedly a substantial factor in

15  over $7 million worth of losses the Debtor suffered and the Debtor's loss over $100 million.

16         d.      The Debtor may have potential D&O Claims against some of its directors

17  and officers for allegedly paying Morales over a million dollars in improper separation payments,

18  which Morales also allegedly improperly negotiated, when they could have paid him nothing and

19  these separation payments were allegedly a substantial factor in over $1.3 million worth of losses

20  and other damages the Debtor suffered.

21         e.      The Debtor may have potential D&O Claims against Morales for allegedly

22  using company funds improperly and causing the directors of the Debtor to pay for a costly

23  investigation into his misconduct.  The cost of this investigation was allegedly a substantial factor

24  in the hundreds of thousands of dollars worth of losses and other damages the Debtor suffered.

25         f.      The Debtor may have potential D&O Claims against some of its directors

26  for allegedly funding a costly investigation into Morales' improper use of company funds for

27  personal enjoyment, and the cost of this investigation was allegedly a substantial factor in

28  hundreds of thousands of dollars worth of losses and other damages the Debtor suffered.

LANDAU
GOTTFRIED
& BERGER LLP

1    The Committee states that its investigation is still ongoing and that the Committee may

2    have additional claims against the Debtor's directors, officers and shareholders that are not

3    described above, including but not limited to potential claims based upon any loss or damage

4    suffered by the Debtor, including but not limited to diminution in the value of the Debtor's stock in

5    Vineyard Bank, N.A. caused by losses or damages suffered by Vineyard Bank, N.A., and potential

6    claims based upon any other breach of duty or other wrongful act or breach of contract committed

7    by the Debtor's directors, officers and/or shareholders.  The Committee contends that the claims in

8    the D&O Claims Complaint are insured under the Debtor's and the directors' and officers'

9    insurance policies for 2008 and 2009.

10    The Plan provides that, after the Effective Date, the Liquidating Trustee will investigate,

11    prosecute, settle, or otherwise resolve all D&O Claims against the Debtor's officers, directors and

12    shareholders, including the foregoing D&O Claims, as the assignee and transferee of the

13    Committee's rights under the Committee Standing Order with respect to such D&O Claims for the

14    benefit of the Beneficiaries of the Liquidating Trust.  No reliance should be placed on the fact that

15    a particular D&O Claim is or is not identified in this Disclosure Statement or on Exhibit "G" as

16    additional D&O Claims may be added or amended prior to the Confirmation Date to provide for

17    additional disclosures or thereafter pursuant to applicable law in any legal proceeding.  The

18    Liquidating Trustee or the Post-Confirmation Committee may seek to investigate, file and

19    prosecute D&O Claims after the Effective Date of the Plan, whether or not the D&O Claims are

20    identified in the Disclosure Statement.

21    **3.    Recovery of Preferential or Fraudulent Transfers.**

22    The Liquidating Trustee will investigate whether certain prepetition payments to creditors

23    may be recovered pursuant to sections 544, 547, 548 and 550 of the Bankruptcy Code or

24    applicable State law.  Exhibit "E" to the Disclosure Statement lists and/or identifies (i) all

25    payments to creditors made within ninety days of the Petition Date, (ii) all payments to insiders

26    made within one year of the Petition Date, and (iii) all distributions given to an insider of the

27    Debtor, including compensation in any form, bonuses, loans, stock, redemptions, and options

28    exercised.  Each transfer listed therein and all other prepetition transfers and obligations of the

Debtor will be evaluated to determine whether the transfer or obligation is avoidable on any grounds. Any creditor or party in interest that received a transfer from the Debtor within four years prior to the Petition Date or in whose favor the Debtor incurred an obligation may be the subject of an Estate Causes of Action on account of such transfer or obligation if grounds exist to avoid the transfer or obligation. The Liquidating Trustee has the authority to prosecute preferential and fraudulent transfers. See Section V.B.3 of the Plan.

### 4.    Objections to Claims.

To date, the Debtor has not filed any objections to Claims. As set forth in Section V.B.3 of the Plan, after the Effective Date, the Liquidating Trustee has the authority to object, prosecute, and settle Claims.

## IV.    THE PLAN OF REORGANIZATION

A DETAILED CHART SETTING FORTH EACH CLASS DESIGNATED UNDER THE PLAN, THE PROPOSED TREATMENT UNDER THE PLAN OF EACH CLASS, THE PROJECTED RECOVERY UNDER THE PLAN FOR EACH CLASS, AND WHETHER A CLASS IS ENTITLED TO VOTE, IS SET FORTH AT THE OUTSET OF THIS DISCLOSURE STATEMENT. See Plan Summary.

The Plan envisions a liquidation of all remaining assets of the Debtor's Estate by the Liquidating Trustee. The assets of the Estate will vest in the Liquidating Trust upon the Effective Date and will be distributed consistent with the Bankruptcy Code priority scheme and in accordance with the terms of the Plan and the Liquidating Trust Agreement.

The Debtor and the Committee believe that through the Plan: (x) holders of impaired unsecured Claims will obtain a greater recovery than would be available if the Debtor's assets were liquidated in any other manner under the Bankruptcy Code or if any other feasible alternatives were pursued; and (y) the value of the assets of the Estate will be maximized by converting the assets of the Estate into Cash in the most efficient and economical manner. THE DEBTOR AND THE COMMITTEE BELIEVE THAT THE PLAN PROVIDES THE BEST FEASIBLE RECOVERIES TO THE HOLDERS OF IMPAIRED CLAIMS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF SUCH HOLDERS. THE

DEBTOR AND THE COMMITTEE THEREFORE RECOMMEND THAT HOLDERS OF IMPAIRED CLAIMS ACCEPT THE PLAN.

In accordance with the Bankruptcy Code, the Plan classifies Claims and Equity Interests separately and provides, separately for each Class, that Holders of Claims or Equity Interests in the Class will receive various types of consideration, thereby giving effect to the different rights of the holders in each Class.

In general, under the Plan, on the Effective Date, all of the Estate's assets will vest in the Liquidating Trust and the Allowed Administrative Expenses, Allowed Priority Tax Claims, and the Allowed Class 1 Claims and Allowed Class 2 Claims will receive payment from the Liquidating Trustee in full in Cash or as otherwise noted in the Plan.

Each Holder of an Allowed Class 3 Claims will receive, as soon as practicable in the discretion of the Liquidating Trustee a Pro Rata Share of the Available Cash (the "Initial Class 3 Distribution"). In addition, after the Initial Class 3 Distribution but prior to the Final Distribution Date, the Disbursing Agent shall, but is not required, to make Pro Rata interim distributions (the "Interim Distributions") of Available Cash to the Holders of Allowed Class 3 Claims, when, in the discretion of the Liquidating Trustee, the Liquidating Trust has sufficient Available Cash to make such Interim Distributions. Pro Rata distributions relating to Disputed Claims will be placed in the Disputed Claims Reserve. Based upon the Debtor's estimate of the total General Unsecured Claims in Class 3 of approximately $54,043,491 and the Debtor's estimate of the Available Cash, the Trustee estimates that holders of Allowed Claims in Class 3 will receive a percentage recovery of approximately 2.0% of the face amount of their Allowed Claims.[8] The actual percentage recovery will vary depending upon, among other things, the actual amount of Allowed Claims and the actual amount of Available Cash realized, such that the actual recovery may be different than the Debtor's estimate. Based upon the Debtor's estimates, the Available Cash are not sufficient to pay the Allowed Class 3 Claims in full. See Exhibit "B" to this Disclosure Statement.

---

[8] This estimate does not take into account any proceeds of, or costs of recovery of, the Debtor's Tax Refund Claims, Estate Causes of Action or D&O Claims, all of which remain unknown at this time.

1       Class 4 Claims are unsecured claims.  Class 4 consists of the Indenture Trustee Claims that

2   may be contractually or otherwise subordinate to the Allowed FTBN Claim and/or other Class 4

3   Claims and unpaid Indenture Trustee Fees.  Subject to Section II.C(4)(c) and the provisions of the

4   Plan related to the payment of the Indenture Trustee Fees, each Holder of a Class 4 Claim shall be

5   allocated a Pro Rata share of each Distribution available to Holders of Class 3 Claims; provided,

6   however, that the amount of distributions to Holders of Allowed Class 4 Claims shall be paid (i)

7   first on account of unpaid Indenture Trustee Fees, including Indenture Trustee fees accrued prior to

8   the Petition Date, in an amount estimated to be $100,000 to $120,000, and (ii) second on account

9   of the Allowed FTBN Claim, until such time as the Allowed FTBN Claim is satisfied in full, after

10  which time distributions to Holders of Allowed Indenture Trustee Claims shall be made.  Based

11  upon the Debtor's estimates, it is unlikely the Senior Indebtedness in Class 3 will be paid in full

12  and therefore a distribution to holders of Allowed Indenture Trustee Claims, subject to Section

13  II.C.(4)(c) of the Plan, is not expected.

14      Holders of Allowed Preferred Stock Interests in Class 5 are junior in priority to Allowed

15  Class 4 Claims, and will not receive a distribution under the Plan unless and until the Holders of

16  Allowed Class 4 Claims are paid in full.  Since no distribution is expected to be made on account

17  of subordinated Allowed Trustee Indenture Claims, Allowed Preferred Stock Interests in Class 5

18  will receive nothing on account of their interests under the Plan, and such Preferred Stock Interests

19  will be deemed cancelled upon confirmation of the Plan.

20      Holders of Allowed VNBC Common Stock Interests in Class 6 are junior in priority to

21  Allowed Class 5 Preferred Stock Interests and will not receive a distribution under the Plan unless

22  and until the Holders of Allowed Class 5 Claims are paid in full.  Since no distribution is expected

23  to be made on account of Allowed Class 5 Preferred Stock Interests, Allowed VNB Common

24  Stock Interests in Class 6 will receive nothing on account of their interests under the Plan, and

25  such VNB Common Stock Interests will be deemed cancelled upon confirmation of the Plan.

26      THE SUMMARY OF THE PLAN SET FORTH HEREIN IS QUALIFIED IN ITS

27  ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN

28

THE PLAN, THE TERMS OF WHICH ARE CONTROLLING.  The Plan is attached hereto as Exhibit A and forms a part of this Disclosure Statement.

### A.    Summary Of Certain Other Provisions Of The Plan.

#### 1.    Executory Contracts and Unexpired Leases.

Subject to the approval of the Bankruptcy Court, the Bankruptcy Code empowers the Debtor to assume, assume and assign, or reject executory contracts and unexpired leases.  As a general matter, an "executory contract" is a contract under which material performance remains due by each party.  If an executory contract or unexpired lease is rejected by the Debtor, the other party to the agreement may file a Claim for any damages incurred by reason of the rejection.  In the case of rejection of employment agreements and leases of real property, such damage Claims are subject to certain limitations imposed by the Bankruptcy Code.  If an executory contract or unexpired lease is assumed, the debtor generally has the obligation to perform its obligations thereunder in accordance with the terms of such agreement.  If an executory contract is assumed and assigned, the assignee generally has the obligation to perform the obligations of the debtor thereunder in accordance with the terms of such agreement.

Section VIII of the Plan discusses the assumption and rejection of executory contracts in further detail.  Executory contracts and unexpired leases to be assumed pursuant to the Plan and the projected Cure Payments, if any, are listed in Exhibit 1 to the Plan.  The procedures for disputing a Cure Payment or objecting to the assumption of such executory contracts or unexpired leases are discussed in further detail in Section VIII.B. of the Plan.  The Debtor reserves the right to delete any contract or lease from Exhibit 1 to the Plan, thereby rejecting the contract or lease, up to and including the hearing on confirmation of the Plan, by filing with the Bankruptcy Court an amended Exhibit 1 to the Plan and by giving notice to counsel for the Committee and counsel for the non-debtor party to the contract or lease.

All executory contracts and unexpired leases which have not previously been rejected, which are not specifically assumed, either pursuant to the Plan or by separate order in the Chapter 11 Case, or which are not the subject of a motion to assume pending on the Effective Date, are deemed rejected pursuant to the Plan as of the Effective Date (or as of such earlier date as

1    announced by the Debtor at the Confirmation Hearing).  Exhibit 2 to the Plan contains a

2    nonexclusive list of executory contracts and unexpired leases to be rejected under the Plan.

3    Section VIII.D sets forth the procedures for filing a Claim arising from the rejection of an

4    executory contract or unexpired lease.

5        All Allowed Claims arising from the rejection of executory contracts or unexpired leases,

6    whether under the Plan or by separate proceeding, will be treated as Allowed Class 3 Claims under

7    the Plan.

8                    **2.        Means Of Implementation.**

9                    **(a)        From the Confirmation Date to the Effective Date.**

10        Although the Plan will become effective only on the Effective Date, on and after the

11    Confirmation Date and until the Effective Date, the Debtor and/or the Committee, as appropriate,

12    shall take or cause to be taken all actions which are necessary or appropriate to enable the Plan to

13    become effective on the Effective Date and to implement and perform the Plan on and after the

14    Effective Date.

15                    **(b)        Vesting of Assets.**

16        Unless otherwise expressly provided under the Plan, on the Effective Date, the Debtor's

17    Assets, including all of the Estate Causes of Action and the D&O Claims, will vest in the

18    Liquidating Trust free and clear of all claims, liens, encumbrances, charges and other interests,

19    subject to the provisions of the Plan.  On and after the Effective Date, the transfer of the Debtors'

20    Assets from the Estate to the Liquidating Trust will be deemed final and irrevocable and

21    distributions may be made from the Liquidating Trust.

22        In connection with the foregoing:

23                    (i)        On the Effective Date, the appointment of the Liquidating

24    Trustee shall become effective and the Liquidating Trustee shall begin to administer the

25    Liquidating Trust pursuant to the terms of the Liquidating Trust Agreement and the Plan and may

26    use, acquire and dispose of property of the Liquidating Trusts free of any restrictions imposed

27    under the Bankruptcy Code.

28

1                     (ii)     The Confirmation Order will provide the Liquidating Trustee

2 with express authority to convey, transfer and assign any and all of the Liquidating Trust Assets

3 and to take all actions necessary to effectuate same and to prosecute any and all Estate Causes of

4 Action and the D&O Claims, and

5                     (iii)    As of the Effective Date, the Liquidating Trust Assets will be

6 free and clear of all liens, claims and interests of holders of Claims and Equity Interests, except as

7 otherwise provided in the Plan.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LANDAU
GOTTFRIED
& BERGER LLP

**(c)      Establishment of the Liquidating Trust.**

On the Effective Date the Liquidating Trust Agreement will become effective, establishing the Liquidating Trust.  The Liquidating Trust is organized and established as a trust for the benefit of the Beneficiaries and is intended to qualify as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d).  As of the Effective Date, the Liquidating Trustee will be responsible for liquidating the assets of the Liquidating Trust.  The Liquidating Trustee shall commence his duties as Liquidating Trustee on the Effective Date for the purpose of carrying out all responsibilities and making distributions provided for under the Plan and Liquidating Trust Agreement.

**(i)      Beneficiaries.**

In accordance with Treasury Regulation Section 301.7701-4(d), the beneficiaries ("Beneficiaries") of the Liquidating Trust will be the Holders of all Allowed Claims against and, to the extent Allowed Claims are paid in full with interest, Allowed Interests in the Debtor.  The Holders of Allowed Claims will receive an allocation of the Liquidating Trust Assets as provided for in the Plan and the Liquidating Trust Agreement.  The Beneficiaries of the Liquidating Trust shall be treated as the grantors and owners of such beneficiaries' respective portion of the Liquidating Trust.

**(ii)      Implementation of the Liquidating Trust.**

On the Effective Date, the Debtor, on behalf of the Estate, and the Liquidating Trustee will be authorized and directed to, and will execute the Liquidating Trust Agreement in substantially the form attached as Exhibit "3" to the Plan, take all such actions as required to transfer from the Debtor and the Estate the Debtor's Assets (except as specifically set forth herein).  From and after the Effective Date, the Liquidating Trustee will be authorized to, and will take all such actions as required to implement the Liquidating Trust Agreement and the provisions of the Plan as are contemplated to be implemented by the Liquidating Trustee, including, without limitation, directing Distributions to Holders of Allowed Claims, objecting to Claims, prosecuting or

LANDAU
GOTTFRIED
& BERGER LLP

1   otherwise resolving Estate Causes of Action and D&O Claims, and causing Distributions from the

2   Liquidating Trusts to be made to the Beneficiaries.

3                          **(iii)     Transfer of Debtor's Assets.**

4         On the Effective Date, pursuant to the Plan and sections 1123, 1141 and 1146(a) of the

5   Bankruptcy Code, the Debtor is authorized and directed to transfer, grant, assign, convey, set over,

6   and deliver to the Liquidating Trustee all of that Debtor's and its Estate's right, title and interest in

7   and to its Assets, including all Estate Causes of Action (and the Committee as to the D&O

8   Claims), free and clear of all liens, Claims, encumbrances or interests of any kind in such property,

9   except as otherwise expressly provided in the Plan.  To the extent required to implement the

10  transfer of the Debtor's Assets from the Debtor and its Estate to the Liquidating Trust, all Persons

11  will cooperate with the Debtor and the Estate to assist the Debtor and the Estate to implement said

12  transfers.

13                          **(iv)     Representative of the Estate.**

14        The Liquidating Trustee will be appointed as the representative of the Estate pursuant to

15  sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code and as such will be vested with

16  the authority and power (subject to the Liquidating Trust Agreement) to inter alia: (i) object to

17  Claims against and Equity Interests in the Debtors; (ii) administer, investigate, prosecute, settle

18  and abandon all Estate Causes of Action and D&O Claims assigned to the Liquidating Trust; (iii)

19  make Distributions provided for in the Plan, including, but not limited to, on account of Allowed

20  Claims; and (iv) take such action as required to administer, wind-down, and close the Chapter 11

21  Case.  As the representative of the Estate, the Liquidating Trustee will be vested  with all of the

22  rights and powers of the Debtor and the Estate (including the Committee under the Committee

23  Standing Order) with respect to all Estate Causes of Action and D&O Claims assigned and

24  transferred to the Liquidating Trust, and the Liquidating Trustee will be substituted in place of the

25  Debtor, the Estate and the Committee, as applicable, as the party in interest in all such litigation

26  pending as of the Effective Date. With respect to the Liquidating Trustee's prosecution of the D&O

27  Claims as the assignee of the Committee's rights, under the Committee Standing Order, to

28  prosecute the Debtor's D&O Claims on a derivative basis on behalf the Debtor's creditors,

shareholders and other parties in interest, the Liquidating Trustee shall be deemed to prosecute such derivative claims as a representative of the creditors', shareholders' and other parties' respective interests.

///

      **3.**      **No Liability of Liquidating Trustee or Post-Confirmation Committee.**

To the maximum extent permitted by law, the Liquidating Trustee, its employees, officers, directors, agents, members, or representatives, or professionals employed or retained by the Liquidating Trustee (the "Liquidating Trustee's Agents"), the members of the Post-Confirmation Committee (as defined below), and their employees, officers, directors, agents, members, or representatives, or professionals employed or retained, will not have or incur liability to any Person for an act taken or omission made in good faith in connection with or related to the administration of the Liquidating Trust Assets, the implementation of the Plan and the Distributions made thereunder or Distributions made under the Liquidating Trust Agreement.  The Liquidating Trustee, the Liquidating Trustee's Agents, the members of the Post-Confirmation Committee, and their employees, officers, directors, agents, members, or representatives, or professionals employed or retained will in all respects be entitled to reasonably rely on the advice of counsel with respect to their duties and responsibilities under the Plan and the Liquidating Trust Agreement.  Entry of the Confirmation Order constitutes a judicial determination that the exculpation provision contained in Section XI.A of the Plan is necessary to, inter alia, facilitate Confirmation and feasibility and to minimize potential claims arising after the Effective Date for indemnity, reimbursement or contribution from the Estate, or the Liquidating Trust, or their respective property.  The Confirmation Order's approval of the Plan will also constitutes a res judicata determination of the matters included in the exculpation provisions of the Plan. Notwithstanding the foregoing, nothing herein or in Section XI.A of the Plan will alter any provision in the Liquidating Trust Agreement that provides for the potential liability of the Liquidating Trustee to any Person.

      **4.**      **Prosecution Of Estate Causes Of Action and D&O Claims By The Liquidating Trustee or the Post-Confirmation Committee.**

1    Pursuant to the Confirmation Order, on the Effective Date, the Debtor and (with respect to

2    the D&O Claims) the Committee, irrevocably assign, transfer and convey to the Liquidating Trust

3    all property of the Estate, including, but not limited to, all Estate Causes of Action and the D&O

4    Claims.  Subject to the provisions of Section V.B.1 of the Plan, the Liquidating Trustee shall have

5    the power and authority to prosecute, compromise or otherwise resolve any and all such Estate

6    Causes of Action and D&O Claims, with all recoveries derived therefrom to be included within

7    Available Cash..

8    Therefore, the Estate Causes of Action described in Exhibit E (potential preference

9    payments), Exhibit F (litigation against third parties and D&O Claims), Exhibit G (potential D&O

10    Claims) and the pending litigation claims described on Exhibit D will be investigated and may be

11    prosecuted by the Liquidating Trustee thereafter.  Additionally, the Liquidating Trustee will

12    investigate and may object to Claims after the Effective Date.  The Debtor, and its Professional

13    Persons have made a diligent effort to identify in Exhibits D, E and F to this Disclosure Statement,

14    all Estate Causes of Action (other than objections to Claims) and, with the Committee, as to D&O

15    Claims.  However, no reliance should be placed on the fact that a particular Estate Cause of Action

16    or D&O Claim is or is not identified in Exhibits D, E, F or G.  The Post-Confirmation Committee

17    or the Liquidating Trustee may seek to investigate, file and prosecute Estate Causes of Action or

18    D&O Claims after the Effective Date of the Plan, whether or not the Estate Causes of Action or

19    D&O Claims are identified in the Disclosure Statement.

20    Neither the Debtor, the Committee, nor the Liquidating Trustee waives, relinquishes, or

21    abandons any right or cause of action which constitutes property of the Debtor's Estate, whether or

22    not such right or cause of action is an Estate Cause of Action or D&O Claim, has been listed or

23    referred to in the Schedules or in this Disclosure Statement and whether or not such right or cause

24    of action is currently known to the Debtor or the Liquidating Trustee.  The Debtor submits that the

25    reservation of Estate Causes of Action and D&O Claims herein is sufficient to preserve such Estate

26    Causes of Action and D&O Claims and shall not give rise to any release, waiver, extinguishment,

27    forfeiture or other impairment of any Estate Cause of Action or D&O Claim against any party, nor

28    shall same subject the Estate, the Committee, or the Liquidating Trustee to any claims or defenses

LANDAU
GOTTFRIED
& BERGER LLP

50

of res judicata, equitable estoppel or any other similar doctrines or theories in connection with any

of the D&O Claims or Estate Causes of Action.

### (a)    Issuance And Execution Of Plan Related Documents And Corporate Action.

Pursuant to Section V.B.F of the Plan, as of the Effective Date, the Liquidating Trustee will

be authorized to execute such amendments, modifications, supplements, and other documents as

provided for in the Plan. From and after the Effective Date, the Debtor shall be dissolved and the

Liquidating Trustee shall be authorized to take all action necessary to dissolve the Debtor.  On the

Effective Date, the employment, retention, appointment and authority of all Officers, Directors,

Employees and Professionals of the Debtor and the Committee shall be deemed to terminate.

### (b)    Cancellation/Surrender of Debentures and Related Agreements.

As of the Effective Date, (a) the Indentures, Declarations of Trust, Debentures, Trust

Securities and Guarantee Agreements shall be terminated, and neither the Debtor nor the other

parties thereto shall have any further rights or obligations thereunder, except that each Indenture

and each Declaration of Trust shall continue to be effective for the following:  (a) allowing a

holder of an Allowed Class 4 Claim, including the Indenture Trustees and Statutory Business

Trustees, holders of Debenture and Capital Securities to receive a distribution provided for under

this Plan and the provisions related to distributions in such documents; (b) the right of an Indenture

Trustee to exercise a charging lien against the recovery otherwise due to a holder of an Allowed

Class 4 Claim as provided for under the Indentures for the payment of any Indenture Trustee Fees

that remain outstanding, or for indemnification as provided under the Indenture and/or Declaration

of Trust; and (c) the right of an Indenture Trustee to continue to serve on the Post-Confirmation

Committee after the Effective Date and to be compensated therefor pursuant to the terms of the

Indentures.  Notwithstanding the termination of the Indentures and Declarations of Trust, the

provisions of such documents shall govern the relationships of the Indenture Trustees and holders

of the Debentures, and the Statutory Trustees and the holders of the Capital Securities,

respectively.

1    Following the Effective Date, holders of Allowed Class 4 Claims will receive from the

2    Indenture Trustees or their designees specific instructions regarding the time and manner in which

3    the Debentures are to be surrendered.  Pending such surrender, such Debentures will be deemed

4    cancelled and shall represent only the right to receive the distributions to which the holder is entitled

5    under this Plan.

6          **5.      Provision For Allowance Of the Indenture Trustee Claims.**

7    As set forth in further detail in Section IV.A. of the Plan, a beneficial owner of the

8    Debentures of record as of January 22, 2010 (the "Record Date") shall, for purposes of

9    distributions under the Plan, be deemed to have an Allowed Class 4 Claim for the outstanding

10   principal amount of the Debentures owned by such beneficial owner plus accrued and unpaid

11   interest as of the Petition Date, and need not file a proof of claim with respect thereto, subject to

12   the aggregate amount of Allowed Class 4 Claims as provided for in the Plan.

13   With respect to distributions to be made to holders of the Debentures classified in Class 4,

14   the Indenture Trustees shall (i) be the Disbursing Agent, (ii) receive the consideration to be paid to

15   holders of Indenture Securities under the Indentures as Indenture Trustees for the respective

16   Indentures which are classified as Allowed Class 4 Claims; (iii) be responsible for making

17   distributions to holders of Allowed Class 4 Claims arising from such Debentures; and (iv) be

18   authorized to deduct the Indenture Trustee Claims from the consideration provided to holders of

19   Allowed Class 4 Claims to the extent so provided for in the Indentures.

20         **6.      Establishment Of The Post-Confirmation Committee.**

21   As set forth in Section VI of the Plan, until the Effective Date, the Committee shall

22   continue in existence.  As of Effective Date, the Committee shall terminate and disband.   As

23   provided in the Plan and Liquidating Trust Agreement, as of the Effective Date, there will be

24   formed a committee for the Liquidating Trust (the "Post-Confirmation Committee") that will have

25   consultation, approval and information rights with respect to the Liquidating Trust as set forth in

26   the Liquidating Trust Agreement.  The members of the Post-Confirmation Committee will be those

27   members of the Committee who wish to continue to serve.  Ten days prior to the Confirmation

28   Hearing, the Committee shall file with the Bankruptcy Court and serve on those requesting notice

LANDAU
GOTTFRIED
& BERGER LLP

1    pursuant to Bankruptcy Rule 2002 a notice of the selection of the Post-Confirmation Committee

2    members, which notice will name the members of the Post-Confirmation Committee.

3        As set for the in Section VI.B of the Plan, the Post-Confirmation Committee will prescribe

4    their own rules of procedure and bylaws; provided, however, that such rules of procedure and

5    bylaws will not be inconsistent with the terms of the Plan or the Liquidating Trust Agreement.

6    Pursuant to Section II.F.2 of the Liquidating Trust Agreement, the Plan Trustee will consult with the

7    Post-Confirmation Committee on all material matters including but not limited to:  (a)  the

8    investment of cash and cash equivalents constituting Liquidating Trust Assets that do not comply

9    with Section 345 of the Bankruptcy Code;  (b)  the purchase of proposed policies of insurance

10    insuring the Liquidating Trust Assets or providing insurance coverage for the Trustee, Post-

11    Confirmation Committee and their respective agents and representatives against claims and losses;

12    (c)  settlements of Claims, Estate Causes of Action or D&O Claims where the amount in controversy

13    equals or exceeds $250,000; (d)  the employment of professionals to assist the Trustee with respect

14    to its responsibilities; (e)  expenditures or the incurrence of liabilities or expenses by the Trustee or

15    Liquidating Trust to any one vendor other than the Trustee's professionals exceeding $50,000 in a

16    single transaction or $150,000 in a series of related transactions; (f)  the abandonment of material

17    assets by the Trustee; and (g)  Claims and the pursuit of Estate Causes of Action or D&O Claims.

18    Additionally, pursuant to Section II.F.3 of the Liquidating Trust Agreement, the Post-Confirmation

19    Committee shall have the absolute right and power to determine the following; (a) to negotiate all

20    modifications to the terms of the employment of the Trustee; (b) to require, at its discretion, the

21    Trustee to post a bond or provide evidence of adequate insurance to ensure the faithful performance

22    of the Trustee's obligations hereunder; and (c) to select a successor Trustee when a successor is

23    required hereunder; and (d) to approve amendments to or waivers of any provisions of this

24    Agreement.

25        Except for the reimbursement of reasonable actual costs and expenses in connection with

26    their duties as members of the Post-Confirmation Committee, the members of the Post-

27    Confirmation Committee will serve without compensation.  Reasonable expenses incurred by

28    members of the Post-Confirmation Committee may be paid by the Liquidating Trust, as

1    appropriate, without need for Bankruptcy Court approval.  Reasonable expense may include

2    reimbursement of the fees and costs of attorneys to each member, including the payment of

3    Indenture Trustee Fees as provided for in the Plan, subject to such parameters as determined by the

4    Post-Confirmation Committee and which parameters are agreed to by the Liquidating Trustee.

5          The Post-Confirmation Committee will have no authority to employ, at the expense of the

6    Liquidating Trust, counsel or any other professionals, except upon petition to and approval by the

7    Bankruptcy Court for cause shown.  The Post-Confirmation Committee and its members will not

8    be liable for any act any member may do or fail to do as a member of the Post-Confirmation

9    Committee while acting in good faith and in the exercise of the member's best judgment.  No

10   member of the Post-Confirmation Committee will be liable in any event for claims, liabilities or

11   damages unless they arise from such member's personal gross negligence or willful misconduct.

12                **7.      Resolution of Disputed Claims.**

13         As set forth in Section IV of the Plan, after the Effective Date and subject to the provisions

14   of the Plan and Liquidating Trust Agreement, the Liquidating Trustee will review all Claims and

15   determine if any grounds exist to object to such Claims.  Only Allowed Claims will be paid.

16   Distributions relating to Disputed Claims will be placed into the Disputed Claims Reserve until

17   such time as such Disputed Claim is adjudicated or otherwise settled.  Any Disputed Claim that

18   becomes an Allowed Claim after the Effective Date will be paid from the Disputed Claims

19   Reserve.  If such Disputed Claim fails to become an Allowed Claim, money placed in the Disputed

20   Claims Reserve on behalf of such Disputed Claim shall be deemed to be Available Cash and shall

21   be distributed to holders of Allowed Class 3 Claims, and if appropriate under the Plan, Allowed

22   Class 4 Claims.

23         Additionally, any Claims filed by the Debtor's officer and directors seeking

24   indemnification from the Debtor pursuant to employment agreements, by-laws or otherwise, shall

25   be channeled, subject to any defenses thereto and 11 U.S.C. 510(b) & (c), to the Debtor's

26   applicable 2008 and 2009 directors' and officers' insurance policies including but not limited to:

27   (a) Lexington Directors and Officers Insurance and Company Reimbursement Policy, Policy No.

28   001621301; (b) XL Specialty Insurance Excess Directors and Officers, Policy No. ELU109215-08;

LANDAU
GOTTFRIED
& BERGER LLP

1    (c) AIG (National Fire) Executive Liability, Policy No. 734-17-82; (d) AIG (National Fire)

2    Executive Liability, Policy No. 00-734-17-82, (e) St. Paul (Traveler's) SelectOne for Community

3    Banks, Policy No. EC06100041, and (f) St. Paul (Traveler's) SelectOne for Community Banks,

4    Policy No. EC06100041.

5              **8.      Distributions Under The Plan.**

6                   **(a)      General Provisions.**

7              Except as otherwise provided herein, or as may be ordered by the Bankruptcy Court,

8    distributions to be made on the Effective Date on account of Allowed Claims, other than Allowed

9    Class 3 Claims and Allowed Class 4 Claims, shall be made on the Effective Date or as soon as

10   practicable thereafter.  Each Holder of an Allowed Class 3 Claim shall receive, as soon as

11   practicable in the discretion of the Liquidating Trustee, a Pro Rata Share of the Available Cash (the

12   "Initial Class 3 Distribution").  Each Holder of a Class 4 Claim shall be allocated a Pro Rata share

13   of each Distribution available to Holders of Class 3 Claims; provided, however, that the amount of

14   distributions to Holders of Allowed Class 4 Claims, subject to Section II.C(4)(c), shall be paid (i)

15   first on account of unpaid Indenture Trustee Fees, and (ii) second on account of the Allowed

16   FTBN Claim, until such time as the Allowed FTBN Claim is satisfied in full, after which time

17   distributions to Holders of Allowed Indenture Trustee Claims shall be made.  Notwithstanding the

18   above, no distributions will be made on a Claim unless it is an Allowed Claim or in the case of a

19   Disputed Claim an order of the Bankruptcy Court has been entered estimating the Claim for

20   purposes of distribution; and, provided further, however, distributions on Allowed Claims may be

21   delayed as a result of, or the allowance or estimation of, Disputed Claims, or the expiration of time

22   for filing a proof of claim.

23                   **(b)      Delivery of Distributions, Address of Holder.**

24             For purposes of all notices and distributions under the Plan, the Liquidating Trustee shall

25   be entitled to rely on the name and address of the Holder of each Claim as shown on, and

26   distributions to Holders of Allowed Claims shall be made by regular U.S. first class mail to, the

27   following addresses: (a) at the addresses set forth in the proofs of Claim Filed by such Holders; (b)

28   at the addresses set forth in any written notices of address change delivered to the Debtor or to the

1   Liquidating Trustee after the date on which any related proof of Claim was Filed; or (c) the address

2   reflected on the Schedules if no proof of Claim or proof of Equity Interest is Filed and the Debtor

3   or the Liquidating Trustee has not received a written notice of a change of address.  The

4   Liquidating Trustee shall be under no duty to attempt to locate Holders of Allowed Claims who are

5   entitled to unclaimed distributions.

6                           **(c)    Record Date.**

7           Pursuant to Bankruptcy Rule 3021, on the Record Date, the transfer ledgers for the

8   Indentures and the Equity Interests shall be closed, and there shall be no further changes in the

9   holders of record of such securities.  The Liquidating Trustee shall not recognize any transfer of

10  such securities occurring after the Record Date, but shall instead be entitled to recognize and deal

11  for all purposes with only those holders of record stated on the applicable transfer ledgers as of the

12  Record Date.

13                  **9.    Conditions Precedent.**

14          The Plan provides that it will not become effective until the Confirmation Order has been

15  entered on the docket of the Bankruptcy Court and no stay of the Confirmation Order is in effect,

16  unless this condition has been waived in writing by the Liquidating Trustee.

17                  **10.    Retention Of Jurisdiction.**

18          The Plan provides for the retention by the Bankruptcy Court of jurisdiction over the

19  Chapter 11 Case as specified in the Plan.

20                  **11.    Effective Date.**

21          The Effective Date is the first date that the Plan becomes effective under Section IX.A. of

22  the Plan.

23                  **12.    Amendment, Modification Or Revocation Of The Plan.**

24          Prior to the Effective Date, the Plan may be altered, amended, or modified pursuant to

25  section 1127 of the Bankruptcy Code solely upon the mutual agreement between the Debtor and

26  the Committee, unless the other party has withdrawn as a proponent of the Plan.  After the

27  Effective Date, the Liquidating Trustee shall have the sole authority and power to alter, amend, or

28  modify the Plan pursuant to section 1127 of the Bankruptcy Code.

LANDAU
GOTTFRIED
& BERGER LLP

1    The Debtor and the Committee reserve the right to jointly revoke or withdraw the Plan

2    prior to the Confirmation Date.  If the Debtor or the Committee withdraws as a proponent of the

3    Plan prior to the Confirmation Date, the other may seek approval as the sole proponent of the Plan.

4    If the Debtor and Committee jointly revoke the Plan prior to the Confirmation Date or if the

5    Confirmation Date or the Effective Date does not occur, then the Plan shall be deemed null and

6    void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of

7    any claims by or against the Debtor or its Estate or any other person or to prejudice in any manner

8    the rights of the Debtor, the Debtor or its Estate or any person in any further proceedings involving

9    the Debtor.

10             **13.    Post Confirmation Notice.**

11    From and after the Effective Date, any person who desires notice of any pleading or

12    document filed in the Bankruptcy Court, or any hearing in the Bankruptcy Court, or other matter as

13    to which the Bankruptcy Code requires notice to be provided, shall file a request for post-

14    confirmation notice and shall serve the request on the Liquidating Trustee; provided, however, the

15    OUST, counsel to the Debtor and the Committee shall be deemed to have requested post-

16    confirmation notice.

17    **V.    EFFECT OF PLAN CONFIRMATION**

18             **A.    Preservation of Rights of Action.**

19    Except to the extent any rights, claims, causes of action, defenses, and counterclaims are

20    expressly and specifically released in connection with the Plan or in any settlement agreement

21    approved during the Chapter 11 Case: (i) any and all Estate Causes of Action and D&O Claims

22    vesting with the Liquidating Trust under the Plan shall remain Liquidating Trust Assets, whether

23    or not litigation relating thereto is pending on the Effective Date, and whether or not any such

24    Estate Causes of Action or D&O Claims have been listed or referred to in this Plan, this Disclosure

25    Statement, or any other document filed with the Bankruptcy Court, and (ii) except with respect to

26    requirements affecting the Debtor under the Committee Standing Order, neither the Debtor's

27    Estate nor the Committee waives, releases, relinquishes forfeits, or abandons (nor shall either be

28    estopped or otherwise precluded or impaired from asserting) any D&O Claim or Estate Cause of

1    Action that constitutes property of the Debtor's Estate: (a) whether or not such D&O Claim or

2    Estate Cause of Action has been listed or referred to in the Plan, this Disclosure Statement, or any

3    other document filed with the Bankruptcy Court, (b) whether or not such Estate Cause of Action or

4    D&O Claim is currently known to the Debtor, the Committee or the Liquidating Trustee, and (c)

5    whether or not a defendant in any litigation relating to such Estate Cause of Action or D&O Claim

6    filed a proof of claim in the Chapter 11 Case, filed a notice of appearance or any other pleading or

7    notice in the Chapter 11 Case, voted for or against this Plan, or received or retained any

8    consideration under this Plan.

9             **B.    No Liability For Solicitation Or Participation.**

10            As specified in section 1125(e) of the Bankruptcy Code, persons who solicit acceptances or

11   rejections of the Plan and/or who participate in the offer, issuance, sale, or purchase of securities

12   offered or sold under the Plan, in good faith and in compliance with the applicable provisions of

13   the Bankruptcy Code, are not liable, on account of such solicitation or participation, for violation

14   of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of

15   the Plan or the offer, issuance, sale, or purchase of securities.

16   **VI.    CONFIRMATION PROCEDURE**

17            HOLDERS OF IMPAIRED CLAIMS AND OTHER INTERESTED PARTIES ARE

18   URGED TO READ THE PLAN (INCLUDING THE EXHIBITS THERETO) IN ITS ENTIRETY

19   SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

20            In order for the Plan to be confirmed by the Bankruptcy Court, all of the applicable

21   requirements of section 1129 of the Bankruptcy Code must be met.  These include, among others,

22   the requirements that the Plan: (i) is accepted by all impaired classes of Claims; (ii) is feasible; and

23   (iii) is in the "best interest" of Holders of Claims and Equity Interests in each class impaired under

24   the Plan.

25            The Plan and the Disclosure Statement were filed with the Bankruptcy Court and, after

26   notice and a hearing, the Bankruptcy Court approved the Disclosure Statement.  The Plan, the

27   Disclosure Statement, Ballots, and other solicitation materials approved by the Bankruptcy Court

28   were distributed to all known holders of impaired Claims in the Voting Classes.  A Confirmation

1  Hearing with respect to the Plan is scheduled to commence as set forth in the Confirmation Notice

2  included in the solicitation materials and served on all creditors and parties in interest.  At the

3  confirmation hearing, the Debtor will request the Bankruptcy Court to confirm the Plan on the

4  basis that all confirmation requirements have been satisfied.

5          **A.      Voting; Acceptance.**

6          Any Holder of a Claim in an impaired Class is entitled to vote if either (i) such Holder's

7  Claim has been scheduled by the Debtor in the Schedules filed with the Bankruptcy Court

8  (provided that such Claim has not been scheduled as disputed, contingent, unknown, or

9  unliquidated), or (ii) such Holder has filed a proof of Claim on or before the deadline previously

10  fixed by the Bankruptcy Court and such Claim is deemed allowed pursuant to section 502 of the

11  Bankruptcy Code or has been allowed by the Bankruptcy Court, unless such Claim has been

12  disallowed for voting purposes by the Bankruptcy Court, or is allowed under the Plan.  The Record

13  Date for determining which Holders of the Debentures and Trust Securities is a "Record Holder,"

14  will be January 22, 2010.  A vote may be disregarded if the Bankruptcy Court determines, after

15  notice and a hearing, that an acceptance or rejection was not solicited or procured or made in good

16  faith or in accordance with the provisions of the Bankruptcy Code.

17          The Voting Classes of Claims will be deemed to have accepted the Plan if the Plan is

18  accepted by Holders of at least two-thirds in dollar amount and more than one-half in number of

19  the Claims of such Class (excluding certain Claims designated under section 1126(e) of the

20  Bankruptcy Code) that will have voted to accept or reject the Plan.

21          THE INDENTURE TRUSTEES ARE NOT PERMITTED TO VOTE ON BEHALF OF

22  THE HOLDERS OF THE DEBENTURES.  FOR PURPOSES OF VOTING, THE BENEFICIAL

23  HOLDER OF A CAPITAL SECURITY AND A DEBENTURE DUE 2017 SHALL BE

24  TREATED AS THE HOLDER OF ITS RESPECTIVE SHARE OF INDENTURE TRUSTEE

25  CLAIMS AND SHALL BE ENTITLED TO VOTE WITH RESPECT TO THE PLAN.

26  CONSEQUENTLY, THE DEBTOR WILL SEND A BALLOT DIRECTLY TO SUCH

27  BENEFICIAL HOLDER AND SUCH BENEFICIAL HOLDER MUST SUBMIT ITS OWN

28

1    BALLOT IN ACCORDANCE WITH THE TERMS OF THE RELEVANT INDENTURES IN

2    ORDER FOR ITS VOTE TO COUNT.

3           Classes 3 and 4 are the only Voting Classes because Classes 1 and 2 are not impaired and

4    therefore are deemed to accept the Plan and Classes 5 and 6 are impaired but deemed to reject the Plan

5    because they will not receive a distribution under the Plan.

6                    **B.      Confirmation Hearing.**

7           Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to

8    hold a hearing on confirmation of the Plan (the "Confirmation Hearing").  The Confirmation

9    Hearing may be postponed from time to time by the Bankruptcy Court without further notice

10   except for an announcement of the postponement made at the Confirmation Hearing.  Section

11   1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of

12   the Plan.  Objections must be made in writing, specifying in detail the name and address of the

13   person or entity objecting, the grounds for the objection, and the nature and amount of the Claim or

14   Equity Interest held by the objector, and otherwise complying with the requirements of the

15   Bankruptcy Rules and Local Bankruptcy Rules.  Objections must be filed and served pursuant to

16   the Confirmation Notice in the manner set forth therein, on or before the time and date designated

17   in the Confirmation Notice as being the last date for serving and filing objections to confirmation

18   of the Plan.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND

19   FILED IN ACCORDANCE WITH THE CONFIRMATION NOTICE, IT MAY NOT BE

20   CONSIDERED BY THE BANKRUPTCY COURT.  AS SET FORTH IN THE

21   CONFIRMATION NOTICE, THE BANKRUPTCY COURT MAY NOT CONSIDER ANY

22   OBJECTIONS THAT ARE NOT TIMELY RAISED.

23          At the Confirmation Hearing, the Bankruptcy Court will determine, among other things,

24   whether the following confirmation requirements specified in section 1129 of the Bankruptcy

25   Code have been satisfied:

26                  1.      The Plan complies with the applicable provisions of the Bankruptcy Code.

27                  2.      The Debtor has complied with the applicable provisions of the Bankruptcy

28   Code.

1            3.       The Plan has been proposed in good faith and not by any means proscribed

2   by law.

3            4.       Any payment made or promised by the Debtor for services or for costs and

4   expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and

5   incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such

6   payment made before the confirmation of the Plan is reasonable or, if such payment is to be fixed

7   after the confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court

8   as reasonable.

9            5.       The Debtor has disclosed the identity and affiliations of any individual

10   proposed to serve, after confirmation of the Plan, as a director or officer of the Debtor, and the

11   appointment to, or continuance in, such office of such individual is consistent with the interests of

12   creditors and with public policy, and the Debtor has disclosed the identity of any insider that will

13   be employed or retained by the Debtor and the nature of any compensation for such insider.

14            6.       Each Holder of an impaired Claim and each Holder of Equity Interests

15   either has accepted the Plan or will receive or retain under the Plan on account of such Holder's

16   Claims or Equity Interests, as the case may be, property of a value, as of the Effective Date, that is

17   not less than the amount that such entity would receive or retain if the Debtor's Estate were

18   liquidated on such date under chapter 7 of the Bankruptcy Code.  See Section VI.D of the

19   Disclosure Statement entitled "Best Interests Test."

20            7.       Unless the Debtor proposes a nonconsensual plan of liquidation, each class

21   of Claims or Equity Interests has either accepted the Plan or is not impaired under the Plan.

22            8.       Except to the extent that the holder of a particular Claim has agreed to a

23   different treatment of such Claim, the Plan provides that Administrative Expenses and Other

24   Priority Claims will be paid in full on the Effective Date and that holders of Priority Tax Claims

25   will receive on account of such Claims payment in full on the Effective Date equal to the allowed

26   amount of such Claims.

27            9.       At least one impaired class of Claims has accepted the Plan, determined

28   without including any acceptance of the Plan by any insider holding a Claim in such class.

LANDAU
GOTTFRIED
& BERGER LLP

10.      The Plan contemplates the disposition of all of the assets of the Estate and the distribution of the proceeds therefrom to holders of Allowed Claims and Allowed Equity Interests in order of priority and as provided for in the Plan.  See Section VI.C of the Disclosure Statement entitled "Feasibility."

The Debtor and the Committee believe that, upon acceptance of the Plan by the Voting Classes, the Plan will satisfy all the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the requirements of Chapter 11, and that the Plan is being proposed and will be submitted to the Bankruptcy Court in good faith.

## C.      Feasibility.

The Bankruptcy Code requires that, in order for the Plan to be confirmed by the Bankruptcy Court, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor, unless a liquidation is contemplated by the Plan.  Here, the Plan contemplates the orderly sale or disposition of all of the assets of the Debtor and the distribution of the proceeds therefrom in accordance with the Plan.  The Debtor has prepared a Projection of the Available Cash (see Exhibit B hereto).  Exhibit B includes a detailed schedule of the sources and uses of Cash and property at the assumed Effective Date.  The aggregate amount of cash required to be distributed (or reserved) under the Plan as of the Effective Date is set forth in Exhibit B hereto.  The sources of funds for such cash payments will be cash on hand at the Effective Date.  The Debtor believes that, based upon the assumptions made, such available funds will be adequate to fund the Plan.

## D.      Best Interests Test.

As referred to in subparagraph 6 of Section VI.B. above, confirmation of the Plan requires that each Holder of an impaired Claim and each Holder of Equity Interests either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtor's Estate were liquidated under chapter 7 of the Bankruptcy Code.

The Debtor has determined that confirmation of the Plan will provide each Holder of a Claim and each Holder of Equity Interests with a recovery that is not less than that which it would

LANDAU
GOTTFRIED
& BERGER LLP

receive pursuant to a liquidation of the Debtor under chapter 7 of the Bankruptcy Code. This determination is based upon a consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to such Holders.

Conversion of this case to one under chapter 7 at this stage would simply add another layer of administrative expenses which would only serve to diminish the distributions to all creditors in this case. In a chapter 7 case, the chapter 7 trustee will incur fees and expenses of professionals that will be paid prior to any chapter 11 Claims. Accordingly, the distributions to creditors will likely be larger under the Plan. Moreover, initial distributions to creditors contemplated by the terms of the Debtor's Plan will be made quicker than any likely distribution that would be made by a Chapter 7 Trustee because a Chapter 7 Trustee will need an undetermined period of time to investigate and comprehend the assets, liabilities, and asserted Claims against the Debtor's Estate.

Based on the foregoing, the Debtor believes that the Plan satisfies the Best Interest Test and represents a preferred alternative to the costs and delays attendant to a chapter 7 case and the appointment of a chapter 7 trustee therein.

### E.    Risks.

Because the final amount of monies that will be collected and the final amount of Allowed Administrative, Priority, Secured, General Unsecured Claims, and Indenture Trustee Claims have not yet been determined, the amounts for distribution to holders of Allowed Class 3 Claims and Allowed Class 4 Claims and the percentage that each holder of Allowed Class 3 Claims and Allowed Class 4 Claims may receive on account of its Allowed Claim could be less than the percentage estimated herein.

### VII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN OF REORGANIZATION

The Debtor believes that the Plan affords Holders of Claims and Equity Interests the potential for the greatest feasible realization out of the Debtor's assets, and, therefore, is in the best interest of such holders. The Debtor has considered alternatives to the Plan such as a liquidation in the context of a chapter 7 case. In the opinion of the Debtor, such alternatives would not afford Holders of Claims or Equity Interests a return greater than that achieved under the Plan.

1  **A.    Liquidation Under Chapter 7.**

2      If no plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter

3  7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate

4  the Debtor's assets for distribution to creditors in accordance with the priorities established by the

5  Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the

6  recovery by holders of Claims and Equity Interests is set forth in Section VI.D of the Disclosure

7  Statement entitled "Best Interests Test."

8      **B.    Alternative Plan Of Liquidation.**

9      If the Plan is not confirmed, the Debtor could attempt to formulate a different plan.  With

10  respect to an alternative plan, the Debtor has explored various other alternatives in connection with

11  the extensive negotiation process involved in the formulation and development of the Plan, but

12  concluded that the Plan provides the best feasible recoveries attainable under the circumstances.

13  The Plan provides for an orderly disposition of the assets of the Estate on a timetable, and on

14  terms, which maximizes the value of the Estate.  Any alternative, liquidation under chapter 11 or

15  under chapter 7, is likely to result in a lower recovery.

16      THE DEBTOR AND THE COMMITTEE BELIEVE THAT CONFIRMATION AND

17  IMPLEMENTATION OF THE PLAN IS PREFERABLE TO ANY OF THE ALTERNATIVES

18  DESCRIBED HEREIN BECAUSE IT IS EXPECTED TO PROVIDE GREATER RECOVERIES

19  AND INVOLVE LESS DELAY AND UNCERTAINTY AND LOWER ADMINISTRATIVE

20  COSTS.

21  **VIII.    VOTING PROCEDURES**

22      The Debtor is providing copies of the Confirmation Notice, this Disclosure Statement, the

23  Plan, and/or Ballots or master ballots ("Master Ballots"), as applicable, to all known Holders of

24  impaired Claims in the Voting Classes, including registered holders as of the Record Date of the

25  Debentures (or, if applicable, to those holders who are listed as participants in a clearing agency's

26  position).  Registered holders may include brokerage firms, commercial banks, trust companies, or

27  other nominees (the "Nominees").  If such Nominees do not hold for their own account, they

28  should follow the procedures described in Section VIII.B below.  Any beneficial owner who has

not received a Ballot should contact such owner's Nominees, or write to the Debtor's Ballot

Tabulator.  Ballots must be returned to the Ballot Tabulator by no later than the Voting Deadline

set forth in the Ballot.

### A.    Procedures For Tabulation Of Votes On The Plan.

Solely for purposes of voting to accept or reject the Plan, and not for the purpose of the

allowance of, or distribution on account of, a Claim and without prejudice to the rights of the

Debtor in any other context, the Debtor proposes that each Claim within the Voting Classes that is

entitled to vote to accept or reject the Plan be temporarily allowed in accordance with the

following rules (collectively, the "Tabulation Rules"):

1.    Ballots and Master Ballots that (a) fail to indicate an acceptance or rejection

on the Ballot; or (b) indicate both an acceptance or rejection on the same Ballot, will not be

accepted or counted by the Debtor in connection with the Debtor's request for confirmation of the

Plan;

2.    Creditors shall not split their vote within a Claim; thus, each creditor shall

be deemed to have voted the full amount of its Claims either to accept or reject the Plan;

3.    Original executed Ballot or Master Ballot is required.  Delivery of a Ballot

or Master Ballot by facsimile, email or any other electronic means will not be accepted;

4.    If multiple Ballots or Master Ballots are received from or on behalf of an

individual holder of a claim with respect to the same Claims prior to the Voting Deadline, the last

Ballot timely received will be deemed to reflect the voter's intent and to supersede and revoke any

prior Ballot;

5.    If a Claim for which a proof of claim has been timely filed is marked as

contingent, unliquidated or disputed on the face of the proof of Claim, such Claim will be

temporarily allowed for voting purposes in the amount of $1.00, unless otherwise ordered by the

Court, after notice and a hearing;

6.    If a proof of Claim has been filed but such Claim is considered by the

Debtor to be a Disputed Claim, such Disputed Claim will not be counted for purposes of voting on

the Plan if the Debtor files an objection to such Disputed Claim no later than fourteen (14) days

prior to the Voting Deadline, unless an order of the Bankruptcy Court is entered after notice and a

hearing temporarily allowing the Disputed Claim for voting purposes under Bankruptcy Rule

3018(a);

      7.     If a Claim holder identifies a Claim amount on its Ballot that is less than the

amount otherwise calculated in accordance with the Tabulation Rules, the Claim will be

temporarily allowed for voting purposes in the lesser amount identified on such Ballot; and

      8.     If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-

in-fact, officer of a corporation, or other person acting in a fiduciary or representative capacity,

such person should indicate such capacity when signing.

    **B.**     **Special Provisions With Respect To Voting By Beneficial Owners Of The
Indenture Securities.**

As stated above, the Indenture Trustees are not permitted to vote on behalf of the beneficial

holders of the Debentures.  Accordingly, the Debtor shall retain an appropriate noticing agent to

(a) provide such beneficial holders (or their Nominees, if held in "street name") with copies of the

Disclosure Statement, the Plan, Confirmation Notice and the Ballot ("Solicitation Package"), and

(b) request that such Nominees (if held in "street name") distribute to such beneficial holders the

Solicitation Package , and (c) such holders shall vote on the Plan in accordance with the terms of

the relevant Indentures.

## IX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES

### A.    Introduction.

The following discussion summarizes certain federal income tax consequences of the

implementation of the Plan to the Holders of Class 3 Claims and Class 4 Claims.  The following

summary does not address the federal income tax consequences to Holders of any other Claims

and Claims that are not Impaired by the Plan, or to Holders of Equity Interest.  The following

summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury

regulations promulgated and proposed thereunder, judicial decisions and published administrative

rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof.

Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.  Further, any discussion of the Liquidating Trust and the powers, obligations and/or actions of the Litigating Trustee that may be set forth below is subject to the applicable provisions of the Plan and the Liquidating Trust Agreement; if and to the extent that there is any inconsistency between such discussion on the one hand and the Plan and the Liquidating Trust Agreement on the other hand, the terms of the latter documents shall control.  Holders of Claims and Equity Interests should read the Plan and the Liquidating Trust Agreement in their entirety.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS or a reviewing court might adopt.  In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, investors in pass-through entities, Holders that hold Claims as part of a hedge, straddle or conversion transaction, Holders who acquired their Claims as compensation, and Holders who do not hold their Claims as capital assets).

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, WE INFORM YOU THAT (A) ANY WRITTEN UNITED STATES FEDERAL TAX ADVICE

1  CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENT) IS

2  NOT INTENDED AND WAS NOT WRITTEN TO BE USED, AND CANNOT BE USED, FOR

3  THE PURPOSE OF AVOIDING UNITED STATES FEDERAL TAX PENALTIES, (B) ANY

4  SUCH ADVICE WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF

5  THE TRANSACTION OR MATTER ADDRESSED HEREIN AND (C) ALL HOLDERS OF

6  CLAIMS AND/OR EQUITY INTEREST SHOULD SEEK ADVICE BASED ON THEIR

7  PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

8  **B.    Consequences to the Debtor**

9  As discussed below, under the Plan, the Debtor will be treated for U.S. federal income tax

10 purposes as transferring the Assets directly to the Holders of Allowed Class 3 Claims and Class 4

11 Claims, who will then be treated as transferring such assets to the Liquidating Trusts.

12 Accordingly, the Debtor's transfer of Assets may result in the Debtor recognizing gain or income,

13 depending in part on the value of such assets on the Effective Date and the adjusted basis of such

14 assets on the Effective Date.

15 **C.    Consequences to Holders of General Unsecured Claims**

16 **1.    Recognition of Gain or Loss Generally**

17 Pursuant to the Plan, on the Effective Date, each Holder of an Allowed Class 3 Claim and

18 Class 4 Claim will receive an interest in the Liquidating Trust, which is a beneficial interest in the

19 Liquidating Trust, entitling the holder thereof to distributions from the Liquidating Trust as

20 provided for in the Plan and in the Liquidating Trust Agreement.  Except to the extent that the

21 holder of a Class 3 Claim, Class 4 Claim or beneficial interest agrees to a different treatment, said

22 Persons will receive on account of their Allowed Class 3 or 4 Claim, in full and complete

23 satisfaction thereof, from the Liquidating Trust, one or more Pro Rata Distributions of the

24 Available Cash based upon the amount of the respective Holder's Allowed Claim.  In general, each

25 holder of an Allowed Claim will recognize gain or loss in an amount equal to the difference

26 between (i) the sum of the amount of any Cash and the fair market value of any other property

27 (including, as discussed below, its undivided interest in the Liquidating Trust Assets) that such

28 holder receives in satisfaction of its Claim (other than in respect of any Claim for accrued but

unpaid interest, and excluding any portion required to be treated as imputed interest due to the

post-Effective Date Distribution of such consideration upon the resolution of Disputed Claims),

and (ii) such Holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid

interest).  For a discussion of the U.S. federal income tax consequences of any Claim for accrued

interest, see Section 2 below.

As discussed below, the Liquidating Trust has been structured to qualify as a "grantor

trust" for U.S. federal income tax purposes.  Accordingly, each holder of an Allowed Claim

receiving a beneficial interest in the Liquidating Trust will be treated for U.S. federal income tax

purposes as directly receiving and as a direct owner of its allocable percentage of the Liquidating

Trust Assets (see section 3 below).  As set forth in the Liquidating Trust Agreement, as soon as

practicable after the Effective Date, and thereafter as may be required, the Liquidating Trustee (if

reasonably deemed necessary or desirable by the Liquidating Trustee) will make or have caused to

be made a good faith valuation of the Liquidating Trust Assets of the Liquidating Trust, and all

parties, including the Holders of Class 3 Claims, must consistently use such valuation for all

federal income tax purposes.

Due to the possibility that a holder of an interest in the Liquidating Trust may receive more

than one Distribution subsequent to the Effective Date (due to the subsequent disallowance of

certain Disputed Claims or unclaimed Distributions), the imputed interest provisions of the IRC

may apply to treat a portion of such later Distributions to such holders as imputed interest.  In

addition, it is possible that any loss realized by a Holder in satisfaction of an Allowed Claim may

be deferred until all subsequent Distributions relating to Disputed Claims are determinable, and

that a portion of any gain realized may be deferred under the "installment method" of reporting.

Holders are urged to consult their tax advisors regarding the possibility for deferral, and the

potential ability to elect out of the installment method of reporting any gain realized in respect of

their Claims.

After the Effective Date, any amount that a Holder receives as a Distribution from the

Liquidating Trust in respect of its beneficial interest therein (other than as a result of the

subsequent disallowance of Disputed Claims) should not be included for federal income tax

1  purposes in the Holder's amount realized in respect of its Allowed Claim, but should be separately

2  treated as a distribution received in respect of such Holder's beneficial (ownership) interest in the

3  Liquidating Trust.

4      Where a Holder recognizes gain or loss in respect of its Claim, the character of such gain or

5  loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined

6  by a number of factors, including the tax status of the Holder, whether the Claim constitutes a

7  capital asset in the hands of the Holder and how long it has been so held, whether the Holder had

8  acquired the Claim at a market discount, and whether and to what extent the Holder had previously

9  claimed a bad debt deduction.  A Holder that purchased its Claim from a prior Holder at a market

10 discount may be subject to the market discount rules of the IRC.  Under those rules, assuming that

11 the Holder has made no election to amortize the market discount into income on a current basis

12 with respect to any market discount instrument, any gain recognized on the exchange of such

13 Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the

14 extent of the accrued market discount on such Claim as of the date of the exchange.

15     In general, a Holder's tax basis in any beneficial interest received (and undivided interest in

16 the Liquidation Trust Assets deemed owned) will equal the fair market value of its proportionate

17 share of the Liquidating Trust Assets on the Effective Date.  The holding period for such assets

18 generally will begin the day following the Effective Date.

19          **2.    Distributions in Payment of Accrued but Unpaid Interest**

20     Distributions to any Holder of an Allowed Claim will be allocated first to the original

21 principal portion of such Claim as determined for federal income tax purposes, and then, to the

22 extent the consideration exceeds such amount, to the portion of such Claim representing accrued

23 but unpaid interest.  However, there is no assurance that the IRS would respect such allocation for

24 federal income tax purposes.

25     To the extent a Holder of debt receives an amount of Cash or property in satisfaction of

26 interest accrued during its holding period, such Holder generally recognizes taxable interest income in

27 such amount (if not previously included in the Holder's gross income).  Conversely, a Holder

28 generally recognizes a deductible loss to the extent any accrued interest claimed was previously

LANDAU
GOTTFRIED
& BERGER LLP

1  included in its gross income and is not paid in full.  Each Holder is urged to consult its tax advisor

2  regarding the allocation of consideration and the deductibility of unpaid interest for U.S. federal

3  income tax purposes.

4          **3.      Tax Treatment of the Liquidating Trust and Holders of Interests Therein**

5          On the Effective Date, the Liquidating Trust will be established for the benefit of Holders

6  of all Allowed Class 3 and Class 4 Claims and, to the extent all Allowed Claims are paid in full

7  with interest, Allowed Interests.  The Liquidating Trust is intended to qualify as a liquidating trust

8  for federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity but

9  rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity).

10  However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as

11  a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2

12  C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a

13  liquidating trust under a chapter 11 plan.  The Liquidating Trusts have been structured with the

14  intention of complying with such general criteria.  Pursuant to the Plan, and in conformity with

15  Revenue Procedure 94-45, all parties (including the Debtor, the Liquidating Trustee, and the

16  Beneficiaries of the Liquidating Trusts) are required for federal income tax purposes to treat the

17  Liquidating Trusts as grantor trusts of which the Persons receiving interests therein are the owners

18  and grantors.  The following discussion assumes that the Liquidating Trusts will be so respected

19  for U.S. federal income tax purposes.  However, no ruling has been requested from the IRS and no

20  opinion of counsel has been requested concerning the tax status of the Liquidating Trust as a

21  grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary

22  position.  If the IRS were to challenge successfully such classification, the federal income tax

23  consequences to the Liquidating Trust and the Beneficiaries could vary from those discussed

24  herein.

25          For all U.S. federal income tax purposes, all parties (including the Debtor, the Liquidating

26  Trustee, and the Beneficiaries) must treat the transfer of the Liquidating Trusts Assets to the

27  Liquidating Trust, in accordance with the terms of the Plan and the Liquidating Trusts Agreement,

28  as a transfer of such Liquidating Trusts Assets directly to the Beneficiaries, followed by such

Beneficiaries' transfer of the Liquidating Trust Assets to the Liquidating Trust.  Consistent

therewith, all parties must treat the Liquidating Trust as a grantor trust of which the Beneficiaries

are the owners and grantors.  Thus, such Beneficiaries will be treated as the direct owners of their

respective undivided interests in the Liquidating Trust Assets for all U.S. federal income tax

purposes.  Each such Person will have a tax basis in its proportionate share of the Liquidating

Trust Assets deemed owned equal to the fair market value thereof on the Effective Date.  As set

forth in the Liquidating Trust Agreement, as soon as practicable after the Effective Date, and

thereafter as may be required, the Liquidating Trustee will (if reasonably deemed necessary or

desirable by the Liquidating Trustee) make or have caused to be made a good faith valuation of the

Liquidating Trust Assets, and all parties, including the Beneficiaries, must consistently use such

valuation for all federal income tax purposes.

Accordingly, except as discussed below (in connection with pending Disputed Claims),

each holder of a Class 3 Claim and Class 4 Claim receiving a beneficial interest in the Liquidating

Trust will be required to report on its U.S. federal income tax return its allocable share of any

income, gain, loss, deduction, or credit recognized or incurred by the Liquidating Trusts, in

accordance with its relative beneficial interest.   The character of items of income, deduction, and

credit to any holder and the ability of such holder to benefit from any deduction or losses may

depend on the particular situation of such holder.

The U.S. federal income tax reporting obligations of a Holder are not dependent upon the

Liquidating Trust distributing any Cash or other proceeds.  Therefore, a Holder may incur a federal

income tax liability with respect to its allocable share of the income of the Liquidating Trust

regardless of the fact that the Holder has not received any prior or concurrent Distribution.  Other

than in respect of Cash retained on account of Disputed Claims and subsequently distributed, the

Liquidating Trust's Distribution of Cash to Beneficiaries generally will not be taxable to said

Beneficiaries because they already are regarded for federal income tax purposes as owning the

underlying Liquidating Trust Assets.

Subject to the Liquidating Trust Agreement, absent definitive guidance from the IRS or a

court of competent jurisdiction to the contrary (including the issuance of applicable Treasury

LANDAU
GOTTFRIED
& BERGER LLP

1    Regulations, the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating

2    Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not

3    contested by the Liquidating Trustee), the Liquidating Trustee will:

4            (i)    treat all Liquidating Trust Assets of each Liquidating Trust allocable to, or

5    retained on account of, Disputed Claims, as a discrete trust for federal income tax purposes,

6    consisting of separate and independent shares to be established in respect of each Disputed Claim,

7    in accordance with the trust provisions of the Code (sections 641 et seq. of the Code);

8            (ii)   treat as taxable income or loss of these separate trusts with respect to any

9    given taxable year the portion of the taxable income or loss of the Liquidating Trust that would

10   have been allocated to the holders of such Disputed Claims had such Claims been Allowed on the

11   Effective Date (but only for the portion of the taxable year with respect to which such Claims are

12   unresolved);

13           (iii)  treat as a distribution from these separate trusts any increased amounts

14   distributed by the Liquidating Trust as a result of any Disputed Claim resolved earlier in the

15   taxable year, to the extent such distribution relates to taxable income or loss of these separate trusts

16   determined in accordance with the provisions hereof, and

17           (iv)   to the extent permitted by applicable law, report consistently for state and

18   local income tax purposes.

19           In addition, pursuant to the Liquidating Trust Agreement, all Beneficiaries are required to

20   report consistently with such treatment.  Accordingly, subject to issuance of definitive guidance,

21   the Liquidating Trustee will report on the basis that any amounts earned by these separate trusts

22   and any taxable income of the Liquidating Trust allocable to them are subject to a separate entity

23   level tax, except to the extent such earnings are distributed during the same taxable year.  Any

24   amounts earned by or attributable to the separate trusts and distributed to a Beneficiary during the

25   same taxable year will be includible in such Beneficiary's gross income.

26           **4.      Withholding**

27           All Distributions to Holders of Allowed Class 3 Claims and Class 4 Claims are subject to

28   any applicable tax withholding, including employment tax withholding.  Under federal income tax

law, interest, dividends, and other reportable payments may, under certain circumstances, be

subject to "backup withholding" at the then applicable withholding rate (currently 28%).  Backup

withholding generally applies if the Holder (a) fails to furnish its social security number or other

taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report

interest or dividends, or (d) under certain circumstances, fails to provide a certified statement,

signed under penalty of perjury, that the TIN provided is its correct number and that it is not

subject to backup withholding.  Backup withholding is not an additional tax but merely an advance

payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons

are exempt from backup withholding, including, in certain circumstances, corporations and

financial institutions.

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL

PURPOSES ONLY.  ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO

CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL

AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## X.    FEES AND EXPENSES

The expenses of seeking acceptances of the Plan and of other aspects of Plan proceedings

have been and will be borne by the Debtor's Estate.  The solicitation has been and is being made

principally by mail.  Arrangements also have been or will be made with brokerage houses and

other custodians, nominees, and fiduciaries to forward this Disclosure Statement, Ballots, and

other pertinent materials to the beneficial holders of the Indenture Securities.  The Debtor has

reimbursed and will reimburse such forwarding agents for reasonable out-of-pocket expenses

incurred by them, but no compensation has been or will be paid for their services.

In addition to the foregoing, the estate is obligated to pay fees and reimburse expenses for the

various professionals employed in connection with the Chapter 11 Case to the extent such fees and

expenses are allowed by the Bankruptcy Court.

LANDAU
GOTTFRIED
& BERGER LLP

74

## XI.    SUMMARY OF ADDITIONAL SOURCES OF INFORMATION

Additional sources of information regarding the Debtor's Estate and documents relating to the Plan are available to holders of Claims and Equity Interests.  The following is a summary of certain documents and the places they can be reviewed or obtained:

A.    Both prior to and after the Petition Date, the Debtor filed documents with the SEC in accordance with the informational requirements of the 1934 Act.  Copies of such material can be obtained from the Public Reference Section of the Commission at 450 Fifth Street, NW, Washington, D.C. 20549, at prescribed rates.  Certain of such material may be accessible via online computer.

B.    Orders of the Bankruptcy Court and related papers pertaining to transactions outside of the Debtor's ordinary course of business may be inspected at the office of the Clerk of the Bankruptcy Court located at 3420 Twelfth Street, Riverside, California 92501-3819.

C.    The Debtor's Schedules of Assets and Liabilities, Statement of Affairs, List of Old Equity Security Holders, and Schedules of Executory Contracts and Unexpired Leases, as amended, may be inspected at the office of the Clerk of the Bankruptcy Court located at 3420 Twelfth Street, Riverside, California 92501-3819.

D.    Periodic post-petition financial reports as filed with the OUST may be inspected at the Office of the OUST located at 3685 Main Street, Suite 300, Riverside, California 92501.

///

///

///

///

///

LANDAU
GOTTFRIED
& BERGER LLP

## XII.    RECOMMENDATION AND CONCLUSION

The Debtor and the Committee believe that confirmation and implementation of the Plan are preferable to any of the feasible alternatives because the Plan will provide substantially greater recoveries for holders of Claims.  Accordingly, the Debtor and the Committee urge holders of Claims in the Voting Classes to accept the Plan.

DATED:  January 6, 2010                    DEBTOR AND DEBTOR-IN-POSSESSION
                                           VINEYARD NATIONAL BANCORP


                                           By: /s/ Donald H. Pelgrim, Jr.
                                               Donald H. Pelgrim, Jr.
                                               Executive Vice President and Chief
                                               Administrative Officer


**SUBMITTED BY:**

LANDAU GOTTFRIED & BERGER LLP


By:    /s/ Jon L. R. Dalberg
       JON L.R. DALBERG
       Attorneys for Debtor Vineyard National Bancorp

1

**EXHIBITS TO DISCLOSURE STATEMENT**

2   Exhibit "A" -  PLAN

3   Exhibit "B" -  PROJECTED AVAILABLE CASH ANALYSIS

4   Exhibit "C" -  HYPOTHETICAL CHAPTER 7 LIQUIDATION ANALYSIS

5   Exhibit "D" -  LIST OF PENDING LITIGATION CLAIMS

6   Exhibit "E"-   POTENTIAL PREFERENCE PAYMENTS

7   Exhibit "F" -  POTENTIAL THIRD PARTY ESTATE CAUSES OF ACTION

8   Exhibit "G" -  D&O CLAIMS COMPLAINT

9   Exhibit "H" -  FDIC POC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LANDAU
GOTTFRIED &
BERGER LLP